08:55:23

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

   UNITED STATES OF AMERICA,        )   CR-15-00065-BLF
5                                    )
                   PLAINTIFF,        )   SAN JOSE, CALIFORNIA
6                                    )
              VS.                    )   MAY 11, 2018
7                                    )
   LIN, ET AL,                       )   VOLUME 5
8                                    )
                   DEFENDANT.        )   PAGES 693-887
9                                    )
   _____   )   **PARTIAL TRANSCRIPT**
10

11              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE BETH LABSON FREEMAN
12              UNITED STATES DISTRICT JUDGE

13              A P P E A R A N C E S

14

15   FOR THE PLAINTIFF:      **BY:  MICHAEL G. PITMAN**
                             UNITED STATES ATTORNEY'S OFFICE
16                           150 ALMADEN BLVD., SUITE 900
                             SAN JOSE, CA 95113
17

18

19   FOR THE DEFENDANT:      **BY:  RANDY SUE POLLOCK**
     LIN                     ATTORNEY AT LAW
20                           286 SANTA CLARA AVENUE
                             OAKLAND, CA 94610
21

22        APPEARANCES CONTINUED ON NEXT PAGE

23   OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                                   CERTIFICATE NUMBER 13185
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

694

1          A P P E A R A N C E S  (CONTINUED)

2     FOR THE PLAINTIFF:       **BY:  CHRISTOPHER MAGNANI**
                               U.S. DEPARTMENT OF JUSTICE
3                              TAX DIVISION
                               BEN FRANKLIN STATION
4                              PO BOX 972
                               WASHINGTON, DC 20044

5

6     FOR THE DEFENDANT:       **BY:  CHRISTOPHER J. CANNON**
      HORNG                    SUGARMAN & CANNON
7                              737 TEHAMA STREET, UNIT #3
                               SAN FRANCISCO, CA 94103

8

9     INTERPRETERS:            SHAN TSAN
                               CHEN-HAO HSU

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          INDEX OF PROCEEDINGS

2

3       PLAINTIFF'S

4       **DEIRDRE GARRISON**
        CROSS-EXAM BY MR. CANNON                P. 698
5       REDIRECT EXAM BY MR. PITMAN             P. 845
        RECROSS-EXAM BY MR. CANNON              P. 871
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX OF EXHIBITS

2                                      IDENT.      EVIDENCE

3           PLAINTIFF'S

4

5

6           DEFENDANT'S

7            1087                                  P. 768

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | SAN JOSE, CALIFORNIA                    MAY 11, 2018 |
| | 2 | P R O C E E D I N G S |
| 09:01:17 | 3 | (COURT CONVENED AT 9:01 A.M.) |
| 09:01:17 | 4 | THE COURT:  WE ARE ON THE RECORD AND ALL OF OUR |
| 09:01:47 | 5 | COUNSEL AND PARTIES ARE HERE.  HELLO EVERYONE.  ALL OF OUR |
| 09:01:53 | 6 | JURORS AND ALTERNATES ARE HERE AS WELL. |
| 09:01:55 | 7 | I HOPE YESTERDAY WAS A GOOD CATCH-UP DAY FOR ALL OF YOU, |
| 09:01:58 | 8 | I'M SURE IT WAS.  WE ARE GOING TO GET RIGHT BACK DOWN TO |
| 09:02:01 | 9 | BUSINESS WE CAN HAVE A PRODUCTIVE DAY HERE AS WELL. |
| 09:02:05 | 10 | MR. PITMAN, I BELIEVE WE CONCLUDED ON WEDNESDAY WITH YOUR |
| 09:02:08 | 11 | CONCLUSION OF THE DIRECT EXAMINATION OF AGENT GARRISON. |
| 09:02:10 | 12 | MR. PITMAN:  THAT'S CORRECT, YOUR HONOR. |
| 09:02:10 | 13 | THE COURT:  ALL RIGHT. |
| 09:02:11 | 14 | SO IS SHE AVAILABLE -- I DON'T SEE HER IN THE COURTROOM? |
| 09:02:15 | 15 | NO.  WE WILL BRING HER BACK IN THE COURTROOM AND WE WILL TURN |
| 09:02:19 | 16 | TO THE DEFENSE FOR CROSS-EXAMINATION. |
| 09:02:21 | 17 | MR. CANNON:  THANK YOU, YOUR HONOR. |
| 09:02:39 | 18 | THE COURT:  MS. GARRISON, IF YOU WOULD COME BACK TO |
| 09:02:42 | 19 | THE WITNESS STAND, YOU KNOW IT WELL, I'M GOING TO HAVE YOU |
| 09:02:46 | 20 | STAND TO BE SWORN AGAIN TODAY. |
| 09:02:58 | 21 | (**PLAINTIFF'S WITNESS, DEIRDRE GARRISON, WAS SWORN.**) |
| 09:02:58 | 22 | THE WITNESS:  YES. |
| 09:03:08 | 23 | THE COURT:  MR. CANNON, WILL YOU BEGIN? |
| 09:03:09 | 24 | MR. CANNON:  THANK YOU, YOUR HONOR. |
| 09:03:10 | 25 | THE COURT:  ALL RIGHT. |

**CROSS-EXAMINATION**

BY MR. CANNON:

Q.   GOOD MORNING, AGENT GARRISON.

A.   GOOD MORNING.

Q.   NOW, YOU TESTIFIED ON WEDNESDAY AND TUESDAY, CORRECT?

A.   CORRECT.

Q.   AND MR. PITMAN ASKED YOU A LOT OF QUESTION, I'M GOING TO
ASK FOLLOWUP ON SOME OF THOSE AND ASK YOU SOME NEW QUESTIONS
TODAY.

    SO YOU RECEIVED THE CASE BACK ON 9-16-08, RIGHT?

A.   AROUND THAT TIME.

Q.   OKAY.  AND THAT'S BECAUSE YOU DON'T REALLY REMEMBER
SPECIFIC DATES WITHOUT LOOKING AT YOUR ACTIVITY REPORT, RIGHT?

A.   EXACTLY.

Q.   OKAY.  AND SO IT WAS TRANSFERRED TO YOU FROM CI THAT DAY,
RIGHT?

A.   YES.

Q.   AND BECAUSE THEY HAD -- AND CI IS CRIMINAL INVESTIGATION,
ISN'T IT?

A.   WELL, WAIT A MINUTE, DO YOU MEAN TRANSFERRED TO ME, I
DIDN'T GET IT FROM CI, I GROT IT FROM MY MANAGER.

Q.   CORRECT.  AND CI TRANSFERRED IT TO YOUR MANAGER?

A.   I GUESS SO.  I MEAN, IF THAT'S THE WORD YOU WANT TO USE.

Q.   YES.  AND CI IS CRIMINAL INVESTIGATION, RIGHT?

A.   YES.

CROSS-EXAMINATION BY MR. CANNON

09:04:28   1    Q.   AND THEY HAD DECLINED TO PROCEED, RIGHT?

09:04:31   2    A.   YES.

09:04:31   3    Q.   OKAY.  AND YOU ALSO TESTIFIED THAT YOU'VE WORKED FOR THE

09:04:36   4    IRS FOR 15 YEARS, RIGHT?

09:04:38   5    A.   ALMOST 15 YEARS.

09:04:39   6    Q.   AND YOU RECEIVE BEEN IN THE SET GROUP, THE SPECIAL

09:04:43   7    INVESTIGATIONS GROUP, FOR TEN YEARS, RIGHT?

09:04:46   8    A.   THAT'S CORRECT.

09:04:46   9    Q.   AND TODAY IS 2018?

09:04:48   10   A.   YES.

09:04:49   11   Q.   AND THIS CASE WAS TRANSFERRED TO YOU IN 2008?

09:04:53   12   A.   YES.

09:04:54   13   Q.   SO THIS WAS ONE OF THE FIRST CASES YOU HAD IN THE SPECIAL

09:04:57   14   ENFORCEMENT GROUP, RIGHT?

09:04:59   15   A.   I DON'T RECALL, BUT IT MAY HAVE BEEN.

09:05:03   16   Q.   OKAY.  SO THIS WAS A CASE THAT YOU WANTED TO DO A GOOD JOB

09:05:06   17   ON?

09:05:06   18   A.   I WANT TO DO A GOOD JOB ON ALL MY CASES.

09:05:09   19   Q.   CORRECT.  BUT THIS WAS ONE OF YOUR FIRST CASES IN SPECIAL

09:05:13   20   ENFORCEMENT?

09:05:13   21   A.   I DON'T KNOW THAT FOR A FACT.  I GET A LOT OF CASES, SO IT

09:05:17   22   CERTAINLY WASN'T MY FIRST INCOME CASE.

09:05:20   23   Q.   ALL RIGHT.  AND THE GOVERNMENT SHOWED YOU YOUR ACTIVITY

09:05:29   24   REPORT; DO YOU RECALL THAT?

09:05:29   25   A.   YES.

09:05:30  1      Q.   AND YOUR ACTIVITY REPORT IS SOMETHING THAT YOU COMMONLY

09:05:36  2      USE TO KEEP TRACK OF THINGS TO UNDERSTAND WHAT'S GOING ON,

09:05:38  3      RIGHT?

09:05:39  4      A.   THAT'S CORRECT.

09:05:39  5      Q.   AND IT KEEPS TRACK OF THE IMPORTANT THINGS THAT YOU DO IN

09:05:44  6      THE COURSE OF AN INVESTIGATION?

09:05:47  7      A.   IT KEEPS TRACK OF MY DAILY ACTIVITIES.

09:05:49  8      Q.   RIGHT.  AND IT ACTS AS A TIME SHEET TOO, RIGHT?

09:05:54  9      A.   IT ACCOUNTS FOR MY TIME ON A CASE.

09:06:01  10     Q.   IT ACCOUNTS FOR YOUR TIME.  OKAY.

09:06:03  11          AND IN YOUR ACTIVITY REPORT, THE FIRST ENTRY FOR 8-16-08,

09:06:17  12     JUST ACKNOWLEDGES IT WAS TRANSFERRED TO YOU, RIGHT?

09:06:20  13              MR. PITMAN:  OBJECTION, YOUR HONOR.  HEARSAY.

09:06:22  14     BY MR. CANNON:

09:06:22  15     Q.   DO YOU RECALL THE FIRST DAY YOU JUST RECEIVED THE CASE?

09:06:25  16     A.   DO I RECALL THE DAY?

09:06:27  17     Q.   YES.

09:06:28  18     A.   NO, NOT SPECIFICALLY.

09:06:30  19     Q.   IF I COULD REFRESH THIS WITNESS'S RECOLLECTION WITH HER

09:06:33  20     ACTIVITY REPORT, YOUR HONOR?

09:06:35  21              THE COURT:  SURE.

09:06:36  22              MR. CANNON:  COULD I APPROACH?

09:06:37  23              THE WITNESS:  THANK YOU.

09:06:38  24     Q.   IS THAT A COPY OF ONE OF YOUR ACTIVITY REPORTS IN THIS

09:06:41  25     CASE?

09:06:41  1    A.   YES, IT IS.

09:06:42  2    Q.   IT'S ACTIVITY REPORT BATES NUMBER 108960 TO 108969?

09:06:50  3              THE COURT:  I'M SORRY, YOU CAN'T READ THEM THAT FAST

09:06:53  4    MR. CANNON, THE COURT REPORTER CAN'T POSSIBLY HEAR YOU.

09:06:57  5              MR. CANNON:  I'M SORRY, YOUR HONOR.

09:06:58  6         IT'S THE ACTIVITY REPORT -- IT'S AGENT GARRISON'S

09:07:06  7    EXAMINING OFFICER'S ACTIVITY REPORT BATES NUMBER U.S. 108960 TO

09:07:17  8    108969.

09:07:18  9         I BELIEVE THIS IS THE SAME ACTIVITY REPORT THAT AGENT

09:07:21  10   GARRISON USED TO REFRESH HER RECOLLECTION ON DIRECT

09:07:24  11   EXAMINATION.

09:07:24  12             THE COURT:  WE ARE NOT GOING TO TALK ABOUT WHAT SHE'S

09:07:27  13   REFRESHING HER RECOLLECTION WITH.  IT COULD BE AN APPLE, IT

09:07:30  14   DOESN'T MATTER.

09:07:31  15        LET'S MOVE ON.

09:07:31  16             MR. CANNON:  OKAY.

09:07:32  17   Q.   NOW, AGENT GARRISON, DO YOU RECALL THE FIRST DAY THAT YOU

09:07:38  18   SPENT ANY HOURS IN THIS CASE, YOU WERE EXAMINING BANK REPORT

09:07:41  19   ACTIVITY?

09:07:43  20   A.   YES.

09:07:45  21   Q.   AND THE FIRST DAY THAT YOU DID THIS CASE, YOU WERE LOOKING

09:07:52  22   AT THE MONTHLY INCOME, CORRECT?

09:07:55  23   A.   YES.

09:07:57  24   Q.   SO THE FIRST DAY OF IS THIS CASE, YOU KNEW WHEN WHERE YOU

09:08:00  25   WERE HEADED, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

09:08:01    1    A.    WELL, I NEVER KNOW WHAT MY DESTINATION IS GOING TO BE.  I

09:08:09    2    NEED TO GATHER FACTS, LOTS OF FACTS.

09:08:12    3    Q.    CORRECT.  AND IN THIS CASE, THE FIRST DAY YOU THOUGHT, OH,

09:08:14    4    THE REPORTED MONTHLY INCOME IS HIGH, RIGHT?

09:08:19    5    A.    THE REPORTED MONTHLY --

09:08:23    6    Q.    THE REPORTED MONTHLY INCOME ON THE BANK LOAN APPLICATIONS

09:08:26    7    WAS HIGH?

09:08:27    8    A.    OH, THE BANK LOAN APPLICATIONS, YES.

09:08:29    9    Q.    THE REPORTED MONTHLY INCOME ON THE TAX RETURNS WAS LOW?

09:08:31   10    A.    CORRECT.

09:08:32   11    Q.    AND THAT'S HOW YOU BEGAN YOUR EXPLANATION TO KIND OF

09:08:34   12    SUPPORT YOUR THESIS THAT THERE WAS UNREPORTED INCOME, RIGHT?

09:08:38   13    A.    WELL, I NEVER SAID THERE WAS UNREPORTED INCOME BECAUSE I

09:08:42   14    NEVER GOT THAT FAR.

09:08:43   15    Q.    ULTIMATELY, YOU GOT THAT FAR, CORRECT LITTLE?

09:08:46   16    A.    NO, ULTIMATELY I REFERRED THE CASE OVER SO THEY CAN MAKE A

09:08:50   17    DETERMINATION.

09:08:50   18    Q.    RIGHT.  ULTIMATELY, YOU REFERRED THE CASE OVER, BUT BEFORE

09:08:54   19    YOU REFERRED THE CASE OVER, YOU ACTUALLY PREPARED A WORK PAPER,

09:08:57   20    RIGHT?

09:08:58   21    A.    I PREPARED WORK PAPERS WHILE I WAS WORKING THE CASE, BUT I

09:09:02   22    NEVER ISSUED ANY AND I NEVER ISSUED A REPORT, IT WAS NEVER

09:09:05   23    FINALIZED.

09:09:06   24    Q.    WELL, YOU PREPARED A GROSS RECEIPTS WORK PAPER, RIGHT?

09:09:09   25    A.    A PRELIMINARY WORK PAPER, BUT AS I SAID, THAT WOULD BE

CROSS-EXAMINATION BY MR. CANNON

```
09:09:13   1        ISSUED IF THERE WAS A FINAL DETERMINATION, I WOULD ISSUE THOSE
09:09:17   2        WORK PAPERS.  BUT THEY WEREN'T ISSUED.
09:09:20   3   Q.   RIGHT.  BUT WHEN YOU PREPARED YOUR GROSS RECEIPTS WORK
09:09:24   4        PAPER IN JUNE 23RD OF 2010, THAT WAS YOUR PRELIMINARY FINDINGS
09:09:32   5        IN THE CASE, RIGHT?
09:09:33   6   A.   THAT WAS -- YES, MY PRELIMINARY FINDINGS BASED ON THE
09:09:36   7        INFORMATION I HAD.  BUT I DIDN'T HAVE ENOUGH INFORMATION TO
09:09:39   8        MAKE A FINAL DETERMINATION.
09:09:40   9   Q.   CORRECT.
09:09:41  10        AND SO THAT WORK PAPER THAT YOU ISSUED ON 66-23-10, DIDN'T
09:09:47  11        REALLY CHANGE FROM THE OPINION THAT YOU HAD ON THE FIRST DAY
09:09:50  12        YOU STARTED LOOKING AT BANK ACCOUNTS, RIGHT?
09:09:56  13   A.   I DON'T REALLY UNDERSTAND THE QUESTION.
09:09:57  14   Q.   WELL, THE FIRST DAY YOU WERE LOOKING AT BANK ACCOUNTS, YOU
09:10:00  15        THOUGHT YOU FOUND A NO MATCH, RIGHT?  YOU THOUGHT THAT THE --
09:10:04  16        LET ME START AGAIN.
09:10:05  17        THE FIRST DAY THAT YOU INVESTED TIME ON THIS CASE, WHICH
09:10:12  18        WAS 9-16-08, YOU THOUGHT OH, THE INFORMATION ON THE BANK LOAN
09:10:19  19        APPLICATION DOESN'T MATCH THE TAX RETURNS, RIGHT.
09:10:22  20   A.   THAT'S CORRECT.
09:10:24  21   Q.   AND YOU THOUGHT, OH, THERE MIGHT BE UNREPORTED INCOME,
09:10:27  22        RIGHT?
09:10:28  23   A.   THAT'S CORRECT.
09:10:28  24   Q.   AND THAT'S THE SAME THING THAT YOU WROTE IN YOUR WORK
09:10:32  25        PAPER ON 6-23-10, RIGHT?
```

CROSS-EXAMINATION BY MR. CANNON

09:10:34   1            MR. PITMAN:  OBJECTION, YOUR HONOR.  HEARSAY.

09:10:36   2            THE COURT:  OVERRULED.

09:10:36   3    BY MR. CANNON:

09:10:36   4    Q.   THAT'S THE FIRST THING THAT YOU HAD CONCLUDED IN YOUR MIND

09:10:40   5    AT THE TIME YOU WROTE YOUR WORK PAPER ON 6-23-10, CORRECT?

09:10:45   6    A.   WELL, WHEN YOU SAY CONCLUDED, IT IMPLIES THAT MY EXAM WAS

09:10:49   7    FINISHED, AND AS I SAID I NEVER ISSUED A REPORT.

09:10:51   8    Q.   OKAY.  BUT YOU ISSUED A PRELIMINARY REPORT?

09:10:56   9    A.   WHAT DO YOU MEAN BY ISSUED, WHEN I SAY ISSUED, IT GOES

09:10:59  10    TO --

09:10:59  11    Q.   YOU WROTE A PRELIMINARY WORK PAPER?

09:11:01  12    A.   I WROTE A PRELIMINARY WORK PAPER.

09:11:03  13    Q.   AND THAT CONTAINED YOUR CONCLUSIONS UP TO THAT DATE?

09:11:06  14    A.   BASED ON THE INFORMATION THAT I HAD.

09:11:08  15    Q.   BASED ON THE -- AND YOU WERE SEEKING INFORMATION TO

09:11:11  16    SUPPORT THE HYPOTHESIS THAT YOU CAME TO ON YOUR FIRST DAY?

09:11:15  17    A.   I SEEK INFORMATION ON EVERY AUDIT.

09:11:17  18    Q.   OKAY.  NOW YESTERDAY AND ON TUESDAY, MR. PITMAN ASKED YOU

09:11:26  19    ABOUT NUMBERS OF BANK ACCOUNTS, /TPO*ERPB BANK ACCOUNTS, THINGS

09:11:29  20    LIKE THAT, RIGHT?

09:11:30  21    A.   RIGHT.

09:11:30  22    Q.   AND YOU REMEMBER THOSE QUESTIONS?

09:11:32  23    A.   YES.

09:11:32  24    Q.   AND THERE ARE A LOT OF BANK ACCOUNTS IN THIS CASE?

09:11:36  25    A.   YES.

CROSS-EXAMINATION BY MR. CANNON

09:11:36  1    Q.   AND IN THIS CASE THOUGH, THE PRIMARY BANK ACCOUNT WAS A

09:11:43  2    BANK OF AMERICA ACCOUNT, RIGHT?

09:11:43  3    A.   YES.

09:11:44  4    Q.   AND THAT BANK OF AMERICA ACCOUNT HAD THE VAST MAJORITY OF

09:11:47  5    THE DEPOSITS INTO IT, ABOUT $23 MILLION, RIGHT?

09:11:50  6    A.   YES.

09:11:50  7    Q.   AND THE TRANSFERS ON BEHALF OF TRMP OR THE MONEY EXCHANGES

09:11:57  8    PRIMARILY WENT INTO THAT ACCOUNT, RIGHT?

09:11:59  9    A.   PRIMARILY.

09:12:01  10   Q.   AND THAT ONE ACCOUNT WAS THE PRIMARY FOCUS OF YOUR

09:12:04  11   INVESTIGATION?

09:12:06  12   A.   NO, I WOULDN'T SAY THAT.

09:12:08  13   Q.   WELL, THAT ONE ACCOUNT HAD THE VAST MAJORITY OF THE

09:12:12  14   TRANSFERS FROM CHINA, RIGHT?

09:12:15  15   A.   YES.

09:12:15  16   Q.   AND THE TRANSFERS FROM CHINA WEREN'T DISTRIBUTED TO THE 30

09:12:22  17   DIFFERENT ACCOUNTS, WERE THEY?

09:12:23  18   A.   THEY DIDN'T JUST GO TO ONE ACCOUNT.

09:12:25  19   Q.   THE VAST MAJORITY, ALMOST 23 MILLION WENT INTO THE BANK OF

09:12:29  20   AMERICA ACCOUNT, RIGHT?

09:12:29  21   A.   RIGHT.

09:12:30  22   Q.   OKAY.  NOW ON 5-13-09, BY THAT TIME YOU HAD CONCLUDED THAT

09:12:47  23   THE MAJORITY OF THE PRELIMINARY POTENTIAL UNREPORTED INCOME IS

09:12:52  24   FROM THE -- GOES INTO THE BANK OF AMERICA ACCOUNT, RIGHT?

09:12:56  25   A.   I LOOKED AT A LOT OF DIFFERENT ACCOUNTS.

CROSS-EXAMINATION BY MR. CANNON

09:12:59  1    Q.   COULD YOU LOOK AT YOUR WORK PAPER AT 5-13-09 -- I'M SORRY,

09:13:05  2    NOT YOUR WORK PAPER, YOUR ACTIVITY REPORT, WHICH IS IN FRONT OF

09:13:08  3    YOU, AND TELL ME, BY 5-13-09, YOU HAD CONCLUDED THAT THE

09:13:19  4    PRELIMINARY POTENTIAL UNREPORTED INCOME, APPROXIMATELY 23

09:13:22  5    MILLION, WENT INTO THE BANK OF AMERICA ACCOUNT?

09:13:23  6    A.   YES, THAT IS CORRECT.

09:13:24  7    Q.   SO ALL THIS MONEY THAT WENT INTO THE BANK OF AMERICA

09:13:28  8    ACCOUNT, IT WASN'T HIDDEN IN A FOREIGN ACCOUNT?

09:13:33  9    A.   WELL, THE MONEY IN A DOMESTIC ACCOUNT IS NOT A FOREIGN

09:13:36 10    ACCOUNT.

09:13:36 11    Q.   I'M ASKING YOU ABOUT THE BANK OF AMERICA ACCOUNT, PLEASE.

09:13:39 12    ALL THE MONEY THAT WENT INTO THE BANK OF AMERICA WASN'T HIDDEN,

09:13:42 13    WAS IT?

09:13:44 14    A.   WELL, WHAT DO YOU MEAN BY "HIDDEN?"

09:13:48 15    Q.   DID IT SHOW UP ON THE ACCOUNT STATEMENTS?

09:13:50 16    A.   IT SHOWED UP ON THE ACCOUNT STATEMENTS.

09:13:52 17    Q.   WAS IT EASY TO TELL IT WAS TRANSFERRED FROM CHINA?

09:13:55 18    A.   YES.

09:13:56 19    Q.   AND SO THERE WERE GOOD RECORDS SHOWING THE VAST MAJORITY

09:14:03 20    OF THE MONEY WENT INTO ONE BANK ACCOUNT, RIGHT?

09:14:05 21    A.   MOST OF THE MONEY.

09:14:06 22    Q.   YES, VAST MAJORITY.

09:14:09 23    A.   IF YOU LIKE.

09:14:10 24    Q.   OKAY.

09:14:14 25         AND WHEN MR. PITMAN WAS ASKING YOU SOME QUESTIONS TOO, HE

CROSS-EXAMINATION BY MR. CANNON

09:14:16  1    ASKED YOU QUESTIONS ABOUT FOREIGN BANK ACCOUNTS, RIGHT?

09:14:19  2    A.   YES, HE DID.

09:14:21  3    Q.   AND YOU TALKED ABOUT FOREIGN BANK ACCOUNTS AS A WAY TO

09:14:24  4    MAKE MONEY?

09:14:24  5    A.   FOR SOME PEOPLE, IT CAN BE.

09:14:26  6    Q.   AND YOU TALKED ABOUT HOW FOREIGN BANK ACCOUNTS HAD BEEN

09:14:29  7    ACCUSED TO HIDE THE PROCEEDS OF STOCK TRADE?

09:14:32  8    A.   THEY CAN BE.

09:14:33  9    Q.   AND YOU TALKED ABOUT LOTS OF WAYS PEOPLE CAN USE FOREIGN

09:14:38  10   BANK ACCOUNTS TO HIDE MONEY, RIGHT?

09:14:39  11   A.   YES.

09:14:39  12   Q.   BUT IN THIS CASE, THE VAST MAJORITY OF THE MONEY WAS

09:14:43  13   TRANSFERRED INTO THE UNITED STATES'S BANK OF AMERICA ACCOUNT,

09:14:46  14   RIGHT?

09:14:46  15   A.   WELL, I DON'T --

09:14:48  16   Q.   YES OR NO?

09:14:49  17   A.   I DON'T NECESSARILY HAVE ALL OF THEIR ACCOUNTS, SO I CAN'T

09:14:52  18   SAY IF THE VAST MAJORITY, BECAUSE IF THERE ARE OTHER ACCOUNTS

09:14:56  19   THEY DON'T KNOW OF, I DON'T KNOW HOW MUCH IS GOING INTO THOSE

09:14:58  20   ACCOUNTS, SO PERHAPS THERE'S EVEN MORE GOING ELSEWHERE, I DON'T

09:15:02  21   KNOW.

09:15:02  22   Q.   PERHAPS.  BUT BASED ON THE EVIDENCE -- SO WHAT YOU WERE

09:15:07  23   DOING JUST NOW WAS SPECULATING, RIGHT, YOU DON'T KNOW OF ANY

09:15:12  24   OTHER FOREIGN ACCOUNTS?

09:15:13  25   A.   THAT'S TRUE.

CROSS-EXAMINATION BY MR. CANNON

09:15:14  1    Q.   AND YOU CONDUCTED A PRETTY EXTENSIVE INVESTIGATION?

09:15:18  2    A.   I DID WHAT I COULD WITH WHAT I HAD, BUT I DON'T HAVE AN

09:15:21  3    ABILITY TO GET A LOT OF FOREIGN RECORDS.

09:15:23  4    Q.   YOU SUBPOENAED A LOT OF RECORDS IN THE U.S.?

09:15:25  5    A.   IN THE U.S., I DID.

09:15:27  6    Q.   AND YOU DID A PRETTY GOOD JOB OF TRACKING AS MUCH MONEY AS

09:15:30  7    YOU COULD, RIGHT?

09:15:31  8    A.   I DID MY BEST.

09:15:32  9    Q.   OKAY.  AND SO USUALLY WHEN YOU'RE LOOKING AT PEOPLE HIDING

09:15:40  10   MONEY, THEY ARE TAKING IT OUT OF THE U.S., RIGHT?

09:15:47  11   A.   I WOULDN'T SAY I HAVE A USUAL, IT COULD BE FOREIGN

09:15:52  12   BUSINESSES, THERE COULD BE A LOT OF DIFFERENT WAYS THEY COULD

09:15:56  13   DO IT.

09:15:57  14   Q.   OKAY.  AND IN THIS CASE, THE MONEY WAS TRANSFERRED INTO

09:16:01  15   THE BANK OF AMERICA ACCOUNT HERE IN THE U.S.?

09:16:03  16   A.   A SUBSTANTIAL AMOUNT WAS, BUT AS I SAID, THERE COULD BE

09:16:06  17   OTHER ACCOUNTS IT WAS TRANSFERRED TO AS WELL.

09:16:09  18   Q.   AND ON THE SUBJECT OF THAT BANK OF AMERICA HERE IN THE

09:16:11  19   U.S., THAT BANK OF AMERICA ACCOUNT GENERATED A LOT OF INTEREST,

09:16:16  20   RIGHT?

09:16:16  21   A.   YES, IT DID.

09:16:17  22   Q.   AND IT GENERATED $485,000 IN INCOME OR SOMETHING LIKE

09:16:26  23   THAT?

09:16:27  24   A.   I'M NOT AWARE OF THAT NUMBER, EXCUSE ME?

09:16:30  25   Q.   I'M SORRY.  IN 2007 THE BANK OF AMERICA ACCOUNT GENERATED

09:16:42  1    $145,000 IN INCOME, RIGHT?

09:16:44  2    A.  I DON'T KNOW OFF THE TOP OF MY HEAD WHAT IT GENERATED.

09:16:47  3    Q.  SO IF YOU WOULD LOOK AT THE 2007 RETURN, THAT MIGHT

09:16:52  4    REFRESH YOUR RECOLLECTION, RIGHT?

09:16:52  5    A.  THAT MIGHT REFRESH MY RECOLLECTION.

09:16:58  6        (OFF-THE-RECORD DISCUSSION.)

09:17:15  7    Q.  OKAY.  IF YOU LOOK AT THE PAGE OF GOVERNMENT'S EXHIBIT 2

09:17:39  8    OF INTEREST, DOES THAT SHOW A TOTAL OF $105,000 IN INTO -- NO,

09:17:49  9    I'M SORRY, IT DOESN'T SHOW $145,000, I TAKE THAT BACK, IT SHOWS

09:17:54  10   $29,000 OF INTEREST FROM BANK OF AMERICA, CORRECT?

09:17:57  11   A.  WELL, IT SHOWS A COUPLE OF DIFFERENT BANK OF AMERICAS.  SO

09:18:01  12   IT SHOWS OVER 30,000 IN THE TWO UP HERE, YES.

09:18:10  13   Q.  OKAY.  AND SO YOU HAVE TO HAVE A LOT OF MONEY IN A BANK TO

09:18:16  14   GENERATE THAT AMOUNT OF INTEREST, RIGHT?

09:18:18  15   A.  YES.

09:18:19  16   Q.  AND SO JUST THE TAX RETURNS THAT WERE FILED WITH THE

09:18:25  17   GOVERNMENT DEMONSTRATED THERE WAS A LOT OF MONEY IN THE BANKS

09:18:28  18   IN THE U.S., RIGHT?

09:18:29  19   A.  YES.

09:18:29  20   Q.  IT WASN'T HIDDEN?

09:18:45  21        THE COURT:  WAS THAT A QUESTION?

09:18:47  22   BY MR. CANNON:

09:18:47  23   Q.  WAS IT BEING HIDDEN?

09:18:49  24        THE COURT:  BECAUSE I'M GOING TO STRIKE IT IF IT WAS

09:18:51  25   A STATEMENT BECAUSE THE WITNESS HAS NOT RESPONDED.

09:18:54  1    BY MR. CANNON:

09:18:54  2    Q.  WAS THE INTEREST IN THE ACCOUNTS THAT THE INTEREST WAS

09:18:56  3    BEING PAID FROM HIDDEN?

09:18:59  4    A.  NO.

09:19:00  5    Q.  OKAY.  THEN SHORTLY AFTER YOU STARTED DOING YOUR

09:19:05  6    INVESTIGATION IN APRIL OF 2009, YOU TALKED TO CRIMINAL

09:19:13  7    INVESTIGATION AGAIN, RIGHT?

09:19:18  8    A.  YES.

09:19:20  9    Q.  AND THEY TOLD YOU THAT THEY DIDN'T WANT THE CASE?

09:19:23  10         MR. PITMAN:  OBJECTION, YOUR HONOR.  HEARSAY.

09:19:25  11         THE COURT:  SUSTAINED.

09:19:25  12   BY MR. CANNON:

09:19:27  13   Q.  DID YOU HAVE A DISCUSSION WITH CI?

09:19:29  14   A.  YES, I DID, PER MY MANAGER'S REQUEST.

09:19:32  15   Q.  CORRECT.  AND YOU TALKED TO YOUR MANAGER?

09:19:36  16   A.  YES.

09:19:37  17   Q.  YOU HAD A CONVERSATION WITH YOUR MANAGER AND SAID YEAH,

09:19:40  18   I'VE GOT A HOT ONE HERE, LET'S REFER IT TO CI.

09:19:43  19         MR. PITMAN:  OBJECTION, YOUR HONOR.  HEARSAY.

09:19:44  20         THE COURT:  I'M SORRY, EXCUSE ME?

09:19:51  21      AS TO WHAT THE WITNESS SAID, SHE MAY TESTIFY.

09:19:54  22      THE QUESTION IS -- MAYBE YOU WANT TO RESTATE.

09:19:57  23   BY MR. CANNON:

09:19:57  24   Q.  DID YOU TELL YOUR MANAGER THAT YES, I THINK I HAVE A GOOD

09:20:00  25   ONE HERE, LET'S REFER THIS TO CI, OR WORDS TO THAT EFFECT?



09:20:04    1    A.    I SAID THERE APPEARS TO BE A SUBSTANTIAL AMOUNT OF INCOME

09:20:12    2    OR MONEYS THAT DOESN'T MATCH THE TAX RETURN, AND I THINK THAT

09:20:17    3    THIS IS HIGH DOLLAR, SO CI SHOULD HAVE AN OPPORTUNITY TO LOOK

09:20:24    4    AT IT BEFORE I BEGIN.

09:20:28    5    Q.    OKAY.  BUT CI HAD LOOKED AT IT BEFORE YOU BEGAN, RIGHT?

09:20:33    6    A.    I'M NOT SURE THEY LOOKED AT 2000 -- I THINK THEY DID

09:20:37    7    ACTUALLY LOOK AT 2006, YES.

09:20:39    8    Q.    AND SO THEN -- THIS WAS YOUR FIRST ATTEMPT TO REFER THIS

09:20:44    9    CASE TO CI, RIGHT?

09:20:45   10    A.    NO.  IT WASN'T AN ATTEMPT, IT WAS A QUESTION BEFORE I

09:20:49   11    BEGAN, BECAUSE --

09:20:53   12    Q.    WELL THIS HAPPENED ON APRIL 27TH OF '09, RIGHT?

09:20:57   13    A.    RIGHT.

09:20:58   14    Q.    AND YOU STARTED ON 9-18-08, RIGHT?

09:21:01   15    A.    NOT WITH -- I NEVER CONTACTED THE DEFENDANTS TO OPEN THE

09:21:07   16    EXAM AT THAT POINT.

09:21:08   17    Q.    CORRECT.  BUT YOU STARTED WORKING UP THE CASE ON 9-18-08,

09:21:15   18    RIGHT?

09:21:15   19    A.    YES, I STARTED ANALYZING THE RECORDS.

09:21:17   20    Q.    AND YOU SPENT A LOT OF TIME ANALYZING THE RECORDS?

09:21:20   21    A.    I DID.

09:21:22   22    Q.    AND SO YOU WERE ANALYZING RECORDS AND THAT WAS SEPTEMBER.

09:21:25   23    SO OCTOBER, NOVEMBER, DECEMBER, JANUARY, FEBRUARY, MARCH, UNTIL

09:21:32   24    APRIL 27TH, YOU WERE ANALYZING RECORDS, RIGHT?

09:21:35   25    A.    WHILE I WAS WORKING ON THIS CASE, I ALSO HAVE A FULL

CROSS-EXAMINATION BY MR. CANNON

09:21:38  1      INVENTORY OF OTHER CASES, BUT YES.

09:21:41  2      Q.   AND WHILE YOU WERE ANALYZING THOSE RECORDS, YOU DIDN'T

09:21:47  3      FIND ANYTHING TO CHANGE YOUR INITIAL IMPRESSION THAT THERE WAS

09:21:50  4      UNDERREPORTED INCOME, RIGHT?

09:21:51  5      A.   RIGHT.

09:21:52  6      Q.   YOU WERE TRYING TO DOCUMENT YOUR INITIAL IMPRESSION?

09:21:54  7      A.   I WAS TRYING TO PUT TOGETHER THE FACTS.

09:21:57  8      Q.   OKAY.  AND AFTER THIS CONVERSATION WITH YOUR MANAGER, YOU

09:22:04  9      CONTINUED ON WITH THIS CASE, RIGHT?

09:22:05  10     A.   AFTER CI SAID THEY DID NOT WANT THE CASE.

09:22:07  11     Q.   OKAY.

09:22:08  12     A.   THEN I OPENED IT.

09:22:09  13     Q.   OKAY.  SO YOU TRIED TO ADD -- YOU TRIED TO STRENGTHEN YOUR

09:22:13  14     CASE, RIGHT?

09:22:15  15     A.   NO.  WHAT DO YOU MEAN BY TRIED TO "STRENGTHEN" MY CASE?

09:22:21  16     Q.   WELL, YOU DECIDED TO DO MORE INVESTIGATION.

09:22:26  17     A.   YES, I WAS AT THE POINT WHERE I WAS EITHER GOING TO OPEN A

09:22:31  18     CIVIL EXAM OR NOT.

09:22:35  19          SO ONCE CI ADVISED ME THAT THEY DID NOT WANT THE CASE,

09:22:43  20     THEN I PROCEEDED TO SEND OUT THE AUDIT LETTER AND OPEN IT UP

09:22:47  21     FOR AUDIT, THEN I WOULD WORK THE CASE MORE.

09:22:49  22     Q.   OKAY.  SO WHEN -- SO ON SEPTEMBER 16TH YOU SPENT EIGHT

09:22:56  23     HOURS WORKING THE CASE AND LOOKING AT BANK RECORDS, RIGHT?

09:23:04  24     A.   OF '09 ARE WE TALKING ABOUT?

09:23:07  25     Q.   OF '08.

CROSS-EXAMINATION BY MR. CANNON

```
09:23:10    1      A.  OF '08?

09:23:12    2      Q.  YES.

09:23:13    3      A.  YES, I REVIEWED A BOX OF RECORDS.

09:23:20    4      Q.  AND ON 3-9-09, YOU SPENT EIGHT MORE HOURS?

09:23:27    5      A.  YES.

09:23:27    6      Q.  THEN 3-10, YOU SPENT EIGHT MORE HOURS?

09:23:30    7      A.  IF THAT'S WHAT IT SAYS.

09:23:31    8      Q.  AND 3-11, YOU SPENT EIGHT MORE HOURS?

09:23:34    9      A.  UH-HUH.

09:23:34   10      Q.  AND 3-12, YOU SPENT EIGHT MORE HOURS?

09:23:37   11      A.  YES.

09:23:37   12      Q.  3-13, DID YOU SPEND EIGHT MORE HOURS?

09:23:41   13      A.  I DID.

09:23:42   14      Q.  3-16, DID YOU SPEND EIGHT MORE HOURS?

09:23:44   15      A.  I DID.

09:23:44   16      Q.  3-17, DID YOU SPEND EIGHT MORE HOURS?

09:23:47   17      A.  I DID.

09:23:48   18      Q.  3-23, EIGHT MORE HOURS?

09:23:52   19      A.  YES.

09:23:53   20      Q.  DID YOU SPEND EIGHT MORE HOURS ON 3-26?

09:23:57   21      A.  YES.

09:23:58   22      Q.  AND ON 3-27, EIGHT MORE HOURS?

09:24:02   23      A.  YES.

09:24:03   24      Q.  SO EVEN THOUGH YOU HAD A LOT OF OTHER CASES, YOU WERE

09:24:07   25      SPENDING A LOT OF HOURS ON THIS CASE?
```

CROSS-EXAMINATION BY MR. CANNON

09:24:11  1    A.    THERE WERE A LOT OF BANK ACCOUNTS.

09:24:12  2    Q.    UH-HUH.  OKAY.

09:24:17  3          SO NOW, WHEN YOU WERE KIND OF GOING THROUGH THIS,

09:24:21  4    MR. PITMAN ASKED YOU SOME QUESTIONS YESTERDAY ABOUT MEI-ZU LIN

09:24:25  5    OR MEI-RU LIN; DO YOU RECALL THAT?

09:24:29  6    A.    YES.

09:24:29  7    Q.    AND YOU REFERRED TO A CONVERSATION THAT YOU HAD WITH

09:24:35  8    MS. LIN, MR. HORNG WAS THERE, THEIR REPRESENTATIVE WAS THERE --

09:24:37  9          THE COURT:  COULD YOU CLARIFY WHICH MS. LIN YOU ARE

09:24:40  10   TALKING ABOUT.

09:24:40  11         MR. CANNON:  OKAY.

09:24:41  12   Q.    LET ME START FROM THE BEGINNING.  I'M TRYING TO CLARIFY

09:24:48  13   THIS.

09:24:49  14         THE COURT:  MS. LIN IS AMBIGUOUS, THAT'S ALL.

09:24:51  15         MR. CANNON:  I UNDERSTAND.

09:24:52  16   Q.    THERE ARE TWO MS. LIN'S RIGHT?

09:24:54  17   A.    YES.

09:24:55  18   Q.    THERE IS MEILI LIN WHO IS SITTING OVER HERE?

09:24:58  19   A.    YES.

09:24:58  20   Q.    AND SHE HAS A SISTER, MEI-ZU OR MEI-RU LIN, DEPENDING ON

09:25:04  21   HOW YOU TRANSLATE HER CHINESE NAME, CORRECT?

09:25:06  22   A.    CORRECT.  I KNOW IT AS MEI-ZU, I NEVER SAW MEI-RU.

09:25:10  23   Q.    CORRECT.  BUT YOU NEVER SPOKE TO MEI-ZU, RIGHT?

09:25:13  24   A.    NO, I NEVER SPOKE TO MEI-ZU.

09:25:15  25   Q.    AND YOU NEVER HEARD THE CHINESE PRONUNCIATION OF HER NAME,

CROSS-EXAMINATION BY MR. CANNON

09:25:19  1    RIGHT?

09:25:19  2    A.   NO.

09:25:20  3    Q.   SO WHEN YOU SAY HER NAME IS MEI-ZU, THAT'S JUST HOW YOU

09:25:24  4    WOULD PRONOUNCE IT FROM READING IT, RIGHT?

09:25:25  5    A.   YES, MEI-ZU.

09:25:29  6    Q.   SO YESTERDAY WHEN YOU WERE TESTIFYING, YOU SPOKE ABOUT A

09:25:33  7    MEETING WITH MS. LIN, MR. HORNG?

09:25:36  8         THE COURT:  I'M SORRY, YOU HAVE TO USE THE FIRST

09:25:38  9    NAME.

09:25:39  10        MR. CANNON:  OKAY.

09:25:42  11        THE COURT:  YOU CAN USE THE WHOLE NAME.

09:25:44  12        MR. CANNON:  GOT IT.  OKAY.

09:25:45  13   Q.   YESTERDAY WHEN YOU WERE TESTIFYING, YOU SPOKE ABOUT A

09:25:48  14   CONVERSATION WITH HENRY HORNG, WITH MEILI LIN, WITH YOURSELF,

09:25:54  15   AND THEIR REPRESENTATIVE?

09:25:55  16   A.   YES.

09:25:56  17   Q.   AND DURING THAT CONVERSATION, YOU ASKED MS. MEILI LIN

09:26:00  18   ABOUT HER SISTER MEI-RU OR MEI-ZU LIN, RIGHT?

09:26:04  19   A.   I ASKED WHO THAT WAS.

09:26:06  20   Q.   CORRECT.  AND YOU ASKED THAT QUESTION, RIGHT?

09:26:09  21   A.   YES.

09:26:10  22   Q.   BECAUSE EARLIER WHILE YOU WERE GOING THROUGH BANK HOURS

09:26:15  23   FOR HOURS AND HOURS, YOU HAD FOUND REFERENCES TO A MEI-ZU LIN,

09:26:20  24   RIGHT?

09:26:21  25   A.   RIGHT.

09:26:22   1   Q.   AND YOU BELIEVED THAT THAT WAS AN ALIAS OF MS. MEILI LIN,

09:26:31   2   RIGHT?

09:26:31   3   A.   I BELIEVED IT COULD BE A POSSIBILITY, I WASN'T SURE.

09:26:33   4   THAT'S WHY I ASKED, BECAUSE SHE'S THE SAME ADDRESS AS MEILI

09:26:40   5   LIN, AS HER PREVIOUS ADDRESS ON THE EAST COAST.  SO I WASN'T

09:26:43   6   SURE, THAT'S WHY I ASKED.

09:26:45   7   Q.   OKAY.  AND THE DATE THAT YOU ASKED, THAT WAS ON 1-13-10,

09:26:52   8   RIGHT?

09:26:52   9   A.   RIGHT.

09:26:54  10   Q.   AND SO FROM THE FALL OF '08 UNTIL THE EARLY PART OF 2010,

09:27:02  11   YOU WERE OPERATING ON THE ASSUMPTION THAT MEI-ZU OR MEI-RU LIN

09:27:08  12   WAS, AS YOU REFERRED TO IT, AN ALIAS OF MEILI LIN, RIGHT?

09:27:12  13         MR. PITMAN:  OBJECTION, YOUR HONOR.

09:27:14  14         THE WITNESS:  NO, THAT'S NOT RIGHT.

09:27:15  15         THE COURT:  OVERRULED.

09:27:19  16   BY MR. CANNON:

09:27:20  17   Q.   WERE YOU OPERATING ON THE ASSUMPTION THAT MEI-ZU OR MEI-RU

09:27:23  18   LIN WAS AN ALIAS OF MEI-LI LIN?

09:27:28  19   A.   NO, I WAS NOT, BECAUSE I DIDN'T HAVE THE INFORMATION TO

09:27:30  20   MAKE THAT DECISION.

09:27:32  21   Q.   IF YOU COULD LOOK AT THE ENTRY OF 8-20-09 OF YOUR ACTIVITY

09:28:10  22   REPORT, PLEASE.  AND WHEN YOU ARE WRITING NOTES, HOW DO YOU

09:28:22  23   REFER TO YOURSELF?

09:28:24  24   A.   RA.

09:28:25  25   Q.   AND DID YOU RIGHT ON THAT DATE, RA BELIEVES THIS IS AN

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 09:28:30 | 1 | ALIAS? |
| 09:28:30 | 2 | A.   YES. |
| 09:28:31 | 3 | Q.   AND WHEN YOU WERE TALKING ABOUT THIS, YOU MEANT MEI-ZU |
| 09:28:34 | 4 | LIN, RIGHT? |
| 09:28:35 | 5 | A.   YES, IT COULD BE. |
| 09:28:36 | 6 | Q.   SO AS OF 8-20-09, YOU BELIEVED MEI-ZU LIN WAS AN ALIAS FOR |
| 09:28:43 | 7 | MEILI LIN, RIGHT? |
| 09:28:44 | 8 | A.   I BELIEVED SHE COULD BE, BUT I DIDN'T HAVE ENOUGH |
| 09:28:49 | 9 | INFORMATION. |
| 09:28:53 | 10 | Q.   SO YOU DIDN'T KNOW? |
| 09:28:54 | 11 | A.   I DIDN'T KNOW. |
| 09:28:55 | 12 | Q.   BUT YOU BELIEVED? |
| 09:28:56 | 13 | A.   I BELIEVED IT WAS A POSSIBILITY. |
| 09:28:59 | 14 | Q.   RIGHT.  BUT YOU DIDN'T WRITE, YOU BELIEVE IT'S A |
| 09:29:02 | 15 | POSSIBILITY, YOU SIMPLY SAID YOU BELIEVED, RIGHT? |
| 09:29:04 | 16 | A.   AS I WAS GOING THROUGH, YES. |
| 09:29:07 | 17 | Q.   NOW, AND YOUR BELIEF EARLY ON PROVED TO BE WRONG, DIDN'T |
| 09:29:12 | 18 | IT? |
| 09:29:14 | 19 | A.   YES, I WONDERED IF IT WAS THE SAME PERSON, IT COULD HAVE |
| 09:29:18 | 20 | BEEN THE SAME PERSON BECAUSE I KNOW THAT THEY DO, IN CERTAIN |
| 09:29:22 | 21 | CULTURES, HAVE DIFFERENT FORMS FOR THE SAME NAME, SO I THOUGHT |
| 09:29:26 | 22 | IT COULD BE SINCE IT HAD THE SAME ADDRESS AND A VERY SIMILAR |
| 09:29:32 | 23 | NAME, IT COULD BE, BUT I LATER LEARNED IT WAS NOT. |
| 09:29:36 | 24 | Q.   CORRECT.  AND TODAY, YOU ARE SAYING IT COULD BE, IT COULD |
| 09:29:41 | 25 | BE.  THAT'S WHAT YOU JUST TESTIFIED TO, RIGHT? |

CROSS-EXAMINATION BY MR. CANNON

09:29:43  1      A.   WHAT COULD BE?

09:29:44  2      Q.   THAT MEI-ZU LIN COULD BE AN ALIAS FOR MEILI LIN, RIGHT?

09:29:50  3      A.   IT COULD HAVE BEEN.

09:29:51  4      Q.   BUT BACK WHEN YOU WERE IN THE INVESTIGATION, YOU DIDN'T

09:29:53  5      SAY IT COULD BE, YOU SAID -- IF YOU WERE TALKING TO SOMEBODY

09:29:56  6      YOU WOULD SAY, I BELIEVE IT'S AN ALIAS, RIGHT?

09:29:59  7      A.   WELL, MY CONCLUSION, THIS IS AN ONGOING EVOLUTION OF AN

09:30:03  8      AUDIT --

09:30:04  9      Q.   YES OR NO, PLEASE.

09:30:05  10     A.   NOTHING WAS FINALIZED, MY OPINIONS ARE CHANGING AS AN

09:30:16  11     AUDIT EVOLVES, THAT'S WHY I COLLECT INFORMATION, SO THAT I CAN

09:30:23  12     MAKE A DETERMINATION IF POSSIBLE.

09:30:26  13     Q.   YES OR NO ANSWER TO WHAT YOU BELIEVED IN '09, DID YOU

09:30:31  14     BELIEVE THAT MEI-ZU LIN WAS AN ALIAS FOR MEILI LIN?

09:30:35  15     A.   I BELIEVE SHE MAY HAVE BEEN.

09:30:37  16     Q.   OKAY.  BUT YOU DIDN'T USE THOSE MODIFIERS BACK THEN, DID

09:30:41  17     YOU?

09:30:41  18     A.   WELL --

09:30:42  19     Q.   YES OR NO?

09:30:44  20     A.   WELL, I DIDN'T USE THOSE MODIFIERS BACK THEN.

09:30:47  21     Q.   THANK YOU.

09:30:48  22          NOW, YOU ALSO MADE SOME OTHER ASSUMPTIONS, RIGHT?

09:30:51  23     A.   IT DEPENDS ON WHAT YOU MEAN BY "ASSUMPTION."

09:30:58  24     Q.   WELL, YOU LOOKED AT A BUNCH OF ACCOUNTS, CORRECT?

09:31:01  25     A.   CORRECT.

CROSS-EXAMINATION BY MR. CANNON

09:31:01  1    Q.  AND BACK THEN YOU ALSO THOUGHT THAT THE BANK OF AMERICA

09:31:05  2    ACCOUNT MIGHT BE USED TO CONCEAL MONEY BELONGING TO THE

09:31:09  3    TAXPAYER, RIGHT?

09:31:09  4    A.  I BELIEVE THERE MAY BE MORE MONEYS THAT SHOULD BE REPORTED

09:31:20  5    THAN WERE.

09:31:21  6    Q.  RIGHT.  BUT YOU BELIEVED THE BANK OF AMERICA WAS USED TO

09:31:24  7    CONCEAL MONEY, RIGHT?

09:31:27  8    A.  IT COULD HAVE BEEN.  AS I SAID, I NEVER MADE MY FINAL

09:31:30  9    DETERMINATION, BUT IT COULD HAVE BEEN.

09:31:32  10   Q.  ALL RIGHT.

09:31:34  11       SO YOUR BELIEF THAT MEI-ZU LIN WAS THE SAME -- WAS AN

09:31:39  12   ALIAS FOR MEILI, YOU WERE KIND OF JUMPING TO CONCLUSIONS,

09:31:44  13   RIGHT?

09:31:44  14   A.  IT WAS A THOUGHT PROCESS THAT I WENT THROUGH THAT I NEEDED

09:31:47  15   TO FIND OUT MORE INFORMATION.  THAT'S WHY I ASKED THE

09:31:50  16   DEFENDANTS ABOUT IT.

09:31:51  17   Q.  OKAY.  NOW, WHEN YOU WERE LOOKING AT THESE ACCOUNTS, WHEN

09:31:57  18   YOU LOOK AT A BANK ACCOUNT, IT'S IMPORTANT TO KNOW WHO IS THE

09:32:00  19   BENEFICIARY OF AN ACCOUNT, RIGHT?

09:32:03  20   A.  YES.

09:32:03  21   Q.  BECAUSE A BENEFICIARY OF AN ACCOUNT IS THE PERSON THAT

09:32:06  22   GETS THE MONEY IF YOU DIE, ESSENTIALLY, RIGHT?

09:32:10  23   A.  WE LOOK AT THE OWNERS OF THE ACCOUNT.

09:32:15  24   Q.  RIGHT.  BUT FOR -- IS THE BENEFICIARY OF THE ACCOUNT THE

09:32:22  25   PERSON WHO GETS THE MONEY IF YOU DIE?

CROSS-EXAMINATION BY MR. CANNON

09:32:24  1    A.    YES.

09:32:24  2    Q.    KIND OF THE SUCCESSOR IN INTEREST TO THAT ACCOUNT?

09:32:29  3    A.    I'M NOT AWARE THAT A BANK ACCOUNT ACTUALLY HAS A

09:32:33  4    BENEFICIARY.

09:32:34  5    Q.    WELL, ON 8-21-09, DIDN'T YOU LOOK AT THE BANK ACCOUNTS AND

09:32:39  6    LEARN THAT MEILI LIN'S MOTHER WAS THE BENEFICIARY OF THOSE

09:32:42  7    ACCOUNTS?

09:32:44  8    A.    OH, I DO RECALL SEEING SHE WAS ONE OF THE NAMES LISTED ON

09:32:51  9    THE ACCOUNT.

09:32:52  10   Q.    OKAY.  AND SHE WAS LISTED AS THE BENEFICIARY, RIGHT?

09:32:54  11   A.    ONE OF THEM.

09:32:55  12   Q.    THANKS.  AND BY 8-25-09, YOU CAME TO MORE, LET'S SEE,

09:33:14  13   TENTATIVE BELIEFS, HOW IS THAT, IS THAT A GOOD WAY TO DESCRIBE

09:33:17  14   THEM?

09:33:17  15   A.    IT DEPENDS ON WHAT YOU'RE GOING TO SAY NEXT.

09:33:20  16   Q.    WELL, YOU HAD A LOT OF TENTATIVE BELIEFS IN THE COURSE OF

09:33:23  17   YOUR INVESTIGATION, DIDN'T YOU?

09:33:24  18   A.    OF COURSE, YOU --

09:33:42  19   Q.    YOU CAME TO A LOT OF TENTATIVE BELIEFS EARLY ON IN THIS

09:33:46  20   AUDIT, RIGHT?

09:33:47  21   A.    AN AUDIT PROCESS IS VERY FLUID AND YES, MY THOUGHT PROCESS

09:33:53  22   CHANGES WITH FACTS AS I UNCOVER.

09:33:56  23   Q.    OKAY.  AND SOME OF THE FACTS THAT YOU THOUGHT YOU BELIEVED

09:34:03  24   EARLY ON TURNED OUT TO BE FALSE, RIGHT?

09:34:06  25   A.    THE SISTER THAT TURNED OUT TO BE A SISTER, FROM WHAT THEY

CROSS-EXAMINATION BY MR. CANNON

09:34:14  1    SAID.

09:34:16  2    Q.   OKAY.  AND WHEN YOU -- EARLY ON IN THIS INVESTIGATION, YOU

09:34:20  3    THOUGHT MS. LIN WAS HERE ON A STUDENT VISA, DIDN'T YOU?

09:34:24  4    A.   I DON'T RECALL.

09:34:34  5    Q.   IF YOU COULD LOOK AT BELOW 8-21-09, WHERE THERE'S AN

09:34:45  6    ENTRY, IMMIGRATION STATUS?

09:34:46  7    A.   OH, I SEE.  UH-HUH.

09:34:48  8    Q.   SO ON 8-21-09, YOU THOUGHT MEILI LIN WAS AN ALIEN STUDENT,

09:34:54  9    RIGHT?

09:34:57  10   A.   YES, IT SAYS TRANSCRIPTS SHOW --

09:35:00  11   Q.   WOULD YOU PLEASE KNOW NOT READ IT, COULD YOU PLEADS JUST

09:35:03  12   ANSWER MY QUESTION.  YOU THOUGHT MS. LIN WAS AN ALIEN STUDENT,

09:35:07  13   RIGHT?

09:35:07  14   A.   NO, I DID NOT, THAT IS NOT WHAT MY REPORT SAYS.

09:35:10  15   Q.   OKAY.  WELL?

09:35:11  16   A.   WOULD YOU LIKE ME TO CLARIFY IT?  WHAT IT DOES SAY?

09:35:16  17   Q.   COULD YOU TELL ME WHAT YOU THOUGHT ON 8-21-09?

09:35:22  18   A.   WELL, ARE YOU REFERRING TO THE BOTTOM OF THAT?

09:35:25  19   Q.   COULD YOU TELL ME WHAT YOU THOUGHT ON 8-21-09, PLEASE.

09:35:29  20        THE COURT:  WHY DON'T YOU REPEAT THE ANSWER TO THE

09:35:30  21   QUESTION, MS. GARRISON.

09:35:31  22        THE WITNESS:  ALL RIGHT.  I WILL JUST HAVE TO READ

09:35:33  23   THE ENTRY.

09:35:52  24   ON 8-21-09 -- ON 8-21-09, I FOUND A DEPOSIT SLIP LISTED,

09:36:27  25   MEILI LIN, DBA FLORENCE TRADING.

CROSS-EXAMINATION BY MR. CANNON

09:36:31  1      Q.   THAT'S NOT WHAT I ASKED YOU.

09:36:32  2      A.   YOU ASKED ME TO LOOK AT THAT DATE, AND THAT'S WHAT I READ

09:36:36  3      ON THAT DATE.

09:36:37  4              THE COURT:  NO, NO, PLEASE LISTEN TO THE QUESTION.

09:36:39  5      THAT DOCUMENT IS ONLY TO AS TO YOUR KNOWLEDGE.

09:36:41  6              THE WITNESS:  OKAY, BUT HE ASKED ME ABOUT 8-21-09.

09:36:45  7              THE COURT:  HE ASKED YOU A DIFFERENT QUESTION.

09:36:47  8      LISTEN TO THE QUESTION.

09:36:47  9              THE WITNESS:  OKAY.

09:36:48  10     BY MR. CANNON:

09:36:48  11     Q.   ON 8-21-09, DID YOU THINK MEILI LIN WAS AN ALIEN STUDENT?

09:36:53  12     A.   NO.  WHAT MY NOTES HERE SAY --

09:36:56  13             THE COURT:  I'M SORRY, I'M SORRY.  LET ME JUST

09:36:59  14     CLARIFY.

09:36:59  15         YOUR NOTES ARE TO JOG YOUR MEMORY, YOU ARE NOT TO READ

09:37:03  16     YOUR NOTES INTO THE RECORD.  IF THEY DON'T JOG YOUR MEMORY,

09:37:09  17     THEN YOU HAVE NO RECOLLECTION.

09:37:11  18         IF YOU LOOK AT YOUR NOTES AND YOU SAY OH, YEAH, I NOW

09:37:13  19     REMEMBER, THEN YOU CAN TESTIFY.

09:37:15  20         OKAY?

09:37:15  21             THE WITNESS:  OKAY.

09:37:16  22     BY MR. CANNON:

09:37:16  23     Q.   SO ON 8-21-09, DID YOU THINK MS. MEILI LIN WAS AN ALIEN

09:37:22  24     STUDENT?

09:37:22  25     A.   NO.

CROSS-EXAMINATION BY MR. CANNON

09:37:23   1    Q.   WELL, DID YOU REVIEW SOME RECORDS ON 8-21-09?

09:37:28   2    A.   I DID.

09:37:29   3    Q.   AND DID THOSE RECORDS MAKE YOU THINK THAT SHE MIGHT BE

09:37:34   4    KNOW AN ALIEN STUDENT?

09:37:35   5    A.   NO, BUT IT MADE ME THINK THAT MR. HORNG WAS AN ALIEN

09:37:38   6    STUDENT.

09:37:39   7    Q.   OKAY.  SO ON 8-21-09, DID YOU THINK THAT MR. HORNG WAS AN

09:37:43   8    ALIEN STUDENT?

09:37:44   9    A.   THAT'S WHAT THE TRANSCRIPT SAID, BUT I LATER CONFIRMED HIS

09:37:49  10    CITIZENSHIP WITH HIM.

09:37:50  11    Q.   CORRECT.  AND YOU CONFIRMED HIS CITIZENSHIP WITH HIM IN

09:37:53  12    THE INTERVIEW THAT YOU HAD WITH HIM ON 1-13-10, RIGHT?

09:37:58  13    A.   YES.

09:37:58  14    Q.   SO UNTIL 1-13-10 WHERE YOU CONFIRMED HIS CITIZENSHIP WITH

09:38:05  15    HIM BASED ON WHAT HE TOLD YOU, YOU WERE LABORING UNDER THE

09:38:09  16    MISAPPREHENSION THAT HE WAS HERE OUT OF STATUS?

09:38:13  17    A.   I WAS NOTICING IT AS SOMETHING THAT WAS ON THE

09:38:17  18    TRANSCRIPTS.

09:38:17  19    Q.   OKAY.  NOW, YOU TESTIFIED THE OTHER DAY ABOUT INCOME

09:38:31  20    ASSETS AND THINGS LIKE THAT, RIGHT?

09:38:33  21    A.   YES.

09:38:34  22    Q.   AND IF SOMEONE IS NOT A U.S. TAXPAYER, BY THAT, NOT A

09:38:42  23    RESIDENTS OR A CITIZEN, THAT INCOME THAT PERSON MAKES ISN'T

09:38:47  24    SUBJECT TO U.S. TAX, IS IT?

09:38:49  25    A.   IF THEY ARE NOT A U.S. CITIZEN?

CROSS-EXAMINATION BY MR. CANNON

09:38:52  1   Q.   OR RESIDENT?

09:38:53  2   A.   OR RESIDENT, NO.

09:38:55  3   Q.   AND WHEN YOU DID YOUR DUE DILIGENCE IN THIS CASE, DID YOU

09:39:11  4   FIND OUT SOME INFORMATION ABOUT A MR. P.K. LIN?

09:39:16  5   A.   YES.

09:39:17  6   Q.   AND DID YOU FIND OUT THAT HE WASN'T A U.S. CITIZEN?

09:39:21  7   A.   YES.

09:39:21  8   Q.   HE WASN'T A U.S. RESIDENT?

09:39:23  9   A.   NOT THAT I'M AWARE OF.  I CAN'T SAY THAT FOR CERTAIN.

09:39:29 10   Q.   OKAY.  SO IF HE'S NOT A U.S. CITIZEN?

09:39:32 11   A.   I CAN'T SAY THAT.  I'M NOT SURE BECAUSE I NEVER SAW -- I

09:39:36 12   DON'T RECALL SEEING DOCUMENTS FOR HIM.

09:39:39 13   Q.   OKAY.  BUT YOU DON'T HAVE ANY EVIDENCE THAT HE'S A U.S.

09:39:43 14   CITIZEN?

09:39:43 15   A.   I DON'T.

09:39:44 16   Q.   YOU DON'T HAVE ANY EVIDENCE THAT HE'S A U.S. RESIDENT?

09:39:47 17   A.   I DON'T HAVE ANY EVIDENCE.

09:39:50 18   Q.   AND SO THE EVIDENCE THAT YOU HAD, HE'S NOT SUBJECT TO U.S.

09:39:56 19   TAXES?

09:39:58 20   A.   GIVEN THE EVIDENCE I HAVE, BUT I WASN'T AUDITING HIM, SO I

09:40:02 21   DIDN'T DO A THOROUGH RESEARCH ON HIM.

09:40:05 22   Q.   BUT IT'S IMPORTANT BECAUSE YOU WERE TALKING ABOUT RELATED

09:40:09 23   ENTITIES THE OTHER DAY, YOU WERE TALKING ABOUT FLORENCE TRADING

09:40:13 24   AND SAYING THAT'S A RELATED ENTITY.  SO YOU WANTED TO

09:40:16 25   INVESTIGATE THAT, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

09:40:17  1    A.   I DIDN'T SAY IT WAS A RELATED ENTITY, I SAID THAT THE BANK

09:40:21  2    RECORDS CAME BACK WITH MEILI LIN HAVING AUTHORITY ON THE

09:40:24  3    ACCOUNT AND MONEY GETTING DEPOSITED TO THAT ACCOUNT.

09:40:28  4    Q.   AND SO YOU DID SOME INVESTIGATION BECAUSE OF THE

09:40:32  5    RELATIONSHIP, RIGHT?

09:40:32  6    A.   YES.

09:40:33  7    Q.   AND DID YOU ALSO THINK THAT THERE WERE ACCOUNTS WITH

09:40:40  8    MR. P.K. LIN'S NAME ON THEM THAT WERE BEING USED TO DIVERT

09:40:47  9    MONEY IN THIS CASE?

09:40:47  10   A.   COULD HAVE BEEN.

09:40:49  11   Q.   NO, I'M ASKING YOU, DID YOU THINK THAT?

09:40:52  12   A.   I THOUGHT IT WAS A POSSIBILITY, BUT I HADN'T COME TO A

09:40:55  13   CONCLUSION ON THE CASE.

09:40:56  14   Q.   OKAY.  BUT YOU HADN'T COME TO A CONCLUSION ON THE CASE

09:41:00  15   THEN BUT YOU THOUGHT THAT MIGHT BE A POSSIBILITY, RIGHT?

09:41:02  16   A.   IT MIGHT BE.

09:41:03  17   Q.   SO THAT'S SOMETHING THAT YOU WOULD INVESTIGATE?

09:41:05  18   A.   SOMETHING I WOULD CERTAINLY ASK ABOUT, YES.

09:41:08  19   Q.   AND THAT'S SOMETHING THAT YOU DID ASK ABOUT?

09:41:12  20   A.   YES.

09:41:14  21   Q.   AND THAT'S SOMETHING THAT YOU DID INVESTIGATE?

09:41:15  22   A.   I DID WHAT I COULD WITH THE RECORDS THAT I HAD.

09:41:17  23   Q.   CORRECT.  AND YOU WEREN'T ABLE TO FIND OUT ANY EVIDENCE

09:41:20  24   WHATSOEVER THAT MR. P.K. LIN HAD TAX RESPONSIBILITY IN THE

09:41:24  25   UNITED STATES?

CROSS-EXAMINATION BY MR. CANNON

09:41:26   1      A.   I DON'T KNOW ABOUT P.K. LIN.

09:41:30   2      Q.   I ASKED YOU, YOU INVESTIGATED P.K. LIN TO A CERTAIN

09:41:35   3      EXTENT, RIGHT?

09:41:40   4      A.   NOT REALLY BECAUSE I NEVER MET HIM, I NEVER INTERVIEWED

09:41:44   5      HIM, I DON'T HAVE ACCESS TO HIM, IF HE'S NOT HERE, I DON'T KNOW

09:41:48   6      WHERE HE IS.  I DON'T KNOW WHAT HAPPENED AFTER I GOT THE CASE,

09:41:50   7      MAYBE THEY DID.

09:41:51   8      Q.   NO I'M ASKING YOU WHAT YOU KNEW?

09:41:53   9      A.   OKAY.  I DID NOT MEET P.K. LIN.

09:41:56  10      Q.   WELL, THERE WERE ACCOUNTS THAT HE WAS A SIGNATORY ON IN

09:41:59  11      THE U.S., RIGHT?

09:42:01  12      A.   YES.

09:42:02  13      Q.   AND THERE WERE ACCOUNTS THAT HIS NAME WAS ON IN THE U.S.?

09:42:05  14      A.   YES, HE AND MEILI LIN.

09:42:07  15      Q.   RIGHT.  AND YOU INVESTIGATED THOSE ACCOUNTS?

09:42:09  16      A.   I INVESTIGATED THE ACCOUNTS THAT MEILI LIN WAS SIGNER ON.

09:42:14  17      Q.   AND WE ALSO TALKED ABOUT MEILI LIN'S MOTHER FOR A WHILE,

09:42:24  18      RIGHT?

09:42:25  19      A.   YES.

09:42:26  20      Q.   AND SHE'S NOT A U.S. CITIZEN?

09:42:30  21      A.   SHE TURNED IN A FORM THAT SAID SHE IS NOT A U.S. CITIZEN.

09:42:34  22      Q.   SHE'S NOT A U.S. RESIDENT?

09:42:36  23      A.   I DON'T KNOW WHY SHE LIVES.

09:42:38  24      Q.   YOU DON'T HAVE THE EVIDENCE THAT SHE'S A U.S. RESIDENT?

09:42:41  25      A.   I DON'T HAVE THE EVIDENCE, I DID NOT INVESTIGATE HER.

CROSS-EXAMINATION BY MR. CANNON

09:42:44 1    Q.   AND AS A NON U.S. CITIZEN, NON U.S. RESIDENT, SHE WOULDN'T

09:42:49 2    HAVE TAX LIABILITIES IN THE U.S., RIGHT?

09:42:50 3    A.   IF SHE WAS A NON U.S. -- NO, SHE WOULDN'T.

09:42:53 4    Q.   OKAY.  NOW WHEN WERE YOU GOING THROUGH YOUR PROCESS IN

09:43:16 5    THIS CASE, YOU BELIEVED THAT ALL OF THE MONEY THAT WAS GOING TO

09:43:19 6    THE BANK OF AMERICA ACCOUNT, THAT WAS INCOME TO REIJIN, RIGHT?

09:43:23 7    A.   I NEVER GOT TO THAT CONCLUSION, IT NEEDED FURTHER

09:43:27 8    INVESTIGATION FROM SOURCES THAT I WASN'T ABLE TO OBTAIN.

09:43:31 9    Q.   RIGHT.  BUT WE TALKED BEFORE ABOUT HOW YOU DESCRIBED YOUR

09:43:34 10   INVESTIGATION, AND YOU WOULD ROUTINELY USED WORD BELIEVE IN

09:43:40 11   YOUR INVESTIGATION, RIGHT?

09:43:42 12   A.   MOST LIKELY.

09:43:43 13   Q.   OKAY.  AND YOU NEVER GOT TO A POINT IN YOUR INVESTIGATION

09:43:51 14   WHERE YOU COULD PROVE THAT THOSE TRANSFERS WERE INCOME, DID

09:43:55 15   YOU?

09:43:57 16   A.   NO, I DIDN'T.

09:43:58 17   Q.   OKAY.  AND THERE'S A DIFFERENCE BETWEEN THE CIVIL STANDARD

09:44:03 18   IN THE IRS AND THE CRIMINAL STANDARD HERE IN THIS COURT, RIGHT?

09:44:07 19   A.   YES.

09:44:10 20   Q.   AND THE CIVIL STANDARD OF PROOF FOR THE IRS MEANS THE

09:44:14 21   BURDENS ON THE TAXPAYER, RIGHT?

09:44:17 22   A.   NOT VERY INCOME.

09:44:18 23   Q.   FOR INCOME, IF THE SERVICE COMES TO A TAXPAYER AND SAYS WE

09:44:23 24   BELIEVE THIS IS INCOME, THE TAXPAYER HAS THE BURDEN TO SHOW

09:44:26 25   IT'S NOT INCOME, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

09:44:27  1    A.   NO.

09:44:28  2    Q.   YOU CAN ASSESS SOMEONE BASED UPON TRANSFERS, RIGHT?

09:44:34  3    A.   THE BURDEN TO PROVE INCOME IS ON THE GOVERNMENT.

09:44:38  4    Q.   CORRECT.  BUT THE BURDEN OF PROOF IN A CIVIL CASE IS BY A

09:44:43  5    PREPONDERANCE OF THE EVIDENCE?

09:44:44  6    A.   YES.

09:44:44  7    Q.   AND THE TAXPAYER HAS TO REBUT THAT, RIGHT?

09:44:48  8    A.   YES.

09:44:48  9    Q.   AND IN A CRIMINAL CASE, THE BURDEN OF PROOF, BEYOND A

09:44:53  10   REASONABLE DOUBT, IS ON THE GOVERNMENT, RIGHT?

09:44:55  11   A.   INCOME IS ALWAYS ON THE GOVERNMENT, EITHER WAY.

09:44:59  12   Q.   BUT THE BURDEN OF PROOF IS DIFFERENT, ISN'T IT?

09:45:01  13   A.   YES.

09:45:04  14   Q.   NOW -- AND YOU ALSO SAID THAT YOU NEVER CAME TO THE

09:45:12  15   CONCLUSION THAT THAT WAS YOUR BELIEF, BUT YOU DIDN'T HAVE A

09:45:15  16   CONCLUSION, RIGHT?

09:45:18  17   A.   RIGHT.

09:45:19  18   Q.   SO EVEN UNDER THE CIVIL STANDARD, YOU DIDN'T KNOW WHETHER

09:45:24  19   THIS WAS INCOME, RIGHT?

09:45:27  20   A.   I COULDN'T BE CERTAIN, BUT IT CERTAINLY LOOKED VERY

09:45:31  21   SUSPICIOUS.

09:45:31  22   Q.   OKAY.  LOOKED SUSPICIOUS?

09:45:32  23   A.   YES.

09:45:33  24   Q.   BUT LOOKED SUSPICIOUS IS DIFFERENT THAN PROVEN, RIGHT?

09:45:37  25   A.   RIGHT.

CROSS-EXAMINATION BY MR. CANNON

09:45:45  1    Q.   NOW, LET'S TALK ABOUT THAT INTERVIEW FOR A MOMENT, OKAY?

09:45:54  2    A.

09:46:04  3    Q.   PRIOR TO THE FIRST INTERVIEW YOU HAD WITH MEILI LIN AND

09:46:08  4    HENRY HORNG AND CINDY SHI IN CUPERTINO ON 1-13-10, YOU HAD

09:46:19  5    TRIED TO REFER THE CASE TO CI, RIGHT?

09:46:25  6    A.   NO, I MEAN, I -- I SPOKE WITH CI TO SEE IF THEY WANTED THE

09:46:30  7    CASE BEFORE WE BEGAN THE AUDIT.

09:46:36  8    Q.   OKAY.  AND THEN YOU ALSO SPOKE TO CI AGAIN ON 4-27-09 TO

09:46:42  9    SEE IF THEY WOULD TAKE IT FROM YOU, RIGHT?

09:46:44  10   A.   THAT IS THE DATE I'M REFERRING TO.

09:46:46  11   Q.   OKAY.  BUT CI HAD THE CASE BEFORE YOU EVER GOT IT, RIGHT?

09:46:51  12   A.   YES.

09:46:51  13   Q.   OKAY.  SO BEFORE YOU WENT TO SPEAK WITH MS. LIN AND

09:46:58  14   MR. HORNG ON JANUARY 10TH, YOU PREPARED A BUNCH OF QUESTIONS,

09:47:04  15   DIDN'T YOU?

09:47:04  16   A.   YES, I DID.

09:47:05  17   Q.   AND THAT'S STANDARD IRS PROCEDURE?

09:47:09  18   A.   YES.

09:47:09  19   Q.   YOU WRITE OUT NOTES?

09:47:11  20   A.   YES.

09:47:12  21   Q.   YOU GO THROUGH THE DOCUMENTS THAT YOU HAVE?

09:47:14  22   A.   UH-HUH.

09:47:15  23   Q.   YOU GET PREPARED TO CONFRONT THE DEFENDANTS?

09:47:17  24   A.   I GET PREPARED TO HAVE A DISCUSSION.

09:47:20  25   Q.   YOU GO INTO THESE INTERVIEWS KNOWING A LOT MORE THAN THE

09:47:24  1      PEOPLE WHO WERE GOING TO BE ANSWERING YOUR QUESTIONS ARE,

09:47:27  2      RIGHT?

09:47:27  3      A.   I KNOW MORE THAN THEY DO?

09:47:30  4      Q.   YES.

09:47:31  5      A.   WELL, I DON'T KNOW MORE THAN THEY DO.

09:47:35  6      Q.   WELL, WHEN YOU GO AND TALK TO PEOPLE, YOU HAVE -- WELL,

09:47:41  7      WHEN YOU SAY YOU KNOW MORE THAN THEY DO, YOU HAVE ACCESS TO

09:47:48  8      DOCUMENTS, RIGHT?

09:47:49  9      A.   YES.

09:47:50  10     Q.   AND YOU DON'T HAVE AN INTERVIEW UNTIL YOU ARE PRETTY

09:47:53  11     SATISFIED THAT YOU HAVE A DEPEND COMMAND OF THE FACTS, RIGHT?

09:47:59  12     A.   NOT REALLY A COMMAND OF THE FACTS, I AM INTERVIEWING THEM

09:48:04  13     TO GET THE FACTS.

09:48:05  14     Q.   OKAY.  AND IN THIS CASE, I BELIEVE YOU TESTIFIED ON

09:48:10  15     TUESDAY THAT ONE OF THE REASONS YOU HAD THE INTERVIEW WAS TO

09:48:14  16     MAKE A RECORD, RIGHT?

09:48:16  17     A.   IS TO WHAT?

09:48:17  18     Q.   MAKE A RECORD, YOU SAID.

09:48:20  19     A.   WHAT DO YOU MEAN MAKE A RECORD?

09:48:22  20     Q.   I DON'T KNOW, THOSE WERE YOUR WORDS ON TUESDAY?

09:48:25  21     A.   OKAY.  TAKEN OUT OF CONTEXT, I DON'T KNOW WHAT THE FULL

09:48:29  22     SENTENCE WAS.

09:48:30  23     Q.   OKAY.  WHEN YOU WERE TRYING TO TALK TO THE TAXPAYERS, AND

09:48:37  24     YOU WERE PREPARED FOR THAT MEETING?

09:48:38  25     A.   YES.

09:48:38   1    Q.   AND YOU EXPENSIVELY PREPARED FOR THAT MEETING?

09:48:42   2    A.   YES.

09:48:42   3    Q.   YOU GATHERED DOCUMENTS?

09:48:45   4    A.   I DON'T KNOW WHAT DOCUMENTS AT THE -- YOU ARE TALKING

09:48:49   5    ABOUT THE MEETING WITH BOTH OF THE DEFENDANTS?

09:48:51   6    Q.   YES.

09:48:52   7    A.   OKAY.

09:48:52   8    Q.   YOU GATHERED BANK LOAN APPLICATIONS?

09:48:55   9    A.   OH, YES -- WELL, THAT WASN'T SHOWN YET, BUT I DID HAVE

09:48:59  10    THOSE.

09:48:59  11    Q.   YEAH.  YOU HAD THOSE.  IT WASN'T SHOWN AT THAT POINT,

09:49:02  12    RIGHT?

09:49:02  13    A.   RIGHT.

09:49:02  14    Q.   YOU WERE HOLDING THAT BACK FOR LATER?

09:49:04  15    A.   I WAS COLLECTING MORE INFORMATION.

09:49:06  16    Q.   OKAY.  AND YOU DIDN'T SHOW IT TO THEM AT THAT TIME?

09:49:08  17    A.   NOT THAT TIME.

09:49:10  18    Q.   OKAY.  AND THE MEETING THAT YOU HAD WITH THEM ON 1-13-10,

09:49:16  19    WAS YOUR FIRST OFFICIAL MEETING WITH THE TAXPAYERS, RIGHT?

09:49:21  20    A.   YES.

09:49:21  21    Q.   AND GENERALLY SPEAKING, IN A FIRST OFFICIAL MEETING WITH

09:49:26  22    THE TAXPAYERS WHO ARE SUBJECT TO CRIMINAL INVESTIGATION,

09:49:33  23    SOMEONE READS THEM A NON-CUSTODIAL STATEMENT OF RIGHTS,

09:49:36  24    CORRECT?

09:49:37  25    A.   I DON'T KNOW WHAT HAPPENS IN A CRIMINAL INVESTIGATION --

CROSS-EXAMINATION BY MR. CANNON

09:49:40   1    THIS WASN'T A CRIMINAL INVESTIGATION.

09:49:42   2              MR. PITMAN:  OBJECTION, YOUR HONOR.

09:49:43   3    BY MR. CANNON:

09:49:43   4    Q.   IN AN INVESTIGATION, YOU ARE FAMILIAR WITH THE INTERNAL

09:49:46   5    REVENUE MANUAL, AREN'T YOU?

09:49:48   6              THE WITNESS:  YES.

09:49:49   7    Q.   AND THAT'S A DOCUMENT THAT YOU READ -- THAT YOU REFER TO

09:49:54   8    REGULARLY?

09:49:56   9    A.   WHEN I NEED TO.

09:49:58   10   Q.   OKAY.  AND IT HAS INSTRUCTIONS IN IT ABOUT HOW TO CONDUCT

09:50:01   11   INTERVIEWS?

09:50:02   12   A.   YES.

09:50:03   13   Q.   AND IT EXPLAINS THE TAXPAYER'S BILL OF RIGHTS?

09:50:08   14   A.   YES.

09:50:09   15   Q.   AND IT EXPLAINS HOW YOU SHOULD TREAT PEOPLE FAIRLY?

09:50:14   16   A.   YES.

09:50:14   17   Q.   AND IT HAS A PORTION IN IT ABOUT A NON-CUSTODY STATEMENT

09:50:18   18   OF RIGHTS, DOESN'T IT?

09:50:19   19   A.   I DON'T KNOW ABOUT THAT.  I DON'T EVEN KNOW WHAT THAT IS.

09:50:23   20   Q.   SO YOU NEVER READ THE NON-CUSTODY STATEMENT OF RIGHTS TO

09:50:28   21   MR. HORNG AND MS. LIN, DID YOU?

09:50:30   22   A.   APPARENTLY NOT BECAUSE I DON'T KNOW WHAT THAT IS.  THEY

09:50:33   23   ARE MAILED A FULL -- WHEN THEY GET THEIR RIGHTS IN A

09:50:38   24   PUBLICATION THAT I SEND OUT TO THEM IN THE BEGINNING OF THE

09:50:41   25   AUDIT WITH THE AUDIT LETTER, IF THAT PHRASE YOU ARE REFERRING

CROSS-EXAMINATION BY MR. CANNON

09:50:46  1    TO IS IN THERE, MAYBE, I DON'T KNOW.

09:50:49  2    Q.   OKAY.  SO BEFORE THAT MEETING -- DURING THAT MEETING, DID

09:51:01  3    YOU TALK ABOUT THE FAMILY STRUCTURE AT ALL?

09:51:04  4    A.   YES.

09:51:04  5    Q.   DID YOU TALK -- AND DID YOU FIND OUT THAT MEILI LIN'S

09:51:11  6    MOTHER WAS AN IMPORTANT MOVING PART IN THE FAMILY?

09:51:17  7    A.   EVERY MOTHER IS AN IMPORTANT MOVING PART OF THE FAMILY.

09:51:20  8    WHAT DO YOU MEAN BY THAT?

09:51:22  9    Q.   THAT SHE MADE A LOT OF ECONOMIC DECISIONS?

09:51:24  10              MR. PITMAN:  OBJECTION, YOUR HONOR.  HEARSAY.

09:51:35  11              THE COURT:  OVERRULED.

09:51:25  12              THE WITNESS:  NO, I DID NOT.

09:51:28  13              MR. CANNON:  OKAY.  SO YOU DIDN'T ASK ABOUT THAT.

09:51:31  14              THE WITNESS:  I DON'T RECALL.

09:51:36  15    BY MR. CANNON:

09:51:36  16    Q.   AND THAT INTERVIEW REALLY ISN'T A PLACE WHERE YOU KIND OF

09:51:40  17    GO TO SOMEBODY'S OFFICE AND SIT DOWN AND YOU SAY, TELL ME

09:51:43  18    EVERYTHING YOU WANT ME TO HEAR, RIGHT?

09:51:47  19    A.   NO, THAT'S NOT USUALLY HOW I SAY IT.

09:51:49  20    Q.   IT'S PRETTY STRUCTURED?

09:51:51  21    A.   YES.

09:51:51  22    Q.   IT'S PRETTY FORMAL?

09:51:55  23    A.   I TRY TO MAKE IT AS COMFORTABLE AS POSSIBLE.

09:51:58  24    Q.   AND YESTERDAY WHEN YOU TESTIFIED, YOU TESTIFIED ABOUT YOUR

09:52:02  25    NOTES, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

09:52:04   1     A.   YES.

09:52:05   2     Q.   AND THE NOTES THAT YOU WERE REFERRING TO WERE THE NOTES

09:52:09   3     THAT YOU PREPARED PRIOR TO THIS INTERVIEW, RIGHT?

09:52:13   4     A.   NO, THE NOTES I REFERRED TO ARE THE NOTES I TOOK DURING

09:52:17   5     THE INTERVIEW.

09:52:18   6     Q.   OKAY.  AND THE NOTES YOU TOOK DURING THE INTERVIEW ARE

09:52:24   7     NOTES THAT YOU PREPARE PRIOR TO THE -- ARE BASED UPON AN IRS

09:52:30   8     FORM, RIGHT?

09:52:33   9     A.   COULD YOU BE MORE SPECIFIC?

09:52:36   10    Q.   IS THERE AN IRS FORM TITLED "INITIAL INTERVIEW QUESTIONS?"

09:52:42   11    A.   YES.

09:52:44   12    Q.   AND WITHIN THAT IRS FORM, INITIAL INTERVIEW QUESTIONS, IS

09:52:51   13    THAT SOMETHING YOU ROUTINELY FILL OUT AND WRITE DOWN THE

09:52:58   14    QUESTIONS YOU ARE GOING TO ASK AT THE INTERVIEW?

09:53:00   15    A.   IT'S AN OUTLINE, I DON'T ALWAYS ANSWER EVERY ONE, GET AN

09:53:04   16    ANSWER TO EVERY SINGLE QUESTION, BUT I USE THAT AS MY OUTLINE,

09:53:10   17    AND THAT'S TAILORED FOR EACH INDIVIDUAL CASE.

09:53:12   18    Q.   OKAY.  SO THIS IS SOMETHING THAT YOU PREPARE FOR?

09:53:14   19    A.   YES, I PREPARE INTERVIEW QUESTIONS.

09:53:16   20    Q.   YES.  AND YOU PREPARE THEM BECAUSE YOU ARE TRYING TO GET

09:53:20   21    EVIDENCE, RIGHT?

09:53:21   22    A.   I'M TRYING TO GET INFORMATION SO THAT I CAN DETERMINE

09:53:25   23    WHAT'S HAPPENING.

09:53:26   24    Q.   YES.  AND INFORMATION IS EVIDENCE?

09:53:30   25    A.   OKAY.

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 09:53:31 | 1 | Q.   AND INFORMATION CAN GO BOTH WAYS, RIGHT? |
| 09:53:34 | 2 | A.   SURE. |
| 09:53:35 | 3 | Q.   EVIDENCE CAN GO BOTH WAYS? |
| 09:53:37 | 4 | A.   YES. |
| 09:53:37 | 5 | Q.   AND IN THIS CASE, YOU WERE TRYING TO GET A LOT OF |
| 09:53:40 | 6 | EVIDENCE, RIGHT? |
| 09:53:41 | 7 | A.   I WAS TRYING TO GET INFORMATION. |
| 09:53:43 | 8 | Q.   OKAY.  SO WHEN YOU TESTIFIED, I BELIEVE IT WAS ON |
| 09:53:52 | 9 | WEDNESDAY, ONE OF THE THINGS THAT YOU WERE ASKED WAS ABOUT |
| 09:53:58 | 10 | ANNUAL GIFTS, RIGHT? |
| 09:53:59 | 11 | A.   RIGHT. |
| 09:54:00 | 12 | Q.   BECAUSE AN AMERICAN HAS NO TAX RESPONSIBILITY IF THEY GET |
| 09:54:08 | 13 | GIFTS FROM A FOREIGN PERSON, RIGHT? |
| 09:54:11 | 14 | A.   RIGHT. |
| 09:54:12 | 15 | Q.   AND AN AMERICAN CAN GET UP TO $100,000 A YEAR WITHOUT EVEN |
| 09:54:17 | 16 | HAVING TO FILE AN INFORMATION RETURN, RIGHT? |
| 09:54:22 | 17 | A.   RIGHT. |
| 09:54:23 | 18 | Q.   AND EVEN IF THEY GET MORE THAN 100,000 A YEAR, THEY STILL |
| 09:54:29 | 19 | DON'T HAVE ANY TAX LIABILITY ON THAT GIFT, CORRECT? |
| 09:54:33 | 20 | A.   NO, THEY HAVE AN INFORMATIONAL REPORT FILING. |
| 09:54:37 | 21 | Q.   CORRECT.  SO LET'S BREAK THIS DOWN BECAUSE I JUST WANT TO |
| 09:54:40 | 22 | BE CLEAR. |
| 09:54:40 | 23 | A.   OKAY. |
| 09:54:41 | 24 | Q.   EVEN IF AN AMERICAN WOULD GET A GIFT OF A MILLION DOLLARS |
| 09:54:45 | 25 | FROM A FOREIGN PERSON, THEY WOULD HAVE ZERO INCOME TAX |

09:54:50  1    LIABILITY ON THAT GIFT, CORRECT?

09:54:52  2    A.   THAT'S CORRECT.

09:54:54  3    Q.   HOWEVER, EVEN THOUGH THEY WOULD HAVE NO TAX LIABILITY,

09:54:59  4    THEY SHOULD FILE A FORM SAYING THAT THEY GOT THAT GIFT, RIGHT?

09:55:02  5    A.   YES.

09:55:02  6    Q.   AND THE REASON THEY SHOULD DO THAT IS BECAUSE THERE ARE

09:55:07  7    TAX TREATIES WITH OTHER COUNTRIES AND THINGS LIKE THAT, RIGHT?

09:55:10  8    A.   RIGHT.

09:55:10  9    Q.   OKAY.  AND WHEN YOU WERE TESTIFYING THE OTHER DAY, $95,000

09:55:21  10   IS A DESCENT AMOUNT OF MONEY, RIGHT?

09:55:23  11   A.   YEAH.

09:55:23  12   Q.   AND IF YOU GET 95,000 A YEAR OVER 10 OR 15 YEARS, IT ADDS

09:55:30  13   UP, DOESN'T IT?

09:55:31  14   A.   YES.

09:55:31  15   Q.   AND I JUST WANT TO CLARIFY THIS, BECAUSE WHEN YOU

09:55:36  16   TESTIFIED ON WEDNESDAY, I THINK YOU WEREN'T SURE WHETHER THESE

09:55:39  17   WERE ANNUAL GIFTS OR NOT, RIGHT?

09:55:44  18   A.   I AM NOT SURE.

09:55:46  19   Q.   IF I COULD REFRESH YOUR RECOLLECTION WITH PAGE 3 OF YOUR

09:55:51  20   NOTES OF THAT DAY, BATES NUMBERED U.S. 10442.  IF YOU COULD

09:55:59  21   LOOK AT THE LOWER RIGHT-HAND CORNER OF THOSE NOTES.

09:56:06  22   A.   ANNUAL GIFT.

09:56:08  23   Q.   OKAY.  SO DID SHE GET AN ANNUAL GIFT FROM HER PARENTS?

09:56:16  24   A.   YES.

09:56:17  25   Q.   THANK YOU.  SO YOU JUST DIDN'T RECALL THAT WHEN YOU WERE

09:56:26   1      TALKING TO MR. PITMAN, BUT YOU RECALL THAT NOW, RIGHT?

09:56:28   2      A.   NOW THAT I'VE SEEN THAT, YES.

09:56:30   3      Q.   OKAY.  AND MR. PITMAN ALSO ASKED YOU SOME QUESTIONS ABOUT

09:56:36   4      A CASH HOARD, RIGHT?

09:56:37   5      A.   YES.

09:56:37   6      Q.   AND WHEN YOU ARE TALKING ABOUT CASH HOARD, THAT'S KIND OF

09:56:42   7      A TERM OF ART BECAUSE WHEN -- ONE OF THE WAYS, ONE OF THE

09:56:49   8      TECHNIQUES THAT THE IRS SHOWS PEOPLE HAVE UNREPORTED INCOME IS

09:56:54   9      THROUGH SHOWING THAT THEY HAVE EXPENDITURES, RIGHT?

09:56:57   10     A.   YES.

09:56:58   11     Q.   AND SO IF YOU HAVE EXPENDITURES THAT AREN'T SUPPORTED BY

09:57:03   12     YOUR INCOME, IT MAKES YOU THINK, IT'S A RED FLAG, THIS PERSON

09:57:08   13     HAS UNREPORTED INCOME, RIGHT?

09:57:09   14     A.   IT COULD BE A RED FLAG THAT REQUIRED FURTHER

09:57:13   15     INVESTIGATION.

09:57:13   16     Q.   OKAY.  AND ON WEDNESDAY YOU USED THE TERM RED FLAG, RIGHT?

09:57:19   17     A.   POSSIBLY.

09:57:20   18     Q.   DEALING WITH $485,000 WORTH OF MORTGAGE INTEREST PAID IN

09:57:24   19     2007, YOU SAID THAT WAS A RED FLAG FOR AN AUDITOR, RIGHT?

09:57:29   20     A.   WHEN YOU CAN PAY $400,000 -- YES.

09:57:35   21     Q.   OKAY.

09:57:36   22     A.   WHEN YOU WERE REPORTING LITTLE INCOME.

09:57:38   23     Q.   OKAY.  AND THAT'S A BIG EXPENDITURE?

09:57:40   24     A.   IT'S A BIG EXPENDITURE.

09:57:42   25     Q.   IT'S A BIG RED FLAG?

CROSS-EXAMINATION BY MR. CANNON

09:57:44   1    A.   IT'S A RED FLAG.

09:57:45   2    Q.   AND THAT'S WHY YOU WANT TO FIGURE OUT WHETHER THE PERSON

09:57:48   3    HAS A CASH HOARD, THAT THEY COULD PAY THESE BIG EXPENDITURES,

09:57:53   4    RIGHT?

09:57:53   5    A.   NO.  THAT IS NOT WHAT I LOOK FOR IN CASH HOARD.

09:57:57   6    Q.   WELL, WHEN YOU ARE TRYING TO FIGURE OUT WHETHER SOMEONE'S

09:58:02   7    EXPENDITURES ARE IN EXCESS OF THEIR INCOME, TO PROVE AN

09:58:07   8    EXPENDITURES CASE, ONE OF THE THINGS YOU DO IS YOU TRY TO

09:58:10   9    ELIMINATE THE POSSIBILITY OF A CASH HOARD, RIGHT?

09:58:13  10    A.   IN THIS CASE, I WASN'T DOING AN EXPENDITURES CASE, SO MY

09:58:16  11    DEFINITION OF CASH HOARD IS MUCH DIFFERENT THAN WHAT YOU ARE

09:58:20  12    IMPLYING.

09:58:22  13    Q.   WELL, IN THIS CASE YOU PREPARED SPREADSHEETS TALKING ABOUT

09:58:25  14    EXPENDITURES, RIGHT?

09:58:27  15    A.   I FOCUSED MORE ON INCOME.

09:58:32  16    Q.   DID YOU ALSO FOCUS ON EXPENDITURES?

09:58:34  17    A.   YES, I WANTED TO SEE -- YES.

09:58:37  18    Q.   AND YOU LISTED EXPENDITURES?

09:58:41  19    A.   SOME.

09:58:42  20    Q.   YOU PREPARED SPREADSHEETS LISTS EXPENDITURES?

09:58:46  21    A.   I DIDN'T HAVE ALL THE EXPENDITURES.

09:58:47  22    Q.   YOU DIDN'T HAVE ALL OF THEM BUT YOU HAD A LOT?

09:58:49  23    A.   I ONLY LOOKED AT WHAT WAS GOING IN AND OUT OF ONE BANK

09:58:55  24    ACCOUNT.

09:58:55  25    Q.   AND YOU TALKED ABOUT A CASH HOARD THE OTHER DAY?

CROSS-EXAMINATION BY MR. CANNON

09:58:58  1    A.   YES.  WOULD YOU LIKE TO KNOW MY DEFINITION OF CASH HOARD?

09:59:01  2    Q.   I WILL ASK YOU SOME QUESTIONS ABOUT THAT NEXT.

09:59:03  3    A.   OKAY.

09:59:03  4    Q.   WHEN YOU ARE TALKING ABOUT A CASH HOARD, YOU ARE NOT

09:59:06  5    TALKING ABOUT GREEN BAGS BURIED IN THE BACKYARD, ARE YOU?

09:59:10  6    A.   YES, I AM.  I'M TALKING -- THAT'S EXACTLY WHAT I'M TALKING

09:59:13  7    ABOUT.  I'M LOOKING FOR MONEY UNDER A MATTRESS, I'M LOOKING FOR

09:59:17  8    CASH OUTSIDE OF A BANK ACCOUNT.  SO THAT'S CORRECT.

09:59:22  9    Q.   SO WHEN YOU ARE LOOKING FOR A CASH HOARD, YOU ARE ONLY

09:59:25 10    LOOKING FOR GREEN BAGS, RIGHT?

09:59:27 11    A.   YES, I'M LOOKING FOR CASH THAT IS HELD OUTSIDE OF A BANK

09:59:30 12    ACCOUNT.

09:59:31 13    Q.   OKAY.  ALL RIGHT.

09:59:33 14         SO IF SOMEONE -- IF YOU ARE LOOKING AT SOMEBODY'S

09:59:39 15    EXPENDITURES -- WELL, LET'S START FROM STEP ONE, SO WE'RE

09:59:43 16    CLEAR.

09:59:44 17         THE U.S. HAS AN INCOME TAX LAW, RIGHT?

09:59:47 18    A.   YES.

09:59:47 19    Q.   INCOME IS TAXED, RIGHT?

09:59:50 20    A.   YES.

09:59:50 21    Q.   ASSETS AREN'T TAXED, RIGHT?

09:59:53 22    A.   NO.

09:59:54 23    Q.   SO IF YOU HAVE 5 MILLION IN THE BANK, YOU ARE PRETTY

10:00:00 24    COMFORTABLE, RIGHT?

10:00:02 25    A.   YEAH.

CROSS-EXAMINATION BY MR. CANNON

10:00:03  1    Q.   AND IF YOU HAVE 5 MILLION IN THE BANK, THAT CAN SUPPORT A

10:00:06  2    LOT OF EXPENDITURES, CAN'T IT?

10:00:08  3    A.   YES.

10:00:09  4    Q.   IT CAN SUPPORT PAYING A LOT OF MORTGAGE INTEREST?

10:00:12  5    A.   SURE.

10:00:13  6    Q.   IT CAN SUPPORT BUYING A LOT OF CARS?

10:00:17  7    A.   YES.

10:00:17  8    Q.   IT CAN SUPPORT BUYING, MAKING A LOT OF PROPERTY PAYMENTS?

10:00:21  9    A.   SURE.

10:00:22  10   Q.   AND SO THE ASSETS THAT YOU HAVE, YOU DON'T CONSIDER THAT

10:00:26  11   PART OF A CASH HOARD, RIGHT?

10:00:29  12   A.   NO.

10:00:30  13   Q.   SO IN THIS CASE WHEN YOU WERE TRYING TO FIGURE OUT WHAT A

10:00:36  14   CASH HOARD WAS, DID YOU EVEN LOOK TO SEE WHAT KIND OF ASSETS

10:00:41  15   MEILI LIN OR HENRY HORNG HAD?

10:00:44  16   A.   THOSE AREN'T CASH.  I WAS LOOKING FOR CASH OUTSIDE OF A

10:00:48  17   BANK ACCOUNT, THAT'S HOW I ASKED THE QUESTIONS.

10:00:52  18   Q.   OKAY.  AND JUST SO WE GET THE TIMELINE RIGHT, OKAY, I JUST

10:01:34  19   WANT TO MAKE SURE WE UNDERSTAND THIS?

10:01:37  20   A.   OKAY.

10:01:37  21   Q.   WHEN YOU TESTIFIED THE OTHER DAY, YOU SAID THAT THE

10:01:40  22   MEETING WITH CINDY SHI -- YOU TESTIFIED ABOUT A MEETING WITH

10:01:46  23   CINDY SHI AND THEN A MEETING WITH THE TAXPAYERS, RIGHT?

10:01:48  24   A.   YES, THE FIRST ONE, FIRST IT WAS JUST CINDY SHI.

10:01:51  25   Q.   AND WHEN I HEARD YOUR TESTIMONY THE OTHER DAY, AND I

CROSS-EXAMINATION BY MR. CANNON

10:01:54  1    THOUGHT IT'S -- IT SEEMED LIKE YOU WERE SAYING THAT THESE

10:01:59  2    INTERVIEWS, FIRST WITH CINDY SHI AND THEN WITH THE TAXPAYERS,

10:02:01  3    WERE PRETTY CLOSE IN TIME?

10:02:04  4    A.   I BELIEVE THEY WERE A MONTH APART.

10:02:07  5    Q.   OKAY.  SO THEY WERE -- AND DURING THAT MONTH, YOU DID A

10:02:28  6    LOT OF WORK ON THE CASE, RIGHT?

10:02:29  7    A.   I MAY HAVE, I PROBABLY DID.

10:02:33  8    Q.   OKAY.  AND YOU CONTINUED TO PUT THINGS TOGETHER?

10:02:36  9    A.   YES.

10:02:37  10   Q.   AND IT'S INTERESTING IN THIS CASE, AND I CAN'T FIGURE THIS

10:02:43  11   OUT, BECAUSE YOU HAVE ONE EXAMINING AGENT'S ACTIVITY RECORD IN

10:02:49  12   FRONT OF YOU, RIGHT?

10:02:50  13   A.   RIGHT.

10:02:51  14        MR. CANNON:  AND IF I COULD APPROACH THE WITNESS,

10:02:52  15   YOUR HONOR, WITH U.S. 108970.

10:03:01  16        MR. PITMAN:  COULD I JUST TAKE A LOOK AT IT?

10:03:03  17        (OFF-THE-RECORD DISCUSSION.)

10:03:11  18        MR. PITMAN:  AND FOR THE RECORD, THIS IS MARKED AS

10:03:14  19   EXHIBIT 240.

10:03:14  20        MR. CANNON:  WHICH HAS BEEN PREVIOUSLY IDENTIFIED AS

10:03:18  21   EXHIBIT 240, BUT IT'S NOT IN EVIDENCE.

10:03:20  22   Q.   NOW, THAT'S A SECOND ACTIVITY REPORT, ISN'T IT?

10:03:24  23   A.   YES.

10:03:25  24   Q.   SO YOU HAD TWO ACTIVITY REPORTS IN THIS CASE?

10:03:29  25   A.   YES, I HAVE TO BECAUSE THE CORPORATION IS A SEPARATE

CROSS-EXAMINATION BY MR. CANNON

| | |
|---|---|
| 10:03:35 | 1 |

ENTITY.

Q.   OKAY.  SO WHEN WE ARE TRYING TO FIND OUT WHAT YOU WERE

DOING IN CONNECTION TO THE TAXPAYERS, MR. HORNG AND MS. LIN,

YOU HAVE TO KIND OF GO BACK AND FORTH FROM ONE ACTIVITY REPORT

TO ANOTHER, RIGHT?

A.   RIGHT.

Q.   AND SO YOU CAN ALLOCATE HOURS TO ONE REPORT AND ALLOCATE

HOURS TO ANOTHER REPORT?

A.   YES.

Q.   OKAY.  THANKS.

     SO KIND OF BACK TO THE ACTUAL INTERVIEW, SO WE TALKED

ABOUT YOU PREPARING THE QUESTIONS FOR THAT INTERVIEW, RIGHT?

A.   RIGHT.

Q.   AND THOSE QUESTIONS WERE BASED ON WHAT YOU BELIEVED GOING

IN, RIGHT?

A.   IF I HAD QUESTIONS, YEAH.

Q.   OKAY.  AND YOU WERE LOOKING TO SUPPORT YOUR BELIEFS,

RIGHT?

A.   I WAS LOOKING FOR THE FACTS.

Q.   OKAY.  AND ONE OF THE FACTS YOU LEARNED IN THAT INTERVIEW

IS THAT MS. LIN SENT A MONTHLY REPORT TO TIANJIN, RIGHT?

A.   YES, THAT'S WHAT THEY SAID, I DO RECALL THEM SAYING THAT.

Q.   YEAH.  AND THAT'S A MONTHLY REPORT THAT WOULD BE A

CONTEMPORANEOUS BUSINESS RECORD, RIGHT?

A.   WELL, THE MONTHLY REPORT.

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 10:05:11 | 1 | Q.   YES OR NO PLEASE? |
| 10:05:13 | 2 | A.   WAS THE BANK STATEMENTS, THAT'S THE ONLY THING THEY SAID |
| 10:05:15 | 3 | THEY SENT.  SO I DON'T KNOW IF A BANK STATEMENT IS A MONTHLY |
| 10:05:19 | 4 | REPORT. |
| 10:05:19 | 5 | Q.   NOW, IT'S INTERESTING, IF I COULD APPROACH THE WITNESS, |
| 10:05:26 | 6 | YOUR HONOR, WITH U.S. 10444. |
| 10:05:34 | 7 | THE COURT:  IS THIS TO REFRESH YOUR RECOLLECTION OR |
| 10:05:35 | 8 | IS THIS -- |
| 10:05:36 | 9 | MR. CANNON:  YES, YOUR HONOR. |
| 10:05:45 | 10 | THE COURT:  I DON'T RECALL THAT SHE SAID SHE LACKED |
| 10:05:47 | 11 | RECOLLECTION. |
| 10:05:49 | 12 | BY MR. CANNON: |
| 10:05:50 | 13 | Q.   DO YOU RECALL THE TAXPAYERS SAYING THAT THEY SENT THINGS |
| 10:05:55 | 14 | IN ADDITION TO BANK STATEMENTS TO TIANJIN ON A MONTHLY BASIS? |
| 10:05:59 | 15 | A.   NO. |
| 10:06:01 | 16 | Q.   DO YOU RECALL THEM SAYING THAT THEY -- DO YOU HAVE A |
| 10:06:05 | 17 | SPECIFIC RECOLLECTION OF THEM SAYING THEY SENT BANK STATEMENTS? |
| 10:06:11 | 18 | A.   THEY SAID THAT CINDY SHI -- SENT BANK STATEMENTS. |
| 10:06:16 | 19 | Q.   COULD YOU SAY WHO SENT WHAT? |
| 10:06:18 | 20 | A.   I BELIEVE CINDY SHI SENDS THE BANK STATEMENTS TO TIANJIN. |
| 10:06:26 | 21 | Q.   AND WHEN YOU'RE WRITING NOTES, IT'S IMPORTANT TO KEEP |
| 10:06:30 | 22 | TRACK OF THE DETAILS, RIGHT? |
| 10:06:33 | 23 | A.   YES. |
| 10:06:34 | 24 | Q.   IT'S IMPORTANT TO KNOW WHO SAID WHAT? |
| 10:06:38 | 25 | A.   WELL -- |

CROSS-EXAMINATION BY MR. CANNON

10:06:39  1    Q.  YES OR NO?

10:06:40  2    A.  IN THIS CASE -- NO.  BECAUSE IT'S A JOINT TAX RETURN.  SO

10:06:44  3    I DIDN'T SPECIFY WHO SAID WHAT.

10:06:46  4    Q.  OKAY.  SO IT'S NOT IMPORTANT IF THE TAXPAYER SAYS

10:06:51  5    SOMETHING OR IF THEIR REPRESENTATIVE SAYS SOMETHING?

10:06:53  6    A.  WELL, THOSE I DISTINGUISH, BUT WHAT I DON'T DISTINGUISH

10:06:59  7    ALL THE TIME, SOME OF THE TIMES I DO, IS BETWEEN THE SPOUSES ON

10:07:03  8    A JOINT RETURN.

10:07:04  9    Q.  AND SOMETIMES YOU DON'T DISTINGUISH BETWEEN THE SPOUSES

10:07:09  10   AND THE REPRESENTATIVES, RIGHT?

10:07:11  11   A.  I BELIEVE I DID.

10:07:12  12   Q.  WELL, WHEN YOU SAY IT'S THE TAXPAYERS'S POSITION, YOU CAN

10:07:17  13   HEAR ABOUT THE TAXPAYER'S POSITION FROM THE REPRESENTATIVE?

10:07:19  14   A.  YES.  ACTUALLY, I TOOK NOTES.  I DID TAKE MY NOTES AND I

10:07:26  15   IDENTIFIED THEM WHEN I INTERVIEWED THE TAX PREPARER, OR

10:07:34  16   MS. SHI, MY NOTES WERE IN PENCIL.  AND THEN WHEN I INTERVIEWED

10:07:37  17   THE TAXPAYERS OR THE DEFENDANTS, MY NOTES WERE IN PEN.

10:07:43  18   Q.  SO WHEN YOU ARE SAYING WHEN YOU INTERVIEWED THE DEFENDANT,

10:07:48  19   SO YOU CONSIDER THEM DEFENDANTS WHEN YOU ARE INTERVIEWING THEM,

10:07:50  20   RIGHT?

10:07:50  21   A.  I CONSIDER THEM DEFENDANTS NOW THAT THEY ARE SITTING HERE

10:07:53  22   IN A CRIMINAL TRIAL.

10:07:54  23   Q.  AND YOU CONSIDERED THEM DEFENDANTS WHEN YOU WERE

10:07:56  24   INTERVIEWING THEM, RIGHT?

10:07:57  25   A.  NO, I DIDN'T.

10:07:58  1    Q.   YOU CONSIDERED THEM FUTURE DEFENDANTS?

10:07:59  2    A.   NO, I CONSIDERED THEM TAXPAYERS.

10:08:03  3    Q.   OKAY.  SO, WHEN YOU HAD -- ON YOUR -- WHEN YOU QUESTIONED

10:08:13  4    THEM WITH YOUR NOTES, YOU USED THE SAME NOTES AND THE SAME

10:08:17  5    PREPARED QUESTIONS TO INTERVIEW CINDY SHI AND YOU ALSO USED

10:08:22  6    THOSE SAME NOTES WHEN -- AT THE SECOND MEETING ON JANUARY 13TH,

10:08:28  7    RIGHT?

10:08:28  8    A.   YES.

10:08:29  9    Q.   AND ON JANUARY 13TH, WHEN YOU MET WITH THE TAXPAYERS AND

10:08:37  10   CINDY SHI, SOMETIMES THE TAXPAYERS WOULD ANSWER QUESTIONS?

10:08:42  11   A.   THE TAXPAYERS WOULD ANSWER THE QUESTIONS.

10:08:44  12   Q.   SOMETIMES CINDY SHI WOULD ANSWER THE QUESTIONS?

10:08:46  13   A.   NOT IN THE SECOND INTERVIEW.  CINDY ANSWERED THE QUESTIONS

10:08:50  14   IN THE FIRST INTERVIEW.

10:08:51  15   Q.   BUT IS SHE ALSO -- SHE TALKED IN THE SECOND INTERVIEW TOO,

10:08:56  16   DIDN'T SHE?

10:08:57  17   A.   SHE MAY HAVE, BUT THE ANSWERS TO THE QUESTIONS CAME FROM

10:09:04  18   THE TAXPAYERS.

10:09:05  19   Q.   OKAY.  SO NOW IF I COULD APPROACH WITH U.S. 10444 TO

10:09:12  20   REFRESH YOUR RECOLLECTION.

10:09:14  21   A.   OKAY.  THANK YOU.

10:09:15  22   Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO EXACTLY WHAT WAS

10:09:21  23   SENT TO TIANJIN EVERY MONTH?

10:09:28  24   A.   YES.

10:09:40  25   Q.   AND WHAT'S YOUR RECOLLECTION NOW?

CROSS-EXAMINATION BY MR. CANNON

| | |
|---|---|
| 10:09:42 | 1 |

A.   WHAT I SAID PREVIOUSLY, THAT THEY SEND THE BANK STATEMENTS

TO TIANJIN.

Q.   IS THE WORD "BANK STATEMENTS" ANYWHERE IN YOUR NOTES?

A.   I BELIEVE IT SAYS BANK ACCOUNTS, YES, BANK ACCOUNTS IS HOW

I WORDED IT.

Q.   THE BANK ACCOUNTS IS YOUR QUESTION, CORRECT?

A.   I DON'T FOLLOW YOUR QUESTION.

Q.   OKAY.  BEFORE GOING TO THAT MEETING, DID YOU WRITE A

QUESTION THAT YOU WERE GOING TO ASK THE TAXPAYERS -- SO YOU

WOULD BE PREPARED FOR THAT MEETING, DID YOU WRITE THE QUESTION,

ARE THE BANK ACCOUNTS RECONCILED MONTHLY, IF SO, BY WHOM?

A.   YES.

Q.   AND DID YOU FIND OUT THAT THE BANK ACCOUNTS WERE

RECONCILED NOT HERE IN THE UNITED STATES BY MEILI LIN, BUT THE

RECONCILIATION TOOK PLACE IN CHINA ON A MONTHLY BASIS?

A.   NO, THAT IS NOT CORRECT.

Q.   OH.  WELL, YOU ASKED THE QUESTION?

        MR. PITMAN:  OBJECTION, YOUR HONOR.  HEARSAY.

        THE COURT:  OVERRULED.

BY MR. CANNON:

Q.   ARE THE BANK ACCOUNTS RECONCILED MONTHLY, RIGHT?

A.   YES, AND MY NOTES SAY BY THE REPRESENTATIVE.

Q.   OKAY.  SO CINDY SHI WHO WAS AT THAT MEETING --

A.   YES.

Q.   AND YOU ASKED THE QUESTION, HOW THE BANK ACCOUNTS ARE

CROSS-EXAMINATION BY MR. CANNON

10:11:10   1    RECONCILED?

10:11:10   2    A.   RIGHT.

10:11:11   3    Q.   AND THE ANSWER WAS CINDY SHI DOES THE RECONCILIATION OF

10:11:18   4    THE BANK ACCOUNTS?

10:11:18   5    A.   YES.

10:11:18   6    Q.   AND THEN THAT'S SENT TO TIANJIN?

10:11:22   7    A.   YES.

10:11:22   8    Q.   SO THE RECONCILIATION WASN'T DONE BY HENRY HORNG?

10:11:28   9    A.   NO.

10:11:29   10    Q.   IT WASN'T DONE BY MEILI LIN?

10:11:31   11    A.   NO.

10:11:31   12    Q.   IT WAS DONE IN TIANJIN?

10:11:34   13    A.   NO.

10:11:34   14    Q.   I'M SORRY IT WAS DONE BY CINDY SHI IN THE UNITED STATES?

10:11:38   15    A.   YES.

10:11:40   16    Q.   AND THEN SENT TO TIANJIN?

10:11:42   17    A.   YES.

10:11:42   18    Q.   AND TIANJIN IS IN CHINA?

10:11:43   19    A.   YES.

10:11:44   20    Q.   AND THAT'S WHERE TRMP IS?

10:11:46   21    A.   YES.

10:11:47   22    Q.   AND THAT'S WHERE P.K. IS?

10:11:49   23    A.   I DON'T KNOW WHERE HE IS.

10:11:51   24    Q.   OKAY.   THANK YOU.

10:11:53   25    A.   YOU'RE WELCOME.

CROSS-EXAMINATION BY MR. CANNON

10:12:14   1    Q.   NOW YOU ALSO ASKED QUESTIONS ABOUT HOW MONEY CAME INTO THE

10:12:18   2    BANK OF AMERICA ACCOUNT, RIGHT?

10:12:20   3    A.   YES.

10:12:23   4    Q.   AND THE WAY MONEY WOULD COME INTO THE ACCOUNT, MAINLY WIRE

10:12:27   5    TRANSFERS, RIGHT?

10:12:28   6    A.   RIGHT.

10:12:28   7    Q.   AND THE WIRE TRANSFERS WERE GENERALLY PRETTY LARGE?

10:12:31   8    A.   YES.

10:12:31   9    Q.   GENERALLY HUNDREDS OF THOUSANDS OF DOLLARS?

10:12:34  10    A.   RIGHT.

10:12:34  11    Q.   AND THEY WOULD COME IN FROM TRMP?

10:12:40  12    A.   YES.

10:12:41  13    Q.   AND TRMP IS SHORT FOR TIANJIN RECYCLED METAL PRODUCTS?  OR

10:12:50  14    WHAT'S TRMP SHORT FOR?

10:12:52  15    A.   IT'S TIANJIN RUIYU METAL PRODUCTS.

10:12:55  16    Q.   TIANJIN RUIYU METAL PRODUCTS.  OKAY.  AND THAT WAS ONE OF

10:12:59  17    THE SOURCES OF THE WIRES, RIGHT?

10:13:00  18    A.   YES.

10:13:00  19    Q.   AND THERE ARE ALSO WIRES FROM CHOW KEI KUI, RIGHT?

10:13:05  20    A.   YES.

10:13:06  21    Q.   AND FROM CHO PAO HSI?

10:13:09  22    A.   I WOULD HAVE TO LOOK AT MY NOTES FOR THAT.  I DON'T RECALL

10:13:15  23    ALL THE NAMES.

10:13:18  24    Q.   SORRY ABOUT THAT, I HAVE SO MANY NOTES, I WANT TO FIND THE

10:13:41  25    RIGHT ONE.  I WILL LOOK FOR THAT.

CROSS-EXAMINATION BY MR. CANNON

10:13:43   1          AND YOU RECALL CARYIYAN ENTERPRISES THE OTHER DAY, RIGHT?

10:13:47   2    A.   YES.

10:13:47   3    Q.   AND THERE'S ALSO A SHEN TAI MEI?

10:13:51   4    A.   Y DON'T KNOW ABOUT THAT ONE IN PARTICULAR.

10:13:53   5    Q.   OKAY.  BUT THERE WERE ABOUT TEN REPEATED TRANSFERS IN FROM

10:14:04   6    THE SAME TEN PEOPLE, RIGHT, FROM THE SAME TEN NAMES?

10:14:10   7    A.   I THOUGHT THERE WERE MORE LIKE 15, BUT THERE WERE SOME

10:14:15   8    FROM TRMP AND SOME FROM OTHERS.

10:14:19   9    Q.   OKAY.  AND YOU ALSO SAID THAT IN THESE QUESTIONS THAT YOU

10:14:30  10    PREPARED FOR THE INTERVIEW WITH THE TAXPAYERS?

10:14:34  11    A.   YES.

10:14:34  12    Q.   YOU REVIEWED THOSE BEFORE YOU TESTIFIED YESTERDAY, RIGHT?

10:14:37  13    A.   YES.

10:14:39  14    Q.   OKAY.  BECAUSE YOUR RECOLLECTION AS TO WHAT HAPPENED BACK

10:14:42  15    THEN ISN'T AS GOOD AS IT IS NOW, IS IT?

10:14:45  16    A.   NO.

10:14:45  17    Q.   AND ONE OF THE THINGS THAT YOU SAID YESTERDAY IS THAT

10:14:52  18    MONEY GOING INTO A BUSINESS ACCOUNT IS A RED FLAG, RIGHT?

10:14:55  19    A.   YES.

10:14:56  20    Q.   PARTICULARLY WHEN MONEY COMES IN FROM PEOPLE THAT YOU

10:15:01  21    DON'T KNOW, RIGHT?

10:15:02  22    A.   WHEN COMPANIES SEND MONEY INTO A BUSINESS ACCOUNT, IT IS

10:15:10  23    SOMETHING I LOOK AT.

10:15:10  24    Q.   OKAY.  NOW LET'S SAY YOU RAN A BUSINESS HERE IN THE UNITED

10:15:18  25    STATES, AND IF YOU WERE SELLING THINGS, YOU WANT TO GET PAID,

CROSS-EXAMINATION BY MR. CANNON

10:15:23  1    RIGHT?

10:15:23  2    A.   RIGHT.

10:15:24  3    Q.   AND IT'S COMMON TO GET PAID BY WIRE TRANSFERS, RIGHT?

10:15:30  4    A.   SURE.

10:15:31  5    Q.   AND WHEN YOU GET PAID BY A WIRE TRANSFER, YOU GET PAID,

10:15:38  6    THERE'S A LOT OF INFORMATION ON THE WIRE TRANSFER, ON THE WIRE

10:15:42  7    TRANSFER FORMS, ISN'T THERE?

10:15:44  8    A.   YES.

10:15:44  9    Q.   BUT MOST OF THAT INFORMATION DOESN'T GET SENT TO THE

10:15:49  10   CUSTOMER, DOES IT, THE PERSON, THE RECIPIENT OF THE WIRE

10:15:53  11   TRANSFER?

10:15:54  12   A.   I'M NOT FAMILIAR WITH WHAT THE BANKS SEND OUT.

10:15:57  13   Q.   OKAY.  WELL, YOU'RE FAMILIAR WITH YOUR PERSONAL BANK

10:16:02  14   ACCOUNT, RIGHT?

10:16:03  15   A.   YES.

10:16:04  16   Q.   AND IN YOUR PERSONAL BANK ACCOUNT, YOU GET DIRECT

10:16:08  17   DEPOSITS, RIGHT?

10:16:09  18   A.   YES.

10:16:09  19   Q.   AND THOSE DIRECT DEPOSITS SHOW UP IN YOUR ACCOUNT AS A

10:16:15  20   DEPOSIT, RIGHT?

10:16:15  21   A.   RIGHT.

10:16:16  22   Q.   YOU DON'T GET THE TRAIL OF HOW THAT MONEY WAS SENT TO YOU,

10:16:21  23   DO YOU?

10:16:22  24   A.   NO, I GET THE SOURCE OF WHO IT'S FROM.

10:16:28  25   Q.   BUT YOU DON'T GET THE INTERMEDIATE INFORMATION?

10:16:31  1     A.   NO.

10:16:31  2     Q.   YOU DON'T GET THE ROUTING NUMBERS?

10:16:33  3     A.   I DON'T RECALL.

10:16:36  4     Q.   YOU DON'T FIGURE OUT WHAT CORRESPONDENT BANK IT WENT

10:16:40  5     THROUGH?

10:16:40  6     A.   NO.

10:16:41  7     Q.   YOU DON'T GET MUCH INFORMATION, YOU JUST FIND OUT THE

10:16:44  8     MONEY COMES INTO YOUR ACCOUNT IT SHOWS UP AS A CREDIT, RIGHT?

10:16:48  9     A.   RIGHT.

10:16:48  10    Q.   AND WHEN YOU'RE LOOKING AT THE DEPOSITS THAT COME INTO

10:16:52  11    YOUR ACCOUNT, YOU JUST WANT TO MAKE SURE THE MONEY SHOWS UP,

10:16:54  12    RIGHT?

10:16:55  13    A.   RIGHT.

10:16:55  14    Q.   AND YOU ASKED MS. MEILI LIN ABOUT MONEY COMING INTO THE

10:17:04  15    TIANJIN ACCOUNT, CORRECT, THE REIJIN ACCOUNT, RIGHT?

10:17:07  16    A.   RIGHT.

10:17:07  17    Q.   AND SHE TOLD YOU THAT SHE DIDN'T KNOW THE ROUTING

10:17:11  18    INFORMATION OR HOW IT CAME, RIGHT?

10:17:13  19    A.   NO, THAT'S NOT WHAT SHE SAID.

10:17:15  20    Q.   SHE TOLD YOU THE MONEY CAME FROM TRMP?

10:17:18  21    A.   UH-HUH.

10:17:19  22    Q.   AND TRMP CUSTOMERS?

10:17:21  23    A.   YES.

10:17:22  24    Q.   AND SHE TOLD YOU SHE DIDN'T KNOW THE NAMES OF THE

10:17:26  25    CUSTOMERS?

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 10:17:28 | 1 | A.   SHE DIDN'T KNOW WHO WAS SENDING MONEY INTO THEIR ACCOUNT. |
| 10:17:32 | 2 | Q.   CORRECT.  BUT SHE KNEW THAT IT WAS CONNECTED WITH THE |
| 10:17:35 | 3 | PURCHASE AND SALES OF SCRAP? |
| 10:17:39 | 4 | A.   SHE SAID THEY WERE TIANJIN'S CUSTOMERS. |
| 10:17:40 | 5 | Q.   RIGHT.  AND SO SHE TOLD YOU THAT THE MONEY THAT WAS COMING |
| 10:17:44 | 6 | IN WAS CONNECTED TO TIANJIN'S CUSTOMERS, RIGHT? |
| 10:17:46 | 7 | A.   RIGHT. |
| 10:17:47 | 8 | Q.   AND IT WAS USED TO PAY FOR THE SCRAP THAT THEY WERE |
| 10:17:49 | 9 | BUYING? |
| 10:17:50 | 10 | A.   RIGHT. |
| 10:17:50 | 11 | Q.   AND ARRANGING TO SHIP IT TO TIANJIN? |
| 10:17:53 | 12 | A.   RIGHT. |
| 10:17:53 | 13 | Q.   AND FROM A BUSINESS REASON, THERE WOULD BE NO REASON TO |
| 10:17:58 | 14 | TRACK DOWN THE SOURCE OF THE MONEY, WOULD THERE BE? |
| 10:18:02 | 15 | A.   I DON'T KNOW, I WOULD -- IF I HAD MONEY COMING INTO AN |
| 10:18:07 | 16 | ACCOUNT, I WOULD WANT TO KNOW WHO WAS SENDING IT AND WHAT IT |
| 10:18:11 | 17 | WAS FOR SO THAT I WOULD KNOW THAT I GOT THE RIGHT AMOUNT. |
| 10:18:14 | 18 | Q.   WELL, IN THIS CASE, YOU HAD RECORDS OF ALL THE MONEY |
| 10:18:19 | 19 | COMING IN? |
| 10:18:20 | 20 | A.   YES. |
| 10:18:20 | 21 | Q.   AND YOU ULTIMATELY GOT RECORDS OF THE INVOICES? |
| 10:18:23 | 22 | A.   YES. |
| 10:18:25 | 23 | Q.   AND YOU WERE ABLE TO DO A COST OF GOODS SOLD ANALYSIS? |
| 10:18:29 | 24 | A.   NO, I WASN'T. |
| 10:18:32 | 25 | Q.   WELL, YOU WERE ABLE -- YOU DID A COST OF GOODS SOLD |

10:18:35   1    ANALYSIS BY TRACKING THE MONEY THAT WENT OUT OF THE ACCOUNT TO

10:18:39   2    PAY FOR SCRAP, RIGHT?

10:18:40   3    A.   NO, I DIDN'T, BECAUSE I ASKED THEM TO PREPARE A COST OF

10:18:45   4    GOODS ANALYSIS, AND THEY SAID THEY DIDN'T HAVE ANY COSTS OF

10:18:49   5    GOODS.

10:18:50   6    Q.   SO YOU HAD NOTHING TO DO WITH THE COSTS OF GOODS SOLD

10:18:53   7    ANALYSIS THAT WAS PREPARED IN THIS CASE?

10:18:55   8    A.   I LOOKED TO SEE WHAT -- I WANTED TO SEE IF THE MONEY

10:19:01   9    COMING IN WAS EQUAL TO THE MONEY COMING OUT.  SO I DID DO A

10:19:04   10   COMPARISON TO SEE IF IT MADE SENSE.

10:19:07   11   Q.   AND WHEN YOU WERE DOING THE COMPARISON OF THE MONEY GOING

10:19:11   12   OUT, YOU DID A COMPARISON OF THE MONEY THAT WAS GOING OUT TO

10:19:15   13   SCRAP METAL SUPPLIERS?

10:19:17   14   A.   YES, SO I TRY -- YES, I TRY TO COME TO A CONCLUSION OF, IF

10:19:22   15   THERE WERE COSTS GOODS, WHAT WOULD THEY BE.

10:19:24   16       BUT AS I SAID, I DON'T HAVE ENOUGH INFORMATION TO MAKE A

10:19:28   17   FINAL DETERMINATION.

10:19:29   18   Q.   AND THERE WAS MORE THAN $20 MILLION GOING OUT TO SCRAP

10:19:32   19   METAL SUPPLIERS, RIGHT?

10:19:34   20   A.   I DON'T RECALL.

10:19:35   21   Q.   NOW YOU WERE ALSO ASKED SOME QUESTIONS YESTERDAY ABOUT

10:19:45   22   GROSS -- ABOUT MONEY COMING IN, RIGHT, MONEY COMING IN TO THE

10:19:51   23   BANK OF AMERICA ACCOUNT?

10:19:52   24   A.   YES.

10:19:52   25   Q.   YOU SAID IT WAS A RED FLAG?

CROSS-EXAMINATION BY MR. CANNON

10:19:56  1    A.    YES.

10:19:56  2    Q.    BUT IT'S NOT -- BUT YOU ALSO SAID IT WASN'T NECESSARILY

10:20:00  3    GROSS RECEIPTS?

10:20:01  4    A.    I DIDN'T HAVE ENOUGH INFORMATION TO COME TO A CONCLUSION.

10:20:04  5    Q.    YOU DIDN'T HAVE ENOUGH INFORMATION TO COME TO A CONCLUSION

10:20:08  6    OF GROSS RECEIPTS.  AND AS YOU SIT THERE NOW, YOU STILL DON'T

10:20:12  7    HAVE ENOUGH INFORMATION?

10:20:12  8    A.    THAT'S CORRECT.

10:20:17  9    Q.    WHEN YOU WERE MEETING WITH MS. SHI?

10:20:39 10          THE COURT:  WOULD YOU SPECIFY WHICH MEETING.

10:20:42 11          MR. CANNON:  THE FIRST MEETING WITH MS. SHI WHEN THE

10:20:45 12    TAXPAYERS WEREN'T THERE ON 12-16, IN MS. SHI'S OFFICE IN

10:20:49 13    CUPERTINO.

10:20:50 14          THE WITNESS:  YEAH, IT WAS TALL ACTUALLY 12-17.

10:20:53 15    BY MR. CANNON:

10:20:54 16    Q.    12-17, SO WHEN YOU PUT IT IN YOUR ACTIVITY RECORD AS 12-16

10:20:58 17    THAT WAS AN ERROR?

10:20:58 18    A.    YES.

10:20:59 19    Q.    AND YOU ARE HUMAN, YOU MAKE ERRORS?

10:21:01 20    A.    IT WAS SCHEDULED FOR THE 16TH, BUT THEY CANCELLED, SO I

10:21:03 21    DIDN'T MAKE IT THERE UNTIL THE 17TH.

10:21:05 22    Q.    OKAY.  SO YOU -- WHEN YOU WERE WRITING YOUR ACTIVITY

10:21:09 23    RECORD YOU PUT THE DATE IN BEFORE IT ACTUALLY HAPPENED, RIGHT?

10:21:12 24    A.    I DON'T KNOW WHEN I PUT IT IN, BUT I PUT IT IN AS AN

10:21:16 25    ERROR, I DON'T KNOW.  IT WAS AN ERROR.

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 10:21:18 | 1 | Q.   OKAY.  THESE THINGS HAPPEN. |
| 10:21:20 | 2 | AND IN THAT MEETING, MS. SHI TOLD YOU THE TAXPAYERS WERE |
| 10:21:30 | 3 | PURCHASING AGENTS, RIGHT? |
| 10:21:31 | 4 | A.   YES. |
| 10:21:32 | 5 | Q.   AND OKAY.  AND SHE ALSO TOLD YOU THAT, ABOUT THE GIFTS |
| 10:21:40 | 6 | FROM THE PARENTS, RIGHT? |
| 10:21:42 | 7 | A.   SHE SAID THAT MEILI LIN COMES FROM A VERY WEALTHY FAMILY. |
| 10:21:46 | 8 | Q.   OKAY.  AND IT WAS NEVER A SECRET THAT MS. LIN CAME FROM A |
| 10:21:51 | 9 | VERY WEALTHY FAMILY? |
| 10:21:52 | 10 | A.   NO. |
| 10:21:53 | 11 | Q.   AND SHE ALSO TOLD YOU THAT THE MONEY COMING INTO THE |
| 10:22:01 | 12 | ACCOUNTS WASN'T THEIRS, RIGHT? |
| 10:22:03 | 13 | A.   YES. |
| 10:22:04 | 14 | Q.   SAID IT WAS TRMP'S MONEY? |
| 10:22:07 | 15 | A.   RIGHT. |
| 10:22:07 | 16 | Q.   AND IT WAS THERE TO PURCHASE SCRAP? |
| 10:22:13 | 17 | A.   RIGHT. |
| 10:22:13 | 18 | Q.   BECAUSE THAT'S THE BUSINESS THEY WERE IN, THEY WERE SCRAP |
| 10:22:15 | 19 | RUNNERS? |
| 10:22:16 | 20 | A.   YES. |
| 10:22:16 | 21 | Q.   AND TO BUY SCRAP YOU HAVE TO HAVE THE MONEY AHEAD OF TIME? |
| 10:22:20 | 22 | A.   YES. |
| 10:22:20 | 23 | Q.   AND YOU HAVE TO GET THE MONEY FROM YOUR CUSTOMER? |
| 10:22:24 | 24 | A.   RIGHT. |
| 10:22:25 | 25 | Q.   AND THEN YOU HAVE TO GIVE THAT MONEY TO THE BROKER? |

CROSS-EXAMINATION BY MR. CANNON

10:22:28   1    A.   YES.

10:22:29   2    Q.   NOT TO THE BROKER, TO THE ACTUAL PERSON THAT OWNS THE

10:22:32   3    SCRAP, RIGHT?

10:22:34   4    A.   YEAH.

10:22:34   5    Q.   AND THEN THAT PERSON SELLS THE SCRAP?

10:22:36   6    A.   YES.

10:22:39   7    Q.   SHIPS IT TO CHICAGO?

10:22:42   8    A.   OR WHEREVER.

10:22:44   9    Q.   AND IT GETS ON A BOAT, IT'S ARRANGED, THEY PUT IT ON A

10:22:49  10    BOAT?

10:22:49  11    A.   YEAH.

10:22:50  12    Q.   AND THEN IT WAS SHIPPED TO CHINA IN THIS CASE, RIGHT?

10:22:52  13    A.   YES.

10:22:53  14    Q.   AND THERE WERE ALSO EXPENSES FOR SHIPPING?

10:22:57  15    A.   YES.

10:22:58  16    Q.   CUSTOMS FEES?

10:23:00  17    A.   RIGHT.

10:23:00  18    Q.   AND THERE WERE PAYMENTS FOR THINGS LIKE THAT OUT OF THE

10:23:05  19    BANK OF AMERICA ACCOUNT, RIGHT?

10:23:07  20    A.   YES.

10:23:10  21    Q.   AND THOSE ARE THE EXPENSES, RIGHT?

10:23:12  22    A.   YES.

10:23:14  23    Q.   NOW, THE INTERVIEWS THAT YOU DID ON JANUARY 13TH WHERE THE

10:23:30  24    INTERVIEW WAS IN MS. SHI'S OFFICE IN CUPERTINO ON JANUARY 13TH,

10:23:39  25    2010, THAT WAS WITH MR. HORNG, MS. LIN AND CINDY SHI, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 10:23:44 | 1 | A.  YES. |
| 10:23:45 | 2 | Q.  AND YOU TOOK NOTES OF THAT INTERVIEW ON THAT DAY? |
| 10:23:48 | 3 | A.  YES. |
| 10:23:48 | 4 | Q.  AND THEN YOU PREPARED SUMMARIES OF THAT INTERVIEW, RIGHT? |
| 10:23:51 | 5 | A.  YES. |
| 10:23:52 | 6 | Q.  BUT YOU DIDN'T DO -- PREPARE THOSE SUMMARIES RIGHT AWAY, |
| 10:23:58 | 7 | YOU TOOK, YOU PREPARED THEM ON FEBRUARY 7TH, RIGHT, EARLY |
| 10:24:05 | 8 | FEBRUARY, IF YOU RECALL? |
| 10:24:05 | 9 | A.  I KNOW IT WAS MAYBE A COUPLE WEEKS. |
| 10:24:09 | 10 | Q.  OKAY.  SO WHEN YOU PREPARED THESE SUMMARIES OF THE |
| 10:24:12 | 11 | INTERVIEW, YOU THINK ABOUT WHAT HAPPENED AT THE TIME? |
| 10:24:15 | 12 | A.  YES. |
| 10:24:15 | 13 | Q.  YOU REFER TO YOUR NOTES? |
| 10:24:16 | 14 | A.  YES. |
| 10:24:17 | 15 | Q.  YOU REFER TO ALL THE OTHER EVIDENCE YOU'VE LOOKED AT? |
| 10:24:21 | 16 | A.  NOT ALL THE OTHER EVIDENCE. |
| 10:24:23 | 17 | Q.  WELL -- |
| 10:24:24 | 18 | A.  I GUESS. |
| 10:24:25 | 19 | Q.  OKAY. |
| 10:24:26 | 20 | A.  OKAY. |
| 10:24:26 | 21 | Q.  AND THEN YOU PREPARE A SUMMARY? |
| 10:24:28 | 22 | A.  YES. |
| 10:24:28 | 23 | Q.  AND THEN YOU PREPARED THAT SUMMARY ON FEBRUARY, EARLY |
| 10:24:35 | 24 | FEBRUARY, OKAY? |
| 10:24:35 | 25 | A.  OKAY. |

10:24:36  1    Q.   AND THEN CONTINUING THROUGH, AT THE END OF MARCH YOU

10:24:49  2    PREPARED A FRAUD REFERRAL, RIGHT?

10:24:51  3    A.   YES.

10:24:53  4    Q.   AND WHEN YOU PREPARE A FRAUD REFERRAL -- WHEN YOU WORK

10:25:01  5    WITH THE IRS, YOU HAVE TO DOCUMENT THINGS, RIGHT?

10:25:03  6    A.   YES.

10:25:03  7    Q.   AND THERE ARE LOTS OF FORMS YOU HAVE TO FILL OUT?

10:25:05  8    A.   WELL, THIS WASN'T AN ACTUAL CRIMINAL REFERRAL, THAT'S NOT

10:25:10  9    WHAT THEY ARE REFERRING TO, RIGHT.

10:25:11  10   Q.   I'M REFERRING TO YOUR FRAUD REFERRAL FORM 11661?

10:25:16  11   A.   RIGHT.  THAT'S TO GET A FRAUD TECHNICAL ADVISOR ASSIGNED

10:25:20  12   TO THE CASE.  IT'S NOT CRIMINAL.

10:25:22  13   Q.   OKAY.  AND THAT'S WHAT YOU WERE TRYING TO DO ON 3-31?

10:25:26  14   A.   I SENT IT TO MY MANAGER.

10:25:28  15   Q.   GOT IT.  OKAY.

10:25:30  16        AND YOU SUBMITTED THAT FORM TO GET A FRAUD TECHNICAL

10:25:34  17   ADVISOR, RIGHT?

10:25:35  18   A.   RIGHT.

10:25:35  19   Q.   BECAUSE YOU WANTED A FRAUD REFERRAL, OKAY.

10:25:41  20        MR. CANNON:  YOUR HONOR, AT THIS POINT, I THINK IT

10:25:43  21   WOULD BE EASIER FOR EVERYBODY, I PREPARED A TIMELINE, AND

10:25:47  22   MS. GARRISON HAS TESTIFIED TO ALL THE EVENTS ON THE TIMELINE.

10:25:50  23        IF I COULD JUST PUT IT ON --

10:25:52  24        THE COURT:  AS A DEMONSTRATIVE?

10:25:54  25        MR. CANNON:  YES, AS A DEMONSTRATIVE.  I'VE SHOWN IT

10:25:57  1    TO THE GOVERNMENT.

10:25:57  2              THE COURT:  AS A DEMONSTRATIVE, IT'S FINE.

10:26:28  3    BY MR. CANNON:

10:26:28  4    Q.   SO WE'VE JUST KIND OF GONE THROUGH THAT PORTION OF THE

10:26:32  5    TIMELINE; IS THAT RIGHT?

10:26:33  6    A.   THAT'S CORRECT.

10:26:33  7    Q.   SO THAT JUST KIND OF MAKE ITS EASIER FOR US TO KEEP TRACK

10:26:38  8    HOW THINGS WENT THROUGH.

10:26:39  9    A.   SURE.

10:26:41  10   Q.   OKAY.  SO THEN AFTER YOU PREPARED THAT FRAUD REFERRAL ON

10:26:46  11   THE 30TH, YOU PREPARED MORE QUESTIONS FOR THE TAXPAYERS, RIGHT?

10:26:54  12   A.   YES, I DID BECAUSE -- YES.  A FRAUD REFERRAL JUST GETS A

10:26:59  13   FRAUD TECHNICAL ADVISOR INVOLVED, IN WHICH CASE THAT DIDN'T

10:27:03  14   EVEN HAPPEN.

10:27:04  15   Q.   OKAY.  IT DIDN'T HAPPEN THEN BUT YOU HAD TRIED TO SEND IT

10:27:07  16   OUT FOR REFERRAL?

10:27:07  17   A.   I SENT IT TO MY MANAGER, IT'S UP TO HIM.

10:27:10  18   Q.   GOT IT.  AND SO YOU WERE STILL WORKING ON YOUR QUESTIONS,

10:27:16  19   RIGHT?  YOU WERE STILL WORKING ON THE QUESTIONS FOR THE

10:27:19  20   TAXPAYERS?

10:27:21  21   A.   I'M STILL WORKING ON THE CASE.

10:27:25  22   Q.   OKAY.  AND IF YOU WOULD LOOK AT THE SAME DAY THAT YOU

10:27:37  23   SUBMITTED THE FRAUD REFERRAL, WOULD IT REFRESH YOUR

10:27:40  24   RECOLLECTION TO LOOK AT YOUR ENTRY FOR 3-31-10, AND DID YOU

10:27:46  25   PREPARE FOLLOWUP INTERVIEW QUESTIONS?

CROSS-EXAMINATION BY MR. CANNON

10:27:49  1    A.   YES, I DO.

10:27:50  2    Q.   DID YOU IN THIS CASE?

10:27:51  3    A.   YES, I BELIEVE I DID.

10:27:56  4    Q.   OKAY.  SO WHEN YOU HAD THE MEETING IN CUPERTINO AT

10:28:01  5    MS. SHI'S OFFICE IN THE FIRST PART OF DECEMBER, YOU WANTED TO

10:28:05  6    ASK MORE QUESTIONS AFTER THAT, RIGHT?

10:28:07  7    A.   WELL, YES, BECAUSE THE DEFENDANTS WERE SUPPOSED TO BE

10:28:13  8    PRESENT AT THAT INTERVIEW, BUT THEY DIDN'T SHOW UP.

10:28:15  9    Q.   OKAY.  BUT THEN THE DEFENDANTS -- THE TAXPAYERS WERE

10:28:19  10   PRESENT LATER, RIGHT?

10:28:20  11   A.   YES, WE HAD TO HAVE ANOTHER INTERVIEW BECAUSE I NEEDED TO

10:28:24  12   SPEAK TO THEM.

10:28:24  13   Q.   AND YOU SPOKE TO THEM?

10:28:25  14   A.   UH-HUH, YES.

10:28:26  15   Q.   AND WE TALKED ABOUT YOU BRINGING DOCUMENTS TO THAT

10:28:31  16   INTERVIEW?

10:28:32  17   A.   TO THE SECOND INTERVIEW, POSSIBLY.

10:28:36  18   Q.   AND -- BUT YOU DIDN'T BRING ALL THE DOCUMENTS YOU HAD?

10:28:39  19   A.   NO.

10:28:40  20   Q.   YOU SAID THAT THERE WERE SOME YOU KIND OF HELD BACK,

10:28:43  21   RIGHT?

10:28:44  22   A.   YES.

10:28:46  23   Q.   AND EVENTUALLY THERE WAS A THIRD INTERVIEW, WASN'T THERE?

10:28:49  24   A.   YES.

10:28:50  25   Q.   AND PRIOR TO THAT THIRD INTERVIEW, YOU PREPARED A WORK

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 10:28:57 | 1 | PAPER, DIDN'T YOU? |
| 10:28:59 | 2 | A.   I'M SURE I DID. |
| 10:29:00 | 3 | Q.   AND THE WORK PAPER THAT YOU PREPARED, DID YOU TITLE IT THE |
| 10:29:09 | 4 | "2006 GROSS RECEIPTS WORK PAPER?" |
| 10:29:12 | 5 | A.   I DID PREPARE A FORM, A WORK PAPER. |
| 10:29:22 | 6 | Q.   AND DID YOU ACTUALLY PREPARE TWO WORK PAPERS IN THIS CASE? |
| 10:29:30 | 7 | A.   6 AND 7?  IS THAT WHAT YOU'RE TALKING ABOUT? |
| 10:29:33 | 8 | Q.   NO, DID YOU PREPARE A GROSS RECEIPTS WORK PAPER FOR THE |
| 10:29:38 | 9 | INDIVIDUALS? |
| 10:29:41 | 10 | A.   I DON'T RECALL WHAT YOU'RE LOOKING AT, SO MAYBE -- |
| 10:29:46 | 11 | MR. CANNON:  IF I CAN APPROACH, YOUR HONOR. |
| 10:29:47 | 12 | THE COURT:  YES. |
| 10:29:47 | 13 | MR. CANNON:  WITH BATES U.S. 108975. |
| 10:29:58 | 14 | THE WITNESS:  THANK YOU.  YES, I PREPARED THIS. |
| 10:30:03 | 15 | Q.   AND THAT GROSS RECEIPTS WORK PAPER THAT YOU PREPARED, DID |
| 10:30:07 | 16 | YOU PREPARE THAT PRIOR TO THE SECOND INTERVIEW WITH THE |
| 10:30:13 | 17 | TAXPAYERS? |
| 10:30:20 | 18 | THE COURT:  WHEN YOU REFER TO THE SECOND INTERVIEW |
| 10:30:21 | 19 | WITH THE TAXPAYERS, IF YOU WOULD BE MORE CLEAR. |
| 10:30:24 | 20 | BY MR. CANNON: |
| 10:30:25 | 21 | Q.   THE SECOND INTERVIEW WITH THE TAXPAYERS WAS ON 9 ---DID |
| 10:30:30 | 22 | YOU HAVE A SECOND INTERVIEW WITH THE TAXPAYERS WHERE -- I'M |
| 10:30:34 | 23 | SORRY, WITH JUST MR. HORNG AND CINDY SHI AND TOM BORGO AT 450 |
| 10:30:41 | 24 | GOLDEN GATE? |
| 10:30:42 | 25 | A.   YES. |

CROSS-EXAMINATION BY MR. CANNON

10:30:43   1    Q.   AND DID THAT HAPPEN ON SEPTEMBER 23RD, 2010?

10:30:47   2    A.   YES.

10:30:47   3    Q.   OKAY.  AND PRIOR TO THAT SECOND INTERVIEW, DID YOU PREPARE

10:30:54   4    A GROSS RECEIPTS WORK PAPER?

10:30:55   5    A.   YES, I DID.

10:30:56   6    Q.   AND DID YOU PREPARE THAT GROSS RECEIPTS WORK PAPER BETWEEN

10:30:59   7    THE FIRST INTERVIEW THAT YOU HAD WITH MS. MEILI LIN AND

10:31:09   8    MR. HENRY HORNG AND CINDY SHI AT CINDY'S OFFICE IN

10:31:14   9    JANUARY 2010?

10:31:15  10    A.   YES, THIS WAS AFTER JANUARY --

10:31:20  11    Q.   AND IN THE GROSS RECEIPTS WORK PAPER, DID YOU INDICATE THE

10:31:25  12    TAXPAYERS PRESENTED A PURCHASE AGREEMENT BETWEEN TIANJIN RUIYU

10:31:30  13    AND REIJIN?

10:31:31  14         MR. PITMAN:  OBJECTION, YOUR HONOR.  HEARSAY.

10:31:39  15         THE COURT:  OVERRULED.

10:31:41  16    BY MR. CANNON:

10:31:42  17    Q.   DID YOU INDICATE THAT THE TAXPAYERS PRESENTED A PURCHASE

10:31:44  18    AGREEMENT BETWEEN REIJIN AND TIANJIN INTERNATIONAL?

10:31:48  19         THE WITNESS:  YES.

10:31:49  20         MR. PITMAN:  YOUR HONOR --

10:31:50  21         THE COURT:  WE ARE GOING TO TAKE A BREAK.  I LET IT

10:31:53  22    GO A LITTLE TOO LONG.  SORRY TO INTERRUPT.

10:31:55  23         LET'S COME BACK AT A LITTLE BIT AFTER QUARTER OF.  WE WILL

10:31:59  24    TAKE 15 MINUTES.

10:32:41  25         (THE PROCEEDINGS WERE HELD OUT OF THE PRESENCE OF THE JURY

CROSS-EXAMINATION BY MR. CANNON

10:32:42  1    AT 10:32 A.M.)

10:32:42  2            THE COURT:  ALL RIGHT.  MR. PITMAN, YOU HAVE AN

10:32:44  3    OBJECTION.  WE MIGHT AS WELL DO IT BEFORE WE TAKE OUR BREAK.

10:32:47  4            MR. PITMAN:  YES, YOUR HONOR.  I HAVE A HEARSAY

10:32:48  5    OBJECTION.

10:32:49  6            THE COURT:  SO I DON'T THINK IT'S HEARSAY TO ASK THE

10:32:51  7    WITNESS WHAT SHE ASKED.  SHE'S HERE TO BE CROSS-EXAMINED ON IT.

10:32:54  8        WE ARE NOT GOING TO ALLOW, IF YOU OBJECT, WHAT THE ANSWERS

10:32:57  9    WERE, BECAUSE THAT WOULD BE HEARSAY.

10:32:59  10            MR. PITMAN:  THANK YOU, YOUR HONOR.

10:32:59  11            THE COURT:  OKAY.  ALL RIGHT.  LET'S TAKE OUR BREAK.

10:33:01  12        (RECESS FROM 10:33 A.M. UNTIL 10:45 A.M.)

10:47:02  13        (THE PROCEEDINGS WERE HELD OUT OF THE PRESENCE OF THE JURY

10:47:04  14    AT 10:47 A.M.)

10:47:04  15            THE COURT:  ALL RIGHT.  WE ARE BACK ON THE RECORD

10:47:53  16    OUTSIDE THE PRESENCE OF THE JURY.

10:47:55  17        I UNDERSTAND THERE'S ANOTHER QUESTION, MR. PITMAN?

10:47:57  18            MR. PITMAN:  I'M NOT SURE IF THEY WORKED IT OUT.

10:48:01  19     SORRY, YOUR HONOR.  WE'RE GOOD.

10:48:04  20            THE COURT:  ALL RIGHT.  EVEN BETTER.  CAN WE BRING IN

10:48:07  21    THE JURY?

10:48:08  22            MR. CANNON:  THAT'S FINE.

10:48:08  23            THE COURT:  OKAY.  LET'S DO THAT.

10:48:10  24        (JURY IN AT 10:48 A.M.)

10:48:17  25            THE COURT:  PLEASE BE SEATED, EVERYONE.  ALL OF OUR

CROSS-EXAMINATION BY MR. CANNON

10:48:49   1    COUNSEL AND PARTIES ARE HERE AND ALL JURORS AND ALTERNATES.

10:48:53   2         MR. CANNON, GO AHEAD, PLEASE.

10:48:54   3              MR. CANNON:  THANK YOU, YOUR HONOR.

10:48:55   4    Q.   SO AGENT GARRISON, BEFORE WE TOOK OUR BREAK, I THINK I WAS

10:49:02   5    ASKING YOU QUESTIONS ABOUT YOUR 2006 GROSS RECEIPTS WORK PAPER

10:49:07   6    DATED 6-23-10?

10:49:09   7    A.   YES.

10:49:09   8    Q.   AND DO YOU RECALL PREPARING THAT WORK PAPER?

10:49:12   9    A.   YES.

10:49:12  10    Q.   AND DID YOU -- YOU PREPARED THAT WORK PAPER TO EXPLAIN

10:49:18  11    WHAT YOU BELIEVED AT THE TIME, RIGHT?

10:49:21  12    A.   YES.

10:49:21  13    Q.   IT'S KIND OF YOUR ANALYSIS OF WHERE THE CASE IS GOING?

10:49:27  14    A.   YES.

10:49:28  15    Q.   AND IT'S A WORK PAPER THAT YOU WERE GOING TO USE TO

10:49:31  16    SUPPORT YOUR THEORIES, RIGHT?

10:49:33  17    A.   IF I HAD ENOUGH EVIDENCE TO DETERMINE THAT MY THEORY WAS

10:49:40  18    ACCURATE, I WOULD HAVE.  BUT AS I SAID, WE NEVER GOT TO THAT

10:49:44  19    POINT.

10:49:45  20    Q.   CORRECT.  AND SO IF YOU HAD EVIDENCE, RIGHT?  NOW, FOR

10:49:55  21    EXAMPLE, PREPARING THAT WORK PAPER, YOU WOULD TALK ABOUT THE

10:50:08  22    TAXPAYER'S POSITION, RIGHT?

10:50:09  23    A.   YES.

10:50:10  24    Q.   AND THE TAXPAYERS TOLD YOU WHAT THEIR POSITION WAS?

10:50:14  25    A.   YES.

CROSS-EXAMINATION BY MR. CANNON

```
10:50:14   1    Q.   THEY TOLD YOU THAT THEY DIDN'T BELIEVE THE MONEY COMING IN

10:50:18   2    FROM CHINA WAS INCOME?

10:50:20   3    A.   RIGHT.

10:50:21   4    Q.   THEY TOLD YOU THEY WERE JUST ACTING AS BROKERS?

10:50:24   5    A.   RIGHT.

10:50:24   6    Q.   THEY TOLD YOU THEY WERE BEING PAID COMMISSIONS?

10:50:28   7    A.   YES.

10:50:28   8    Q.   AND THE MONEY THAT WAS IN THE BANK OF AMERICA ACCOUNT, IT

10:50:32   9    WAS LIKE AN ESCROW ACCOUNT?

10:50:34  10    A.   THAT'S WHAT THEY SAID.

10:50:35  11    Q.   AND THAT'S WHAT THEY TOLD YOU?

10:50:36  12    A.   THAT'S WHAT THEY TOLD ME.

10:50:38  13    Q.   AND THEN SO WHEN YOU WROTE THIS WORK PAPER, YOU WROTE THIS

10:50:41  14    WORK PAPER TO SUPPORT YOUR POSITION, RIGHT?

10:50:47  15    A.   I WROTE THIS WORK PAPER TO SUM UP MY POSITION BASED ON

10:50:53  16    WHAT I HAD, BUT I NEVER ISSUED THE WORK PAPER, LIKE I SAID,

10:50:57  17    BECAUSE I NEVER ISSUED THE REPORT.

10:51:01  18         BUT WHEN WE MAKE A REFERRAL, BECAUSE I COULDN'T DO ANY

10:51:05  19    MORE WORK, I COULDN'T GET THE FOREIGN RECORDS FOR THIS, WE HAVE

10:51:09  20    TO HAVE SOME KIND OF AN IDEA OF NUMBERS.

10:51:12  21    Q.   AND IN THE WORK PAPER, YOU TALK ABOUT THE TAXPAYER'S

10:51:17  22    POSITION?

10:51:17  23    A.   YES.

10:51:18  24    Q.   AND YOU TALK ABOUT THE GOVERNMENT'S POSITION?

10:51:21  25    A.   YES.
```

CROSS-EXAMINATION BY MR. CANNON

10:51:22  1    Q.   AND WHEN YOU ARE TALKING ABOUT THE GOVERNMENT'S POSITION,

10:51:25  2    YOU ARE TALKING ABOUT THE -- WHAT YOU BELIEVE THE POSITION TO

10:51:29  3    BE, RIGHT?

10:51:29  4    A.   AT THE TIME.

10:51:31  5    Q.   THIS WASN'T SIGNED OFF BY COUNSEL FOR THE IRS?

10:51:35  6    A.   NO.

10:51:36  7    Q.   THIS WASN'T SIGNED OFF BY A MANAGER?

10:51:40  8    A.   THIS WASN'T EVER ISSUED OR TAKEN INTO CONSIDERATION WHEN

10:51:44  9    DOING A REPORT.

10:51:45  10   Q.   RIGHT.  THIS NEVER WENT HIGHER THAN YOU?

10:51:48  11   A.   NO.

10:51:49  12   Q.   SO WHEN YOU ARE TALKING ABOUT THE GOVERNMENT'S POSITION,

10:51:51  13   THAT'S YOUR POSITION?

10:51:55  14   A.   I AM REPRESENTING THE GOVERNMENT, SO WHEN I WRITE UP MY

10:52:00  15   WORK PAPERS I'M DOING SO ON BEHALF OF THE GOVERNMENT'S

10:52:03  16   POSITION.

10:52:03  17   Q.   SO WHEN YOU SAY THE GOVERNMENT'S POSITION, YOU MEAN MY

10:52:07  18   POSITION IS THE GOVERNMENT'S POSITION?

10:52:08  19   A.   AS A REVENUE AGENT, REPRESENTING THE IRS, IT IS THE

10:52:14  20   GOVERNMENT'S POSITION.

10:52:15  21   Q.   GOT IT.  OKAY.  AND ONE OF THE THINGS -- AND IT WAS THE

10:52:29  22   GOVERNMENT'S POSITION, AND ONCE AGAIN, THIS IS -- YOU DIDN'T

10:52:33  23   DISCUSS THIS WITH HIGHER UPS, RIGHT?

10:52:36  24   A.   THIS WAS A WORK PAPER THAT NEVER WAS UTILIZED, NEVER WAS

10:52:40  25   ISSUED IN THE REPORT, NEVER WAS A FINAL CONCLUSION.

CROSS-EXAMINATION BY MR. CANNON

10:52:43  1    Q.   OKAY.  AND SO YOU WOULD SAY IT'S THE GOVERNMENT'S POSITION

10:52:49  2    THAT THE FUNDS WERE RECEIVED AS TAXABLE INCOME, RIGHT?

10:52:52  3    A.   BASED ON THE INFORMATION I HAD AT THE TIME, YES.

10:52:55  4    Q.   OKAY.  NOW WE TALKED ABOUT THE GOVERNMENT AND THE IRS, AND

10:53:08  5    THERE ARE -- YOU KNOW WHAT THE INTERNAL REVENUE MANUAL IS,

10:53:13  6    RIGHT, YOU TALKED ABOUT THAT BRIEFLY BEFORE?

10:53:15  7    A.   YES.

10:53:15  8    Q.   AND THEY ISSUE GUIDES ON HOW TO AUDIT BUSINESSES, RIGHT?

10:53:19  9    A.   THEY DO.

10:53:21  10   Q.   AND THEY HAVE GUIDES THAT ARE ISSUED FOR CASH INTENSIVE

10:53:28  11   BUSINESSES, RIGHT?

10:53:29  12   A.   YES.

10:53:30  13        MR. CANNON:  YOUR HONOR, IF I COULD APPROACH THE

10:53:32  14   WITNESS WITH WHAT'S BEEN MARKED FOR IDENTIFICATION AS

10:53:35  15   DEFENDANT'S EXHIBIT 187 -- I'M SORRY, 1087.  I BELIEVE I GAVE

10:53:42  16   YOUR CLERK A COPY FOR THE COURT.

10:54:01  17   Q.   IS THAT A PRINTOUT FROM THE IRS WEBSITE THAT HAS THE NAME

10:54:07  18   ON IT?

10:54:07  19   A.   THAT LOOKS LIKE THE CASH INTENSIVE BUSINESS AUDIT

10:54:10  20   TECHNIQUES.

10:54:11  21   Q.   OKAY.  AND IS CHAPTER 16 -- CHAPTER 16 SPECIFICALLY

10:54:15  22   RELATES TO THE AUDIT OF SCRAP METAL BUSINESSES.

10:54:20  23   A.   I DON'T KNOW --

10:54:21  24   Q.   YOU COULD LOOK FOR CHAPTER 16.

10:54:37  25   A.   YES.

10:54:38   1              MR. CANNON:  YOUR HONOR, AT THIS TIME I WOULD OFFER

10:54:40   2    DEFENSE EXHIBIT 1087 INTO EVIDENCE THE COURT ANY OBJECTION?

10:54:43   3              MR. PITMAN:  OBJECTION, YOUR HONOR.

10:54:46   4              THE COURT:  AND CAN YOU GIVE ME A CLUE?

10:54:49   5              MR. PITMAN:  HEARSAY.  403.  AND RELEVANCE.

10:54:52   6              THE COURT:  OVERRULED.  IT WILL BE ADMITTED.

10:54:55   7         (DEFENDANT'S EXHIBIT 1087 WAS ADMITTED INTO EVIDENCE.)

10:54:55   8    BY MR. CANNON:

10:54:56   9    Q.   AND IF YOU LOOK AT CHAPTER 16, IT CONTAINS A LINK TO CASH

10:55:03  10    INTENSIVE BUSINESS AUDIT TECHNIQUES GUIDE CHAPTER 16 SCRAP

10:55:06  11    METAL.

10:55:07  12         COULD THE CLERK PLEASE HAND YOU WHAT'S BEEN MARKED FOR

10:55:10  13    IDENTIFICATION AS DEFENSE EXHIBIT 1086.  AND DOES THAT APPEAR

10:55:29  14    TO BE WHAT YOU WOULD GET IF YOU WOULD HIT THE LINK ON 1087?

10:55:33  15    A.   IF I WAS DOING A CASH INTENSIVE BUSINESS, THESE WOULDN'T

10:55:40  16    APPLY TO THEIR BUSINESS.  THEY WEREN'T RECEIVING CASH.  SO THIS

10:55:43  17    WOULD BE IRRELEVANT.

10:55:44  18    Q.   OKAY.  BUT IS IT AN AUDIT TECHNIQUE FOR SCRAP METAL

10:55:52  19    BUSINESSES?

10:55:52  20    A.   THAT ARE CASH INTENSIVE.

10:55:53  21    Q.   OKAY.  BUT IS IT THE -- BUT THE SCRAP METAL BUSINESS

10:55:59  22    GENERALLY IS CONSIDERED BY THE IRS TO BE A CASH INTENSIVE

10:56:02  23    BUSINESS?

10:56:02  24    A.   IT CAN IF THEY ARE TAKING MONEY IN TO SELL IT AND GET CASH

10:56:08  25    BACK FOR IT.

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 10:56:09 | 1 | Q.   AND IN THIS CASE THERE WASN'T ANY CASH INVOLVED, RIGHT? |
| 10:56:12 | 2 | A.   NO. |
| 10:56:12 | 3 | Q.   MONEY ALL WENT INTO THE BANK ACCOUNTS? |
| 10:56:14 | 4 | A.   YES. |
| 10:56:15 | 5 | Q.   IT WAS ALL REPORTED? |
| 10:56:17 | 6 | A.   IT WAS ALL REPORTED? |
| 10:56:18 | 7 | Q.   YES.  IN THE BANK ACCOUNTS, THE TRANSFERS CAME IN BY WIRES |
| 10:56:23 | 8 | TO THE BANK OF AMERICA ACCOUNT? |
| 10:56:24 | 9 | A.   THE WIRES WERE RECORDED ON BANK STATEMENTS AS BEING |
| 10:56:27 | 10 | RECEIVED. |
| 10:56:27 | 11 | Q.   OKAY.  AND IF YOU COULD TURN TO PAGE 5 OF EXHIBIT FOR |
| 10:56:36 | 12 | IDENTIFICATION 1086. |
| 10:56:39 | 13 | A.   WHICH ONE IS THAT? |
| 10:56:40 | 14 | Q.   THE LINK THAT YOU WOULD HIT -- THE CASH INTENSIVE |
| 10:56:43 | 15 | BUSINESSES AUDIT TECHNIQUES GUIDE, SCRAP METAL. |
| 10:56:52 | 16 | A.   OKAY. |
| 10:56:52 | 17 | MR. CANNON:  YOUR HONOR, AT THIS TIME I WOULD MOVE |
| 10:57:00 | 18 | 1086 INTO EVIDENCE. |
| 10:57:06 | 19 | THE COURT:  I DON'T KNOW THE RELEVANCE OF THE |
| 10:57:08 | 20 | DOCUMENT? |
| 10:57:08 | 21 | MR. CANNON:  IT'S AN IRS DOCUMENT DEALING WITH THE |
| 10:57:10 | 22 | AUDIT SCRAP METAL FACILITIES. |
| 10:57:13 | 23 | THE COURT:  YES, IT IS.  THAT'S WHAT IT SAYS IT IS. |
| 10:57:16 | 24 | MR. CANNON:  AND IT WOULD BE RELEVANT BECAUSE IF YOU |
| 10:57:18 | 25 | WOULD LOOK TO PAGE 5. |

CROSS-EXAMINATION BY MR. CANNON

10:57:20  1       THE COURT:  LET'S DO THIS AT SIDEBAR.

10:57:22  2       (SIDEBAR DISCUSSION ON THE RECORD.)

10:57:38  3       THE COURT:  SO THIS IS A GOVERNMENT DOCUMENT, IT'S

10:57:42  4   GENERALLY ADMISSIBLE BECAUSE IT'S A GOVERNMENT PUBLICATION.  WE

10:57:46  5   GENERALLY DON'T KEEP THESE OUT OF EVIDENCE.

10:57:48  6       NOW I DON'T SEE ANY RELEVANCE BECAUSE THE WITNESS HAS

10:57:51  7   TESTIFIED THIS WAS NOT A CASH INTENSIVE BUSINESS AND THERE'S NO

10:57:54  8   EVIDENCE IN THE RECORD THAT IT WAS.

10:57:56  9       I DON'T BELIEVE THERE EVER WILL BE, IF I'M MISTAKEN, I

10:57:59  10  JUST DON'T KNOW, YOU ARE AHEAD OF ME ON IT.

10:58:02  11      MR. CANNON:  OKAY.  WELL, IN THIS CASE, THIS

10:58:04  12  PARTICULAR SCRAP METAL BUSINESS WASN'T -- DIDN'T USE CASH.

10:58:07  13      WHEN YOU SAY CASH INTENSIVE BUSINESSES, IT APPLIES TO MANY

10:58:13  14  DIFFERENT KINDS OF BUSINESSES, AND THIS IS THE GENERAL GUIDE

10:58:17  15  FOR HOW YOU AUDIT SCRAP METAL BUSINESSES.

10:58:20  16      THE COURT:  NO, NO, THAT'S NOT WHAT THE WITNESS SAYS,

10:58:22  17  YOU MAY THINK IT IS.

10:58:23  18      THE WITNESS SAYS THIS IS THE GENERAL GUIDE FOR CASH

10:58:26  19  INTENSIVE BUSINESSES AND SCRAP METAL IS A SUBSET.

10:58:29  20      YOU HAVE NOT ESTABLISHED THIS IS A CASH INTENSIVE

10:58:31  21  BUSINESS.  JUST LIKE BAIL BONDS HERE, CAR WASHES WHERE PEOPLE

10:58:36  22  COME IN AND THEY EMPTY THEIR POCKETS ACROSS THE TABLE.

10:58:38  23      THAT'S NOT WHAT THIS IS.  AND THERE'S NOTHING IN THIS

10:58:40  24  DOCUMENT THAT SAYS THAT THIS IS FOR SCRAP METAL BUSINESS AUDITS

10:58:44  25  WITH TWO SUBSETS, CASH INTENSIVE AND NOT.

CROSS-EXAMINATION BY MR. CANNON

```
10:58:47   1        SO THE PRIMARY PURPOSE OF THIS DOCUMENT IS FOR CASH

10:58:50   2   INTENSIVE BUSINESSES, AND I'M READING IT, IT'S IN ABOUT 20

10:58:55   3   POINT TYPE.  YOU CAN'T MISS IT.

10:58:57   4        AND SO UNLESS YOU CAN ESTABLISH SOME RELEVANCE, AND I

10:59:01   5   DON'T BELIEVE YOUR CLIENTS ARE EVER GOING TO TESTIFY THEY GOT

10:59:05   6   CASH INTO THIS BUSINESS.

10:59:07   7        MR. CANNON:  I HEAR WHAT THE COURT IS SAYING, AND

10:59:09   8   WHILE THE IRS LABELS CERTAIN TYPES OF BUSINESSES AS CASH

10:59:16   9   INTENSIVE BUSINESSES, LIKE CAR WASHES, LIKE BAIL BONDS, LIKE

10:59:20  10   SCRAP METAL BUSINESSES, THIS IS ALSO A GENERAL GUIDE ON HOW --

10:59:24  11        THE COURT:  DO YOU HAVE AN EXPERT THAT'S GOING TO

10:59:26  12   TESTIFY TO THAT?  I DON'T KNOW THAT.  THAT'S A REPRESENTATION

10:59:28  13   YOU ARE MAKING TO ME WITHOUT ANY FOUNDATION.  AND YOU CAN ASK

10:59:32  14   THIS WITNESS IF THIS IS USED THAT WAY AND SHE COULD TESTIFY ONE

10:59:35  15   WAY OR THE OTHER.

10:59:36  16        MR. CANNON:  I WILL TRY TO ASK HER.

10:59:38  17        THE COURT:  OKAY.  THAT SOUNDS FINE.

10:59:39  18        MR. PITMAN:  SO JUST FOR THE RECORD, YOUR HONOR, WE

10:59:41  19   WOULD HAVE ADDITIONAL OBJECTIONS.  EVEN IF MR. CANNON WERE ABLE

10:59:45  20   TO ESTABLISH RELEVANCE, WE HAVE ADDITIONAL OBJECTIONS TO THIS

10:59:48  21   DOCUMENT.

10:59:48  22        THE COURT:  WHICH ARE?

10:59:49  23        MR. PITMAN:  WELL, FIRST OF ALL, IT HAS NOT BEEN

10:59:56  24   AUTHENTICATED, WE SAW THIS DOCUMENT FOR THE FIRST TIME THIS

10:59:59  25   MORNING, I HAVE NO IDEA WHERE IT CAME FROM.
```

CROSS-EXAMINATION BY MR. CANNON

11:00:02  1        THE COURT:  WELL, THIS WITNESS CAN AUTHENTICATE IT.

11:00:04  2        MR. PITMAN:  AND OUR CONTINUING OBJECTION WOULD ALSO

11:00:06  3   BE THAT IT'S 403, TO THE EXTENT IT'S A 15-20 PAGE DOCUMENT,

11:00:12  4   I'VE NEVER REVIEWED IT.  I DON'T KNOW WHAT'S IN IT AND I CAN'T

11:00:16  5   COMPARE IT'S PROBATIVE VALUE TO ITS POTENTIAL PREJUDICE.

11:00:19  6        THE COURT:  YOU WANT TO JUST GO HOME FOR THE DAY, IS

11:00:21  7   THAT WHAT YOU ARE SUGGESTING?  I CAN'T DO THAT.  LOOK IT UP ON

11:00:24  8   THE INTERNET, YOU GOT YOUR COMPUTER RIGHT THERE.  JUST PULL IT

11:00:27  9   UP.  YOU HAVE EVERY ACCESS TO THIS DOCUMENT.  YOU SHOULD KNOW

11:00:29  10  THIS DOCUMENT BACKWARDS AND FORWARDS, THIS CAN'T BE A SECRET.

11:00:32  11       MR. PITMAN:  IT'S NEVER BEEN LISTED ON ANY EXHIBIT

11:00:34  12  LIST.  HE HANDED IT TO ME FOR THE FIRST TIME WHEN I WALKED INTO

11:00:37  13  COURT TODAY.

11:00:38  14       THE COURT:  WELL, YOU DIDN'T SEEM TO HAVE AN

11:00:40  15  AGREEMENT THAT THEY HAD TO GIVE YOU EVERY DOCUMENT IN ADVANCE,

11:00:42  16  DID YOU?

11:00:43  17       MR. PITMAN:  I THINK WHEN THEY FAILED TO DO THAT --

11:00:46  18       THE COURT:  THE BEST YOU GET IS -- YOU KNOW WHAT, I

11:00:49  19  CAN LET YOU GO OUT IN THE HALLWAY AND LOOK AT IT AND LET THE

11:00:52  20  JURY SITTING HERE WAITING FOR YOU, DO YOU WANT TO DO THAT?

11:00:55  21       MR. PITMAN:  NO, YOUR HONOR.  THANK YOU.

11:01:06  22       THE COURT:  MR. CANNON, I'M GOING TO ASK THAT YOU LAY

11:01:08  23  A LITTLE BIT MORE FOUNDATION ON THIS DOCUMENT, PLEASE.

11:01:11  24       MR. CANNON:  THANK YOU.

11:01:15  25  Q.  MS. GARRISON, THE IRS ISSUES MANY GUIDES TO HELP AGENTS

CROSS-EXAMINATION BY MR. CANNON

11:01:19  1    PERFORM AUDITS, RIGHT?

11:01:21  2    A.   THEY DO.

11:01:22  3    Q.   AND THERE ARE MANY DIFFERENT KINDS OF BUSINESSES THAT THE

11:01:26  4    IRS AUDITS, RIGHT?

11:01:28  5    A.   YES.

11:01:28  6    Q.   AND WHEN THEY ARE TALKING ABOUT A CASH INTENSIVE BUSINESS,

11:01:32  7    THEY ARE TALKING ABOUT THE GENERIC TYPE OF BUSINESS, RIGHT?

11:01:35  8    A.   THEY ARE TALKING ABOUT CASH INTENSIVE BUSINESSES.

11:01:38  9    Q.   AND SO WHEN THEY ARE TALKING -- WHEN THE IRS USES THE TERM

11:01:42  10   CASH INTENSIVE BUSINESS, THEY USE, THEY ARE TALKING ABOUT TYPES

11:01:46  11   OF BUSINESSES, RIGHT?

11:01:48  12   A.   NO, THEY ARE TALKING ABOUT CASH INTENSIVE BUSINESSES.

11:01:52  13   Q.   CORRECT.  SO BAIL BONDS WOULD BE -- AND LOOKING AT

11:01:56  14   EXHIBIT 1087, WHICH IS IN EVIDENCE, BAIL BONDS WOULD, IS

11:02:01  15   DESCRIBED BY THE IRS IN THEIR OWN MATERIALS AS A CASH INTENSIVE

11:02:04  16   BUSINESS, RIGHT?

11:02:05  17   A.   I DON'T KNOW I'VE NEVER AUDITED A BAIL BONDSMAN.

11:02:08  18   Q.   COULD YOU PLEASE LOOK AT CHAPTER 9 IN EXHIBIT 1087?

11:02:15  19   A.   WHICH ONE IS 1087?  IS THAT --

11:02:19  20          THE COURT:  THE SHORTER ONE.

11:02:20  21          THE WITNESS:  THE SHORTER ONE?  OKAY.

11:02:22  22          MR. CANNON:  YES.

11:02:27  23          THE WITNESS:  AND YOU WANTED ME TO LOOK AT WHICH PART

11:02:30  24   OF THIS?

11:02:31  25          MR. CANNON:  CHAPTER 5.

CROSS-EXAMINATION BY MR. CANNON

11:02:33  1    Q.  I'M SORRY, CHAPTER 9, 6 UPSIDE DOWN.  DOES IT TALK ABOUT

11:02:39  2    BAIL BONDS?

11:02:40  3    A.  IT DOES.

11:02:41  4    Q.  AND DOES CHAPTER 10 TALK ABOUT BEAUTY SHOPS?

11:02:46  5    A.  YES.

11:02:47  6    Q.  DOES CHAPTER 11 TALK ABOUT CAR WASHES?

11:02:50  7    A.  YES.

11:02:51  8    Q.  DOES CHAPTER 12 TALK ABOUT CHECK CASHING LOCATIONS?

11:02:54  9    A.  YES.

11:02:55  10   Q.  DOES CHAPTER 13 TALK ABOUT COIN OPERATED AMUSEMENTS?

11:02:58  11   A.  YES, THOSE ARE ALL CASH INTENSIVE BUSINESS.

11:03:01  12   Q.  DOES CHAPTER 14 TALK ABOUT MINI STORES?

11:03:04  13   A.  YES.

11:03:05  14   Q.  DOES CHAPTER 15 TALK ABOUT LAUNDROMATS?

11:03:08  15   A.  YES, IT DOES.

11:03:08  16   Q.  DOES CHAPTER 16 TALK ABOUT SCRAP METAL?

11:03:11  17   A.  IT DOES, BUT THESE WEREN'T CASH INTENSIVE BUSINESSES.

11:03:15  18   THIS WAS NOT A CASH INTENSIVE BUSINESS.  I WOULDN'T HAVE

11:03:18  19   CONSULTED THIS BECAUSE I'M NOT DEALING IN CASH.

11:03:21  20   Q.  SO YOU WOULDN'T HAVE LOOKED AT THIS?

11:03:23  21   A.  NO, I WOULDN'T HAVE LOOKED AT HOW TO AUDIT A CASH

11:03:27  22   INTENSIVE BUSINESS WHEN I'M NOT DEALING WITH CASH.

11:03:29  23   Q.  OKAY.  BUT YOU WOULDN'T HAVE LOOKED AT A GUIDE ON HOW TO

11:03:34  24   AUDIT SCRAP METAL BUSINESSES, RIGHT?

11:03:36  25   A.  I DON'T RECALL DOING THAT, NO.

CROSS-EXAMINATION BY MR. CANNON

11:03:38  1    Q.   OKAY.  SO IF YOU COULD LOOK AT PAGE 5, MARKED FOR

11:03:46  2    IDENTIFICATION AS 1086.

11:03:48  3    A.   IS THAT THE THICKER ONE?

11:03:50  4    Q.   YES.

11:04:00  5    A.   YES.

11:04:01  6    Q.   DOES THAT DESCRIBE PURCHASERS OF SCRAP METAL?

11:04:05  7    A.   THE COMPLIANCE ISSUE HERE IS DEALING WITH PROBLEMS WHEN

11:04:08  8    RECEIVING CASH.

11:04:10  9    Q.   DOES -- IS IT IMPORTANT HOWEVER TO -- ONE OF THE ISSUES IN

11:04:15  10   THIS CASE IS WHETHER THE TAXPAYERS WERE BROKERS OR THE

11:04:20  11   RECIPIENTS OF THE METAL, RIGHT?

11:04:24  12   A.   NO.

11:04:26  13   Q.   WELL, IT WAS THE TAXPAYER'S POSITION THAT THEY WERE

11:04:29  14   AGENTS, RIGHT?

11:04:31  15   A.   YES.

11:04:32  16   Q.   AND SO IF THEY WERE AGENTS, THAT WOULD MAKE THEM BROKERS,

11:04:36  17   RIGHT?

11:04:39  18   A.   I DON'T KNOW.

11:04:40  19   Q.   OKAY.  BUT YOU UNDERSTAND THE ISSUE, RIGHT?

11:04:49  20   A.   I DON'T KNOW WHAT ISSUE YOU ARE REFERRING TO.  I'M NOT

11:04:53  21   AGREEING WITH YOUR SAYING THIS IS A CASH INTENSIVE BUSINESS.

11:04:55  22   Q.   I'M NOT ASKING YOU WHETHER THIS IS A CASH -- I'M NOT

11:04:59  23   ASKING YOU WHETHER REIJIN ITSELF WAS A CASH INTENSIVE BUSINESS.

11:05:03  24   REIJIN, HOWEVER, WAS IN THE SCRAP METAL BUSINESS, RIGHT?

11:05:07  25   A.   RIGHT.

CROSS-EXAMINATION BY MR. CANNON

11:05:08  1    Q.   AND IN THE CHAIN OF A SCRAP METAL BUSINESS, YOU HAVE THE

11:05:13  2    SCRAP METAL COLLECTORS, RIGHT?

11:05:17  3    A.   OKAY.

11:05:19  4    Q.   DO YOU?

11:05:21  5    A.   SOMEONE WHO WANTS TO PURCHASE, IS THAT WHAT YOU ARE

11:05:24  6    TALKING ABOUT?

11:05:24  7    Q.   OKAY.  WE WILL START FROM THE TOP OF THE SUPPLY CHAIN.

11:05:28  8         YOU HAVE THE PURCHASER OF THE SCRAP METAL?

11:05:30  9    A.   YES.

11:05:30  10   Q.   YOU HAVE THE PROCESSOR OF THE SCRAP METAL?

11:05:32  11   A.   OKAY.

11:05:33  12   Q.   YOU HAVE THE BROKER OF THE SCRAP METAL?

11:05:36  13   A.   OKAY.

11:05:38  14   Q.   YOU HAVE THE SHIPPER OF THE SCRAP METAL?

11:05:41  15   A.   YES.

11:05:41  16   Q.   YOU HAVE THE SELLER OF THE SCRAP METAL?

11:05:43  17   A.   YES.

11:05:44  18   Q.   YOU HAVE THE COLLECTOR OF THE SCRAP METAL?

11:05:48  19   A.   OKAY.

11:05:49  20   Q.   AND WOULD IT BE FAIR TO SAY THAT EXAMPLES OF PURCHASES OF

11:05:55  21   SCRAP METAL ARE FOUNDRIES, MILLS, MINIMILLS, BROKERS, PEDDLERS

11:06:00  22   AND SCRAP PROCESSORS, IS THAT A FAIR DESCRIPTION OF PEOPLE IN

11:06:05  23   THE SUPPLY CHAIN IN THE SCRAP METAL BUSINESS?

11:06:10  24   A.   SAY THE QUESTION AGAIN?

11:06:12  25   Q.   IS IT FAIR TO SAY THAT EXAMPLES OF PURCHASERS OF SCRAP

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 11:06:17 | 1 | METAL ARE FOUNDRIES, MILLS, MINIMILLS, BROKERS, PEDDLERS AND |
| 11:06:22 | 2 | SCRAP PROCESSORS; IS THAT AN ACCURATE STATEMENT? |
| 11:06:25 | 3 | A.   SURE, YES. |
| 11:06:26 | 4 | Q.   AND IS A FOUNDRY DIFFERENT THAN A MILL? |
| 11:06:30 | 5 | A.   I DON'T KNOW THE DIFFERENCE BETWEEN A FOUNDRY AND A MILL. |
| 11:06:34 | 6 | Q.   IS A MILL DIFFERENT THAN A MINIMILL? |
| 11:06:36 | 7 | A.   I DON'T KNOW. |
| 11:06:37 | 8 | Q.   IS A BROKER DIFFERENT THAN A PEDDLER? |
| 11:06:40 | 9 | A.   IT'S A DIFFERENT WORD. |
| 11:06:43 | 10 | Q.   AND IS A PEDDLER DIFFERENT THAN SCRAP PROCESSOR? |
| 11:06:47 | 11 | A.   IS A PEDDLER DIFFERENT THAN -- |
| 11:06:49 | 12 | Q.   A SCRAP PROCESSOR. |
| 11:06:52 | 13 | A.   I GUESS, I DON'T KNOW. |
| 11:06:54 | 14 | Q.   OKAY.  AND IS IT FAIR TO SAY THAT A PEDDLER PURCHASES |
| 11:07:04 | 15 | SCRAP METAL AND RESELLS IT TO THE SCRAP PROCESSOR? |
| 11:07:07 | 16 | MR. PITMAN:  OBJECTION, YOUR HONOR. |
| 11:07:08 | 17 | ASKED AND ANSWERED.  THIS WITNESS DOESN'T KNOW THE ANSWER |
| 11:07:11 | 18 | TO THESE QUESTIONS. |
| 11:07:12 | 19 | THE COURT:  SUSTAINED. |
| 11:07:12 | 20 | BY MR. CANNON: |
| 11:07:17 | 21 | Q.   NOW DOES A PEDDLER STORE SCRAP METAL? |
| 11:07:19 | 22 | MR. PITMAN:  OBJECTION, YOUR HONOR. |
| 11:07:20 | 23 | THE COURT:  SUSTAINED. |
| 11:07:21 | 24 | BY MR. CANNON: |
| 11:07:23 | 25 | Q.   DOES A BROKER TAKE TITLE TO SCRAP METAL? |

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 11:07:26 | 1 | MR. PITMAN:  SAME OBJECTION, YOUR HONOR. |
| 11:07:28 | 2 | THE COURT:  SUSTAINED. |
| 11:07:28 | 3 | BY MR. CANNON: |
| 11:07:29 | 4 | Q.   SO IS IT FAIR TO SAY YOU KNOW VERY LITTLE ABOUT THE SCRAP |
| 11:07:34 | 5 | METAL BUSINESS? |
| 11:07:35 | 6 | A.   THAT'S FAIR TO SAY. |
| 11:07:37 | 7 | Q.   AND IS IT FAIR TO SAY YOU DIDN'T INVESTIGATE HOW BUSINESS |
| 11:07:40 | 8 | IS DONE IN THE SCRAP METAL BUSINESS? |
| 11:07:43 | 9 | A.   I DIDN'T CONSULT A CASH INTENSIVE BUSINESS GUIDE. |
| 11:07:47 | 10 | Q.   THAT'S NOT THE QUESTION I ASKED YOU.  IS IT FAIR TO SAY |
| 11:07:51 | 11 | THAT YOU DIDN'T INVESTIGATE HOW BUSINESS IS DONE IN THE SCRAP |
| 11:07:55 | 12 | METAL? |
| 11:07:55 | 13 | A.   I DID INVESTIGATE BECAUSE I ASKED THE TAXPAYERS THE |
| 11:08:01 | 14 | PROCESS. |
| 11:08:02 | 15 | Q.   OKAY.  AND IN ADDITION TO ASKING THE TAXPAYERS'S PROCESS, |
| 11:08:06 | 16 | AND YOU REJECTED THEIR EXPLANATION, RIGHT? |
| 11:08:09 | 17 | A.   YES. |
| 11:08:10 | 18 | Q.   OKAY.  AND YOU DIDN'T CONSULT OTHER AVAILABLE IRS |
| 11:08:16 | 19 | REFERENCES ABOUT HOW BUSINESS IS DONE IN THE SCRAP METAL |
| 11:08:19 | 20 | BUSINESS, DID YOU? |
| 11:08:20 | 21 | A.   NO, I DID NOT LOOK IN THE CASH INTENSIVE SECTION OF -- |
| 11:08:25 | 22 | Q.   DID YOU LOOK AT ANY OTHER AVAILABLE IRS MANUALS REGARDING |
| 11:08:28 | 23 | THE AUDITS OF THE SCRAP METAL BUSINESS? |
| 11:08:31 | 24 | A.   I DON'T HAVE A RECOLLECTION OF DOING SO. |
| 11:08:34 | 25 | Q.   DID YOU LOOK -- GO TO ANY OUTSIDE SOURCES TO FIND OUT HOW |

CROSS-EXAMINATION BY MR. CANNON

11:08:38 1    BUSINESS IS DONE IN THE SCRAP METAL BUSINESS?

11:08:40 2    A.   I DON'T RECALL.

11:08:41 3    Q.   SO IT'S FAIR TO SAY YOU DIDN'T LOOK AT ANYTHING TO

11:08:45 4    DETERMINE HOW BUSINESS IS GENERALLY DONE IN THE SCRAP METAL

11:08:48 5    BUSINESS?

11:08:49 6    A.   I DON'T HAVE A RECOLLECTION.

11:08:51 7    Q.   EXCUSE ME?

11:08:52 8    A.   I DON'T HAVE A RECOLLECTION.

11:08:53 9    Q.   OKAY.  AND GENERALLY, IF THERE'S AN INTERNATIONAL ASPECT

11:09:05 10   TO A SCRAP METAL, YOU WOULD TRY TO SEE IF AN EXCHANGE OF

11:09:10 11   INFORMATION IS AVAILABLE, RIGHT?

11:09:13 12   A.   NO, I DID NOT DO THAT.

11:09:14 13   Q.   OKAY.  NOW TALKING ABOUT EXCHANGES OF INFORMATION, DID YOU

11:09:29 14   UNDERSTAND THAT THERE'S A TAX TREATY BETWEEN THE U.S. AND

11:09:33 15   CHINA?

11:09:34 16   A.   NO.  I'M NOT AWARE OF THAT.

11:09:37 17   Q.   DID YOU UNDERSTAND THAT -- DO YOU KNOW WHAT AN MLAT IS?

11:09:44 18   A.   THAT'S FOR CRIMINAL RECORDS, I THINK.  I'M NOT POSITIVE.

11:09:50 19   Q.   OKAY.  AND DO YOU KNOW WHEN YOU HAVE A TAX TREATY, YOU CAN

11:09:55 20   REQUEST THE ASSISTANCE OF ANOTHER COUNTRY TO GET INFORMATION?

11:09:58 21   A.   YES.

11:10:00 22   Q.   AND DO YOU KNOW THAT YOU CAN DO THAT IN CIVIL TAX CASES?

11:10:05 23   A.   YES.

11:10:06 24   Q.   DID YOU LOOK AT THE TAX TREATY BETWEEN U.S. AND CHINA?

11:10:10 25   A.   NO, I DIDN'T.

CROSS-EXAMINATION BY MR. CANNON

11:10:12  1    Q.   AND SO YOU DIDN'T INVESTIGATE WAYS TO GET INFORMATION FROM

11:10:17  2    CHINA, DID YOU?

11:10:19  3    A.   I HAD AN INDICATION THAT THIS CASE NEEDED TO BE LOOKED AT

11:10:25  4    FURTHER THROUGH CRIMINAL INVESTIGATION.

11:10:28  5    Q.   OKAY.  SO YOU COULDN'T EVEN COME -- SO YOU COULDN'T FIND

11:10:35  6    ENOUGH EVIDENCE THAT THIS WAS INCOME, RIGHT?

11:10:38  7    A.   I THOUGHT THIS CASE SHOULD BE REFERRED TO CRIMINAL BASED

11:10:41  8    ON WHAT I SAW.

11:10:42  9    Q.   RIGHT.  AND ON MULTIPLE OCCASIONS, YOU TRIED TO REFER THIS

11:10:46  10   CASE TO CRIMINAL, RIGHT?

11:10:48  11   A.   NO.  THE FIRST TIME WAS BEFORE I STARTED THE CASE, I

11:10:55  12   WANTED TO MAKE SURE THEY REALLY DIDN'T WANT THIS CASE BECAUSE

11:10:57  13   OF THE HIGH DOLLAR.  THEN I BEGAN IT, I ONLY REFERRED IT OVER

11:11:01  14   TO CRIMINAL ONCE.

11:11:03  15   Q.   WELL, YOU STARTED THE CASE ON SEPTEMBER 18, '08, RIGHT?

11:11:13  16   A.   RIGHT.

11:11:13  17   Q.   AND YOU SPOKE WITH CI ON APRIL 27, 2009, RIGHT?

11:11:19  18   A.   YES, BEFORE I STARTED THE -- YES.

11:11:22  19   Q.   AND YOU SPENT -- WE WENT THROUGH YOUR HOURS BEFORE, I

11:11:26  20   DON'T WANT TO BORE EVERYBODY.  YOU SPENT A HUGE AMOUNT OF TIME

11:11:29  21   BETWEEN THE FIRST TIME YOU TALKED TO CRIMINAL, RIGHT?

11:11:31  22   A.   BEFORE I TALKED TO CRIMINAL?

11:11:35  23   Q.   YES, ON APRIL 27TH?

11:11:37  24   A.   YES, I ANALYZED BACKGROUNDS.

11:11:39  25   Q.   AND YOU PREPARED A FRAUD REFERRAL ON MARCH 30, 2010?

CROSS-EXAMINATION BY MR. CANNON

11:11:43  1    A.   NOT TO CRIMINAL.

11:11:44  2    Q.   IT WAS A FRAUD REFERRAL, RIGHT?

11:11:45  3    A.   RIGHT.

11:11:46  4    Q.   AND THEN ON SEPTEMBER 24TH, 2010, YOU PREPARED A FORM

11:11:53  5    F11661 AND A REPORT OF POTENTIAL CRIMINAL FRAUD, RIGHT?

11:11:58  6    A.   YES.

11:11:58  7    Q.   SO YOU MADE THREE FRAUD REFERRALS?

11:12:03  8         THE COURT:  THAT MISSTATES THE WITNESS'S TESTIMONY.

11:12:05  9         MR. CANNON:  OKAY.

11:12:06  10   Q.   SO YOU RECEIVED THIS CASE AFTER CI DECLINED IT ON 9-18-08?

11:12:11  11   A.   YES.

11:12:11  12   Q.   AND YOU PREPARED A FRAUD REFERRAL FOR A FRAUD EXPERT ON

11:12:19  13   3-30-10?

11:12:19  14   A.   YES.

11:12:20  15   Q.   AND THAT WAS VIA A FORM 11661?

11:12:23  16   A.   YES.

11:12:24  17   Q.   YOU SUBMITTED THAT FRAUD REFERRAL THE NEXT DAY?

11:12:27  18   A.   TO MY MANAGER.

11:12:28  19   Q.   CORRECT.  ON 9-24-10, YOU PREPARED ANOTHER FORM 11661?

11:12:36  20   A.   YES, BECAUSE MY MANAGER DIDN'T SUBMIT -- IT DIDN'T GO ANY

11:12:41  21   FURTHER, WE DIDN'T GET TO A TECHNICAL ADVISOR.

11:12:44  22   Q.   AND A REPORT OF POTENTIAL CRIMINAL FRAUD CASE F2997?

11:12:49  23   A.   YES.

11:12:50  24   Q.   SO THE POTENTIAL FOR A CRIMINAL REFERRAL WAS ALWAYS AT THE

11:12:56  25   TOP OF YOUR MIND IN THIS CASE, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

11:12:57  1    A.   NOT AT THE TOP OF MY MIND.  I DIDN'T DEVELOP IT AS A

11:13:01  2    CRIMINAL CASE, BUT AS THE FACTS UNFOLDED, IT LOOKED LIKE A

11:13:06  3    CRIMINAL CASE TO ME.

11:13:07  4    Q.   AND IT LOOKED LIKE -- AND THIS WAS ONE OF YOUR FIRST CASES

11:13:10  5    IN THE SPECIAL ENFORCEMENT PROGRAM, RIGHT?

11:13:12  6    A.   IT WAS EARLY ON, I DON'T KNOW IF IT WAS ONE OF MY FIRST

11:13:17  7    CASES, BUT I'VE DONE MANY INCOME CASES BEFORE THEN.

11:13:22  8    Q.   AND NOW, AND SO, YOU JUST TESTIFIED THAT YOU DIDN'T KNOW

11:13:28  9    ABOUT THE TAX TREATY WITH CHINA, RIGHT?

11:13:29  10   A.   RIGHT.

11:13:30  11   Q.   AND YOU DIDN'T REALLY KNOW WHAT AN MLAT WAS?

11:13:34  12   A.   RIGHT.

11:13:35  13   Q.   YOU DIDN'T KNOW WHAT A REQUEST FOR FOREIGN ASSISTANCE WAS?

11:13:37  14   A.   A REQUEST FOR FOREIGN ASSISTANCE?

11:13:42  15   Q.   UH-HUH.

11:13:43  16   A.   I DON'T KNOW WHAT A REQUEST FOR FOREIGN ASSISTANCE IS.

11:13:46  17   Q.   DID YOU EVER CONTACT THE OFFICER OF INTERNATIONAL AFFAIRS?

11:13:50  18   A.   NO.

11:13:51  19   Q.   OKAY.  NOW, INVESTIGATION, YOU ALWAYS WANT TO DO

11:14:00  20   INVESTIGATION TO DETERMINE THE SOURCE OF THE FUNDS, RIGHT?

11:14:02  21   A.   YES.

11:14:03  22   Q.   BECAUSE IT'S IMPORTANT TO KNOW THE SOURCE OF THE FUNDS?

11:14:05  23   A.   RIGHT.

11:14:06  24   Q.   AND IN THIS CASE, YOU WANT TO KNOW WHY PEOPLE ARE SENDING

11:14:10  25   MONEY, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

11:14:11   1    A.   RIGHT.

11:14:12   2    Q.   ALL THE MONEY WAS A RED FLAG, RIGHT?

11:14:15   3    A.   RIGHT.

11:14:16   4    Q.   SO IN THIS CASE, AND WE TALKED ABOUT THIS BEFORE, THE

11:14:21   5    SOURCES WERE TRMP, RIGHT?

11:14:23   6    A.   THAT WAS ONE OF THEM.

11:14:25   7    Q.   AND CARIYAN WAS ANOTHER?

11:14:26   8    A.   YES.

11:14:27   9    Q.   AND THERE WERE OTHER SOURCES TOO, RIGHT?

11:14:32  10    A.   RIGHT.

11:14:32  11    Q.   AND WHO DID YOU CONTACT AT TRMP TO FIND OUT WHETHER THEY

11:14:37  12    WERE REALLY THE SOURCE OF THE FUNDS?

11:14:39  13    A.   I DIDN'T CONTACT THEM BECAUSE THEY'RE IN CHINA.

11:14:44  14    Q.   DID YOU GOOGLE THEM?

11:14:47  15    A.   I DON'T RECALL.

11:14:49  16    Q.   DID YOU DO ANY INVESTIGATION INTO TRMP AT ALL?

11:14:52  17    A.   I DON'T RECALL.

11:14:53  18    Q.   AND YOU REMEMBERED CARIYAN ENTERPRISES THEY WERE ANOTHER

11:14:59  19    SOURCE FUNDS, RIGHT?

11:15:01  20    A.   YES.

11:15:01  21    Q.   THEY WERE A REPEATING SOURCE OF FUNDS, RIGHT?

11:15:04  22    A.   YES.

11:15:05  23    Q.   AND DID YOU EVER INVESTIGATE ANYTHING ABOUT CARIYAN

11:15:08  24    ENTERPRISES?

11:15:08  25    A.   I DON'T RECALL.

11:15:09 Q. DID YOU GOOGLE THEM?
11:15:10 A. I DON'T REMEMBER.
11:15:11 Q. DID YOU ASK FOR ANY DOCUMENTS?
11:15:14 A. ASK FOR ANY DOCUMENTS? FROM WHO.
11:15:16 Q. FROM CARIYAN ENTERPRISES?
11:15:18 A. NO, THEY ARE OVERSEAS, I COULDN'T GET THEM.
11:15:21 Q. WELL, SO IN THIS CASE, ALL THE TRANSFERS THAT CAME IN, 11:15:29 CAME IN FROM OVERSEAS, RIGHT?
11:15:31 A. YES.
11:15:31 Q. AND IS IT FAIR TO SAY YOU DIDN'T FOLLOW UP ON ANY OF THOSE 11:15:34 TO SEE WHO THOSE TRANSFEREES WERE?
11:15:36 A. NO, BECAUSE I COULDN'T GET THE RECORDS FROM -- I CAN'T 11:15:41 ISSUE A SUMMONS FOR INTERNATIONAL, WHICH IS THE WAY I GET 11:15:46 DOMESTIC RECORDS.
11:15:48 Q. AND DID YOU TALK TO ANYBODY HIGHER UP TO TRY TO FIGURE OUT 11:15:51 HOW YOU COULD GET RECORDS FROM CHINA?
11:15:52 A. NO, I SPOKE TO MY MANAGER AND HE THOUGHT THIS WAS A 11:15:56 CRIMINAL CASE.
11:15:57 Q. OKAY.
11:15:58 A. IT SHOULD BE REFERRED TO CRIMINAL.
11:15:59 Q. WELL, LATER HE DID, BUT THE FIRST TIME YOU TALKED TO YOUR 11:16:05 MANAGER HE DIDN'T SAY IT WOULD BE REFERRED TO CRIMINAL, DID HE?
11:16:09 A. NO.
11:16:09 Q. NO. YOU KIND OF PUT THINGS TOGETHER AND PROVIDED HIM MORE 11:16:13 AND MORE DOCUMENTS, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

11:16:14  1    A.   RIGHT.

11:16:15  2    Q.   AND YOU DIDN'T PROVIDE HIM ANY DOCUMENTS OF INVESTIGATIONS

11:16:20  3    OF THE SOURCE OF THE FUNDS, DID YOU?

11:16:22  4    A.   THE INTERNATIONAL SOURCES, NO, I DIDN'T HAVE THOSE.

11:16:25  5    Q.   OKAY.  NOW, THROUGHOUT THIS CASE, IN YOUR CONFERENCES WITH

11:16:37  6    THE TAXPAYERS AND WITH THEIR REPRESENTATIVES AND IN YOUR WORK

11:16:43  7    PAPERS, IT'S ALWAYS BEEN THE TAXPAYER'S POSITION THAT THE MONEY

11:16:50  8    THAT WAS COMING IN WAS NOT THEIR, RIGHT?

11:16:52  9    A.   RIGHT.

11:16:52  10   Q.   AND YOU REJECTED THAT, RIGHT?

11:16:55  11   A.   I REJECTED THEIR EXPLANATION, YES.

11:16:59  12   Q.   YOU REJECTED THEIR EXPLANATION.  NOW, IF WE COULD -- AND

11:17:10  13   YOU NEVER GOT ANY EVIDENCE, THAT WAS JUST YOUR BELIEF, AS WE

11:17:16  14   WERE TALKING ABOUT BELIEFS BEFORE, RIGHT?

11:17:18  15   A.   NEVER GOT ANY EVIDENCE OF WHAT?

11:17:20  16   Q.   YOU NEVER TALKED TO ANYBODY TO FIGURE OUT WHO REALLY OWNED

11:17:25  17   THE MONEY?

11:17:26  18   A.   NO, I JUST SAW THE MONEY GOING INTO THE BANK ACCOUNT OF

11:17:30  19   THE DEFENDANTS.

11:17:30  20   Q.   OKAY.  SO YOUR BELIEFS IS JUST BASED ON THE MONEY COMING

11:17:36  21   IN?

11:17:36  22   A.   YES, MONEY GOING INTO AN ACCOUNT THAT HAS A LOT OF

11:17:41  23   MONEY -- YEAH.

11:17:42  24   Q.   OKAY.

11:17:43  25   A.   I HAD QUESTIONS ABOUT IT.

CROSS-EXAMINATION BY MR. CANNON

11:17:45   1    Q.   NOW YESTERDAY -- COULD YOU PLEASE BRING UP EXHIBIT 244.

11:18:16   2         NOW THE GOVERNMENT ASKED YOU A LOT OF QUESTIONS ABOUT

11:18:19   3    EXHIBIT 244 YESTERDAY, RIGHT?

11:18:21   4    A.   RIGHT.

11:18:22   5    Q.   AND JOHN, COULD YOU PLEASE GO -- AND THIS IS A UNIFORM

11:18:27   6    RESIDENTIAL LOAN APPLICATION, RIGHT?

11:18:28   7              THE COURT:  DID YOU WANT THE JURY TO SEE THIS AS

11:18:30   8    WELL?

11:18:30   9              MR. CANNON:  YES, PLEASE.

11:18:31   10             THE COURT:  AND THIS HAS BEEN ADMITTED?

11:18:34   11             MR. CANNON:  IT'S IN EVIDENCE.

11:18:38   12   Q.   AND THIS IS A UNIFORM RESIDENTIAL LOAN APPLICATION, RIGHT?

11:18:41   13   A.   YES.

11:18:42   14   Q.   AND WE'VE SEEN A LOT OF THOSE IN THIS CASE, YOU REVIEWED A

11:18:45   15   LOT OF THEM, RIGHT?

11:18:46   16   A.   RIGHT.

11:18:47   17   Q.   AND ON THE -- ABOUT HALFWAY DOWN THE PAGE THERE ARE BOXES

11:18:58   18   FOR THE BORROWER?

11:19:00   19   A.   YES.

11:19:01   20   Q.   AND THERE'S A SPACE FOR A CO-BORROWER, RIGHT?

11:19:06   21   A.   YES.

11:19:06   22   Q.   AND THE BORROWER IS LISTED AS MEILI LIN, CORRECT?

11:19:10   23   A.   CORRECT.

11:19:11   24   Q.   IS THERE A CO-BORROWER LISTED?

11:19:14   25   A.   NO.

| | | |
|---|---|---|
| 11:19:15 | 1 | Q.   AND COULD WE GO TO THE SIGNATURE PAGE OF THIS, PLEASE, |
| 11:19:18 | 2 | JONATHAN. |
| 11:19:27 | 3 | AND IS THIS THE SIGNATURE PAGE?  AND THERE'S A BANK FOR |
| 11:19:39 | 4 | THE CO-BORROWER SIGNATURE, RIGHT? |
| 11:19:40 | 5 | A.   THERE'S A WHAT? |
| 11:19:41 | 6 | Q.   IN THE BOX WHERE THE CO-BORROWER WOULD SIGN, IT'S BLANK, |
| 11:19:47 | 7 | ISN'T IT? |
| 11:19:47 | 8 | A.   YES. |
| 11:19:48 | 9 | Q.   SO BEFORE YOU SHOWED THIS TO MR. HORNG IN THE INTERVIEW, |
| 11:19:56 | 10 | DID YOU HAVE ANY IDEA THAT HE HAD SEEN THIS? |
| 11:20:02 | 11 | A.   I DIDN'T KNOW WHETHER HE HAD SEEN IT. |
| 11:20:05 | 12 | Q.   OKAY.  AND YOU JUST KIND OF SPRANG THIS ON HIM, RIGHT? |
| 11:20:09 | 13 | A.   YES. |
| 11:20:10 | 14 | Q.   AND WHEN YOU SPRANG THIS ON HIM -- OH, ALSO, JONATHAN, CAN |
| 11:20:17 | 15 | YOU BRING UP EXHIBIT 3 -- BEFORE, LET'S GO TO THE FIRST PAGE OF |
| 11:20:23 | 16 | THAT AGAIN.  AND IF WE COULD SHOW WHAT PROPERTY THIS IS FOR. |
| 11:20:28 | 17 | THIS IS A LOAN FOR 188 MINNA STREET, RIGHT. |
| 11:20:35 | 18 | A.   YES. |
| 11:20:43 | 19 | Q.   GOVERNMENT'S EXHIBIT 331.  AND COULD YOU GO TO THE NEXT |
| 11:21:22 | 20 | PAGE OF THAT SO IT SHOULD HAVE THE PROPERTY ADDRESS.  OF COURSE |
| 11:21:25 | 21 | IT DOESN'T.  COULD YOU GO TO THE FIRST PAGE OF THIS, PLEASE. |
| 11:21:38 | 22 | THAT'S A DOCUMENT IN EVIDENCE.  IS THAT WHAT'S KNOWN AS A |
| 11:21:43 | 23 | QUITCLAIM DEED. |
| 11:21:44 | 24 | A.   YES, THAT'S WHAT IT SAYS. |
| 11:21:46 | 25 | Q.   AND A QUITCLAIM DEED SAYS SOMEONE HAS NO INTEREST IN THE |

11:21:51  1    PROPERTY?

11:21:51  2    A.   EXCUSE ME?

11:21:52  3    Q.   DOES A QUITCLAIM DEED INDICATE SOMEONE HAS NO INTEREST IN

11:21:56  4    A PARTICULAR PROPERTY?

11:21:56  5    A.   I BELIEVE IT MEANS THEY'RE RELINQUISHING THEIR NAME FROM

11:22:03  6    THE DEED, BUT I'M NOT A REALTOR.

11:22:07  7    Q.   AND DOES EXHIBIT 331 REFER TO AN EXHIBIT A, ATTACHED HIRE

11:22:12  8    IN MADE A PARTY HEREOF?

11:22:17  9    A.   EXCUSE ME?

11:22:18  10   Q.   DOES THIS QUITCLAIM DEED THAT YOU ARE LOOKING AT, DOES IT

11:22:22  11   HAVE AN ADDRESS TO THE PROPERTY THAT IT REFERS TO?

11:22:25  12   A.   YES, IT DOES.  188 MINNA STREET.

11:22:34  13   Q.   THANK YOU VERY MUCH.

11:22:35  14        NOW, I'M NOT TRYING TO GET INTO YOUR PERSONAL LIFE, BUT

11:22:39  15   ARE YOU MARRIED OR DO YOU HAVE A SIGNIFICANT OTHER?

11:22:42  16            MR. PITMAN:  OBJECTION, YOUR HONOR.  RELEVANCE.

11:22:43  17            THE COURT:  SUSTAINED.

11:22:44  18   BY MR. CANNON:

11:22:45  19   Q.   YOU'VE DONE A LOT OF AUDITS, RIGHT?

11:22:48  20   A.   YES.

11:22:48  21   Q.   YOU'VE DONE A LOT OF AUDITS OF COUPLES?

11:22:51  22   A.   YES.

11:22:51  23   Q.   YOU'VE DONE A LOT OF AUDITS OF HUSBAND'S AND WIVES?

11:22:54  24   A.   YES.

11:22:55  25   Q.   AND THE IRS IN CIVIL AUDITS, THERE'S A PROVISION CALLED

CROSS-EXAMINATION BY MR. CANNON

11:23:00  1    THE INNOCENT SPOUSE, RIGHT?

11:23:01  2    A.   YES.

11:23:01  3    Q.   AND IT'S KIND OF COMMONLY APPLIED?

11:23:04  4    A.   I DON'T KNOW HOW COMMON IT IS.

11:23:07  5    Q.   BUT IN YOUR AUDITS AND IN THE IRS POLICIES, THERE'S A

11:23:13  6    COMMON UNDERSTANDING THAT ONE SPOUSE MAY NOT KNOW ALL THE

11:23:16  7    FINANCIAL DEALINGS OF THE OTHER SPOUSE, RIGHT?

11:23:18  8    A.   YES.

11:23:18  9    Q.   NOW, AS TO THE 188 MINNA LOAN APPLICATION, YOU HAVE NO

11:23:31  10   EVIDENCE THAT HENRY HORNG EVER SAW THAT UNTIL YOU SPRUNG IT ON

11:23:35  11   HIM IN YOUR MEETING, RIGHT?

11:23:37  12   A.   RIGHT.

11:23:37  13   Q.   NOW LET'S TALK ABOUT SOME OF THESE FOREIGN BANK ACCOUNTS

11:23:46  14   THAT YOU TALKED ABOUT THE OTHER DAY, OKAY.

11:23:52  15        YOU NOT -- MR. PITMAN ASKED YOU QUESTIONS ABOUT THE

11:23:56  16   AGRICULTURAL BANK OF CHINA, RIGHT?

11:23:58  17   A.   YES.

11:23:59  18   Q.   JONATHAN, COULD YOU PLEASE BRING UP EXHIBIT 314, PLEASE.

11:24:09  19        NOW IS THIS A CERTIFICATE OF DEPOSIT -- ACTUALLY, DOES

11:24:16  20   THIS HAVE A CERTIFICATE OF DEPOSIT BALANCE AT THE AGRICULTURAL

11:24:21  21   BANK OF CHINA?

11:24:23  22   A.   YES.

11:24:24  23   Q.   AND IS HENRY HORNG'S NAME ANYWHERE ON THAT?

11:24:33  24   A.   NO, JUST MEILI LIN.

11:24:35  25   Q.   AND COULD YOU GO TO EXHIBIT 315, JONATHAN, PLEASE.

| | | |
|---|---|---|
| 11:24:44 | 1 | AND IS THIS ANOTHER CD OF THE AGRICULTURAL BANK OF CHINA? |
| 11:24:52 | 2 | A.   YES. |
| 11:24:52 | 3 | Q.   AND IS HENRY HORNG'S NAME EVER ON THAT? |
| 11:24:58 | 4 | A.   I DON'T SEE IT.  I CAN'T READ THE PARTS THAT ARE IN |
| 11:25:05 | 5 | CHINESE, THOUGH. |
| 11:25:06 | 6 | Q.   OKAY.  IF WE COULD GO TO EXHIBIT 316, PLEASE. |
| 11:25:14 | 7 | THIS IS A TRANSLATION THAT THE GOVERNMENT MADE.  DO YOU |
| 11:25:19 | 8 | SEE HENRY HORNG'S NAME ON THAT TRANSLATION AT ALL? |
| 11:25:23 | 9 | A.   NO. |
| 11:25:28 | 10 | Q.   SO -- AND YOU NEVER SHOWED THESE DOCUMENTS TO THE |
| 11:25:35 | 11 | TAXPAYER'S REPRESENTATIVE? |
| 11:25:37 | 12 | A.   I'VE NEVER SEEN THESE DOCUMENTS. |
| 11:25:40 | 13 | Q.   AND YOU NEVER SHOWED THE BANK LOAN APPLICATION THAT WAS |
| 11:25:43 | 14 | LISTED AS GOVERNMENT'S EXHIBIT 244 IN EVIDENCE TO THE |
| 11:25:51 | 15 | TAXPAYER'S REPRESENTATIVE, DID YOU? |
| 11:25:53 | 16 | A.   I DON'T KNOW WHAT YOU ARE REFERRING TO. |
| 11:25:55 | 17 | Q.   OKAY.  EXHIBIT 244 -- |
| 11:25:58 | 18 | THE COURT:  THE WITNESS DOESN'T HAVE THE DOCUMENT IN |
| 11:26:00 | 19 | FRONT OF HER. |
| 11:26:02 | 20 | MR. CANNON:  IF YOU COULD JUST PULL UP EXHIBIT 244, |
| 11:26:05 | 21 | PLEASE, JONATHAN. |
| 11:26:07 | 22 | Q.   EXHIBIT 244 IS THE BANK LOAN APPLICATION FOR 188 MINNA, |
| 11:26:14 | 23 | RIGHT? |
| 11:26:14 | 24 | A.   YES. |
| 11:26:15 | 25 | Q.   AND YOU NEVER SHOWED THAT TO THE TAXPAYER'S |

CROSS-EXAMINATION BY MR. CANNON

11:26:20    1    REPRESENTATIVE?

11:26:20    2    A.   I DON'T RECALL.

11:26:21    3    Q.   YOU DIDN'T SAY, WHAT'S THE EXPLANATION FOR THIS?

11:26:24    4    A.   I DON'T RECALL.

11:26:27    5    Q.   YOU JUST KIND OF SPRUNG IT ON HIM AT MEETING, RIGHT?

11:26:31    6    A.   IF YOU WANT TO CALL IT THAT, THAT'S FINE.

11:26:35    7    Q.   OKAY.  AND YOU WILL RECALL THAT AT THAT MEETING ON

11:26:51    8    9-23-10, MS. LIN WASN'T THERE, RIGHT?

11:26:53    9    A.   NO, SHE WASN'T.

11:26:54   10    Q.   AND YOU ASKED A LOT OF QUESTIONS?

11:26:58   11    A.   YES.

11:26:59   12    Q.   AND SOME OF THE QUESTIONS MR. HORNG COULDN'T ANSWER,

11:27:03   13    CORRECT?

11:27:05   14    A.   I BELIEVE THAT'S CORRECT.

11:27:08   15    Q.   AND SO THE NEXT DAY OR IN THE NEXT WEEK, YOU KIND OF GAVE

11:27:14   16    HIM A HOMEWORK ASSIGNMENT, RIGHT, YOU TOLD HIM TO GET YOU SOME

11:27:17   17    INFORMATION?

11:27:19   18    A.   I THINK SO.  I'M NOT POSITIVE.

11:27:25   19    Q.   OKAY.  AND THEN HE SENT YOU SOME MORE INFORMATION?

11:27:30   20    A.   ON HIS BROTHER-IN-LAW.

11:27:33   21    Q.   AND HE SENT YOU SOME INFORMATION ABOUT HOW FUNDS COME IN

11:27:37   22    FROM CHINA?

11:27:39   23    A.   OH, RIGHT, UH-HUH.

11:27:40   24    Q.   AND SO -- AND THIS WAS INFORMATION THAT HE DIDN'T HAVE AT

11:27:44   25    THE TIME THAT YOU TALKED TO HIM ON 9-23, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 11:27:48 | 1 | A.   WHEN DO YOU MEAN INFORMATION HE DIDN'T HAVE? |
| 11:27:50 | 2 | Q.   WELL, ON 9-23, YOU ASKED HIM QUESTIONS ABOUT HOW MONEY |
| 11:27:54 | 3 | CAME IN FROM CHINA, RIGHT? |
| 11:27:55 | 4 | A.   I ASKED HIM HOW MONEY ENDED UP IN FLORENCE TRADING WHEN |
| 11:28:05 | 5 | THEY SAID THE BUSINESS WAS -- HADN'T BEEN USED IN YEARS.  AND I |
| 11:28:09 | 6 | ASKED HIM WHY THERE WERE PEOPLE THAT WERE SENDING MONEY TO |
| 11:28:14 | 7 | REIJIN. |
| 11:28:15 | 8 | Q.   CORRECT.  SO LET'S DO THIS ONE BY ONE, OKAY. |
| 11:28:18 | 9 | A.   OKAY. |
| 11:28:19 | 10 | Q.   SO ONE OF THE QUESTIONS YOU ASKED HIM WAS HOW MONEY CAME |
| 11:28:22 | 11 | IN FROM CHINA, RIGHT? |
| 11:28:25 | 12 | A.   NO.  I WOULDN'T HAVE ASKED HOW IT CAME IN BECAUSE I KNOW |
| 11:28:29 | 13 | IT COMES IN THROUGH WIRES. |
| 11:28:31 | 14 | Q.   RIGHT.  BUT DID YOU ASK HIM ABOUT THE PROCESS? |
| 11:28:35 | 15 | A.   FOR REIJIN? |
| 11:28:39 | 16 | Q.   I WILL COME BACK TO THIS, YOUR HONOR. |
| 11:28:43 | 17 |      I HAVE AN EXHIBIT WHICH I WILL FIND AND I WILL TALK TO YOU |
| 11:28:47 | 18 | ABOUT IT. |
| 11:28:48 | 19 |      OKAY.  SO LET'S GO TO, BACK TO YOUR 2006 GROSS RECEIPTS |
| 11:28:52 | 20 | WORK PAPER, OKAY, IF YOU COULD LOOK AT THAT.  THAT'S IN FRONT |
| 11:28:56 | 21 | OF YOU, RIGHT? |
| 11:28:57 | 22 | A.   YES, IT IS. |
| 11:28:58 | 23 | Q.   NOW YOU ASKED QUESTIONS ABOUT FLORENCE TRADING, RIGHT? |
| 11:29:04 | 24 | A.   YES. |
| 11:29:05 | 25 | Q.   AND WHEN YOU WERE ASKING QUESTIONS ABOUT FLORENCE TRADING, |

| | | |
|---|---|---|
| 11:29:10 | 1 | YOU ASKED QUESTIONS ABOUT WHAT KIND OF BUSINESS IT WAS, RIGHT? |
| 11:29:13 | 2 | A.   YES. |
| 11:29:16 | 3 | Q.   AND WITH FLORENCE TRADING, ONE OF THE -- YOU ACTUALLY HAD |
| 11:29:22 | 4 | BANK RECORDS ABOUT FLORENCE TRADING, RIGHT? |
| 11:29:24 | 5 | A.   YES. |
| 11:29:25 | 6 | Q.   JONATHAN, IF YOU COULD PULL UP 591, I BELIEVE THIS WAS |
| 11:29:37 | 7 | ADMITTED YESTERDAY, CORRECT? |
| 11:29:56 | 8 | COULD YOU PULL UP EXHIBIT 591, PLEASE.  AND THIS WAS |
| 11:30:08 | 9 | EXHIBIT 591 IN EVIDENCE AND THIS IS WHERE YOU HEARD ABOUT |
| 11:30:10 | 10 | FLORENCE TRADING, RIGHT? |
| 11:30:14 | 11 | A.   THIS DIDN'T LOOK LIKE WHAT I LOOKED AT FOR FLORENCE |
| 11:30:26 | 12 | TRADING. |
| 11:30:26 | 13 | Q.   NO.  THIS IS A CHECKING ACCOUNT.  I'M SORRY.  LET'S TALK |
| 11:30:35 | 14 | ABOUT THIS ONE ANY WAYS, PLEASE. |
| 11:30:40 | 15 | THIS IS A CHECK BEING GUILTY LISTED FOR MEILI LIN DBA |
| 11:30:43 | 16 | REIJIN INTERNATIONAL, RIGHT? |
| 11:30:46 | 17 | A.   YES. |
| 11:30:46 | 18 | Q.   AND THE OPENING DEPOSIT IS 5,000? |
| 11:30:49 | 19 | A.   YES. |
| 11:30:50 | 20 | Q.   AND IT WAS OPENED IN 2004, CORRECT? |
| 11:30:54 | 21 | A.   CORRECT. |
| 11:30:56 | 22 | Q.   AND THIS ACCOUNT -- I WILL DEAL WITH THIS LATER, |
| 11:31:17 | 23 | YOUR HONOR, I MAY HAVE MIXED UP THE EXHIBIT NUMBER. |
| 11:31:19 | 24 | ACTUALLY -- SORRY ABOUT THAT.  SO THIS IS ALSO PART OF |
| 11:32:13 | 25 | EXHIBIT 591, CORRECT? |

CROSS-EXAMINATION BY MR. CANNON

11:32:15  1    A.   YES.

11:32:18  2    Q.   AND THAT REFERS TO REIJIN DOING BUSINESS -- IT'S ANOTHER

11:32:24  3    NAME ON THE ACCOUNT, RIGHT?

11:32:27  4    A.   THIS IS FOR FLORENCE TRADING COMPANY.

11:32:29  5    Q.   RIGHT.  AND THAT'S PART OF EXHIBIT 591, RIGHT?

11:32:34  6    A.   ALL I'M LOOKING AT IS THIS ONE SHEET SO I DON'T KNOW WHAT

11:32:37  7    IT'S PART OF.  IT DOES SAY 591-037.

11:32:42  8    Q.   OKAY.  AND THAT'S ALSO DATED 4-22-04?

11:32:46  9    A.   NO, IT'S MAY 4TH, 2004.

11:32:51  10   Q.   OKAY.  IS THAT DIFFERENT THAN 4-22-04?

11:32:57  11   A.   OH, I SEE, THE 4-22-04, OPENED, THEN SCANNED MAY 4TH.

11:33:03  12   Q.   OKAY.  AND THAT LISTS MEILI LIN AS THE PRESIDENT, RIGHT?

11:33:07  13   A.   LISTS MEILI LIN AS THE VICE PRESIDENT.

11:33:11  14   Q.   CORRECT.  AND LISTS HER FATHER TIEN FU LIN AS THE

11:33:16  15   PRESIDENT, CORRECT?

11:33:17  16   A.   CORRECT.

11:33:18  17   Q.   AND IT DOESN'T LIST HENRY HORNG AS HAVING ANYTHING TO DO

11:33:21  18   WITH FLORENCE TRADING, RIGHT?

11:33:24  19   A.   RIGHT.

11:33:24  20   Q.   AND WHEN YOU TALKED TO THE TAXPAYERS, THEY INDICATED THAT

11:33:27  21   FLORENCE TRADING WAS AN OLD COMPANY, RIGHT?

11:33:30  22   A.   YES, THEY INDICATED IT WAS AN INACTIVE COMPANY.

11:33:36  23   Q.   IT MAY HAVE HAD SOMETHING TO DO WITH TRADING SCRAP PAPER,

11:33:40  24   RIGHT?

11:33:40  25   A.   MANY, MANY YEARS AGO.

CROSS-EXAMINATION BY MR. CANNON

11:33:41 1    Q.   AND YOU LATER LEARNED THAT MEI-ZU LIN WAS TRADING SCRAP

11:33:45 2    PAPER, RIGHT?

11:33:46 3    A.   NO, I NEVER LEARNED THAT.

11:33:47 4    Q.   OKAY.  SO IF YOU COULD GO BACK TO THE 2006 GROSS RECEIPTS

11:34:00 5    WORK PAPER, AND IF YOU COULD LOOK AT THE SECOND PAGE OF THAT

11:34:02 6    BATES NUMBER, 8976.

11:34:11 7    A.   YES.

11:34:11 8    Q.   THE BOTTOM PARAGRAPH OF THAT, DID YOU INDICATE IN YOUR

11:34:18 9    WORK PAPER THAT MEILI LIN STATED TO REVENUE AGENT GARRISON

11:34:22 10   DURING THEIR INTERVIEW THAT FLORENCE TRADING WAS NOT AN ACTIVE

11:34:31 11   BUSINESS?

11:34:31 12   A.   YES.

11:34:34 13   Q.   AND YOU DIDN'T SAY THAT HENRY HORNG STATED THAT, CORRECT?

11:34:41 14   A.   MEILI LIN STATED THAT.

11:34:52 15   Q.   NOW IF YOU LOOK AT THE NEXT PAGE OF YOUR GROSS RECEIPTS

11:34:54 16   WORK PAPER IN THE THIRD PARAGRAPH, WHEN YOU WROTE "THE SERVICE

11:35:10 17   CONTENDS THESE PAYMENTS ARE ACTUALLY RETURNS OF REIJIN

11:35:13 18   INTERNATIONAL'S GROSS RECEIPTS THAT WERE DEPOSITED TO THE

11:35:15 19   NOMINEE ACCOUNTS?"

11:35:17 20   A.   I DON'T SEE THAT.  YOU SAID THE THIRD PAGE?

11:35:19 21   Q.   THE -- BATES NUMBER 108977?

11:35:27 22   A.   OKAY.

11:35:37 23   Q.   AND THE THIRD PARAGRAPH OF THAT PAGE, THE LAST SENTENCE OF

11:35:41 24   THE THIRD PARAGRAPH.

11:35:43 25   A.   YES, BASED ON THE KNOWLEDGE I HAD AT THE TIME, I DID WRITE

11:35:46  1    THAT.

11:35:46  2    Q.   OKAY.  AND ONCE AGAIN, I DON'T WANT TO SAY THIS TOO MANY

11:35:52  3    TIMES, BUT BASED ON THE KNOWLEDGE YOU HAD AT THE TIME, THE

11:35:55  4    KNOWLEDGE YOU HAD AT THE TIME YOU GOT FROM BANK RECORDS AND

11:35:57  5    FROM INTERVIEWS WITH THE TAXPAYERS, BUT YOU HADN'T DONE OTHER

11:36:01  6    INVESTIGATION, RIGHT?

11:36:01  7    A.   I COULDN'T GET THE FOREIGN RECORDS, YES.

11:36:04  8    Q.   OKAY.  AND ONCE AGAIN, WHEN YOU SAY THE SERVICE CONTENDS,

11:36:09  9    THAT'S AGENT GARRISON CONTENDS, RIGHT?

11:36:12  10   A.   WELL, IT'S THE SERVICE CONTENDS WHEN I WRITE UP MY WORK

11:36:15  11   PAPERS, BECAUSE I'M WRITING THAT FOR THE GOVERNMENT.

11:36:18  12   Q.   OKAY.  AND IN THAT PARAGRAPH, YOU REFER TO NOMINEE

11:36:24  13   ACCOUNTS, RIGHT?

11:36:26  14   A.   YES.

11:36:26  15   Q.   AND SO IT WAS YOUR BELIEF OR SUSPICION, OR WHATEVER IT

11:36:31  16   WAS, THAT SOME OF THESE ACCOUNTS WERE NOMINEE, ACCOUNTS?

11:36:35  17   A.   COULD BE.

11:36:36  18   Q.   COULD BE NOMINEE ACCOUNTS.

11:36:41  19        AND IT COULD BE ALSO TRUE THAT THESE ACCOUNTS IN THE NAME

11:36:43  20   OF MEILI LIN COULD BE NOMINEE ACCOUNTS FOR HER MOTHER OR HER

11:36:49  21   BROTHER TOO, CORRECT?

11:36:49  22   A.   CORRECT.

11:36:50  23   Q.   AND YOU HAVE A SECTION IN THAT REPORT DEALING WITH

11:37:05  24   LIFESTYLE, RIGHT?

11:37:06  25   A.   YES.

CROSS-EXAMINATION BY MR. CANNON

```
11:37:07   1      Q.   AND ONE OF THE THINGS THAT STRUCK YOUR EYE, WAS THE REVIEW

11:37:12   2      OF BANK RECORDS REVEALED EXTRAVAGANT PURCHASES.  AND

11:37:18   3      "EXTRAVAGANT" WAS YOUR WORD, RIGHT?

11:37:19   4      A.   YES.

11:37:20   5      Q.   OF A $170,000 AUTOMOBILE, RIGHT?

11:37:23   6      A.   THEY BOUGHT A BENTLEY AND A FERRARI.

11:37:28   7      Q.   CORRECT.

11:37:28   8      A.   CASH.

11:37:29   9      Q.   SO THOSE WERE EXTRAVAGANT PURCHASES, RIGHT?

11:37:32  10      A.   I BELIEVE THOSE WERE EXTRAVAGANT.

11:37:34  11      Q.   AND IF THOSE WOULD HAVE BEEN NOT FOR MR. HORNG AND

11:37:40  12      MS. LIN, BUT FOR MS. LIN'S BROTHER WITH HIS MONEY, THAT

11:37:45  13      WOULDN'T BE EXTRAVAGANT FOR THEM, WOULD IT?

11:37:48  14      A.   I DON'T KNOW.  I DIDN'T -- I SAW A FERRARI TITLED IN MEILI

11:37:54  15      LIN'S NAME, PAID FOR WITH MONEY FROM THE REIJIN ACCOUNT.

11:37:59  16      Q.   CORRECT.  BUT IF MEILI LIN WAS ACTING AS A NOMINEE FOR HER

11:38:04  17      BROTHER, THAT WOULD BE HER BROTHER'S CAR, RIGHT?

11:38:07  18      A.   IT WOULDN'T BE HER BROTHER'S CAR IF IT'S REGISTERED TO

11:38:12  19      HER, KEPT AT HER HOME AND HE LIVES IN A DIFFERENT COUNTRY,

11:38:15  20      WOULD IT?

11:38:15  21      Q.   WELL, ONE OF THE THINGS THAT THE IRS OFTEN HAS TO DEAL

11:38:18  22      WITH IS NOMINEES, RIGHT?

11:38:20  23      A.   YES.

11:38:20  24      Q.   AND THAT'S A WORD THAT YOU USE, RIGHT?

11:38:23  25      A.   YES.
```

CROSS-EXAMINATION BY MR. CANNON

11:38:23  1    Q.   AND THAT'S WHERE ONE PERSON IS HOLDING SOMETHING FOR

11:38:27  2    SOMEBODY ELSE, RIGHT?

11:38:28  3    A.   THAT'S WHERE ONE PERSON OPENS AN ACCOUNT, GETS ADDED ON AS

11:38:32  4    POWER OF ATTORNEY SO THEY CAN MOVE THINGS THROUGH THAT ACCOUNT,

11:38:35  5    AND IF THEY ARE NOT THE PRIMARY PERSON ON THE ACCOUNT, THEN

11:38:37  6    THEY MIGHT NOT ---THE INCOME RECEIPTS WOULDN'T BE REPORTED TO

11:38:43  7    THEM.

11:38:43  8    Q.   AND IT'S NOT EVEN THE PRIMARY PERSON ON THE ACCOUNT,

11:38:45  9    SOMETIMES ONE PERSON SAYS HERE HOLD THIS FOR ME, RIGHT?

11:38:48  10   A.   COULD BE.

11:38:49  11   Q.   AND THAT PERSON WOULD THEN BE A NOMINEE?

11:38:53  12   A.   I'M NOT SURE.

11:39:04  13   Q.   NOW IF YOU GO TO THE NEXT PAGE OF YOUR WORK PAPER, BATES

11:39:13  14   NUMBER 8978, YOU WROTE OUT WHAT YOU THOUGHT THE TAXPAYER'S

11:39:20  15   POSITION WAS, RIGHT?

11:39:21  16   A.   YES.

11:39:22  17   Q.   BECAUSE THIS WAS KIND OF, WE HAD THE TAXPAYER'S POSITION

11:39:26  18   AND WE HAD AGENT GARRISON'S POSITION, RIGHT?

11:39:30  19   A.   YES.

11:39:31  20   Q.   AND THE TAXPAYERS WERE ALWAYS CONSISTENT THAT THE MONEYS

11:39:37  21   DEPOSITED TO THEIR ACCOUNTS ARE NOT REALLY THEIR MONEY, RIGHT?

11:39:39  22   A.   YES.

11:39:40  23   Q.   AND IT'S THE MONEY OF THEIR ONE AND ONLY CUSTOMER, TO USE

11:39:46  24   YOUR WORDS, TIANJIN METAL, SORRY ABOUT THIS, TIANJIN RUIYU

11:39:50  25   METAL PRODUCTS, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

11:39:53  1    A.    THAT'S WHAT THEY SAID.

11:39:54  2    Q.    OKAY.  AND YOU SAID THAT THE SERVICE DOES NOT FIND THIS

11:40:01  3    EXPLANATION TO BE PLAUSIBLE, RIGHT?

11:40:03  4    A.    RIGHT.

11:40:04  5    Q.    SO THIS WAS YOUR BELIEF?

11:40:08  6    A.    YES.

11:40:10  7    Q.    AND ONCE AGAIN, YOU TALK ABOUT THE DIFFICULTY OF GETTING

11:40:13  8    EVIDENCE FROM CHINA.

11:40:16  9    A.    YES.

11:40:16  10   Q.    BUT YOU DIDN'T REALLY HAVE SPECIFIC HARD EVIDENCE THAT YOU

11:40:24  11   COULD POINT TO TO CONTRADICT THE TAXPAYER'S BELIEF DID YOU --

11:40:29  12   TIP'S POSITION?

11:40:30  13   A.    WELL, YEAH, I ACTUALLY DID.  THE MONEY GOING INTO THEIR

11:40:34  14   ACCOUNT THAT IS ONLY THEIR NAMES ON IT, TIANJIN WASN'T ON THE

11:40:39  15   ACCOUNT.

11:40:40  16   Q.    OKAY.  SO IT WAS -- THE MOST IMPORTANT THING TO YOU WAS

11:40:44  17   WHOSE NAME WAS ON THE ACCOUNT, RIGHT?

11:40:46  18   A.    A BUSINESS ACCOUNT GETTING MILLIONS OF DOLLARS, YES, THAT

11:40:52  19   CAUGHT MY ATTENTION.

11:40:52  20   Q.    THAT WAS -- IT CAUGHT YOUR ATTENTION AND THAT WAS REALLY

11:40:56  21   DETERMINATIVE TO YOU, RIGHT?

11:40:57  22   A.    IT DETERMINED FURTHER INVESTIGATION.

11:41:00  23   Q.    RIGHT.  AND ONCE YOU SAW THE MONEY GOING INTO THE ACCOUNT,

11:41:04  24   THAT WAS IT, GAME OVER?

11:41:06  25   A.    OH, NO.  IT WASN'T GAME OVER.

11:41:08  1    Q.   WELL, YOU NEVER SAW ANYTHING OTHER THAN THAT, DID YOU?

11:41:12  2    A.   WHAT DO YOU MEAN BY THAT?

11:41:14  3    Q.   WELL, YOU HAVE MONEY GOING INTO THE BANK OF AMERICA

11:41:18  4    ACCOUNT?

11:41:19  5    A.   YES.

11:41:20  6    Q.   AND YOU HAVE SOME EXPENDITURES.

11:41:22  7    A.   YES.

11:41:22  8    Q.   BUT YOU DON'T HAVE OTHER ADDITIONAL INCOME FROM AN EXPERT

11:41:30  9    IN THE SCRAP BUSINESS, YOU DON'T HAVE AN ACCOUNTANT THAT SAYS

11:41:37  10   OH, THIS WAS INCOME?

11:41:39  11   A.   I DON'T HAVE THEIR ACCOUNTANT SAYING THAT.

11:41:42  12   Q.   YOU DON'T HAVE ANOTHER -- YOU DON'T HAVE EVIDENCE, YOU

11:41:47  13   HAVE -- TO SAY THIS IS THEIR INCOME.  YOU HAVE NO EVIDENCE THAT

11:41:54  14   IT'S NOT THE INCOME OF TRMP, RIGHT?

11:41:57  15   A.   I DON'T HAVE EVIDENCE THAT ANYONE OTHER THAN THE PEOPLE ON

11:42:02  16   THE BANK ACCOUNT WHO HAD ACCESS TO THE MONEY, I HAVE NO

11:42:07  17   INDICATION THAT IT'S NOT THEIR MONEY.

11:42:09  18   Q.   CORRECT.  AND THIS IS WHY I WAS TALKING TO YOU ABOUT

11:42:12  19   NOMINEES BEFORE.

11:42:12  20        IF YOU ARE HOLDING MONEY FOR SOMEONE ELSE, AND THAT'S WHY

11:42:17  21   WHEN YOU FILL OUT THESE FORMS, YOU HAVE TO SAY WHETHER YOU ARE

11:42:21  22   HOLDING IT FOR SOMEONE ELSE, RIGHT, IT'S IMPORTANT?

11:42:24  23   A.   YEAH, I'M UNAWARE OF THAT.

11:42:27  24   Q.   AND THEY ALWAYS TOLD YOU THEY WERE HOLDING IT FOR OTHER

11:42:31  25   PEOPLE, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 11:42:31 | 1 | A.   THEY ALWAYS SAID THE MONEY WASN'T THEIRS. |
| 11:42:33 | 2 | Q.   AND YOU JUST REJECTED THAT? |
| 11:42:35 | 3 | A.   YES. |
| 11:42:42 | 4 | Q.   NOW IN PREPARING THIS WORK PAPER, YOU DID A LOT OF |
| 11:42:45 | 5 | RESEARCH, RIGHT, WELL, SOME RESEARCH, RIGHT?  YOU LOOKED UP TAX |
| 11:42:52 | 6 | COURT CASES? |
| 11:42:53 | 7 | A.   YES. |
| 11:42:55 | 8 | Q.   YOU DIDN'T LOOK UP -- AND WE WENT OVER THIS BEFORE, YOU |
| 11:42:58 | 9 | DIDN'T LOOK UP ANYTHING ABOUT THE SCRAP BUSINESS IN PARTICULAR, |
| 11:43:01 | 10 | RIGHT? |
| 11:43:01 | 11 | A.   NOT THAT I RECALL. |
| 11:43:02 | 12 | Q.   OKAY.  AND ONCE AGAIN, IF YOU LOOK ON 108979, YOU HAVE A |
| 11:43:19 | 13 | NUMBER 2 HALFWAY DOWN THE PAGE? |
| 11:43:22 | 14 | A.   YES. |
| 11:43:22 | 15 | Q.   AND UP ABOVE IT, LAST SENTENCE, AGAIN, WHERE YOU SAID THE |
| 11:43:29 | 16 | GOVERNMENT DOES NOT FIND THIS EXPLANATION CREDIBLE. |
| 11:43:34 | 17 | A.   IN WHICH PARAGRAPH? |
| 11:43:35 | 18 | Q.   THE LAST SENTENCE OF -- |
| 11:43:37 | 19 | A.   OH, YES, ON ITEM 1.  I THOUGHT YOU WERE TALKING ABOUT |
| 11:43:43 | 20 | ITEM 2.  WHICH ONE? |
| 11:43:43 | 21 | Q.   AND ONCE AGAIN, YOU DIDN'T FIND THIS EXPLANATION CREDIBLE, |
| 11:43:46 | 22 | RIGHT? |
| 11:43:46 | 23 | A.   ARE YOU TALKING ABOUT ITEM 1 OR -- |
| 11:43:48 | 24 | Q.   YES, ITEM 1, LAST SENTENCE OF ITEM 1. |
| 11:43:59 | 25 | A.   NO, I DID NOT FIND THAT EXPLANATION CREDIBLE. |

11:44:02  1    Q.   OKAY.  AND THE REASON YOU WERE DOING THIS, YOU WERE TRYING

11:44:05  2    TO FIND OUT IF REIJIN WAS AN AGENT OR A BROKER, RIGHT?

11:44:12  3    A.   I WANTED TO SEE IF THEY QUALIFIED AS AN AGENCY, YES.

11:44:18  4    Q.   OKAY.  AND THERE ARE A LOT OF POINTS THAT YOU LOOKED AT TO

11:44:21  5    DETERMINE THAT, RIGHT?

11:44:22  6    A.   YES.

11:44:23  7    Q.   AND SO ONE OF THE THINGS THAT YOU'VE LOOKED AT IS WHETHER

11:44:29  8    THEY BIND THE PRINCIPAL BY THEIR ACTIONS, RIGHT?

11:44:35  9    A.   RIGHT.

11:44:35  10   Q.   AND YOU SAID IN THIS CASE THERE'S NO WAY REIJIN CAN BIND

11:44:38  11   THE PRINCIPAL BY THEIR ACTIONS, RIGHT?

11:44:41  12   A.   I SAID WHEN AN ORDER WAS PLACED FOR METALS, REIJIN

11:44:49  13   INTERNATIONAL WAS THE ONE BOUND BY THE AGREEMENT WITH THE

11:44:51  14   SUPPLIER.

11:44:52  15        THERE WAS NEVER ANY INVOICES THAT REFERENCED THAT TIANJIN

11:45:00  16   WAS BOUND.  IF THEY HAD DEFAULTED ON THAT PAYMENT, THAT'S A

11:45:04  17   DEFAULT ON THEM.  IT'S IN THEIR NAME, IT WASN'T IN TIANJIN'S.

11:45:09  18   Q.   WELL, LET'S KIND OF UNPACK THIS A LITTLE BIT, OKAY?

11:45:13  19   A.   OKAY.

11:45:13  20   Q.   BECAUSE IF YOU ARE GOING TO BUY SCRAP METAL, WE'VE HEARD A

11:45:17  21   LOT ABOUT THAT PROCESS, OKAY?

11:45:19  22   A.   YES.

11:45:19  23   Q.   SO THE MONEY CAME INTO THE REIJIN BANK OF AMERICA ACCOUNT

11:45:24  24   IN ADVANCE OF A PURCHASE, RIGHT?

11:45:27  25   A.   THAT'S WHAT I SAID.

CROSS-EXAMINATION BY MR. CANNON                                    803

11:45:29   1    Q.   AND SO THEN REIJIN, THAT'S MEILI LIN AND HER HUSBAND

11:45:35   2    HENRY, WOULD PURCHASE SCRAP METAL, RIGHT?

11:45:37   3    A.   YES.

11:45:38   4    Q.   AND SO THEY WOULD THEN WIRE THE MONEY, BECAUSE YOU HAD TO

11:45:42   5    PAY IN ADVANCE TO BUY THE SCRAP METAL, RIGHT?

11:45:44   6    A.   YES.

11:45:45   7    Q.   SO THE MONEY THAT WAS PUT IN REIJIN'S ACCOUNT IN ADVANCE

11:45:51   8    OF EVEN LOOKING FOR THE PURCHASE, WOULD BE GONE AS SOON AS THE

11:45:57   9    PURCHASE WAS MADE, RIGHT?

11:46:00   10   A.   IT WASN'T THE SAME AMOUNT OF MONEY.

11:46:03   11   Q.   CORRECT.  THERE WERE DIFFERENT AMOUNTS, BUT ONCE REIJIN

11:46:08   12   SHIPPED THAT MONEY TO THE SCRAP METAL SUPPLIER, THE MONEY WAS

11:46:11   13   GONE, RIGHT?

11:46:12   14   A.   YES.

11:46:14   15   Q.   SO WHEN THE MONEY THAT WAS SHIPPED IN IS THEN OUT, IT

11:46:20   16   CERTAINLY SEEMS LIKE THEY'RE BOUND, DOESN'T IT?

11:46:23   17   A.   NO, NOT TIANJIN, HOW IS THAT?

11:46:29   18   Q.   WELL, TIANJIN SHIPPED THE MONEY IN, RIGHT?

11:46:31   19   A.   TIANJIN AND OTHERS SHIPPED THE MONEY IN.

11:46:35   20   Q.   AND THAT MONEY WAS USED TO PURCHASE SCRAP?

11:46:37   21   A.   REIJIN PURCHASED SCRAP, AND THE INVOICES CAME TO REIJIN.

11:46:42   22   Q.   CORRECT.

11:46:44   23   A.   NOT TIANJIN.

11:46:46   24   Q.   CORRECT.  AND REIJIN USED THE MONEY THAT HAD BEEN WIRED IN

11:46:50   25   TO PURCHASE THE SCRAP?

CROSS-EXAMINATION BY MR. CANNON

11:46:51  1    A.   YES.

11:46:51  2    Q.   SO THE MONEY WAS GONE?

11:46:53  3    A.   THE MONEY OUT OF REIJIN'S ACCOUNT, THE ACCOUNT THAT WAS IN

11:46:57  4    REIJIN'S NAME, THE MONEY WAS GONE TO PURCHASE MATERIALS THAT

11:47:02  5    WERE PURCHASED IN THE NAME OF REIJIN.

11:47:05  6    Q.   CORRECT.  SO REIJIN HAD NO RISK?

11:47:08  7    A.   HOW CAN YOU SAY REIJIN HAD NO RISK?

11:47:11  8    Q.   BECAUSE THEY GOT THE MONEY IN ADVANCE, THEY PURCHASE THE

11:47:15  9    SCRAP AND THEY PAID FOR THE SCRAP?

11:47:16  10   A.   THEY DIDN'T PAY FOR IT, THEY ARE THE ONES THAT THE

11:47:20  11   SUPPLIERS WOULD HAVE RECOURSE AGAINST.  SO I WOULD SAY THEY DID

11:47:24  12   HAVE RISK.

11:47:24  13   Q.   CORRECT.  BUT THEY HAD TO PAY THE SUPPLIERS BEFORE THE

11:47:27  14   SUPPLIERS WOULD TURN IT OVER?

11:47:29  15   A.   OKAY.

11:47:31  16   Q.   SO REIJIN DIDN'T HAVE THE RISK, RIGHT?

11:47:35  17   A.   WELL, I THINK IF THEY PURCHASED IT, THAT THE RISK IS ON

11:47:38  18   THEM.

11:47:39  19   Q.   BUT IF THEY PAID IN ADVANCE FOR THEIR PURCHASES, WHERE'S

11:47:44  20   THE RISK?

11:47:47  21   A.   I DON'T KNOW, WHERE IS THE RISK ON TIANJIN?

11:47:51  22   Q.   ON TIANJIN?

11:47:52  23   A.   YEAH.

11:47:53  24   Q.   IF THEIR AGENT WOULD JUST KEEP THE MONEY AND RUN AWAY,

11:47:57  25   THAT'S A RISK.

CROSS-EXAMINATION BY MR. CANNON

11:48:32  1      JONATHAN COULD YOU PLEASE PULL UP THE 2003 TAX RETURN.

11:48:58  2  SCHEDULE E, SPECIFICALLY.

11:49:08  3      OKAY.  THIS IS EXHIBIT 2 IN EVIDENCE.  IF WE COULD KIND OF

11:49:13  4  GO DOWN TO THE RENTAL INCOME.  OH, THIS IS SCHEDULE C.

11:49:22  5  SCHEDULE E, PLEASE.

11:49:41  6          THE COURT:  THIS IS THE 2007 TAX RETURN?

11:49:45  7          MR. CANNON:  THE 2007 TAX RETURN, SCHEDULE E, PLEASE.

11:49:51  8  AS IN, NOT SO EASY.

11:50:05  9  Q.  SO IF YOU LOOK AT THE 2007 TAX RETURN, SCHEDULE E, IN

11:50:08  10  EVIDENCE AS GOVERNMENT'S EXHIBIT 2, IS THAT A STATEMENT,

11:50:14  11  SUPPLEMENTAL INCOME AND LOSS STATEMENT, BUT IS THAT ESSENTIALLY

11:50:17  12  THE FORM WHERE THEY REPORT THEIR RENTAL INCOME?

11:50:21  13  A.  YES.

11:50:22  14  Q.  AND IF YOU GO TO LINE 2 -- LINE 3, I'M SORRY, DOES THAT

11:50:28  15  REPORT THE RENTS RECEIVED?

11:50:29  16  A.  YES.

11:50:30  17  Q.  AND DO THE RENTS TIE IN TO PARTICULAR PROPERTIES?

11:50:34  18  A.  YES.

11:50:36  19  Q.  AND SO DID THEY RECEIVE $100,000 FOR THE RENT ON MINNA?

11:50:43  20  A.  YES, THEY DID.

11:50:44  21  Q.  AND 11,000 FOR 88 SOUTH BROADWAY?

11:50:49  22  A.  YES.

11:50:49  23  Q.  AND 67 FOR 1446 RHODE ISLAND?

11:50:54  24  A.  YES.

11:50:54  25  Q.  AND THEN DOES IT SHOW MORTGAGE INTEREST DEDUCTIONS?

CROSS-EXAMINATION BY MR. CANNON

11:50:57  1    A.   YES.

11:50:58  2    Q.   AND AS WE KIND OF GO DOWN TO THE BOTTOM, LET'S GET TO THE

11:51:01  3    BOTTOM LINE, DOES IT SHOW DEPRECIATION IN LINE 20 OF $199,000?

11:51:12  4    A.   YES.

11:51:13  5    Q.   AND WE TALKED THE OTHER DAY ABOUT DEPRECIATION, RIGHT?

11:51:19  6    A.   RIGHT.

11:51:19  7    Q.   AND DEPRECIATION IS KIND OF A PHANTOM EXPENSE, RIGHT?

11:51:24  8    A.   YEAH, YOU COULD CALL IT THAT.

11:51:26  9    Q.   IT'S WHY IT MAKES INVESTING IN REAL ESTATE A GOOD DEAL?

11:51:31  10   A.   YEAH.

11:51:33  11   Q.   BECAUSE YOU GET TO BUY A KNOWLEDGE FOR A MILLION BUCKS AND

11:51:36  12   YOU GET TO DEPRECIATE A LARGE PART OF THAT COST OVER 27 AND A

11:51:41  13   HALF YEARS, RIGHT?

11:51:42  14   A.   CORRECT.

11:51:42  15   Q.   AND THAT COUNTS AS AN EXPENSE?

11:51:45  16   A.   YES.

11:51:45  17   Q.   AND SO EVEN THOUGH YOU HAVE SPENT THIS MILLION DOLLARS,

11:51:50  18   AND YOU HOPE THAT THE REAL ESTATE IS GOING TO GO UP, IN THE

11:51:53  19   MEANTIME, YOU GET TO WRITE OFF PORTIONS OF THE PURCHASE PRICE

11:51:56  20   EVERY YEAR, RIGHT?

11:51:57  21   A.   RIGHT.

11:51:57  22   Q.   AND THAT'S A TAX SHELTER, CORRECT?

11:52:03  23   A.   I DON'T KNOW IF IT'S A TAX SHELTER BUT IT'S A TAX

11:52:08  24   DEDUCTION.

11:52:09  25   Q.   IT'S A TAX DEDUCTION, IT'S IN THE TAX CODE?

CROSS-EXAMINATION BY MR. CANNON

11:52:12  1    A.   YES.

11:52:12  2    Q.   AND THE TAX CODE IS PRETTY FAVORABLE TO REAL ESTATE

11:52:15  3    INVESTMENTS?

11:52:15  4    A.   YES.

11:52:16  5    Q.   AND ONE OF THE REASONS IT'S SO FAVORABLE IS BECAUSE OF THE

11:52:20  6    ABILITY TO DEPRECIATE REAL ESTATE, RIGHT?

11:52:24  7    A.   IN RENTS RECEIVED.

11:52:29  8    Q.   EXCUSE ME?

11:52:30  9    A.   YEAH, AND IT'S FAVORABLE BECAUSE RENTS, ARE YOU TALKING

11:52:35  10   ABOUT WHAT MAKES A RENTAL PROPERTY FAVORABLE?

11:52:37  11   Q.   YEAH.

11:52:38  12   A.   YOU GET RENT, RENTAL INCOME.

11:52:40  13   Q.   BUT THE RENTAL INCOME YOU HAVE TO PAY TAX ON, RIGHT?

11:52:44  14   A.   YES.

11:52:44  15   Q.   BUT IT'S OFFSET TO A CERTAIN DEGREE BY THE DEPRECIATION,

11:52:49  16   RIGHT?

11:52:49  17   A.   TO A CERTAIN DEGREE, YES.

11:52:51  18   Q.   NOW LET'S KIND OF GO BACK TO THE TIMELINE, AND SO WHEN YOU

11:53:53  19   LOOK AT THIS TIMELINE, SO WE ARE NOW AT 6-30-10, THE DATE OF

11:54:02  20   THE WORK PAPER, RIGHT?

11:54:04  21   A.   SAY THAT AGAIN?

11:54:05  22   Q.   I'VE JUST ASKED YOU A BUNCH OF QUESTIONS ABOUT THE WORK

11:54:08  23   PAPER YOU PREPARED, RIGHT?

11:54:09  24   A.   YES.

11:54:10  25   Q.   AND IN THAT WORK PAPER YOU TOOK THE POSITION THAT THE

CROSS-EXAMINATION BY MR. CANNON

11:54:15  1    MONEY WIRED IN IS GROSS RECEIPTS TO REIJIN, RIGHT?

11:54:21  2    A.   WELL, AS I SAID, THIS NEVER WAS FINISHED, BECAUSE I DIDN'T

11:54:25  3    HAVE ENOUGH, I NEVER ISSUED A REPORT, I NEVER ISSUED THESE WORK

11:54:29  4    PAPERS, THE CASE NEEDED FURTHER DEVELOPMENT TO FIND OUT WHAT

11:54:38  5    WAS THAT MONEY, I DON'T KNOW.

11:54:39  6    Q.   OKAY.  AND YOU WERE THE LEAD REVENUE AGENT?

11:54:44  7    A.   YES.

11:54:45  8    Q.   AND YOU WERE DEALING WITH A CIVIL CASE?

11:54:49  9    A.   YES.

11:54:50 10    Q.   WITH A PREPONDERANCE OF THE EVIDENCE STANDARD?

11:54:57 11    A.   YES.

11:54:58 12    Q.   AND THERE WASN'T ENOUGH THERE YET, RIGHT?

11:55:00 13    A.   THIS CASE, LIKE I SAID, LOOKED LIKE A CRIMINAL CASE TO ME

11:55:04 14    AND IT NEEDED TO BE LOOKED AT.

11:55:06 15    Q.   IT NEEDED TO BE LOOKED AT, BUT YOU DIDN'T HAVE ENOUGH

11:55:08 16    EVIDENCE TO CONCLUDE YOUR CIVIL OPINION, DID YOU?

11:55:11 17    A.   NO.

11:55:11 18    Q.   OKAY.  AND THEN SO AFTER YOU PREPARED THIS WORK PAPER, YOU

11:55:17 19    MET WITH HENRY HORNG AND YOUR MANAGER AND CINDY SHI AGAIN,

11:55:25 20    RIGHT?

11:55:25 21    A.   YES, BUT I DIDN'T GIVE THEM THIS WORK PAPER.

11:55:27 22    Q.   AGREED.  THIS WAS YOUR ARGUMENT, AND THIS WAS -- YOU KNEW

11:55:31 23    WHERE YOU WERE GOING, RIGHT?

11:55:33 24    A.   BUT I WAS -- YES.  I WAS STILL OPEN TO THEIR EXPLANATIONS.

11:55:40 25    Q.   WELL, THEY HAD GIVEN YOU THE EXPLANATIONS IN DECEMBER,

CROSS-EXAMINATION BY MR. CANNON

11:55:45  1    THROUGH MS. SHI?

11:55:47  2    A.   YES.

11:55:48  3    Q.   AND THEY GAVE YOU THE EXPLANATIONS IN JANUARY WHEN BOTH

11:55:54  4    MR. HORNG AND MS. LIN WERE THERE, AS WELL AS THEIR

11:55:57  5    REPRESENTATIVE?

11:55:57  6    A.   YES.

11:55:58  7    Q.   SO YOU DIDN'T REALLY EXPECT THEIR EXPLANATIONS TO CHANGE,

11:56:02  8    DID YOU?

11:56:02  9    A.   THEY WANTED TO HAVE A CHANCE TO SPEAK WITH MY MANAGER TO

11:56:08  10   SEE IF MAYBE HE SAW THINGS THE WAY THEY DID.

11:56:13  11   Q.   RIGHT.  SO YOU WEREN'T EXPECTING ANYTHING TO CHANGE, WERE

11:56:16  12   YOU?

11:56:17  13   A.   I DIDN'T KNOW WHAT THEIR ANSWERS WERE GOING TO BE.

11:56:22  14   Q.   OKAY.  AND YOU HAD SUBMITTED A FRAUD REFERRAL BACK AT THE

11:56:28  15   END OF MARCH, RIGHT?

11:56:32  16   A.   TO MY MANAGER, BUT IT NEVER WENT FORWARD.

11:56:34  17   Q.   OKAY.  AND THEN YOU PREPARED A WORK PAPER ARGUING THAT ALL

11:56:42  18   THE MONEY COMING IN AS GROSS RECEIPTS IS INCOME, RIGHT?

11:56:47  19   A.   AS I SAID, MY WORK WAS NOT COMPLETE, I NEVER MADE A FINAL

11:56:52  20   DETERMINATION.

11:56:52  21   Q.   AND THEN YOU DECIDED TO HAVE A MEETING WITH THE TAXPAYERS

11:57:00  22   AND YOUR MANAGER AND THEIR REPRESENTATIVE, RIGHT?

11:57:02  23   A.   THEY REQUESTED IT.

11:57:03  24   Q.   OKAY.  AND YOU HAD THAT MEETING, RIGHT?

11:57:07  25   A.   AT THEIR REQUEST.

CROSS-EXAMINATION BY MR. CANNON

11:57:08  1    Q.   AND THEY DIDN'T SAY ANYTHING NEW?

11:57:13  2    A.   I DON'T KNOW WHETHER THEY SAID ANYTHING NEW.

11:57:16  3    Q.   THEY REAFFIRMED THEIR POSITION THAT ALL OF THE TRANSFERS

11:57:21  4    IN WERE THE MONEY OF TRMP AND FAMILY MONEY?

11:57:26  5    A.   THEY DIDN'T SAY FAMILY MONEY, THEY CONTINUED WITH THEIR

11:57:31  6    POSITION THAT THE MONEY IN THEIR ACCOUNT WAS NOT THEIRS.

11:57:35  7    Q.   WAS NOT THEIRS.

11:57:37  8         AND THE DAY AFTER THAT MEETING, YOU PREPARED A CRIMINAL

11:57:44  9    FRAUD REFERRAL, RIGHT?

11:57:45  10   A.   RIGHT.

11:57:47  11   Q.   SO YOU DIDN'T LEARN ANYTHING NEW AT THAT MEETING?

11:57:49  12   A.   WELL, THEY HAD THE CHANCE TO MAKE THEIR EXPLANATION TO MY

11:57:56  13   MANAGER.

11:57:58  14   Q.   AND YOU'RE THE PERSON THAT PREPARED THE CRIMINAL FRAUD

11:58:02  15   REFERRAL THE DAY AFTER THAT MEETING?

11:58:03  16   A.   YES, I PREPARED IT AND THEN I SENT IT ON.  THOSE HAVE TO

11:58:10  17   BE SIGNED OFF BY THE MANAGER, THE TERRITORY MANAGER, CRIMINAL

11:58:13  18   INVESTIGATION, IT'S NOT JUST MY DECISION.  MANY PEOPLE LOOK AT

11:58:17  19   THE CASE BEFORE IT'S ACCEPTED.

11:58:19  20   Q.   AND YOU HAD BEEN TRYING -- AND YOU HAD THOUGHT THIS WAS A

11:58:23  21   CRIMINAL CASE FROM DAY ONE, RIGHT?

11:58:26  22   A.   I THOUGHT THAT IT NEEDED TO BE LOOKED AT, THEY SAID THEY

11:58:33  23   DIDN'T WANT IT, SO --

11:58:35  24   Q.   AND ONCE AGAIN, YOU NEVER CONTACTED ANYBODY IN TRMP?

11:58:39  25   A.   ONCE AGAIN, I CAN'T CONTACT CHINA.

CROSS-EXAMINATION BY MR. CANNON



11:58:42  1    Q.   YOU NEVER CONTACTED ANYBODY AT ANY OF THE OTHER ENTITIES

11:58:46  2    THAT TRANSFER MONEY?

11:58:48  3    A.   AS I SAID, I NEVER CAN CONTACT CHINA.

11:58:51  4    Q.   YOU DIDN'T CONSULT IRS MANUALS REGARDING HOW THESE SCRAP

11:58:59  5    METAL BUSINESSES WORK?

11:59:00  6    A.   I DIDN'T CONSULT THE CASH INTENSIVE MANUAL, NO, BECAUSE I

11:59:06  7    DIDN'T HAVE A REASON TO.

11:59:07  8    Q.   DID YOU DISCUSS ANY OTHER IRS MANUALS ON HOW TO AUDIT

11:59:11  9    SCRAP METAL BUSINESSES?

11:59:12  10   A.   I DON'T RECALL.

11:59:15  11   Q.   DID YOU FIND OUT ANYTHING ABOUT SCRAP METAL BUSINESSES?

11:59:18  12   A.   I DON'T RECALL.

11:59:19  13   Q.   IN YOUR NOTES IN THE QUESTIONS THAT YOU PREPARED, PEOPLE

11:59:49  14   WERE TALKING ABOUT -- ASKING QUESTIONS ABOUT THAT YESTERDAY,

11:59:53  15   AND A LOT OF TIMES YOU DIDN'T NOTE WHO SAID WHAT, RIGHT?

11:59:57  16   A.   RIGHT.

11:59:57  17   Q.   BUT YOU LEARNED A LOT OF THINGS, RIGHT?

12:00:01  18   A.   RIGHT.

12:00:02  19   Q.   AND ONE OF THE THINGS THAT YOU LEARNED WAS THAT THEY WERE

12:00:09  20   FROM TAIWAN, RIGHT?

12:00:14  21   A.   I DON'T KNOW THAT I LEARNED THEY WERE FROM TAIWAN, I KNOW

12:00:20  22   I LEARNED THEY ARE U.S. CITIZENS.

12:00:24  23   Q.   WELL, YOU ASKED -- ONE OF THE THINGS THAT YOU TESTIFIED TO

12:00:30  24   THE OTHER DAY WAS ASKING THEM ABOUT FOREIGN BANK ACCOUNTS; DO

12:00:36  25   YOU REMEMBER THAT?

CROSS-EXAMINATION BY MR. CANNON

12:00:36  1    A.   YES.

12:00:37  2    Q.   AND YOU KNEW THAT THEY WERE IMMIGRANTS FROM TAIWAN?

12:00:44  3    A.   I DON'T KNOW WHETHER I KNEW THEY WERE IMMIGRANTS FROM

12:00:47  4    TAIWAN.

12:00:48  5    Q.   WELL, YOU LOOKED AT THEIR IMMIGRATION FILES, RIGHT, WE

12:00:53  6    TALKED ABOUT THAT BEFORE?

12:00:54  7    A.   I CONFIRMED WITH THEM THAT -- I DIDN'T LOOK AT THEIR

12:00:57  8    IMMIGRATION FILES.

12:00:59  9    Q.   WELL, YOU GOT SOME INFORMATION ABOUT THEIR IMMIGRATION

12:01:01  10   STATUS?

12:01:01  11   A.   THERE WAS SOMETHING ON THE TRANSCRIPTS, BUT I DIDN'T -- WE

12:01:05  12   CAN'T GO OFF OF THAT.  SO I ASKED THEM AND THEY TOLD ME THEY

12:01:09  13   WERE EACH U.S. CITIZENS.

12:01:11  14   Q.   AND THEY TOLD YOU THEY WERE U.S. CITIZENS.  AND YOU KNEW

12:01:14  15   THAT THEY GOT -- THEY CAME TO THE UNITED STATES ABOUT

12:01:19  16   COLLEGE-AGE OR LATER?

12:01:20  17   A.   I DON'T RECALL LEARNING WHEN THEY CAME HERE, I DON'T KNOW

12:01:25  18   THAT I ASKED THAT.

12:01:26  19   Q.   NO, BUT --

12:01:27  20   A.   I DON'T KNOW.

12:01:28  21   Q.   BUT WHEN YOU CHECKED THEIR IMMIGRATION STATUS, WE TALKED

12:01:30  22   ABOUT THAT EARLIER, YOU LEARNED THAT THEY CAME IN ON A

12:01:34  23   STUDENT -- THAT MR. HORNG CAME IN ON A STUDENT VISA, RIGHT?

12:01:38  24   A.   THAT'S WHAT THE -- I DON'T KNOW IF IT WAS MR. HORNG, I

12:01:42  25   THOUGHT HE WAS AND SHE WAS A NON-WORKING ALIEN, ACCORDING TO

CROSS-EXAMINATION BY MR. CANNON

12:01:47  1     TRANSCRIPTS.  BUT I DON'T KNOW, I HAVEN'T SEEN THAT BEFORE, SO

12:01:54  2     I ASKED THEM TO CONFIRM THAT THEY'RE CITIZENS.

12:01:58  3     Q.   OKAY.  BUT SO YOU KNEW THEY LIVED IN THE COUNTRY BEFORE

12:02:02  4     COMING TO THE UNITED STATES, RIGHT?

12:02:03  5     A.   I DON'T RECALL, IT WAS A LONG TIME AGO.

12:02:06  6     Q.   AND IF YOU LIVE OUTSIDE THE UNITED STATES -- IF YOU LIVE

12:02:10  7     ALMOST ANYWHERE IN THE WORLD, YOU ARE GOING TO HAVE A BANK

12:02:12  8     ACCOUNT IN THE COUNTRY THAT YOU LIVE IN, RIGHT?

12:02:14  9     A.   YOU WOULD THINK SO.

12:02:15  10    Q.   SO THE IDEA THAT SOMEBODY WOULD SAY I'VE NEVER HAD A BANK

12:02:20  11    ACCOUNT ANYWHERE OTHER THAN THE UNITED STATES EVER, WHEN YOU'RE

12:02:24  12    AN IMMIGRANT, SEEMS A LITTLE ODD, DOESN'T IT?

12:02:26  13    A.   YES, IT DOES.

12:02:28  14    Q.   AND THAT'S NOT SOMETHING THAT YOU ASK QUESTIONS ABOUT, YOU

12:02:32  15    CAN SAY, OH, COME ON, GIVE ME A BREAK, YOU CAME HERE IN GRADE

12:02:37  16    SCHOOL, WHEN YOU WERE IN HIGH SCHOOL WORKING PART TIME, WHERE

12:02:40  17    DID YOU PUT YOUR WAGES, DID YOU ASK THAT QUESTION?

12:02:45  18    A.   NO.

12:03:02  19    Q.   AND IN THE KIND OF QUESTIONS THAT YOU PREPARED THAT ASK

12:03:07  20    EVERYBODY, CINDY SHI TOLD YOU THAT THE FAMILY WAS FROM -- THAT

12:03:12  21    MEILI LIN WAS FROM A WEALTHY FAMILY IN CHINA?

12:03:15  22    A.   SHE COMES FROM A WEALTHY FAMILY, YES.

12:03:18  23    Q.   AND THAT'S WHAT LOTS OF PEOPLE TOLD YOU?

12:03:23  24    A.   THAT'S WHAT MS. SHI TOLD ME, I DON'T KNOW LOTS OF PEOPLE,

12:03:28  25    I DON'T KNOW ANYONE ELSE THAT TOLD ME THAT.

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 12:03:30 | 1 | Q.   YOU NEVER HAD ANY EVIDENCE TO CONTRADICT THAT, DID YOU? |
| 12:03:34 | 2 | A.   NO. |
| 12:03:34 | 3 | Q.   OKAY.  AND DID YOU ASK QUESTIONS ABOUT WHAT KINDS OF BOOKS |
| 12:03:40 | 4 | AND FAMILY BOOKS AND RECORDS THERE WERE? |
| 12:03:44 | 5 | A.   FAMILY BOOKS? |
| 12:03:47 | 6 | Q.   YES. |
| 12:03:49 | 7 | A.   WHAT DO YOU MEAN, PHOTO ALBUMS?  WHAT ARE YOU TALKING |
| 12:03:51 | 8 | ABOUT? |
| 12:03:52 | 9 | Q.   DID YOU ASK IF THEY KEPT ANY KIND OF BOOKS DETERMINING |
| 12:03:55 | 10 | WHAT FAMILY MONEY WAS ALLOCATED TO WHICH PERSON? |
| 12:03:58 | 11 | A.   NO. |
| 12:04:08 | 12 | THE COURT:  MR. CANNON, WE ARE GOING TO NEED TO TAKE |
| 12:04:11 | 13 | OUR LUNCH BREAK.  I WAS LOOKING FOR A BREAK IN YOUR QUESTIONS. |
| 12:04:14 | 14 | MR. CANNON:  THAT'S FINE, YOUR HONOR.  BECAUSE THEN I |
| 12:04:16 | 15 | CAN KIND OF REORGANIZE, AND I WILL BE PRETTY QUICK AFTER LUNCH. |
| 12:04:20 | 16 | THE COURT:  THAT'S GREAT. |
| 12:04:21 | 17 | OKAY.  WE ARE GOING TO TAKE OUR LUNCH BREAK.  LET'S COME |
| 12:04:25 | 18 | BACK AT TEN MINUTES PAST ONE. |
| 12:04:38 | 19 | (WHEREUPON A RECESS WAS TAKEN.) |
| 01:13:13 | 20 | THE COURT:  ALL RIGHT.  PLEASE BE SEATED, EVERYONE. |
| 01:13:16 | 21 | ALL COUNSEL AND PARTIES ARE PRESENT.  AND ALL OF OUR |
| 01:13:18 | 22 | JURORS AND ALTERNATES ARE HERE. |
| 01:13:21 | 23 | MR. CANNON, WOULD YOU LIKE TO CONTINUE? |
| 01:13:23 | 24 | MR. CANNON:  THANK YOU, YOUR HONOR. |
| 01:13:23 | 25 | Q.   SO I THOUGHT I WOULD BEAT SOME THINGS TO DEATH, APPARENTLY |

CROSS-EXAMINATION BY MR. CANNON                                815

```
01:13:30   1       I DIDN'T, BECAUSE PEOPLE TOLD ME I WASN'T CLEAR, SO I WILL TRY
01:13:34   2       TO CLARIFY SOME THINGS, OKAY?
01:13:37   3            WE TALKED ABOUT MONEY BEING TRANSFERRED INTO THE REIJIN
01:13:41   4       BANK OF AMERICA ACCOUNT, CORRECT?
01:13:42   5       A.   CORRECT.
01:13:42   6       Q.   AND WE TALKED ABOUT THAT MONEY BEING USED TO PAY FOR
01:13:45   7       SCRAP, RIGHT?
01:13:46   8       A.   YES.
01:13:46   9       Q.   AND SO -- AND THE SCRAP HAD TO BE PAID FOR BEFORE IT WAS
01:13:51  10       PURCHASED, RIGHT?
01:13:53  11       A.   BEFORE IT WAS SHIPPED.
01:13:55  12       Q.   IT WAS BEFORE IT WAS SHIPPED, RIGHT.
01:13:57  13            SO FOR EXAMPLE, MR. HEITMEIER TESTIFIED THE OTHER DAY, AND
01:14:06  14       HE'S ONE OF THE PEOPLE THAT WAS INTERVIEWED IN THE COURSE OF
01:14:09  15       THIS INVESTIGATION, RIGHT?
01:14:10  16       A.   I DON'T KNOW WHO HE IS.
01:14:11  17       Q.   ARE YOU AWARE THAT GENERALLY THE SCRAP DEALERS WANT TO BE
01:14:14  18       PAID IN ADVANCE BEFORE THEY HAND OVER THE SCRAP?
01:14:16  19       A.   YES.
01:14:17  20       Q.   OKAY.  AND SO REIJIN WOULD HAVE TO PAY THE SCRAP DEALERS
01:14:22  21       IN ADVANCE BEFORE THE SCRAP WAS SHIPPED, RIGHT?
01:14:25  22       A.   YES.
01:14:25  23       Q.   AND REIJIN WOULD PAY THE SCRAP DEALERS FROM THE BANK OF
01:14:30  24       AMERICA ACCOUNT THAT HAD MONEY IN IT THAT WAS WIRED FROM CHINA,
01:14:34  25       RIGHT?
```

CROSS-EXAMINATION BY MR. CANNON

01:14:34   1    A.   YES.

01:14:37   2    Q.   SO BECAUSE REIJIN WOULD PAY THE SCRAP DEALERS BEFORE THE

01:14:41   3    SCRAP WAS SHIPPED, THERE WAS NO RISK FOR REIJIN AT THAT POINT?

01:14:46   4    A.   I'M NOT AWARE OF ANY RISKS FOR ANYONE AT THAT POINT.

01:14:50   5    Q.   WELL, TRMP WOULD STILL BE AT RISK BECAUSE THEY HAD TO MAKE

01:14:56   6    SURE IT WOULD BE DELIVERED?

01:14:57   7    A.   NO, THEIR NAME WASN'T ON IT, SO I DON'T KNOW HOW THEY

01:15:00   8    WOULD BE.

01:15:01   9    Q.   THEIR MONEY HAD BEEN ALREADY USED TO PAY FOR THE SCRAP,

01:15:04   10   RIGHT?

01:15:04   11   A.   MONEY THAT WAS IN THE REIJIN ACCOUNT CAME FROM MANY

01:15:09   12   SOURCES, WAS USED TO PAY FOR THE SCRAP.

01:15:12   13   Q.   OKAY.

01:15:13   14        AND I ASKED YOU SOME QUESTIONS ABOUT WIRE TRANSFERS,

01:15:16   15   RIGHT?

01:15:16   16   A.   YES.

01:15:17   17   Q.   AND IF I COULD APPROACH THE WITNESS, YOUR HONOR, JUST TO

01:15:21   18   REFRESH HER RECOLLECTION OF WHAT'S BEEN BATES NUMBERED 6063344.

01:15:37   19        I'M JUST SHOWING YOU A COPY OF KIND OF GENERIC WIRE

01:15:42   20   TRANSFER RECEIPT, RIGHT?

01:15:44   21   A.   YES, I'VE NEVER SEEN IN DOCUMENT.

01:15:46   22   Q.   BUT YOU'VE SEEN MANY WIRE TRANSFER DOCUMENTS, RIGHT?

01:15:52   23   A.   YES, BUT NONE THAT LOOK LIKE THIS.

01:15:56   24   Q.   OKAY.  WHEN WIRE TRANSFERS ARE MADE, THERE'S SOMETHING

01:16:01   25   CALLED A SWIFT CODE, RIGHT?

CROSS-EXAMINATION BY MR. CANNON

01:16:04  1    A.   I'M NOT A BANKER, SO I DON'T KNOW, I'VE HEARD OF THE TERM

01:16:10  2    SWIFT CODE, I'M NOT SURE WHAT IT MEANS, I'M NOT A BANKER.

01:16:14  3    Q.   RIGHT.   BUT THE BANKS KEEP RECORDS OF WIRE TRANSFER

01:16:17  4    INSTRUCTIONS, RIGHT?

01:16:18  5    A.   YES.

01:16:19  6    Q.   AND THOSE RECORDS SHOW WHO SENT THE MONEY?

01:16:22  7    A.   YES.

01:16:23  8    Q.   WHAT THE ADDRESS IS OF THE SENDER OF THE MONEY?

01:16:28  9    A.   YES.

01:16:28  10   Q.   WHAT ACCOUNT THE MONEY COMES FROM?

01:16:30  11   A.   I'M SURE THEY MUST.

01:16:34  12   Q.   AND TO GET A WIRE TRANSFER -- TO RECEIVE A WIRE TRANSFER

01:16:38  13   IN THE U.S., THERE HAS TO BE A U.S. CORRESPONDENT BANK, RIGHT?

01:16:43  14   A.   OKAY.

01:16:44  15   Q.   AND SO IF SOMEONE SHIPS MONEY FROM CHINA, GOES FROM CHINA

01:16:48  16   TO THE U.S. BANK TO THE ULTIMATE DESTINATION IN THE U.S.,

01:16:52  17   RIGHT?

01:16:53  18   A.   IT GOES FROM CHINA TO THE U.S.?

01:16:56  19   Q.   YEAH, SOMEONE MAKES A WIRE TRANSFER FROM CHINA TO THE

01:17:00  20   U.S., THERE'S A RECORD KEPT OF THAT, RIGHT?

01:17:02  21   A.   YES.

01:17:02  22   Q.   IT'S A STANDARD WIRE TRANSFER RECORD?

01:17:04  23   A.   YES.

01:17:04  24   Q.   SHOWS THE SENDER?

01:17:05  25   A.   YES.

CROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 01:17:06 | 1 | Q.  THE SENDER'S ADDRESS? |
| 01:17:08 | 2 | A.  YES.  I DON'T KNOW IF IT HAS A FULL ADDRESS, BUT I WAS |
| 01:17:12 | 3 | ABLE TO SEE FROM THE WIRES, THE COUNTRY AND THE NAME. |
| 01:17:18 | 4 | Q.  OH, OKAY.  THANK YOU. |
| 01:17:22 | 5 | A.  YOU'RE WELCOME. |
| 01:17:23 | 6 | Q.  NOW, YOU ALSO -- LET'S KIND OF GO BACK TO YOUR -- THE |
| 01:17:37 | 7 | QUESTIONS THAT YOU PREPARED BEFORE YOUR INTERVIEWS, OKAY? |
| 01:17:40 | 8 | A.  OKAY. |
| 01:17:41 | 9 | Q.  AND YOU PREPARED THOSE QUESTIONS AND YOU TYPED THEM OUT, |
| 01:17:49 | 10 | AND APPARENTLY YOU ARE LIKE ME, AS YOU LEARN MORE AND AS THINGS |
| 01:17:53 | 11 | GO ON, WE BECOME LESS ORGANIZED; IS THAT FAIR TO SAY? |
| 01:18:00 | 12 | A.  UM, NO. |
| 01:18:02 | 13 | Q.  OKAY.  SO WHEN YOU WERE FIRST WERE PREPARING YOUR |
| 01:18:07 | 14 | QUESTIONS BEFORE YOUR INTERVIEW, YOU WERE PREPARING SOME |
| 01:18:10 | 15 | QUESTIONS ABOUT FLORENCE TRADING, RIGHT? |
| 01:18:13 | 16 | A.  I HAD SOME QUESTIONS ABOUT FLORENCE TRADING. |
| 01:18:16 | 17 | Q.  AND AT THAT POINT, YOU DIDN'T DISTINGUISH BETWEEN FLORENCE |
| 01:18:20 | 18 | TRADING AND FLORENCE CAPITAL, DID YOU? |
| 01:18:23 | 19 | A.  WHAT DO YOU MEAN I DIDN'T DISTINGUISH?  THEY ARE TWO |
| 01:18:26 | 20 | DIFFERENT COMPANIES, I CERTAINLY DID. |
| 01:18:27 | 21 | Q.  CORRECT.  THAT'S SOMETHING THAT YOU KNOW NOW, ISN'T IT? |
| 01:18:29 | 22 | A.  WELL, THAT'S SOMETHING I KNEW THEN AS WELL. |
| 01:18:32 | 23 | Q.  COULD I HAVE YOU TAKE A LOOK AT YOUR NOTES, BATES NUMBER |
| 01:18:37 | 24 | 10447.  AND IS THAT A COPY OF THE NOTES THAT YOU PREPARED |
| 01:18:44 | 25 | BEFORE YOU WENT TO INTERVIEW THE TAXPAYERS? |

01:18:49  1     A.   THESE ARE NOTES FROM DURING THE INTERVIEWS.

01:18:56  2     Q.   CORRECT?

01:18:57  3     A.   THEY SAY NOTES FROM INTERVIEW.

01:19:02  4     Q.   CORRECT BUT THE TYPEWRITTEN PORTION OF THOSE NOTES IS WHAT

01:19:05  5     YOU PREPARED BEFORE YOU WENT TO THE INTERVIEW, RIGHT?

09:36:04  6     A.   YES.

01:19:08  7     Q.   AND THE TYPEWRITTEN PORTION OF THOSE NOTES IS WHAT YOU

01:19:12  8     WERE ASKING QUESTIONS ABOUT, RIGHT?

01:19:13  9     A.   THESE WOULD BE SOME OF MY QUESTIONS, BUT CERTAINLY NOT ALL

01:19:16  10    OF MY QUESTIONS.

01:19:17  11    Q.   CORRECT.  BUT THIS TYPEWRITTEN PORTION OF THE QUESTIONS IS

01:19:20  12    WHAT YOU THOUGHT WAS IMPORTANT, WHAT YOU WANTED TO ASK

01:19:23  13    QUESTIONS ABOUT, RIGHT?

01:19:24  14    A.   YES.

01:19:25  15    Q.   AND ONE OF THE THINGS THAT YOU WANTED TO ASK QUESTIONS

01:19:28  16    ABOUT WAS FLORENCE TRADING COMPANY, RIGHT?

01:19:31  17    A.   THAT'S RIGHT.

01:19:31  18    Q.   AND IT'S KIND OF A COMMON PRACTICE WHEN ENFORCEMENT

01:19:37  19    PERSONNEL ARE ASKING ABOUT A PARTICULAR ENTITY, THEY CAPITALIZE

01:19:41  20    IT, RIGHT?

01:19:42  21    A.   EXCUSE ME?

01:19:44  22    Q.   IN WRITING REPORTS AND WRITING ABOUT PEOPLE, IT'S A VERY

01:19:48  23    COMMON ENFORCEMENT PRACTICE TO CAPITALIZE THE NAME OF THE

01:19:54  24    ENTITY YOU ARE INQUIRING ABOUT, RIGHT?

01:19:56  25    A.   WRONG.

CROSS-EXAMINATION BY MR. CANNON

01:19:56  1    Q.   WELL, IN YOUR NOTES, DID YOU CAPITALIZE THE NAME OF

01:19:59  2    FLORENCE TRADING COMPANY?

01:20:00  3    A.   YES.

01:20:01  4    Q.   AND DID YOU TYPE OUT THAT CAPITALIZED TERM, FLORENCE

01:20:04  5    TRADING COMPANY?

01:20:04  6    A.   YES.

01:20:05  7    Q.   AND IS THAT BECAUSE YOU WANTED TO FIND OUT INFORMATION

01:20:08  8    ABOUT FLORENCE TRADING?

01:20:09  9    A.   YES.

01:20:09  10   Q.   AND DID YOU TYPE OUT ANY QUESTIONS ABOUT FLORENCE CAPITAL?

01:20:18  11   A.   FLORENCE CAPITAL?  I ASKED QUESTIONS, I DON'T SEE THEM ON

01:20:25  12   THIS ONE PAGE OF A MULTI-PAGE DOCUMENT.  BUT I ASKED QUESTIONS,

01:20:31  13   I KNOW WHAT FLORENCE CAPITAL IS.

01:20:33  14   Q.   RIGHT.  YOU KNOW WHAT FLORENCE CAPITAL IS NOW, RIGHT?

01:20:37  15   A.   WELL, I ACTUALLY HAVE NOTES REFERRING TO FLORENCE CAPITAL

01:20:40  16   ON THIS SHEET.

01:20:40  17   Q.   RIGHT.  AND YOU HAVE NOTES REFERRING TO FLORENCE CAPITAL

01:20:43  18   ON THAT SHEET.  AND THE NOTES THAT YOU HAVE REFERRING TO

01:20:46  19   FLORENCE CAPITAL ON THAT SHEET ARE NOTES THAT YOU WROTE ON THE

01:20:50  20   DATE OF YOUR INTERVIEW ON JANUARY 13, 2010, RIGHT?

01:20:53  21   A.   SAY THAT AGAIN?

01:20:55  22   Q.   THE NOTES THAT YOU HAVE IN HANDWRITING REFERRING TO

01:21:01  23   FLORENCE CAPITAL, ARE NOTES THAT YOU WROTE ON THAT SHEET ON

01:21:04  24   JANUARY 13TH, 2010, RIGHT?

01:21:11  25   A.   NO.  THE NOTES, IT WOULD HAVE BEEN BOTH, BECAUSE THE FIRST

01:21:18   1    NOTES THAT I EXPLAINED WHAT FLORENCE CAPITAL IS, ARE IN PENCIL.

01:21:24   2    SO THAT MEANS I WOULD HAVE ASKED MS. SHI AT THE INITIAL

01:21:28   3    INTERVIEW.

01:21:29   4    Q.   OKAY.

01:21:33   5    A.   SO I WAS AWARE OF FLORENCE CAPITAL.

01:21:35   6    Q.   AND YOU SPOKE TO MS. SHI ON DECEMBER 16, 2009, RIGHT?

01:21:38   7    A.   UH-HUH.

01:21:39   8    Q.   AND THAT'S WHEN YOU LEARNED ABOUT FLORENCE CAPITAL, RIGHT?

01:21:43   9    A.   NO, I BELIEVE -- I'M NOT SURE EXACTLY WHEN I LEARNED ABOUT

01:21:50   10   FLORENCE CAPITAL.

01:21:51   11   Q.   OKAY.  SO IT'S FAIR TO SAY YOU HAD TYPE WRITTEN QUESTIONS

01:21:54   12   ABOUT FLORENCE TRADING?

01:21:57   13   A.   YES.

01:21:57   14   Q.   AND YOU INTENDED TO ASK QUESTIONS ABOUT FLORENCE TRADING?

01:22:01   15   A.   YES.

01:22:02   16   Q.   AND YOU DIDN'T HAVE ANY TYPEWRITTEN QUESTIONS ABOUT

01:22:06   17   FLORENCE CAPITAL?

01:22:06   18   A.   NOT ON THIS SHEET OF PAPER.  I DON'T KNOW IF THEY WERE IN

01:22:09   19   THE OTHER QUESTIONS.  I HAVE MANY PAGES OF QUESTIONS.  ON THIS

01:22:14   20   PARTICULAR, THEY ARE NOT WRITTEN OUT, BUT THERE ARE ANSWERS

01:22:17   21   ABOUT THEM.

01:22:17   22   Q.   CORRECT.

01:22:18   23        SO IF YOU'RE ANSWERING QUESTIONS ABOUT FLORENCE CAPITAL,

01:22:22   24   THAT CAME UP DURING THE COURSE OF THAT CONVERSATION, RIGHT?

01:22:24   25   A.   WHICH CONVERSATION?

CROSS-EXAMINATION BY MR. CANNON

01:22:25  1    Q.   THE CONVERSATION WITH CINDY SHI'S OFFICE IN CUPERTINO ON

01:22:30  2    12-16-09.

01:22:32  3    A.   YES.

01:22:33  4    Q.   AND AGAIN, IN THE FIRST PART OF JANUARY, JANUARY 13TH,

01:22:39  5    THERE WERE ALSO DISCUSSIONS ABOUT FLORENCE CAPITAL?

01:22:41  6    A.   YES.

01:22:41  7    Q.   BUT THERE ARE NO TYPEWRITTEN QUESTIONS ABOUT FLORENCE

01:22:47  8    CAPITAL?

01:22:47  9    A.   NOT ON THIS PAGE.

01:22:48  10   Q.   OKAY.  AND YOU ALSO ASKED QUESTIONS ABOUT -- OR YOU FOUND

01:23:21  11   OUT INFORMATION ABOUT LOAN BROKER REFERRAL FEES, RIGHT?

01:23:25  12   A.   YES.

01:23:25  13   Q.   AND YOU FOUND OUT THAT THERE WERE LOAN BROKER REFERRAL

01:23:31  14   FEES TO A MR. FU JU WU, CORRECT?

01:23:38  15   A.   NO, THAT'S NOT CORRECT.

01:23:54  16        MR. CANNON:  IF I COULD APPROACH, YOUR HONOR, WITH

01:23:57  17   104455.

01:24:04  18   A.   YES, THEY DID A PAY FEES TO THIS FU JU (JASON) WU, HE WAS

01:24:10  19   THE LOAN BROKER WHO PAID THEM FEES, IT DIDN'T GO THE OTHER WAY

01:24:15  20   AROUND.

01:24:16  21   Q.   AND YOU FOUND THAT OUT DURING THE INTERVIEW?

01:24:21  22   A.   YES, THIS WAS WRITTEN IN PEN, SO THIS WOULD HAVE BEEN FROM

01:24:23  23   THE DEFENDANT'S STATEMENT.

01:24:24  24   Q.   GOT IT.  AND THAT'S SOMETHING YOU LEARNED DURING THE

01:24:30  25   INTERVIEW?

CROSS-EXAMINATION BY MR. CANNON

01:24:31  1   A.   YES.

01:24:32  2   Q.   IT WASN'T HIDDEN FROM YOU IN ANY WAY?

01:24:37  3   A.   NO.

01:24:40  4   Q.   OKAY.  AND FROM THE MEETING IN CUPERTINO ON DECEMBER 16,

01:24:55  5   '09, THROUGH THE MEETING IN CUPERTINO AGAIN IN JANUARY 2010,

01:24:59  6   THROUGH THE MEETING IN 450 GOLDEN GATE IN SEPTEMBER 2010, THE

01:25:04  7   TAXPAYER'S POSITION REMAINED THE SAME, RIGHT?

01:25:07  8   A.   YES, THE MONEY WASN'T THEIRS.

01:25:09  9   Q.   CORRECT.  AND YOU NEVER ACCEPTED THAT DECISION?

01:25:14  10  A.   NO.

01:25:15  11  Q.   AND NOW BRIEFLY, WE TALKED ABOUT THE DIFFERENCE BETWEEN

01:25:30  12  TAXABLE AND NON-TAXABLE MONEY, RIGHT?

01:25:32  13  A.   RIGHT.

01:25:33  14  Q.   AND MONEY FROM A CASH HOARD IS NOT TAXABLE?

01:25:37  15  A.   MONEY THAT THEY SAVED UP, MY DEFINITION OF A CASH HOARD,

01:25:41  16  MONEY THAT THEY HAVE NOT PUT INTO A BANK ACCOUNT THAT THEY HAVE

01:25:45  17  SAVED FROM THEIR FUNDS.  I DON'T KNOW IF THAT'S TAXABLE,

01:25:48  18  BECAUSE I DON'T KNOW IF THAT WAS MONEY THAT WAS REPORTED ON TAX

01:25:51  19  RETURNS.  IT'S CASH.

01:25:54  20  Q.   OKAY.  BUT ASSETS THAT PEOPLE HAVE ACCUMULATED BEFORE THE

01:25:58  21  YEARS IN QUESTION ARE NOT INCOME IN THE YEARS IN QUESTION, ARE

01:26:03  22  THEY?

01:26:04  23  A.   THAT'S CORRECT.

01:26:05  24  Q.   OKAY.  AND DID YOU HAVE ANY SPECIALIZED TRAINING IN TAX

01:26:09  25  BEFORE YOU BECAME PART OF THE SPECIAL ENFORCEMENT PROGRAM?

CROSS-EXAMINATION BY MR. CANNON

01:26:13  1    A.    DID I HAVE ANY SPECIALIZED TRAINING IN TAX?

01:26:15  2    Q.    TRAINING IN AUDITING TAX RETURNS IN THE SPECIAL

01:26:18  3    ENFORCEMENT PROGRAM FROM THE IRS.  I'M NOT TALKING ABOUT YOUR

01:26:21  4    EDUCATIONAL QUALIFICATIONS.

01:26:22  5    A.    YES.

01:26:23  6    Q.    AND WHAT WAS THAT SPECIALIZED TRAINING?

01:26:27  7    A.    WHAT DO YOU MEAN?  TAX LAW TRAINING?  IS THAT WHAT YOU'RE

01:26:32  8    TALKING ABOUT?

01:26:33  9    Q.    DID YOU HAVE SPECIALIZED TRAINING IN USING INDIRECT

01:26:35  10   METHODS OF DETERMINING INCOME?

01:26:38  11   A.    YES, ALL REVENUE AGENTS DO.

01:26:42  12   Q.    AND I UNDERSTAND THAT ALL REVENUE AGENTS HAVE TRAINING

01:26:48  13   REGARDING INDIRECT METHODS OF DETERMINING INCOME.

01:26:52  14        I'M ASKING IF YOU HAD ANY PARTICULAR SPECIALIZED TRAINING

01:26:55  15   IN THAT AREA?

01:26:58  16   A.    I HAVE BEEN TRAINED IN THAT AREA, SO I DON'T KNOW WHAT YOU

01:27:05  17   MEAN BY "SPECIALIZED."

01:27:07  18   Q.    MORE THAN THE AVERAGE AGENT?

01:27:09  19   A.    I DON'T KNOW IF MY TRAINING FOR INCOME WAS DIFFERENT

01:27:23  20   BECAUSE INDIRECT METHODS ARE TAUGHT TO REGULAR REVENUE AGENTS

01:27:27  21   TOO.

01:27:27  22   Q.    OKAY.

01:27:29  23   A.    SO I CAN'T TELL YOU IF THERE WAS ANY SPECIALIZED.

01:27:34  24   Q.    OKAY.  AND HOW MANY APPROVED METHODS ARE THERE TO

01:27:36  25   DETERMINE INCOME?

CROSS-EXAMINATION BY MR. CANNON

01:27:39  1    A.   HOW MANY?  I'M NOT SURE HOW MANY THERE ARE.

01:27:44  2    Q.   WHAT ARE THEY?

01:27:46  3    A.   YOU CAN DO BANK DEPOSITS ANALYSIS, YOU CAN DO EXPENDITURES

01:27:51  4    METHOD, YOU CAN DO A NET WORTH CALCULATION.  I DON'T KNOW HOW

01:27:58  5    MANY OTHERS.

01:27:58  6    Q.   AND WHAT'S THE SINGLE COMMON THREAD THAT LINKS THESE

01:28:05  7    METHODS?

01:28:06  8    A.   I DON'T KNOW.

01:28:07  9    Q.   WHEN YOU ARE TRYING TO DETERMINE SOMEBODY'S INCOME, IS IT

01:28:10  10   GENERALLY IMPORTANT TO SOURCE THE INCOME?

01:28:13  11   A.   YES.

01:28:14  12   Q.   AND SOME SOURCES OF INCOME AREN'T TAXABLE, ARE THEY?

01:28:22  13   A.   NO, THAT'S WHY I ASKED ABOUT NONTAXABLE SOURCES IN MY

01:28:26  14   INTERVIEWS.

01:28:26  15   Q.   GOT IT.

01:28:27  16        AND WHAT WOULD BE -- CAN YOU NAME ALL THE NONTAXABLE

01:28:31  17   SOURCES THAT YOU CAN, PLEASE?

01:28:32  18   A.   ALL THE NONTAXABLE SOURCES?  WELL, LET'S SEE, THEY COULD

01:28:37  19   HAVE GIFTS, THEY COULD HAVE LOANS REPAID TO THEM THAT THEY HAD

01:28:48  20   MADE, THEY COULD HAVE A LAWSUIT SETTLEMENT BASED ON INJURIES.

01:28:57  21        I DON'T KNOW ALL OF THEM, I WOULD LOOK UP SPECIFICS IF YOU

01:29:02  22   HAD A SPECIFIC QUESTION.  IS THERE SOMETHING SPECIFIC YOU ARE

01:29:05  23   LOOKING FOR?

01:29:07  24   Q.   AS I INDICATED BEFORE, THE TAXPAYER'S POSITION TO YOU WAS

01:29:15  25   CONSISTENT THROUGHOUT THEIR INTERVIEWS?

| 01:29:17 | 1 | A.   YES. |

01:29:17  1      A.   YES.

01:29:18  2      Q.   AND YOUR POSITION WOULD BE INCONSISTENT?

01:29:20  3      A.   I REMAINED OPEN.  AND AS I SAID, I NEVER CAME TO A

01:29:23  4      CONCLUSION, AND A REPORT WAS NEVER ISSUED, SO MY AUDIT WAS

01:29:30  5      NEVER FINALIZED.

01:29:30  6      Q.   OKAY.  AND YOUR AUDIT WASN'T FINALIZED BECAUSE YOU DIDN'T

01:29:33  7      HAVE ENOUGH INFORMATION TO COME TO A CONCLUSION, ROUTE RIGHT?

01:29:36  8      A.   BECAUSE I THOUGHT THAT CRIMINAL INVESTIGATION SHOULD LOOK

01:29:39  9      AT THIS.

01:29:40  10     Q.   CORRECT.  BUT YOUR PERSONAL INVESTIGATION DIDN'T COME TO A

01:29:43  11     CONCLUSION?

01:29:43  12     A.   MY PERSONAL, NO, I NEVER ISSUED A REPORT.

01:29:45  13     Q.   AND IT DIDN'T COME TO A CONCLUSION BECAUSE YOU COULDN'T --

01:29:49  14     YOU DIDN'T HAVE ENOUGH FACTS, RIGHT?

01:29:51  15     A.   CORRECT.

01:29:53  16          MR. CANNON:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

01:29:57  17          THE COURT:  MS. POLLOCK?

01:30:06  18                     **CROSS-EXAMINATION**

01:30:06  19     BY MS. POLLOCK:

01:30:08  20     Q.   AGENT GARRISON, AS YOU JUST LEFT OFF, YOU SAID --

01:30:31  21          MR. CANNON:  EXCUSE ME, ONE MOMENT.  MAY I GRAB THE

01:30:33  22     DOCUMENTS THAT I GAVE HER TO REFRESH HER RECOLLECTION?

01:30:38  23          THE WITNESS:  YES, I WAS WONDERING IF YOU WANT THOSE.

01:30:43  24          MR. CANNON:  THANKS.

01:30:44  25          THE WITNESS:  YOU'RE WELCOME.

CROSS-EXAMINATION BY MS. POLLACK

01:30:46  1    BY MS. POLLOCK:

01:30:48  2    Q.   AGENT GARRISON, YOU HAD JUST FINISHED TELLING MR. CANNON

01:30:51  3    THAT YOU THOUGHT CRIMINAL INVESTIGATION SHOULD HAVE BEEN

01:30:54  4    INVOLVED MANY TIMES DURING THE COURSE OF YOUR INVESTIGATION,

01:30:59  5    CORRECT?

01:31:00  6    A.   BEFORE I STARTED THE INVESTIGATION, I THOUGHT CRIMINAL

01:31:04  7    MIGHT WANT THE CASE, AND THEN I MADE ONE REFERRAL.

01:31:09  8    Q.   BUT I BELIEVE YOU SAID THAT YOU THOUGHT MANY TIMES DURING

01:31:12  9    THE COURSE OF YOUR INVESTIGATION THAT CRIMINAL INVESTIGATIONS

01:31:16  10   SHOULD TAKE OVER AND THAT THEY WOULD BE FURTHER BETTER ABLE TO

01:31:20  11   DO AN INVESTIGATION?

01:31:22  12   A.   NO, THAT'S NOT CORRECT.

01:31:24  13   Q.   YOU SAID THAT YOU WEREN'T ABLE TO INVESTIGATE IN A FOREIGN

01:31:28  14   COUNTRY, CORRECT?

01:31:28  15   A.   THAT'S CORRECT.

01:31:29  16   Q.   DID YOU BELIEVE THAT CRIMINAL -- THE CRIMINAL

01:31:32  17   INVESTIGATION'S END OF THE IRS COULD INVESTIGATE IN A FOREIGN

01:31:35  18   COUNTRY?

01:31:35  19   A.   I BELIEVE THERE WERE ENOUGH ELEMENTS OF FRAUD TO WARRANT A

01:31:41  20   REFERRAL.

01:31:42  21   Q.   OKAY.  THAT WASN'T MY QUESTION.

01:31:45  22        MY QUESTION WAS, DID YOU BELIEVE THAT THE CRIMINAL

01:31:47  23   INVESTIGATIONS DIVISION OF THE IRS WAS ABLE TO INVESTIGATE

01:31:51  24   INTERNATIONALLY?

01:31:55  25   A.   YES, THAT ISN'T THE ONLY REASON I SENT IT OVER TO THEM.

01:31:58  1    Q.   THE QUESTION WAS, DID YOU BELIEVE THAT THEY WERE ABLE TO

01:32:01  2    DO A CRIMINAL INVESTIGATION ABROAD, AND YOU, AS A REVENUE

01:32:06  3    AGENT, COULD NOT?

01:32:08  4    A.   THAT WAS NOT THE REASON THE CASE WAS REFERRED.

01:32:11  5            THE COURT:  IF YOU WOULD PLEASE JUST ANSWER THE

01:32:13  6    QUESTION.  SHE'S NOT ASKING WHY IT WAS REFERRED.

01:32:15  7            THE WITNESS:  YES, I THINK THAT'S ONE OF THE THINGS

01:32:17  8    THAT THEY ARE ABLE TO GET.

01:32:22  9    Q.   OKAY.  NOW, THIS CASE WAS REFERRED TO CRIMINAL FINALLY IN

01:32:27  10   2010, CORRECT?

01:32:28  11   A.   CORRECT.

01:32:29  12   Q.   ALL RIGHT.  DID YOU KNOW THAT AGENT MARIA MARTINEZ WAS THE

01:32:33  13   AGENT ASSIGNED TO THIS CASE?

01:32:34  14   A.   YES.

01:32:35  15   Q.   AND YOU MET WITH AGENT MARTINEZ, DIDN'T YOU?

01:32:38  16   A.   YES.

01:32:38  17   Q.   AND YOU GAVE HER NOT JUST AN OVERVIEW OF YOUR CASE, YOUR

01:32:43  18   INVESTIGATION, BUT YOU DISCUSSED WITH HER WHAT YOU THOUGHT

01:32:47  19   SHOULD BE DONE BY CRIMINAL INVESTIGATIONS, CORRECT?

01:32:49  20   A.   I DON'T DIRECT CRIMINAL INVESTIGATIONS ON HOW TO DO THEIR

01:32:52  21   JOB.  I DON'T KNOW WHAT THEY DO.

01:32:54  22   Q.   WHAT I'M ASKING YOU, AGENT, IS WHEN YOU MET WITH AGENT

01:33:00  23   MARTINEZ, DID YOU GIVE HER SOME SUGGESTIONS ABOUT WHAT SHE

01:33:03  24   COULD DO IN LOOKING INTO EVIDENCE IN CHINA?

01:33:05  25   A.   I DON'T RECALL.

CROSS-EXAMINATION BY MS. POLLACK

01:33:06  1    Q.   OKAY.  WHAT DO YOU RECALL THAT YOU TOLD AGENT MARTINEZ,

01:33:10  2    HERE IS A CASE AND YOU THINK CRIMINAL SHOULD BE INVESTIGATING

01:33:13  3    IT?

01:33:13  4    A.   YES.

01:33:14  5    Q.   GIVE HER ANY SPECIFIC INFORMATION ABOUT NAMES THAT YOU HAD

01:33:19  6    SEEN IN THE COURSE OF YOUR INVESTIGATION, SUCH AS PING KUANG

01:33:24  7    LIN?

01:33:24  8    A.   YES.

01:33:25  9    Q.   AND PING KUANG LIN IS MEILI'S BROTHER, CORRECT?

01:33:28  10   A.   YES.

01:33:29  11   Q.   AND YOU GAVE HER THE NAMES OF OTHER NAMES THAT YOU HAD

01:33:32  12   SEEN ON MANY CHECKS SUCH AS MEILI'S MOTHER, CORRECT?

01:33:36  13   A.   I GAVE HER MY COMPLETE FILES.

01:33:39  14   Q.   I'M JUST ASKING YOU SPECIFIC QUESTIONS.

01:33:41  15   A.   YES, THAT WAS PART OF MY COMPLETE FILES I GAVE.

01:33:43  16   Q.   THE FILE INCLUDED CHECKS THAT HAD MRS. LIN'S MOTHER'S NAME

01:33:50  17   ON THE TOP, CORRECT?

01:33:51  18   A.   THAT DOES NOT SOUND FAMILIAR.

01:33:53  19   Q.   DOESN'T SOUND FAMILIAR.

01:33:55  20        DID YOU GIVE HER NAMES -- DID YOU PROVIDE HER -- YOU

01:33:57  21   PROVIDED YOUR ENTIRE FILE TO AGENT MARTINEZ, CORRECT?

01:34:00  22   A.   YES.

01:34:00  23   Q.   ALL RIGHT.  AND DIDN'T IT INCLUDE CHECKS WITH THE NAME OF

01:34:04  24   MEILI LIN'S FATHER ON IT?

01:34:07  25   A.   I DON'T RECALL --

01:34:09  1     Q.   TIEN FU LIN?

01:34:11  2     A.   I DON'T RECALL SPECIFICALLY IF THAT OCCURRED.

01:34:14  3     Q.   DID YOU EVER TALK TO AGENT MARTINEZ ABOUT THE FACT THAT

01:34:17  4     MEILI LIN'S FAMILY LIVED IN CHINA AND IN TAIWAN?

01:34:21  5     A.   I PROBABLY -- I DON'T REMEMBER THE SPECIFIC CONVERSATION

01:34:24  6     OF THAT, BUT I'M SURE I WOULD HAVE.

01:34:27  7     Q.   OKAY.  AND DID YOU PROVIDE HER, AS YOU SIT HERE TODAY,

01:34:31  8     WITH THEIR ADDRESSES, BOTH IN TAIWAN AND IN CHINA?

01:34:35  9     A.   NO, I DON'T BELIEVE I HAVE THEIR ADDRESSES.

01:34:38  10    Q.   OKAY.  DID YOU PROVIDE HER WITH THE ADDRESS OF TIANJIN

01:34:45  11    RUIYU, THE COMPANY IN CHINA?

01:34:48  12    A.   I DON'T KNOW THE SPECIFIC ADDRESS, BUT THEY -- I'M SURE IT

01:34:53  13    WOULD HAVE BEEN INCLUDED IN MY FILE.  I DON'T KNOW.

01:34:55  14    Q.   OKAY.  DID YOU, IN THE COURSE OF YOUR INVESTIGATION, EVER

01:34:58  15    GOOGLE THE COMPANY TIANJIN RUIYU METAL PRODUCTS?

01:35:02  16    A.   I DON'T REMEMBER.

01:35:04  17    Q.   WELL, IN THE COURSE OF YOUR INVESTIGATIONS, DO YOU USE

01:35:07  18    GOOGLE AS A SEARCH ENGINE --

01:35:11  19    A.   YES, TO INVESTIGATE THE PERSON THAT I'M AUDITING.  I NEVER

01:35:17  20    AUDITED TIANJIN.  AND I DON'T EVEN KNOW IF I CAN GET

01:35:20  21    INTERNATIONAL -- I DON'T KNOW.  I DON'T KNOW THAT.

01:35:23  22    Q.   HAVE YOU EVER USED GOOGLE TO SEARCH ANY COMPANIES ABROAD?

01:35:31  23    A.   ABROAD?  NO, I DON'T BELIEVE I HAVE.

01:35:43  24    Q.   DO YOU, AS AN AGENT, ROUTINELY USE GOOGLE AS AN

01:35:48  25    INVESTIGATIVE TOOL?

CROSS-EXAMINATION BY MS. POLLACK

01:35:49    1      A.    YES.

01:35:50    2      Q.    OKAY.  BASICALLY ANYTHING AND EVERYTHING IS ACCESSIBLE ON

01:35:55    3      GOOGLE, ISN'T IT?

01:35:57    4      A.    YES.

01:35:58    5      Q.    BUT YOU DON'T RECALL, AS YOU SIT HERE TODAY, WHETHER OR

01:36:02    6      NOT YOU GOOGLED TIANJIN RUIYU?

01:36:05    7      A.    I DO NOT RECALL THAT.

01:36:06    8      Q.    DO YOU RECALL IF YOU GOOGLED REIJIN?

01:36:09    9      A.    OH, I WOULD HAVE -- I WOULD HAVE GOOGLED THEM.

01:36:13   10      Q.    AND YOU DON'T, AS YOU SIT HERE TODAY, RECALL GOOGLING

01:36:17   11      EITHER MEILI LIN'S MOTHER'S NAME OR FATHER'S NAME OR BROTHER'S

01:36:22   12      NAME?

01:36:23   13      A.    NO.

01:36:24   14      Q.    OKAY.  NOW, AFTER THE CASE WENT TO CRIMINAL INVESTIGATIONS

01:36:31   15      AND TO SPECIAL AGENT MARIA MARTINEZ, DID YOU MEET WITH AGENT

01:36:36   16      MARTINEZ MORE THAN ONE TIME?

01:36:37   17      A.    YES.

01:36:38   18      Q.    HOW MANY TIMES WOULD YOU ESTIMATE YOU MET WITH HER?

01:36:44   19      A.    WELL, I'M NOT SURE HOW MANY TIMES.

01:36:47   20      Q.    OKAY.  YOU SPENT AT LEAST A MINIMUM OF 500 HOURS

01:36:52   21      INVESTIGATING THIS CASE ON YOUR END AS A REVENUE AGENT,

01:36:55   22      CORRECT?

01:36:56   23      A.    IF THAT'S WHAT MY ACTIVITY REPORT SHOWS.  I DON'T RECALL

01:36:59   24      THE SPECIFIC NUMBER OF HOURS.

01:37:01   25      Q.    ALL RIGHT.  IT'S A LOT OF TIME, ISN'T IT?

CROSS-EXAMINATION BY MS. POLLACK

| | | |
|---|---|---|
| 01:37:03 | 1 | A.   YEAH, IT'S A LOT OF TIME.  IT'S A LOT OF BANK ACCOUNTS. |
| 01:37:06 | 2 | Q.   OKAY.  WOULD YOU SAY THAT YOU MET WITH AGENT MARTINEZ MORE |
| 01:37:10 | 3 | THAN TEN TIMES? |
| 01:37:15 | 4 | A.   I REALLY DON'T REMEMBER HOW MANY TIMES I MET WITH HER. |
| 01:37:18 | 5 | Q.   YOU KEPT AN ACTIVITY RECORD IN YOUR REVENUE FILE, CORRECT, |
| 01:37:22 | 6 | OF EVERYTHING YOU DID DAY-BY-DAY, CORRECT? |
| 01:37:25 | 7 | A.   WELL, IF -- YES, BEFORE I TRANSFERRED IT, THEN I DON'T. |
| 01:37:29 | 8 | Q.   OKAY.  DID YOU KEEP -- DO YOU KEEP A TIME SHEET OF YOUR |
| 01:37:33 | 9 | ACTIVITIES ON A DAY TO DAY BASIS AS A REVENUE AGENT SO THAT YOU |
| 01:37:37 | 10 | CAN ACCOUNT FOR YOUR HOURS? |
| 01:37:38 | 11 | A.   YES. |
| 01:37:39 | 12 | Q.   OKAY.  DID YOU KEEP A RECORD OF HOW MANY TIMES YOU SPOKE |
| 01:37:42 | 13 | TO AGENT MARTINEZ? |
| 01:37:45 | 14 | A.   NO, BECAUSE THEY'RE NOT KEPT THAT WAY FOR, WHEN THEY ARE |
| 01:37:50 | 15 | JUST AS A COOPERATING AGENT.  IT DOESN'T WORK THAT WAY.  WE |
| 01:37:55 | 16 | DON'T HAVE TO WRITE UP WHAT WE DID OR WHAT DATES. |
| 01:37:58 | 17 | Q.   I'M NOT ASKING WHAT YOU DID OR WHAT DATE.  DID YOU KEEP |
| 01:38:03 | 18 | ANY RECORD OF TIMES THAT YOU MET WITH AGENT MARTINEZ? |
| 01:38:10 | 19 | A.   IT WOULD HAVE BEEN ON MY CALENDAR. |
| 01:38:12 | 20 | Q.   PARDON ME? |
| 01:38:13 | 21 | A.   I WOULD HAVE HAD A CALENDAR.  BUT IT WOULDN'T -- THERE'S |
| 01:38:16 | 22 | NOT AN ACTIVITY REPORT FOR A CASE THAT'S IN CRIMINAL. |
| 01:38:22 | 23 | Q.   ALL RIGHT.  IS YOUR OFFICE HERE ON MARKET STREET IN |
| 01:38:25 | 24 | SAN JOSE? |
| 01:38:25 | 25 | A.   NO. |

CROSS-EXAMINATION BY MS. POLLACK

01:38:26  1    Q.   OKAY.  WHERE ARE YOU LOCATED?

01:38:28  2    A.   SAN RAFAEL.

01:38:30  3    Q.   ALL RIGHT.  AND DO YOU KNOW WHERE AGENT MARTINEZ WAS

01:38:37  4    HEADQUARTERED?

01:38:37  5    A.   SAN JOSE.

01:38:38  6    Q.   DID YOU MEET WITH AGENT MARTINEZ HERE IN SAN JOSE?

01:38:41  7    A.   YES.

01:38:41  8    Q.   AND YOU CAN'T GIVE ME ANY ESTIMATE OF HOW MANY TIMES YOU

01:38:44  9    ACTUALLY HAD IN FACE, PERSON-TO-PERSON MEETINGS WITH HER?

01:38:47  10   A.   I'M SORRY, THAT'S TEN YEARS AGO -- EIGHT YEARS AGO.  I

01:38:49  11   DON'T RECALL THE NUMBER OF TIMES I MET WITH HER.

01:38:52  12   Q.   OKAY.  THE CASE WAS REFERRED TO AGENT MARTINEZ EIGHT YEARS

01:38:55  13   AGO?

01:38:55  14   A.   CORRECT.

01:38:56  15   Q.   WHEN WAS THE LAST TIME YOU SPOKE TO HER?  AND I'M ASKING

01:38:59  16   FOR THE YEAR, NOT THE EXACT DAY OR MONTH, BUT THE YEAR.

01:39:03  17   A.   I DON'T KNOW WHAT YEAR.  I DON'T KNOW WHAT YEAR.  THE CASE

01:39:06  18   WAS IN CRIMINAL FOR THE PAST TEN YEARS.  I DON'T KNOW WHEN THE

01:39:14  19   LAST TIME -- IT'S BEEN A LONG TIME.

01:39:16  20   Q.   DID AGENT MARTINEZ EVER DISCUSS WITH YOU, INITIATE A

01:39:20  21   CONVERSATION WITH YOU ABOUT INDIVIDUALS SHE CAN BE

01:39:24  22   INVESTIGATING IN THE COURSE OF THIS CASE?

01:39:26  23   A.   NO.

01:39:28  24   Q.   AND YOU NEVER INQUIRED OF HER, HAY, HOW IS THE CASE GOING,

01:39:32  25   HAVE YOU TALKED TO SO-AND-SO, HAVE YOU TALKED TO MR. HEITMEIER?

834

CROSS-EXAMINATION BY MS. POLLACK

01:39:35  1    A.   I DON'T EVEN KNOW WHO THAT IS THAT YOU ARE TALKING ABOUT.

01:39:39  2    AND THEY CAN'T TELL ME THINGS LIKE THAT.  THEY DON'T SHARE THAT

01:39:43  3    INFORMATION, SO NO.

01:39:45  4    Q.   AS A REVENUE AGENT, ISN'T IT TRUE THAT CRIMINAL

01:39:50  5    INVESTIGATIONS AND REVENUE CAN, AT TIMES, WORK SIMULTANEOUSLY

01:39:55  6    ON A CASE?

01:39:55  7    A.   YES, A CRIMINAL AGENT CAN REQUEST A COOPERATING AGENT.

01:40:00  8    Q.   OKAY.  AND THAT WAS NOT DONE IN THIS CASE, DO YOU KNOW?

01:40:03  9    A.   THAT WAS DONE IN THAT CASE, YEAH.

01:40:05  10   Q.   AND YET YOU WERE NOT COMMUNICATING WITH AGENT MARTINEZ?

01:40:09  11   A.   I WAS THE COOPERATING AGENT FOR A TIME, AND I WAS

01:40:13  12   COMMUNICATING WITH AGENT MARTINEZ, BUT I WAS PREPARING

01:40:17  13   SPREADSHEETS, I WASN'T ASKING HER ABOUT WHO SHE WAS

01:40:21  14   INVESTIGATING.  SHE WOULDN'T BE ABLE TO TELL ME THAT, THAT'S

01:40:25  15   PRIVATE.

01:40:25  16   Q.   SO YOU WERE -- IS IT FAIR TO SAY YOU WERE FOCUSSING ONLY

01:40:28  17   ON THE MONEY?  IS THAT TRUE, WHEN YOU ARE TALKING ABOUT

01:40:32  18   SPREADSHEETS?

01:40:33  19   A.   YES, RENTAL INCOME AND MONEY GOING IN.

01:40:37  20   Q.   AND YOU WEREN'T GIVING MUCH WEIGHT TO WHAT MEILI LIN AND

01:40:42  21   HER HUSBAND WERE TELLING YOU ABOUT THE COMPANY IN CHINA AND

01:40:46  22   WHAT THEIR ROLE HERE WAS AS BROKERS AND AGENTS?

01:40:49  23   A.   I DID NOT FIND THEIR EXPLANATION TO BE PLAUSIBLE OR THE

01:40:53  24   INVOICES THAT THEY PRODUCED TO SUBSTANTIATE THEIR INCOME.

01:40:57  25   Q.   SO YOU BASICALLY DIDN'T BELIEVE IT, PUT IT ASIDE AND JUST

01:41:02  1    FOCUSED ON THE NUMBERS?  IT'S A YES-OR-NO QUESTION.

01:41:05  2    A.   I TRIED TO -- SAY THE QUESTION AGAIN.

01:41:12  3    Q.   YEAH.  IT WAS A YES-OR-NO QUESTION.

01:41:16  4         BASICALLY, YOU DISREGARDED -- BECAUSE YOU DID NOT BELIEVE

01:41:18  5    THEIR STORY, YOU DISREGARDED WHAT THEY SAID AND FOCUSED ON

01:41:21  6    DOING YOUR SPREADSHEETS OF NUMBERS, CORRECT?

01:41:24  7    A.   CORRECT.

01:41:25  8    Q.   NOW, AND I MAY HAVE ASKED THIS, BUT YOU NEVER GAVE AGENT

01:41:38  9    MARTINEZ, WHEN YOU MET WITH HER AFTER THE CASE WAS REFERRED TO

01:41:41  10   CRIMINAL INVESTIGATIONS, ANY INFORMATION OF WHAT YOU THOUGHT

01:41:43  11   WAS AN IMPORTANT LINE OF INVESTIGATION FOR HER TO DO?

01:41:49  12   A.   I DON'T TELL SPECIAL AGENTS HOW TO DO THEIR JOB.  I GIVE

01:41:52  13   HER MY FILES AND SHE DETERMINES HER COURSE OF ACTION.

01:41:56  14   Q.   OKAY.  BUT YOU CONSIDER YOUR -- YOU SPENT A LOT OF TIME ON

01:41:59  15   THIS CASE, DIDN'T YOU?

01:42:02  16   A.   YES.

01:42:02  17   Q.   AND YOU FELT THAT YOU KNEW IT FAIRLY WELL, CORRECT?

01:42:05  18   A.   I FELT THAT I NEEDED A LOT OF TIME TO GO THROUGH ALL THOSE

01:42:09  19   BANK ACCOUNTS AND ALL THAT MONEY.

01:42:11  20   Q.   BUT YOU DIDN'T THINK IT WAS IMPORTANT TO SHARE YOUR

01:42:13  21   INSIGHT, THE QUESTIONS THAT HAD ARISEN IN YOUR MIND, THAT MIGHT

01:42:18  22   AID AGENT MARTINEZ WHO WAS BRAND-NEW TO THE CASE?

01:42:21  23   A.   SHE GOT ALL MY WORK PAPERS, SHE GOT EVERYTHING ABOUT THE

01:42:25  24   CASE, SHE WAS ONE OF THE AGENTS THAT I WAS -- I BELIEVE WAS IN

01:42:31  25   ON THE DECISION TO TAKE THE CASE FROM MY MANAGER.

CROSS-EXAMINATION BY MS. POLLACK

01:42:37    1    Q.    OKAY.  I WOULD LIKE TO REFER TO A MOMENT TO GOVERNMENT

01:42:40    2    EXHIBIT 314, IF THAT COULD BE PLACED IN FRONT OF THE WITNESS --

01:42:46    3    IS IT UP THERE.

01:42:57    4          MS. POLLOCK:  IF IT COULD BE PUT ON THE ELMO.

01:43:01    5          THE COURT:  SO THE JURY CAN SEE IT?

01:43:03    6          MS. POLLOCK:  YES, SO THE JURY CAN SEE IT.

01:43:05    7          THE COURT:  OH, OF COURSE.

01:43:08    8        (OFF-THE-RECORD DISCUSSION.)

01:43:43    9    Q.    AGENT, YOU PREVIOUSLY IDENTIFIED THIS AS A CERTIFICATE OF

01:43:49   10    DEPOSIT BALANCE, CORRECT?

01:43:50   11    A.    I IDENTIFIED IT ON THE SCREEN HERE, BUT THIS IS -- I ALSO

01:43:53   12    MENTIONED THAT THIS IS SOMETHING I'VE NEVER SEEN BEFORE.

01:43:56   13    Q.    OKAY.  DID YOU EVER SEE ANY DOCUMENTS PERTAINING TO THE

01:44:08   14    BANK OF AGRICULTURE IN CHINA?

01:44:11   15    A.    NO.

01:44:17   16    Q.    AND IF EXHIBIT 244 COULD BE PLACED BEFORE THE WITNESS AND

01:44:21   17    ON THE ELMO.

01:44:43   18        AGENT, DIRECTING YOU TO THIS DOCUMENT WHICH IS UNIFORM

01:44:55   19    RESIDENTIAL LOAN APPLICATION FOR 188 MINNA STREET UNIT 32B.

01:45:01   20    A.    YES.

01:45:01   21    Q.    DID YOU RESEARCH WHERE THAT RESIDENCE WAS?

01:45:05   22    A.    YES.

01:45:05   23    Q.    OKAY.  YOU INDICATED EARLIER THAT THERE WAS A LUXURIOUS

01:45:12   24    CONDOMINIUM OR APARTMENT, IS THIS THE RESIDENCE YOU ARE

01:45:15   25    REFERRING TO?

CROSS-EXAMINATION BY MS. POLLACK

01:45:15  1    A.   I BELIEVE THAT'S AT ST. REGIS.

01:45:18  2    Q.   DID YOU GO TO THE ST. REGIS TO OBSERVE IT?

01:45:20  3    A.   NO, I DIDN'T.

01:45:21  4    Q.   BUT THE ST. REGIS IS IN DOWNTOWN SAN FRANCISCO?

01:45:25  5    A.   IT COMES UP ON THE INTERNET WITH THAT ADDRESS.

01:45:27  6    Q.   OKAY.  NOW, WHEN YOU LOOKED AT THIS DOCUMENT, DID YOU

01:45:30  7    ASSUME THAT IT WAS ACCURATE?

01:45:34  8    A.   I DON'T KNOW WHETHER IT WAS ACCURATE, THAT WOULD BE AN

01:45:42  9    ASSUMPTION.

01:45:43  10   Q.   THAT'S WHAT I ASKED YOU.  I ASKED YOU IF WHEN YOU SAW THIS

01:45:47  11   DOCUMENT IN THE COURSE OF YOUR INVESTIGATION IN THIS CASE, DID

01:45:50  12   YOU ASSUME THAT WAS AN ACCURATE DOCUMENT?

01:45:53  13   A.   I BELIEVE THIS WAS A MORE ACCURATE DOCUMENT THAN THEIR TAX

01:45:58  14   RETURN.

01:46:00  15   Q.   OKAY.  YOU MENTIONED ON WEDNESDAY, I BELIEVE, THAT IN THE

01:46:07  16   COURSE OF YOUR INVESTIGATION, IT'S IMPORTANT THAT YOU RECORD

01:46:10  17   THINGS.  DO YOU REMEMBER YOU USED THAT WORD, TO RECORD?

01:46:20  18   A.   I DON'T RECALL, BUT IT IS POSSIBLE.

01:46:22  19   Q.   YOU PREPARED AN ACTIVITY SUMMARY, CORRECT?

01:46:24  20   A.   YES.

01:46:24  21   Q.   AND THAT'S LIKE YOUR LOG?

01:46:25  22   A.   YES.

01:46:25  23   Q.   DID YOU TAKE NOTES IN THE COURSE OF YOUR MEETINGS WITH

01:46:29  24   MR. LIN AND MR. HORNG -- MS. LIN, RATHER, AND MR. HORNG AND THE

01:46:34  25   ACCOUNTANT CINDY SHI?

CROSS-EXAMINATION BY MS. POLLACK

01:46:35  1    A.   YES.

01:46:35  2    Q.   HANDWRITTEN NOTES?

01:46:37  3    A.   YES.

01:46:37  4    Q.   AND THEN AT THE END OF THE MEETINGS, DID YOU INCORPORATE

01:46:40  5    THEM INTO A TYPED ACTIVITY SUMMARY WHICH YOU'VE TESTIFIED

01:46:43  6    ABOUT?

01:46:43  7    A.   YES, AFTER.

01:46:45  8    Q.   AND WAS THAT DONE IMMEDIATELY AFTER THE MEETING?

01:46:47  9    A.   NO, I BELIEVE WE SAID IT WAS A COUPLE OF WEEKS, I BELIEVE.

01:46:54  10   I WOULD HAVE TO REFRESH -- I WOULD HAVE TO SEE, BUT I THINK

01:46:57  11   THERE WAS SOME LITTLE DELAY, SMALL, A COUPLE WEEKS.

01:47:01  12   Q.   NO, WHAT I'M ASKING YOU IS, AFTER THE MEETING, YOU HAD

01:47:06  13   HANDWRITTEN NOTES OF THE MEETING, CORRECT?

01:47:08  14   A.   YES.

01:47:08  15   Q.   DID YOU IMMEDIATELY TRANSMIT THOSE INTO A WRITTEN REPORT

01:47:14  16   ON YOUR ACTIVITY SUMMARY OR DID YOU WAIT?

01:47:16  17   A.   ON MY ACTIVITY SUMMARY?

01:47:18  18   Q.   YES.

01:47:19  19   A.   I DON'T SUMMARIZE THINGS ON MY ACTIVITY RECORD.

01:47:23  20   Q.   WHAT DID YOU DO WITH YOUR WRITTEN NOTES?

01:47:25  21   A.   I WRITE A SUMMARY, AN INTERVIEW SUMMARY, IS THAT WHAT YOU

01:47:29  22   ARE REFERRING TO?

01:47:30  23   Q.   LISTEN TO MY QUESTION.

01:47:31  24        YOU TOOK WRITTEN NOTES DURING THE MEETINGS, CORRECT?

01:47:33  25   A.   YES.

CROSS-EXAMINATION BY MS. POLLACK

01:47:33  1    Q.   WHAT DID YOU DO WITH THOSE WRITTEN NOTES AFTER THE

01:47:36  2    MEETING?

01:47:36  3    A.   I PREPARED A SUMMARY OF THE INTERVIEW.

01:47:38  4    Q.   OKAY.  AND WHAT DID YOU DO WITH YOUR NOTES AFTER YOU

01:47:41  5    PREPARED THE SUMMARY?

01:47:42  6    A.   THEY WERE IN THE SAME SECTION I KEPT THEM.

01:47:45  7    Q.   YOU KEPT YOUR NOTES?

01:47:47  8    A.   YES.

01:47:47  9    Q.   ALL RIGHT.  NOW, IT WAS IMPORTANT THAT YOU KEEP THOSE

01:47:50  10   NOTES BECAUSE THEY WERE A RECORD OF WHAT OCCURRED AT THE

01:47:53  11   MEETING, CORRECT?

01:47:54  12   A.   THEY ARE USED TO REFRESH MY MEMORY TO WRITE UP THE SUMMARY

01:47:59  13   OF WHAT OCCURRED IN THE MEETING.

01:48:01  14   Q.   OKAY.  AND HERE IN COURT, YOU SEE THAT WE HAVE A COURT

01:48:03  15   REPORTER WHO IS TAKING EVERYTHING DOWN, SO THAT WE HAVE, HERE

01:48:06  16   IN THE JURY, AN ACCURATE RECORD OF EVERYTHING THAT'S SAID IN

01:48:12  17   THE COURTROOM, CORRECT?

01:48:13  18   A.   YES.

01:48:13  19   Q.   AND IT WAS IMPORTANT TO YOU THAT YOU HAVE A RECORD OF WHAT

01:48:16  20   WAS SAID IN THESE MEETINGS, CORRECT?

01:48:21  21   A.   NOT EVERY WORD LIKE A COURT REPORTER TAKES DOWN.  I TAKE

01:48:26  22   NOTES OF THE CONVERSATIONS FOR RECOLLECTION SO I CAN DO A

01:48:31  23   SUMMARY.

01:48:31  24   Q.   OKAY.  AND YOU NEVER USED A TAPE RECORDER, DID YOU, TO

01:48:36  25   RECORD IT?

CROSS-EXAMINATION BY MS. POLLACK

| | | |
|---|---|---|
| 01:48:37 | 1 | A.    NO. |
| 01:48:37 | 2 | Q.    AND THAT WOULD HAVE BEEN AN EVEN MORE ACCURATE RECORD OF |
| 01:48:40 | 3 | WHAT WAS SAID, CORRECT? |
| 01:48:41 | 4 | A.    I'VE NEVER USED A TAPE RECORDER. |
| 01:48:43 | 5 | Q.    OKAY.  THE QUESTION WAS, THAT WOULD HAVE BEEN A MORE |
| 01:48:45 | 6 | ACCURATE RECORD OF WHAT WAS SAID, CORRECT? |
| 01:48:50 | 7 | A.    YES. |
| 01:48:53 | 8 | Q.    NOW REGARDING THE WIRES THAT MR. CANNON WAS ASKING YOU -- |
| 01:49:06 | 9 | A.    CAN I GO BACK TO THAT, BECAUSE I DON'T THINK I ANSWERED |
| 01:49:08 | 10 | THAT CORRECTLY.  I DON'T THINK I ANSWERED THAT LAST QUESTION |
| 01:49:11 | 11 | CORRECTLY. |
| 01:49:13 | 12 | MS. POLLOCK:  YOUR HONOR, COULD THERE BE A REREAD OF |
| 01:49:17 | 13 | THE QUESTION. |
| 01:49:17 | 14 | THE COURT:  SURE. |
| 01:49:34 | 15 | (RECORD READ.) |
| 01:49:35 | 16 | BY MS. POLLOCK: |
| 01:49:35 | 17 | Q.    YOU DON'T AGREE WITH WHAT YOU JUST SAID? |
| 01:49:38 | 18 | A.    WELL, I DON'T KNOW IF IT WOULD HAVE BEEN -- I DON'T THINK |
| 01:49:41 | 19 | IT'S MORE ACCURATE, IT MAY HAVE BEEN A MORE LENGTHY RECORDING, |
| 01:49:47 | 20 | IT MIGHT HAVE RECORDED -- IT WOULD HAVE RECORDED MORE. |
| 01:49:53 | 21 | Q.    IT WOULD HAVE BEEN A RECORD OF EVERYTHING THAT WAS SAID |
| 01:49:57 | 22 | DURING THAT MEETING, CORRECT? |
| 01:50:00 | 23 | A.    YES. |
| 01:50:00 | 24 | Q.    OKAY.  NOW MOVING ON FOR A MOMENT TO THE WIRES THAT |
| 01:50:03 | 25 | MR. CANNON WAS JUST ASKING YOU ABOUT? |

CROSS-EXAMINATION BY MS. POLLACK

01:50:05   1    A.   YES.

01:50:05   2    Q.   IN YOUR REVIEW OF THE BANK RECORDS, YOU OBTAINED MANY

01:50:10   3    WIRES, CORRECT?  BANK WIRES?

01:50:14   4    A.   YES, I DON'T RECALL WHETHER I GOT THE ACTUAL WIRES OR I

01:50:17   5    JUST GOT THE WIRE NOTATIONS ON THE STATEMENTS, I DON'T RECALL

01:50:22   6    SPECIFICALLY.

01:50:23   7    Q.   WELL, THE WIRE NOTATION ON A BANK STATEMENT IS NOT THAT

01:50:27   8    THOROUGH, IS IT?  IT JUST SHOWS WIRE TRANSFER AND THE AMOUNT,

01:50:31   9    RIGHT?

01:50:31   10   A.   AND WHO IT'S FROM AND JUST MORE THAN JUST THE WIRE

01:50:35   11   TRANSFER AND THE AMOUNT.

01:50:37   12   Q.   IT DOESN'T HAVE THE BANK NAME AND THE ROUTING INFORMATION,

01:50:43   13   DOES IT?

01:50:43   14   A.   I'M NOT SURE.  WE COULD LOOK ONE UP IF YOU WOULD LIKE TO.

01:50:47   15        MS. POLLOCK:  IF I COULD HAVE A MOMENT.

01:50:51   16        IF I COULD HAVE TWO SECONDS, YOUR HONOR.

01:51:07   17   Q.   FOLLOWING UP ON SOMETHING ELSE UNTIL MR. CANNON GETS HERE.

01:51:12   18        HAVE YOU EVER HEARD OF THE OFFICE OF INTERNATIONAL AFFAIRS

01:51:14   19   THAT'S UNDER THE UNITED STATES TREASURY?

01:51:17   20   A.   NO.

01:51:18   21   Q.   HAVE YOU -- DO YOU KNOW OF ANY WAY THAT THE IRS REVENUE

01:51:27   22   CIVIL INVESTIGATIONS CAN INVESTIGATE IN ANY COUNTRY OUTSIDE OF

01:51:30   23   THE UNITED STATES?

01:51:37   24   A.   INVESTIGATE OUTSIDE THE UNITED STATES?

01:51:41   25   Q.   IT'S BEEN YOUR TESTIMONY THAT BECAUSE TIANJIN WAS IN

CROSS-EXAMINATION BY MS. POLLACK

01:51:44   1    CHINA, YOU COULDN'T DO ANY INVESTIGATION, IT'S FOREIGN,

01:51:48   2    CORRECT?

01:51:50   3    A.   YES.

01:51:51   4    Q.   OKAY.  SO MY QUESTION TO YOU IS, DO YOU KNOW OF ANY WAY

01:51:55   5    THAT THE IRS IN CIVIL REVENUE, CAN INVESTIGATE OUTSIDE OF THE

01:52:00   6    UNITED STATES?

01:52:03   7    A.   THERE ARE CERTAIN COUNTRIES WE CAN GET INFORMATION FROM

01:52:11   8    OUTSIDE THE UNITED STATES.

01:52:13   9    Q.   WHICH COUNTRIES?

01:52:15   10   A.   I DON'T KNOW.

01:52:16   11   Q.   OKAY.  BUT YOU ARE AWARE THAT THE IRS HAS THE ABILITY TO

01:52:19   12   LOCATE INFORMATION THAT'S IN OTHER COUNTRIES?

01:52:23   13   A.   BANK RECORDS, BUT NOT -- NOT IN-DEPTH INFORMATION, BUT I

01:52:30   14   THINK WE CAN GET BANK RECORDS THROUGH CERTAIN COUNTRIES, IT'S A

01:52:37   15   VERY LENGTHY PROCESS.

01:52:38   16   Q.   OKAY.  WELL YOU HAD THIS CASE FOR A LONG TIME, DIDN'T YOU?

01:52:42   17   A.   I'VE HAD CASES LONGER.

01:52:44   18   Q.   OKAY.  BUT YOU'VE HAD THIS CASE FOR AT LEAST TWO YEARS,

01:52:47   19   DIDN'T YOU?

01:52:47   20   A.   UH-HUH.

01:52:48   21   Q.   AND YOU COULD HAVE PURSUED TRYING TO LOCATE BANK RECORDS,

01:52:52   22   EVEN THOUGH THAT WOULD BE A LENGTHY PROCESS, YOUR INVESTIGATION

01:52:56   23   WAS LENGTHY, WASN'T IT?

01:52:58   24   A.   YES.

01:52:58   25   Q.   NOW YOU INDICATED THAT YOU DO NOT USE THE MLAT TO OBTAIN

01:53:05   1    INFORMATION ABROAD?

01:53:07   2    A.   I THINK THAT'S CRIMINAL.  NO, I DO NOT, I DO NOT USE MLAT.

01:53:13   3    Q.   OKAY.  DO YOU KNOW WHAT THE MLAT IS?

01:53:16   4    A.   I'M NOT POSITIVE.  I THINK IT'S GETTING INFORMATION, BUT I

01:53:20   5    DON'T KNOW HOW THEY DO IT, AND I DON'T KNOW WHAT IT ENTAILS.

01:53:25   6    Q.   OKAY.  IT'S THE UNITED STATES GOVERNMENT, CORRECT?

01:53:27   7    A.   EXCUSE ME?

01:53:29   8    Q.   IT'S THROUGH THE UNITED STATES GOVERNMENT, THE DEPARTMENT

01:53:32   9    OF JUSTICE?

01:53:32   10   A.   I DON'T KNOW.

01:53:34   11   Q.   WHEN YOU HAD WIRES FROM BANKS THAT YOU WERE EXAMINING,

01:53:57   12   SOME OF THEM HAD NAMES OF COMPANIES ON THEM, DID THEY NOT?

01:53:59   13   A.   YES.

01:54:00   14   Q.   OKAY.  AND WITH THOSE, SUCH AS A JEWELRY STORE, CORRECT,

01:54:10   15   DID YOU SEE ANY WITH JEWELRY STORES ON THEM?

01:54:12   16   A.   I DON'T REMEMBER.

01:54:13   17   Q.   WOULD IT BE POSSIBLE THAT YOU LOOKED AT SOME THAT HAD

01:54:16   18   JEWELRY STORES ON THEM?

01:54:17   19   A.   POSSIBLY, I DON'T KNOW.

01:54:19   20   Q.   FROM MANY OF THE COMPANIES THAT YOU DID SEE ON WIRES,

01:54:22   21   THERE WERE ADDRESSES, WEREN'T THERE?

01:54:24   22   A.   I THINK SO.  THEY MUST HAVE, OR I WOULDN'T HAVE KNOWN THEY

01:54:29   23   WERE IN CHINA.

01:54:31   24   Q.   AND ELSEWHERE, CORRECT, THERE WERE SOME IN TAIWAN THAT YOU

01:54:35   25   SAW, CORRECT?

CROSS-EXAMINATION BY MS. POLLACK

01:54:36  1    A.    I SAW THEM FROM ALL OVER, YES.

01:54:38  2    Q.    OKAY.  AND YOU ALSO SAW THEM FROM HONG KONG?

01:54:42  3    A.    OKAY.

01:54:42  4    Q.    OKAY.  IS THAT TRUE?  I MEAN, JUST SAYING "OKAY," I WANT A

01:54:46  5    YES OR NO.

01:54:47  6    A.    I MEAN, I DON'T KNOW EXACTLY WHERE ALL THE WIRE TRANSFERS

01:54:51  7    WERE FROM.

01:54:52  8    Q.    OKAY.  FOR THE WIRE TRANSFERS THAT HAD A NAME OF A COMPANY

01:54:58  9    AND AN ADDRESS, DID YOU EVER WRITE A LETTER TO THAT COMPANY TO

01:55:01  10   OBTAIN INFORMATION?

01:55:02  11   A.    NO, I'M NOT ALLOWED TO DO THAT.

01:55:04  12   Q.    THE IRS PREVENTS YOU FROM WRITING A LETTER?

01:55:06  13   A.    TO ANOTHER COUNTRY, YES.

01:55:08  14   Q.    SO YOU COULDN'T PURSUE ANY INVESTIGATION TO CORROBORATE

01:55:14  15   WHAT MS. LIN AND MR. HORNG WERE TELLING YOU, RIGHT?

01:55:17  16   A.    RIGHT.

01:55:18  17   Q.    YOU JUST RELIED ON BANK NUMBERS?

01:55:21  18   A.    I RELIED ON TURNING OVER THE CASE TO WHERE FURTHER

01:55:27  19   INFORMATION COULD BE DETERMINED.

01:55:28  20   Q.    WHAT I'M SAYING, ALL YOU DID WAS RELY ON YOUR ANALYSIS OF

01:55:35  21   THE BANK RECORDS TO THE EXCLUSION OF THE INFORMATION THAT

01:55:39  22   MS. LIN AND MR. HORNG WERE GIVING YOU?

01:55:41  23   A.    I RELIED ON BANK RECORDS.

01:55:43  24   Q.    AND DID NOT GIVE ANY CONSIDERATION TO THE ACTUAL

01:55:46  25   INFORMATION THEY WERE GIVING YOU, CORRECT?

| | | |
|---|---|---|
| 01:55:48 | 1 | A.   I GAVE CONSIDERATION. |
| 01:55:50 | 2 | Q.   YOU DISCOUNTED IT, DIDN'T YOU, AND YOU FOUND IT -- |
| 01:55:53 | 3 | A.   I DID NOT FIND IT CREDIBLE. |
| 01:55:55 | 4 | Q.   THAT'S WHAT I WAS GOING TO SAY. |
| 01:55:56 | 5 |      ALL RIGHT.  THANK YOU. |
| 01:56:04 | 6 |         THE COURT:  REDIRECT FOR THIS WITNESS, MR. PITMAN? |
| 01:56:13 | 7 |         MR. PITMAN:  THANK YOU, YOUR HONOR. |
| 01:56:14 | 8 | **REDIRECT EXAMINATION** |
| 01:56:16 | 9 | BY MR. PITMAN: |
| 01:56:18 | 10 | Q.   HELLO, AGENT GARRISON. |
| 01:56:46 | 11 | A.   HELLO, MR. PITMAN. |
| 01:56:47 | 12 | Q.   I HAVE A FEW QUESTIONS FOR YOU JUST TO ADDRESS SOME ISSUES |
| 01:56:50 | 13 | THAT CAME UP ON CROSS-EXAMINATION. |
| 01:56:52 | 14 | A.   OKAY. |
| 01:56:52 | 15 | Q.   THE FIRST IS MR. CANNON MENTIONED THAT WHEN YOU GOT THE |
| 01:56:58 | 16 | CASE, IT WAS BECAUSE THE CASE HAD BEEN DECLINED BY CI. |
| 01:57:05 | 17 |      DO YOU REMEMBER THAT? |
| 01:57:05 | 18 | A.   YES. |
| 01:57:06 | 19 | Q.   SO FIRST OF ALL, WHEN WE TALK ABOUT CI, WHAT ARE WE |
| 01:57:09 | 20 | TALKING ABOUT? |
| 01:57:10 | 21 | A.   CRIMINAL INVESTIGATION. |
| 01:57:11 | 22 | Q.   OKAY.  AND SO YOU ARE, YOUR TITLE IS? |
| 01:57:15 | 23 | A.   REVENUE AGENT, CIVIL. |
| 01:57:17 | 24 | Q.   OKAY.  SO YOU WORK ON THE CIVIL SIDE? |
| 01:57:20 | 25 | A.   YES. |

REDIRECT EXAMINATION BY MR. PITMAN

01:57:20  1    Q.   BUT YOU DO SOMETIMES PROVIDE ASSISTANCE TO CRIMINAL

01:57:24  2    INVESTIGATORS?

01:57:24  3    A.   YES, I DO.

01:57:25  4    Q.   BUT YOUR WORK ON THIS CASE WAS --

01:57:28  5    A.   CIVIL.

01:57:28  6    Q.   OKAY.  AND SO WHEN WE TALK ABOUT CI OR CRIMINAL

01:57:32  7    INVESTIGATIONS, IS THAT SORT OF A DIFFERENT PART OF THE IRS?

01:57:35  8    A.   YES.

01:57:36  9    Q.   OKAY.  AND THE AGENTS THAT WORK IN CI, WHAT ARE THEY

01:57:41  10   CALLED?

01:57:41  11   A.   SPECIAL AGENTS.

01:57:42  12   Q.   OKAY.  AND SPECIAL AGENTS ARE DIFFERENT THAN REVENUE

01:57:45  13   AGENTS, RIGHT?

01:57:46  14   A.   YES.

01:57:46  15   Q.   THEY GET BADGES?

01:57:47  16   A.   YEAH.

01:57:48  17   Q.   THEY GET GUNS?

01:57:49  18   A.   THEY GET MORE MONEY.

01:57:52  19   Q.   THEY ARE THE CRIMINAL INVESTIGATORS THAT WORK ON BEHALF OF

01:57:56  20   THE IRS?

01:57:56  21   A.   YES.

01:57:56  22   Q.   AND SO WHEN YOU RECEIVED THIS CASE, IS IT FAIR TO SAY THAT

01:58:01  23   A CRIMINAL SPECIAL AGENT HAD BEEN WORKING ON IT BEFORE THAT?

01:58:06  24   A.   YES.

01:58:07  25   Q.   AND DO YOU KNOW WHY THAT CRIMINAL INVESTIGATION ENDED?

01:58:15  1   A.   BECAUSE THERE'S SUPPOSED TO BE A FREEZE CODE ON A CRIMINAL

01:58:22  2   CASE WHICH STOPS ANY FURTHER ACTION FROM CIVIL SIDE.

01:58:26  3        AND THEY HAD TAKEN TOO LARGE OF A DEDUCTION OF MORTGAGE

01:58:33  4   INTEREST ON SCHEDULE A IN 2005, AND SO THE SERVICE CENTER

01:58:40  5   DIDN'T SEE A FREEZE CODE SO THEY DIDN'T KNOW THAT THE CASE WAS

01:58:43  6   BEING WORKED BY CI, SO THE SERVICE CENTER SENT OUT A REPORT.

01:58:49  7   Q.   OKAY.  SO WHAT'S A FREEZE CODE?

01:58:53  8   A.   FREEZE CODE IS JUST A CODE THAT SHOWS, DON'T TOUCH THIS

01:59:00  9   CASE, IT'S IN CI, IT'S UNDER CRIMINAL INVESTIGATION, DON'T DO

01:59:09  10  ANYTHING WITH IT.

01:59:10  11  Q.   WHEN YOU SAY A CODE, WHAT ARE WE TALKING ABOUT?

01:59:12  12  A.   IT JUST GOES ON OUR SYSTEM, IT'S LIKE A FREEZE, AND YOU

01:59:17  13  LOOK UP THE TRANSCRIPTS WHEN YOU SEE WHERE A CASE IS AT, WHAT

01:59:21  14  THE HISTORY IS, AND WITH THAT FREEZE CODE, YOU KNOW THAT'S AN

01:59:27  15  ACTIVE CRIMINAL INVESTIGATION AND THEY FORGOT TO PUT THE CODE

01:59:29  16  ON.

01:59:30  17  Q.   SO WHEN CI PICKS UP A CASE, THERE'S SUPPOSED TO BE SOME

01:59:34  18  SORT OF ENTRY IN A COMPUTER SOMEWHERE?

01:59:36  19  A.   YES, AND THEY FORGOT.

01:59:37  20  Q.   AND THEN THAT CODE OR THAT ENTRY IN THE COMPUTER SYSTEM,

01:59:41  21  WHAT IS THAT SUPPOSED TO CONVEY TO OTHER IRS EMPLOYEES?

01:59:44  22  A.   DO NOT TOUCH THAT CASE.

01:59:46  23  Q.   OKAY.  AND IN THIS CASE, THERE WAS A SNAFU?

01:59:50  24  A.   YES, THE CODE DIDN'T GET APPLIED.

01:59:53  25  Q.   AND SO THEN THE CIVIL SIDE?

REDIRECT EXAMINATION BY MR. PITMAN

01:59:56  1    A.    YES.

01:59:56  2    Q.    DID SOMETHING?

01:59:58  3    A.    THEY ISSUED A REPORT.

01:59:59  4    Q.    WHAT DOES THAT MEAN?

02:00:00  5    A.    THEY MEANS A SENT OUT A REVENUE AGENT REPORT, THE RAR,

02:00:07  6    ASSESSING TAX.  THEY MADE A TAX ASSESSMENT.

02:00:10  7    Q.    OKAY.  AND SO WHY, THEN, DID THE SPECIAL AGENT WHO WAS

02:00:15  8    INVESTIGATING THE DEFENDANTS DECIDE THAT THAT EVENT, IF YOU

02:00:19  9    KNOW, SHOULD RESULT IN DETERMINATION OF HIS INVESTIGATION?

02:00:24  10   A.    BECAUSE ONCE A CIVIL REPORT GOES OUT, THAT'S BLOWN THE

02:00:32  11   CASE, THE CRIMINAL CASE HAD TO BE DROPPED SIMPLY BECAUSE OF A

02:00:38  12   MISSED FREEZE CODE.

02:00:39  13   Q.    AND DO YOU REMEMBER WHAT YEAR IT WAS THAT WAS UNDER

02:00:41  14   INVESTIGATION?

02:00:41  15   A.    2005.

02:00:42  16   Q.    2005.  OKAY.  SO NOT THE YEARS AT ISSUE IN THIS CASE?

02:00:45  17   A.    NOT THAT I'M AWARE OF.

02:00:49  18   Q.    OKAY.  NOW LET ME ASK YOU A COUPLE QUESTIONS ABOUT

02:00:52  19   FLORENCE TRADING.

02:00:54  20        AND FIRST OF ALL, CAN WE, JOHN, CAN WE TAKE A LOOK AT

02:01:00  21   EXHIBIT NUMBER 1.  AND CAN YOU PAGE DOWN, PLEASE, JOHN.

02:01:33  22        OKAY.  I WILL COME BACK TO THAT.

02:01:40  23        I WANT TO ASK YOU A COUPLE QUESTIONS ABOUT THE THIRD

02:01:44  24   MEETING.  THE THIRD MEETING WAS -- DO YOU REMEMBER THE DATE OF

02:01:54  25   THE THIRD MEETING?

REDIRECT EXAMINATION BY MR. PITMAN

02:01:55  1     A.   I THINK IT WAS JANUARY 13TH.

02:01:58  2     Q.   LET ME ASK YOU, PLEASE, TO TAKE A LOOK AT -- AND THIS IS

02:02:03  3     NOT IN EVIDENCE, EXHIBIT 237.

02:02:06  4          MR. PITMAN:  YOUR HONOR, MAY I APPROACH THE WITNESS?

02:02:08  5          THE COURT:  YES.

02:03:19  6     Q.   ALL RIGHT, AGENT GARRISON, DO YOU HAVE EXHIBIT NUMBER 237

02:03:22  7     IN FRONT OF YOU?

02:03:23  8     A.   YES.

02:03:23  9     Q.   AND IS IT CORRECT TO SAY THAT THE THIRD MEETING HAPPENED

02:03:27  10    ON JANUARY 13TH?

02:03:29  11    A.   237, IT'S SHOWING A SUMMARY OF MY 9-23-10 -- IS THERE

02:03:42  12    ANOTHER?

02:03:43  13    Q.   SO 9-23-10.  WHO DID YOU MEET WITH ON SEPTEMBER 23RD OF

02:03:50  14    2010?

02:03:51  15    A.   OH, 9-23-10, I MET WITH HENRY HORNG AND CINDY SHI AND A

02:04:06  16    FRIEND OF MR. HORNG'S.

02:04:08  17    Q.   AND WAS THAT THE MEETING THAT MR. BORGO ATTENDED?

02:04:11  18    A.   YES.

02:04:11  19    Q.   WAS THAT THE THIRD MEETING?

02:04:13  20    A.   THAT WAS THE THIRD MEETING, I GOT THAT DATE WRONG, SORRY.

02:04:16  21    Q.   NOW CAN YOU JUST CLARIFY FOR THE RECORD, PLEASE, WHAT DATE

02:04:19  22    THAT MEETING OCCURRED?

02:04:20  23    A.   THIS THIRD MEETING WAS ON 9-23-10.

02:04:23  24    Q.   OKAY.  AND THAT'S THE MEETING AT 450 GOLDEN GATE?

02:04:27  25    A.   YES.

REDIRECT EXAMINATION BY MR. PITMAN

02:04:27  1      Q.   AND AT THAT MEETING YOU ASKED MR. HORNG SOME QUESTIONS

02:04:30  2      ABOUT AN ENTITY CALLED FLORENCE TRADING?

02:04:33  3      A.   YES.

02:04:34  4              MR. CANNON:  OBJECTION.  LEADING.

02:04:38  5              THE COURT:  OVERRULED.

02:04:39  6      BY MR. PITMAN:

02:04:39  7      Q.   WHEN YOU BROACHED THAT SUBJECT WITH HIM, WHAT DID HE SAY

02:04:45  8      INITIALLY IN RESPONSE?

02:04:49  9      A.   CAN I REFRESH MY MEMORY WITH THIS?

02:04:52  10     Q.   ARE YOU LOOKING AT EXHIBIT 237?

02:04:55  11     A.   YES.

02:04:56  12     Q.   IF THAT WILL HELP YOU REMEMBER.

02:05:14  13     A.   YES.  IN THE INTERVIEW THAT WE HAD WITH BOTH OF THEM, THEY

02:05:20  14     SAID THAT THE BUSINESS WAS NOT ACTIVE AND NEVER HAD ANY -- THEY

02:05:27  15     NEVER HAD ANY AFFILIATION WITH FLORENCE TRADING --

02:05:31  16     Q.   DID HE REPEAT THAT ASSERTION AT THE THIRD MEETING?

02:05:34  17     A.   HE DID.

02:05:35  18     Q.   OKAY.  SO HE TOLD YOU HE NEVER HAD ANY AFFILIATION WITH

02:05:38  19     THAT BUSINESS?

02:05:39  20     A.   RIGHT.

02:05:39  21     Q.   AND THEN WHAT DID YOU DO AFTER THAT?

02:05:41  22     A.   I SHOWED HIM HIS BUSINESS CARD WITH THE NAME OF THAT

02:05:44  23     BUSINESS ON IT.

02:05:45  24     Q.   AND WHAT DID HE SAY WHEN YOU SHOWED HIM THE BUSINESS CARD?

02:05:48  25     A.   SOMETIMES HE TRANSLATES E-MAILS FROM HIS FATHER -- FOR HIS

02:05:54  1    FATHER-IN-LAW, AND SO PEOPLE NEED TO KNOW WHO HE IS.

02:05:57  2    Q.    OKAY.  THANK YOU.

02:06:00  3          MR. CANNON ASKED YOU SOME QUESTIONS ABOUT THE DEFENDANT'S

02:06:05  4    DOMESTIC BANK ACCOUNTS.

02:06:08  5    A.    YES.

02:06:08  6    Q.    AND HE ASKED YOU WHETHER THOSE DOMESTIC BANK ACCOUNTS HAD

02:06:13  7    BEEN HIDDEN FROM YOU; DO YOU REMEMBER THAT?

02:06:15  8    A.    YES.

02:06:16  9    Q.    OKAY.  SO WHEN DOMESTIC BANK ACCOUNTS OPEN UP AN ACCOUNT,

02:06:27  10   DO THEY REQUIRE THAT AN INDIVIDUAL BE ASSOCIATED WITH ACCOUNT?

02:06:34  11   A.    YES.

02:06:34  12   Q.    AND WHAT ARE SOME OF THE REASONS THAT THEY HAVE THAT

02:06:37  13   REQUIREMENT?

02:06:37  14   A.    BECAUSE THEY ISSUE A 1099 FOR INTEREST ON THAT ACCOUNT OR

02:06:44  15   INTERESTS ON THAT ACCOUNT.

02:06:45  16   Q.    AND THE 1099 THAT'S ASSOCIATED WITH INTEREST THAT'S

02:06:49  17   ACCUMULATING IN AN ACCOUNT, WHEN THAT'S PREPARED, WHO IS IT

02:06:53  18   SENT TO?

02:06:53  19   A.    THE FIRST PERSON ON THE ACCOUNT.

02:06:55  20   Q.    OKAY.  AND IS IT SENT TO ANYBODY ELSE?

02:06:57  21   A.    IT'S SENT TO THE IRS AS WELL.

02:06:59  22   Q.    OKAY.  SO THE IRS RECEIVES NOTIFICATION OF BANK ACCOUNTS,

02:07:08  23   DOMESTIC BANK ACCOUNTS, INDEPENDENTLY OF WHETHER THE TAXPAYER

02:07:11  24   REPORTS THEM OR NOT; IS THAT FAIR TO SAY?

02:07:14  25   A.    YES.

REDIRECT EXAMINATION BY MR. PITMAN

| | | |
|---|---|---|
| 02:07:14 | 1 | Q.   WHAT ABOUT FOREIGN BANKS?  DO YOU KNOW WHETHER FOREIGN |
| 02:07:23 | 2 | BANKS ISSUE 1099'S? |
| 02:07:27 | 3 | A.   I DON'T THINK THEY DO.  WE DON'T GET ANYTHING ON FOREIGN |
| 02:07:32 | 4 | BANKS. |
| 02:07:32 | 5 | Q.   OKAY.  SO FOR FOREIGN BANKS, THAT SYSTEM WORKS A LITTLE |
| 02:07:37 | 6 | BIT DIFFERENTLY? |
| 02:07:37 | 7 | A.   YES. |
| 02:07:38 | 8 | Q.   BECAUSE THE IRS DOESN'T RECEIVE ANY -- |
| 02:07:41 | 9 | MR. CANNON:  OBJECTION, YOUR HONOR. |
| 02:07:42 | 10 | MS. POLLOCK:  OBJECTION. |
| 02:07:43 | 11 | ASSUMES FACTS NOT IN EVIDENCE.  SPECULATION ON THE PART OF |
| 02:07:45 | 12 | THIS WITNESS. |
| 02:07:49 | 13 | THE COURT:  WELL, WHY DON'T YOU LAY A LITTLE MORE |
| 02:07:52 | 14 | FOUNDATION, MR. PITMAN. |
| 02:07:52 | 15 | BY MR. PITMAN: |
| 02:07:53 | 16 | Q.   IN YOUR EXPERIENCE AS A REVENUE AGENT, ARE YOU -- YOU'RE |
| 02:07:56 | 17 | COMFORTABLE WITH THE IRS'S COMPUTER SYSTEMS? |
| 02:07:58 | 18 | A.   YES. |
| 02:07:58 | 19 | Q.   AND THOSE COMPUTER SYSTEMS ACCUMULATE LOTS OF DIFFERENT |
| 02:08:03 | 20 | INFORMATION ABOUT TAXPAYERS? |
| 02:08:04 | 21 | A.   YES. |
| 02:08:05 | 22 | Q.   AND DO THEY ALSO ACCUMULATE INFORMATION THAT'S REPORTED BY |
| 02:08:09 | 23 | THIRD PARTIES? |
| 02:08:10 | 24 | A.   YES. |
| 02:08:10 | 25 | Q.   SO INFORMATION THAT'S REPORTED ON, FOR INSTANCE, |

02:08:15   1    FORM 1099?

02:08:16   2    A.   YES.

02:08:16   3    Q.   IS THAT INFORMATION ACCUMULATED IN THE IRS'S -- EXCUSE ME,

02:08:21   4    THE IRS'S COMPUTERS?

02:08:22   5    A.   YES.

02:08:23   6    Q.   OKAY.  AND THAT'S A SYSTEM THAT YOU'RE -- YOU USE AS A

02:08:27   7    REGULAR PART OF YOUR JOB?

02:08:28   8    A.   YES.

02:08:28   9    Q.   AS YOU SIT HERE, CAN YOU REMEMBER EVER HAVING SEEN A 1099

02:08:37  10    ON THE COMPUTER SYSTEM THAT YOU KNOW WAS ISSUED BY A FOREIGN

02:08:41  11    BANK?

02:08:42  12    A.   NEVER.

02:08:43  13    Q.   OKAY.  LET ME ASK YOU PLEASE TO TAKE A LOOK AT

02:08:52  14    EXHIBIT 380, WHICH IS NOT IN EVIDENCE.

02:08:56  15          MR. PITMAN:  YOUR HONOR, MAY I APPROACH THE WITNESS?

02:08:59  16    MAY I APPROACH, YOUR HONOR.

02:09:00  17          THE COURT:  YES, OF COURSE.

02:09:39  18    Q.   HAVE YOU EVER SEEN THAT BEFORE?

02:09:41  19    A.   NO.

02:09:42  20    Q.   OKAY.  THANKS.  CAN YOU PUT IT AWAY.

02:09:46  21    MR. CANNON ASKED YOU A FEW QUESTIONS ABOUT MEI-ZU OR

02:09:58  22    MEI-RU LIN?

02:10:00  23    A.   YES.

02:10:00  24    Q.   DO YOU REMEMBER THOSE QUESTIONS?

02:10:02  25    A.   I DO.

REDIRECT EXAMINATION BY MR. PITMAN

02:10:03   1    Q.   AND AS YOU APPROACHED THIS AUDIT, DID YOU HAVE SOME

02:10:12   2    QUESTIONS ABOUT WHO THAT PERSON WAS?

02:10:13   3    A.   YES.

02:10:14   4    Q.   AND CAN YOU JUST REMIND US WHY YOU HAD SOME INTEREST IN

02:10:18   5    THE PERSON UNDER THAT NAME?

02:10:18   6    A.   BECAUSE THE NAME WAS SO SIMILAR TO MEILI LIN, AND BECAUSE

02:10:28   7    THE ADDRESS ON THE ACCOUNT MEI-ZU LIN WAS THE FORMER ADDRESS OF

02:10:37   8    MEILI LIN.  SO MEI-ZU LIN WAS USING THE SAME ADDRESS AS MEILI

02:10:43   9    LIN.

02:10:43   10   Q.   AND DID YOU SAY -- YOU SAID SOMETHING ABOUT AN ACCOUNT

02:10:48   11   ASSOCIATED WITH MEI-ZU LIN?

02:10:53   12   A.   YES.

02:10:54   13   Q.   DO YOU REMEMBER OR NOT?

02:10:56   14   A.   I CAN'T REALLY RECALL.

02:10:58   15   Q.   I'M JUST TRYING TO ASK, WHY WERE YOU INTERESTED IN WHO

02:11:01   16   THAT PERSON WAS AND HOW SHE FIT INTO THIS SITUATION?  IF YOU

02:11:07   17   REMEMBER.

02:11:07   18   A.   BECAUSE I THINK THERE WERE INCOME GOING INTO THAT ACCOUNT

02:11:12   19   AND I WAS WONDERING IF THAT MIGHT BE AN ALIAS OF MEILI LIN.

02:11:18   20   Q.   OKAY.  SO THAT WAS A QUESTION THAT AROSE AS PART OF YOUR

02:11:21   21   WORK ON THE CASE?

02:11:22   22   A.   YES.

02:11:22   23   Q.   AND YOU THOUGHT IT MIGHT BE SIGNIFICANT?

02:11:25   24   A.   YES.

02:11:26   25   Q.   AND SO WHEN YOU TALKED TO THE TAXPAYERS, YOU ASKED THEM

REDIRECT EXAMINATION BY MR. PITMAN

02:11:29  1    ABOUT IT?

02:11:29  2    A.   YES.

02:11:29  3    Q.   WHEN YOU TALKED TO THE DEFENDANTS, YOU ASKED THEM ABOUT

02:11:32  4    IT?

02:11:32  5    A.   YES.

02:11:32  6    Q.   THE FACT THAT THERE IS -- THERE MAY BE ANOTHER PERSON WITH

02:11:40  7    THAT NAME, DOES THAT PRECLUDE THE POSSIBILITY THAT MEILI LIN

02:11:44  8    COULD HAVE STILL BEEN USING IT AS AN ALIAS?

02:11:48  9    A.   NO, THAT DOESN'T PRECLUDE IT.

02:11:50  10   Q.   MR. CANNON ON CROSS ASKED YOU SOME QUESTIONS ABOUT THE

02:11:54  11   DEFENDANT'S IMMIGRATION STATUS, AND YOUR KNOWLEDGE ABOUT THAT?

02:11:59  12   A.   YES, RIGHT.

02:12:00  13   Q.   AND THERE WAS SOME TESTIMONY ABOUT ALIEN STUDENT STATUS?

02:12:04  14   A.   YES.

02:12:05  15   Q.   SO AS PART OF YOUR WORK ON THE CASE, YOU WERE CURIOUS

02:12:08  16   ABOUT THE DEFENDANT'S CITIZENSHIP STATUS?

02:12:12  17   A.   YES.

02:12:12  18   Q.   AND WHEN YOU MET WITH THEM, YOU ASKED THEM ABOUT IT?

02:12:15  19   A.   YES.

02:12:15  20   Q.   OKAY.  AND CAN CITIZENSHIP STATUS BE SIGNIFICANT FOR TAX

02:12:20  21   PURPOSES?

02:12:20  22   A.   YES.

02:12:21  23   Q.   OKAY.  AND JUST TO BE VERY, VERY CLEAR, IS IT YOUR

02:12:24  24   UNDERSTANDING THAT IN 2006 AND 2007, THE DEFENDANTS WERE

02:12:29  25   CITIZENS OF THE UNITED STATES?

REDIRECT EXAMINATION BY MR. PITMAN

02:12:31  1          MR. CANNON:  OBJECTION.  LEADING, YOUR HONOR.

02:12:32  2          THE WITNESS:  YES.

02:12:33  3          THE COURT:  OVERRULED.

02:12:38  4   BY MR. PITMAN:

02:13:15  5   Q.   WHEN YOU ANALYZED THE BANK RECORDS THAT YOU RECEIVED AS

02:13:18  6   PART OF THIS INVESTIGATION, DID YOU NOTE THAT THERE WAS MONEY

02:13:23  7   COMING INTO REIJIN'S BANK ACCOUNTS FROM TRMP?

02:13:27  8   A.   YES.

02:13:28  9   Q.   AND DID YOU ALSO NOTE THAT THERE WAS MONEY COME INTO THOSE

02:13:33  10  BANK ACCOUNTS FROM OTHER INDIVIDUALS AND ENTITIES?

02:13:35  11  A.   YES.

02:13:36  12  Q.   AND WHEN YOU TALKED TO THE DEFENDANTS, DID YOU ASK THEM

02:13:41  13  WHO THOSE PEOPLE AND ENTITIES WERE, OTHER THAN TRMP SENDING

02:13:45  14  MONEY TO REIJIN?

02:13:46  15  A.   YES.

02:13:46  16  Q.   AND WHAT DID THEY TELL YOU?

02:13:47  17  A.   THEY TOLD ME THAT THOSE WERE CUSTOMERS OF TIANJIN.

02:13:54  18  Q.   OKAY.  AND DID THEY TELL YOU WHETHER THEY KNEW WHO THOSE

02:13:58  19  PEOPLE OR BUSINESSES WERE?

02:13:59  20  A.   NO, THEY SAID THEY DIDN'T KNOW WHO THEY WERE AND THE

02:14:05  21  AMOUNTS THAT THEY WERE SENDING, THEY DIDN'T KNOW.

02:14:08  22  Q.   OKAY.  AND DID THEY TELL YOU WHETHER THEY KNEW OR NOT WHY

02:14:15  23  PEOPLE OTHER THAN TIANJIN WERE SENDING MONEY TO THEIR COMPANY?

02:14:19  24  A.   THEY WANTED TO, THEY WANTED TO REDUCE THE WIRE COST.

02:14:30  25  Q.   CAN YOU JUST --

REDIRECT EXAMINATION BY MR. PITMAN

02:14:31  1    A.   TRANSFER.

02:14:32  2    Q.   CAN YOU EXPLAIN THAT A LITTLE BIT MORE, HOW WOULD THEY

02:14:37  3    REDUCE THE WIRE COST BY DOING IT THIS WAY?

02:14:39  4    A.   THEY SAID THAT THEY WOULD HAVE TO WIRE -- THE CUSTOMER

02:14:41  5    WOULD HAVE TO WIRE THE MONEY TO TIANJIN AND THEN TIANJIN WOULD

02:14:45  6    WIRE THE MONEY TO REIJIN, SO IT WAS MORE COST-EFFECTIVE FOR

02:14:51  7    THEM TO JUST HAVE THEIR CUSTOMERS WIRE THE MONEY TO REIJIN.

02:14:59  8         AND THE DEFENDANTS DID NOT KNOW, THEY DIDN'T KNOW WHO WAS

02:15:03  9    SENDING THE MONEY, HOW MUCH MONEY THEY WERE SENDING, AND I

02:15:17 10    GUESS THAT'S IT.

02:15:17 11    Q.   OKAY.  SO THEY NEVER TOLD YOU THAT THEY WERE KEEPING --

02:15:20 12    A.   OH, I'M SORRY.  I FORGOT ONE PART.

02:15:23 13    Q.   OKAY.

02:15:23 14    A.   THEY ALSO SAID -- I SAID WELL, THEN HOW DO YOU KNOW, WHAT

02:15:29 15    IS THIS MONEY IN YOUR ACCOUNT, ONLY YOU CONTROL THE ACCOUNT.

02:15:39 16    AND NOW I'M LOSING MY TRAIN OF THOUGHT NOW, SORRY.

02:15:42 17         OH, I KNOW, SORRY -- SORRY.  I'M GETTING TIRED.  TIANJIN,

02:15:48 18    THEY SAID TIANJIN MUST HAVE GIVEN THOSE CUSTOMERS THE

02:15:53 19    DEFENDANTS'S BANK ACCOUNT INFORMATION AND THAT'S HOW THE MONEY

02:15:57 20    GOT THERE.

02:15:59 21    Q.   SO DID THEY TELL YOU THEY WERE KEEPING --

02:16:01 22              MR. CANNON:  OBJECTION.  LACKS FOUNDATION.

02:16:06 23              THE COURT:  THIS IS ABOUT THE DEFENDANT'S STATEMENTS?

02:16:09 24              MR. PITMAN:  IT IS, YOUR HONOR.

02:16:09 25              THE COURT:  GO AHEAD.  OVERRULED.

REDIRECT EXAMINATION BY MR. PITMAN

02:16:11  1    BY MR. PITMAN:

02:16:11  2    Q.   DID THE DEFENDANTS EVER TELL YOU THAT THEY WERE KEEPING

02:16:14  3    METICULOUS DETAILS --

02:16:16  4              MS. POLLOCK:  OBJECTION.  LEADING.

02:16:18  5              THE COURT:  SUSTAINED.

02:16:23  6    BY MR. PITMAN:

02:16:24  7    Q.   DID THE DEFENDANTS EVER SHOW YOU ANY RECORDS?

02:16:26  8              MR. CANNON:  OBJECTION.  AMBIGUOUS.

02:16:28  9              THE COURT:  PLEASE ASK AN OPEN-ENDED QUESTION.

02:16:36  10   BY MR. PITMAN:

02:16:36  11   Q.   WELL, LET'S TRY IT A DIFFERENT WAY.

02:16:49  12        CAN WE TAKE A LOOK, PLEASE, AS EXHIBIT 220, WHICH IS IN

02:16:54  13   EVIDENCE.

02:17:02  14             THE COURT:  DO YOU WANT IT ON THE SCREEN FOR THE

02:17:05  15   JURY?

02:17:05  16             MR. PITMAN:  OH, JOHN, PLEASE JUST THE SECOND PAGE.

02:17:09  17        THANK YOU.  THIS PAGE IS IN EVIDENCE.

02:17:12  18   Q.   SO WHAT ARE WE LOOKING AT HERE?

02:17:19  19   A.   THEIR 2006 COMMISSIONS AND BONUS FROM TIANJIN.

02:17:27  20   Q.   AND WAS THIS THE MOST DETAILED RECORD THEY GAVE YOU OF THE

02:17:34  21   ACCOUNTING FOR THEIR BUSINESS?

02:17:35  22             MR. CANNON:  OBJECTION.  AMBIGUOUS.

02:17:37  23             THE COURT:  OVERRULED.

02:17:38  24             THE WITNESS:  YES, IT WAS.

02:17:40  25   BY MR. PITMAN:

REDIRECT EXAMINATION BY MR. PITMAN

02:17:41  1    Q.   OKAY.  LET ME ASK YOU A COUPLE QUESTIONS ABOUT GIFTS.

02:17:51  2         ON CROSS EXAM, YOU TESTIFIED THAT MS. LIN TOLD YOU SHE

02:17:57  3    RECEIVED $95,000 A YEAR IN GIFTS.

02:18:02  4    A.   YES.

02:18:02  5    Q.   OKAY.  ARE YOU FAMILIAR WITH THE FORM 3520?

02:18:06  6    A.   YES.

02:18:07  7    Q.   AND THAT'S -- WELL, CAN YOU DESCRIBE FOR THE JURY WHAT

02:18:10  8    THAT FORM IS USED FOR?

02:18:11  9    A.   THAT'S WHEN YOU RECEIVE A GIFT OF OVER $100,000, $100,001,

02:18:18  10   THEN YOU JUST HAVE TO REPORT IT.  THERE'S NOT TAX ON IT, BUT

02:18:22  11   YOU DO NEED TO REPORT THAT.

02:18:23  12   Q.   SO DID YOU DISCUSS THAT FORM WITH MS. LIN?

02:18:27  13   A.   NO, I DIDN'T.

02:18:28  14   Q.   DID YOU NOTE THE AMOUNT SHE GAVE YOU WAS JUST UNDER THAT

02:18:34  15   REPORTING THRESHOLD?

02:18:35  16   A.   I DIDN'T CATCH THAT AT THE TIME.

02:18:37  17   Q.   DO YOU KNOW AS YOU SIT HERE TODAY WHETHER THESE DEFENDANTS

02:18:40  18   FILED FORMS 35 -- EITHER OF THE DEFENDANTS FILED FORMS 3520 FOR

02:18:45  19   2006 OR 2007?

02:18:46  20   A.   NO.

02:18:48  21   Q.   OKAY.  DID THEY EVER TELL YOU THEY RECEIVED MILLIONS OF

02:18:51  22   DOLLARS OF GIFTS FROM THEIR FAMILY?

02:18:53  23   A.   NO.

02:18:55  24        MR. CANNON:  OBJECTION.  AMBIGUOUS.

02:18:56  25        THE COURT:  OVERRULED.

REDIRECT EXAMINATION BY MR. PITMAN

02:18:57   1           MR. PITMAN:  THE ANSWER WAS NO?

02:18:58   2           THE WITNESS:  THE ANSWER WAS NO.

02:19:12   3   Q.   SO THERE WERE QUITE A FEW QUESTIONS ON CROSS EXAM ABOUT

02:19:18   4   YOUR -- THE TECHNIQUE AND THE METHODS THAT YOU FOLLOWED AS PART

02:19:21   5   OF THE INVESTIGATION?

02:19:22   6   A.   YES.

02:19:23   7   Q.   I WOULD LIKE TO JUST DISCUSS WITH YOU SOME OF THE FINDINGS

02:19:31   8   OF YOUR INVESTIGATION.

02:19:35   9        AFTER WORKING ON THE CASE, DID IT SEEM TO YOU THAT THE

02:19:38   10  DEFENDANTS WERE LIVING WITHIN THEIR MEANS?

02:19:42   11  A.   NO.

02:19:43   12  Q.   AND CAN YOU JUST DESCRIBE WHAT IT WAS THAT LEAD TO THAT

02:19:48   13  CONCLUSION?

02:19:50   14  A.   WELL, SEEING THEY'RE LIVING IN A $4 MILLION HOUSE,

02:19:58   15  $4 MILLION IN 2004, THEY PURCHASED -- THERE WAS A CHECK WRITTEN

02:20:07   16  FOR $257,000 FOR A FERRARI --

02:20:10   17  Q.   OKAY.  SO LET'S SORT OF SLOW IT DOWN AND TAKE IT ONE AT A

02:20:15   18  TIME.

02:20:16   19  A.   OKAY.

02:20:17   20  Q.   OKAY.  SO THEY WERE LIVING IN A HOUSE?

02:20:19   21  A.   YES.

02:20:19   22  Q.   AND THE VALUE OF THAT HOUSE WAS?

02:20:22   23  A.   WHEN THEY PURCHASED IT, IT WAS $3.7 MILLION.

02:20:25   24  Q.   OKAY.  AND WERE THEY CARRYING MORTGAGES?

02:20:27   25  A.   THERE WAS A $2.7 MILLION LOAN.

REDIRECT EXAMINATION BY MR. PITMAN

02:20:29  1    Q.    OKAY.  DID YOU AS PART OF YOUR WORK ON THE CASE, TRY TO

02:20:33  2    DETERMINE HOW MUCH MONEY WAS FLOWING OUT OF THIS FAMILY TO PAY

02:20:40  3    MORTGAGE INTEREST IN 2006 AND 2007?

02:20:42  4    A.    YES.

02:20:42  5    Q.    AND DO YOU REMEMBER YOUR CONCLUSIONS?

02:20:45  6    A.    THEY -- THE REPORTED INCOME WASN'T ENOUGH TO COVER ALL

02:20:50  7    THAT MONEY GOING OUT FOR MORTGAGE INTEREST.

02:20:53  8    Q.    LET'S TAKE A LOOK AT EXHIBIT NUMBER 25, PLEASE.  THE

02:21:06  9    SECOND PAGE, PLEASE.

02:21:08  10        OKAY.  WHAT ARE WE LOOKING AT HERE?

02:21:12  11   A.    THAT'S A SUMMARY OF THE INFORMATION REPORTS THAT WERE

02:21:15  12   SUBMITTED TO THE IRS.

02:21:18  13   Q.    OKAY.  AND WE WERE JUST TALKING ABOUT MORTGAGE INTEREST?

02:21:22  14   A.    YES.

02:21:23  15   Q.    DOES THIS FORM TELL US ANYTHING ABOUT HOW MUCH MEILI LIN

02:21:27  16   PAID TOWARDS MORTGAGES IN 2006?

02:21:30  17   A.    $225,339.

02:21:34  18   Q.    OKAY.  AND LET'S TAKE A LOOK AT EXHIBIT NUMBER 27, PLEASE.

02:21:58  19   I'M SORRY.  LET'S TAKE A LOOK AT EXHIBIT 26, EXCUSE ME.

02:22:11  20        OKAY.  SO WHAT ARE WE LOOKING AT HERE?

02:22:14  21   A.    THAT'S A SUMMARY OF ALL THE INFORMATION REPORTS FILED FOR

02:22:17  22   2007.

02:22:19  23   Q.    OKAY.  AND IS THAT ALSO FOR MS. LIN?

02:22:21  24   A.    THIS IS FOR MS. LIN.

02:22:23  25   Q.    AND HOW MUCH MORTGAGE INTEREST DID SHE PAY TO BANKS IN

REDIRECT EXAMINATION BY MR. PITMAN

02:22:29  1    2007?

02:22:31  2    A.   $478,327.

02:22:35  3    Q.   ALL RIGHT.  SO COMBINED, DID YOU REMEMBER THE FIRST

02:22:41  4    NUMBER?

02:22:41  5    A.   NO.

02:22:42  6    Q.   OKAY.

02:22:45  7    A.   200 SOMETHING, I THOUGHT.

02:22:46  8    Q.   OKAY.  SO LET'S SAY 200, AND 478.  SO FOR THESE TWO YEARS,

02:22:53  9    WELL OVER $650,000 ON MORTGAGE INTEREST ALONE; IS THAT RIGHT?

02:22:58  10   A.   YEAH.

02:22:59  11   Q.   OKAY.  NOW YOU MENTIONED A FERRARI?

02:23:04  12   A.   YES.

02:23:05  13   Q.   OKAY.  LET ME -- WELL, DO YOU REMEMBER, WHAT DO YOU

02:23:12  14   REMEMBER ABOUT THE FERRARI?

02:23:13  15   A.   I REMEMBER IT WAS PAID FOR WITH A CHECK FOR $257,000.  I

02:23:19  16   REMEMBER THAT IT IS REGISTERED TO MEILI LIN AND GARAGED AT HER

02:23:28  17   HOUSE.

02:23:30  18        AND THE STORY THAT THE DEFENDANTS GAVE ME ABOUT THAT WAS

02:23:33  19   THAT IT WAS FOR HER BROTHER WHEN HE COMES HERE TO THE STATES TO

02:23:42  20   DRIVE, SO HE HAS A FERRARI TO DRIVE WHEN HE GETS HERE.

02:23:49  21   Q.   OKAY.  DO YOU REMEMBER NOTICING ANY PAYMENTS TO AN ENTITY

02:23:55  22   CALLED LPL?

02:23:58  23   A.   YES.

02:23:59  24   Q.   AND WHAT CAN YOU TELL US ABOUT THE PAYMENTS TO LPL?

02:24:08  25   A.   I BELIEVE THERE WERE HUNDREDS OF THOUSANDS OF DOLLARS

REDIRECT EXAMINATION BY MR. PITMAN

| | | |
|---|---|---|
| 02:24:11 | 1 | GOING INTO LPL FOR INVESTMENTS. |
| 02:24:13 | 2 | Q.   WOULD IT HELP YOU TO MAYBE LOOK AT YOUR ACTIVITY RECORD TO |
| 02:24:17 | 3 | REMEMBER? |
| 02:24:18 | 4 | A.   YES. |
| 02:24:18 | 5 | Q.   DO YOU HAVE EXHIBIT 240 IN FRONT OF YOU? |
| 02:24:22 | 6 | A.   LET ME SEE.   240 ARE MY INTERVIEW NOTES. |
| 02:24:41 | 7 | Q.   EXHIBIT 240. |
| 02:24:47 | 8 | A.   240. |
| 02:24:50 | 9 | Q.   WELL -- |
| 02:24:52 | 10 | A.   IT'S MY INTERVIEW NOTES. |
| 02:24:54 | 11 | Q.   LET ME HAND YOU A DOCUMENT, THE BATES NUMBER IS U.S. |
| 02:25:08 | 12 | 104470. |
| 02:25:10 | 13 | MR. PITMAN:  MAY I APPROACH, YOUR HONOR? |
| 02:25:11 | 14 | THE COURT:  YES. |
| 02:25:13 | 15 | THE WITNESS:  IT GOT CUT OFF. |
| 02:25:16 | 16 | Q.   I'M SORRY, I DON'T UNDERSTAND WHAT YOU ARE SAYING. |
| 02:25:19 | 17 | A.   OH, HERE, THEY ARE CUT OFF ON THIS SIDE. |
| 02:25:23 | 18 | Q.   IS IT OKAY IF I GIVE YOU THIS PIECE OF PAPER? |
| 02:25:25 | 19 | A.   YES. |
| 02:25:26 | 20 | Q.   AND DO YOU RECOGNIZE THAT DOCUMENT? |
| 02:25:35 | 21 | A.   YES. |
| 02:25:36 | 22 | Q.   AND IS THAT YOUR ACTIVITY RECORD? |
| 02:25:38 | 23 | A.   YES. |
| 02:25:38 | 24 | Q.   AND DOES IT REFRESH YOUR RECOLLECTION ABOUT THE PAYMENTS |
| 02:25:41 | 25 | TO LPL? |

REDIRECT EXAMINATION BY MR. PITMAN

02:25:43  1    A.   YES.

02:25:45  2    Q.   AND CAN YOU DESCRIBE THEM FOR THE JURY.

02:25:51  3    A.   $600,000 WAS DEPOSITED TO THE LPL ACCOUNT, AND IT'S FBO,

02:26:04  4    FOR THE BENEFIT OF, MEILI LIN.

02:26:06  5    Q.   OKAY.  THANK YOU.

02:26:08  6         AND DO YOU REMEMBER WHAT YEAR THOSE PAYMENTS WERE MADE?

02:26:16  7    A.   2007.

02:26:20  8    Q.   AND DO YOU HAVE ANY RECOLLECTION OF THE DEFENDANTS BEING

02:26:24  9    MEMBERS OF A GOLF CLUB?

02:26:27  10   A.   I DO.

02:26:28  11   Q.   OKAY.  AND DID YOU REVIEW ANY RECORDS IN CONNECTION WITH

02:26:32  12   THAT MEMBERSHIP?

02:26:33  13   A.   I DID.  AND I DON'T RECALL THE AMOUNTS, BUT I THINK IT WAS

02:26:41  14   CALLED BOULDER RIDGE, I'M NOT CERTAIN, BUT THEY SAID THAT THAT

02:26:50  15   WAS A GOLF CLUB MEMBERSHIP THAT THEY BOUGHT, SO THAT WHEN THE

02:26:55  16   PEOPLE FROM TIANJIN CAME OVER, ONE OR TWO TIMES, IT COULD BE

02:27:02  17   THREE TIMES A YEAR, SO THEY WOULD HAVE A PLACE TO GOLF.  BUT

02:27:06  18   THE DEFENDANTS DON'T USE THE GOLF CLUB MEMBERSHIP.  I BELIEVE

02:27:11  19   IT WAS EXPENSIVE.

02:27:12  20   Q.   OKAY.  AND AS PART OF YOUR INVESTIGATION, DID YOU ALSO

02:27:17  21   DISCOVER WHAT APPEARED TO BE PERSONAL SPENDING COMING FROM THE

02:27:23  22   CORPORATE ACCOUNT?

02:27:25  23   A.   YES, I ALSO RECALL THAT.

02:27:30  24   Q.   FOR INSTANCE, DO YOU REMEMBER THE PURCHASE OF A BENTLEY

02:27:33  25   CAR?

REDIRECT EXAMINATION BY MR. PITMAN

02:27:34  1    A.   THAT IS ONE I REALLY RECALL, YES.

02:27:37  2    Q.   OKAY.  AND DO YOU REMEMBER HOW MUCH THE BENTLEY COST?

02:27:40  3    A.   I SAW THE CHECK FOR $170,000.

02:27:44  4    Q.   OKAY.  WAS THAT CHECK CUT AGAINST REIJIN'S ACCOUNT?

02:27:47  5    A.   YES, IT WAS.

02:27:48  6    Q.   AND DID YOU EVER RECEIVE ANY EXPLANATION AS TO WHY REIJIN

02:27:55  7    WOULD NEED A BENTLEY FOR BUSINESS PURPOSES?

02:27:58  8    A.   THEY SAID THEY SHIPPED THE BENTLEY TO CHINA SO THAT, I

02:28:06  9    THINK IT WAS SO TIANJIN -- I CAN'T RECALL IF IT WAS SO TIANJIN

02:28:11  10   WOULD HAVE IT TO DRIVE -- I WOULD HAVE TO REFRESH MY MEMORY ON

02:28:16  11   THE BENTLEY, BUT I DEFINITELY REMEMBER IT CAME OUT OF THE

02:28:19  12   CORPORATE ACCOUNT.

02:28:45  13   Q.   AND AS PART OF YOUR WORK ON THE CASE, DID YOU DISCOVER

02:28:52  14   WHAT APPEARED TO BE INSTANCES OF THE DEFENDANTS MOVING

02:28:56  15   CORPORATE MONEY INTO THEIR OWN PERSONAL ACCOUNTS?

02:29:00  16   A.   YES.

02:29:01  17          MR. CANNON:  OBJECTION.  CALLS FOR A CONCLUSION.

02:29:03  18   VAGUE AND AMBIGUOUS.

02:29:04  19          THE COURT:  OVERRULED.

02:29:05  20   BY MR. PITMAN:

02:29:05  21   Q.   AND DO YOU REMEMBER ANY SPECIFIC INSTANCES?

02:29:10  22   A.   NOT OFF THE TOP OF MY HEAD.

02:29:13  23   Q.   OKAY.  I'M GOING TO SHOW YOU -- THIS IS A DOCUMENT THAT

02:29:15  24   MR. CANNON SHOWED YOU ON CROSS-EXAMINATION.  IT'S A WORK PAPER.

02:29:24  25   THE BATES NUMBER IS 108983.

REDIRECT EXAMINATION BY MR. PITMAN

02:29:28   1          MR. CANNON:  COULD I HAVE THAT AGAIN, PLEASE?

02:29:32   2          MR. PITMAN:  HERE, I'VE GOT A COPY.

02:29:52   3       MAY I APPROACH, YOUR HONOR?  I'M SORRY.

02:29:58   4          THE WITNESS:  THANK YOU.  I'M GOING TO HAVE TO FLIP

02:30:45   5   THROUGH BECAUSE IT'S NOT ON THIS PAGE.

02:30:47   6   Q.   OKAY.  IF THAT DOESN'T HELP, WE CAN JUST PUT IT AWAY AND

02:30:51   7   MOVE ON.

02:30:51   8   A.   BECAUSE IT MAY BE ON A DIFFERENT PAGE, BECAUSE I HAVE -- I

02:30:54   9   THINK IT IS.  I GUESS YOU CAN GO ON, I'M NOT FINDING IT RIGHT

02:31:17  10   OFF THE TOP.

02:31:18  11   Q.   OKAY.  SO AS PART OF YOUR WORK ON THE AUDIT, DID YOU

02:31:23  12   CONSIDER THE FACT THAT THE DEFENDANTS WERE OR APPEAR TO BE

02:31:26  13   LIVING -- THEY APPEARED TO BE LIVING BEYOND THEIR MEANS; WAS

02:31:30  14   THAT A RED FLAG FOR YOU?

02:31:31  15   A.   YES.

02:31:31  16   Q.   AND IS THAT SOMETHING YOU CONSIDERED WHEN YOU REFERRED THE

02:31:34  17   CASE TO CI?

02:31:36  18   A.   YES.

02:31:36  19   Q.   AND THE FACT THAT THE DEFENDANTS WERE TAKING MONEY OUT OF

02:31:39  20   THE CORPORATION AND APPEARED TO BE SPENDING IT TO THEMSELVES,

02:31:44  21   WAS THAT A RED FLAG FOR YOU?

02:31:46  22   A.   YES.

02:31:46  23   Q.   AND IS THAT SOMETHING YOU CONSIDERED WHEN YOU REFERRED THE

02:31:48  24   CASE TO CI?

02:31:49  25   A.   YES.

REDIRECT EXAMINATION BY MR. PITMAN

02:31:49  1    Q.   NOW, DID YOU HAVE A CHANCE TO TAKE A LOOK AT THE RENTAL

02:31:54  2    INCOME THAT WAS REPORTED ON THE DEFENDANT'S INCOME TAX RETURNS

02:31:59  3    FOR 2006 AND 2007?

02:32:02  4    A.   YES.

02:32:02  5    Q.   AND DID YOU COMPARE THAT RENTAL INCOME TO WHAT YOU SAW IN

02:32:07  6    THE BANK RECORDS?

02:32:07  7    A.   YES.

02:32:08  8    Q.   CAN YOU DESCRIBE THAT FOR THE JURY, PLEASE.

02:32:10  9    A.   I BELIEVE IT WAS UNDERREPORTED EACH YEAR BY OVER $100,000.

02:32:17  10   Q.   AND HOW DID YOU IDENTIFY WHAT APPEARED TO BE RENTAL

02:32:20  11   PAYMENTS IN THE BANK RECORDS?

02:32:22  12   A.   I GOT -- I MADE A SPREADSHEET OF THE RENTS, BECAUSE THEY

02:32:35  13   HAD SO MANY, AND I WAS ABLE TO TIE THE ADDRESSES ON CHECKS TO

02:32:39  14   THE NAMES OF THE PROPERTIES.

02:32:42  15        AND ALSO, I WENT THROUGH PUBLIC RECORDS USING A DATABASE

02:32:50  16   WHERE WE COULD PUT AN ADDRESS IN THERE, AND IT SHOWS US ALL THE

02:32:57  17   RESIDENCES.

02:32:57  18        SO I WAS ABLE TO TIE UP A PERSON WITH THE RENT CHECK

02:33:00  19   AMOUNT, WITH THE ADDRESS, AND THEN COMPARE THEM.

02:33:06  20        AND THEY WERE UNDERREPORTED.

02:33:07  21   Q.   OKAY.  AND SO YOUR CONCLUSION THAT THE DEFENDANTS HAD

02:33:10  22   UNDERREPORTED THEIR RENTAL INCOME FOR THESE YEARS, WAS THAT A

02:33:15  23   RED FLAG FOR YOU?

02:33:15  24   A.   YES.

02:33:16  25   Q.   AND WAS THAT SOMETHING YOU CONSIDERED IN REFERRING THE

REDIRECT EXAMINATION BY MR. PITMAN

02:33:18   1    CASE TO THE CRIMINAL SIDE?

02:33:19   2    A.   YES.

02:33:19   3    Q.   OKAY.  AND THEN WE'VE TALKED A LITTLE BIT ABOUT, OR YOU

02:33:24   4    TALKED ON CROSS EXAM ABOUT, IT WAS YOUR OPINION THAT THE

02:33:29   5    EXPLANATIONS THE DEFENDANTS GAVE YOU FOR THEIR BUSINESS AND

02:33:32   6    THEIR FINANCIAL LIFE WERE IMPLAUSIBLE; IS THAT FAIR TO SAY?

02:33:39   7    A.   YES.

02:33:39   8    Q.   AND FOR INSTANCE, DID YOU FIND THEIR DESCRIPTION OF THEIR

02:33:42   9    BUSINESS MODEL TO BE IMPLAUSIBLE?

02:33:48   10   A.   COULD YOU BE A LITTLE BIT MORE SPECIFIC?  OH, WHAT THEY

02:33:53   11   WERE SAYING -- YES, OKAY.

02:33:55   12       THEIR BUSINESS MODEL MEANS HOW THEY WERE PAID AND ALL OF

02:33:57   13   THAT, YES, I FOUND THAT IMPLAUSIBLE.

02:33:59   14   Q.   SO YOU, HAVING HAD A CHANCE TO CONSIDER WHAT THEY TOLD YOU

02:34:03   15   ABOUT HOW THEY CONDUCTED THEIR BUSINESS AND HOW THEY MADE

02:34:07   16   MONEY, DID YOU FIND IT TO BE INCREDIBLE?

02:34:11   17   A.   YES, UNBELIEVABLE.

02:34:12   18   Q.   AND WHEN THEY TOLD YOU THAT THEY WEREN'T ACCOUNTING FOR

02:34:24   19   THE TENS OF MILLIONS OF DOLLARS GOING THROUGH THEIR BANK

02:34:28   20   ACCOUNTS, DID YOU FIND THAT IMPLAUSIBLE?

02:34:30   21   A.   YES.

02:34:33   22   Q.   AND WHEN THEY TOLD YOU THAT THEY DIDN'T KNOW WHO THE

02:34:36   23   PEOPLE WERE OTHER THAN TIANJIN THAT WERE SENDING MONEY TO THEIR

02:34:40   24   BUSINESS, DID YOU FIND THAT IMPLAUSIBLE?

02:34:43   25   A.   YES.

REDIRECT EXAMINATION BY MR. PITMAN

```
02:34:43   1    Q.   WAS IT A RED FLAG FOR YOU THAT IT APPEARED THAT THEY MAY
02:34:51   2    HAVE BEEN DOING BUSINESS IN THE NAME OF FLORENCE TRADING BUT
02:34:53   3    HADN'T REPORTED THAT ENTITY ON THEIR 1040'S?
02:34:56   4    A.   YES.
02:34:57   5    Q.   AND DID YOU FIND THEIR EXPLANATIONS DURING THE INTERVIEWS
02:34:59   6    IMPLAUSIBLE?
02:35:01   7    A.   YES.
02:35:02   8    Q.   DURING ONE OF THE INTERVIEWS, DID HENRY HORNG TELL YOU
02:35:06   9    THAT HE DIDN'T KNOW THE NAME OF MEILI LIN'S SISTER?
02:35:12  10    A.   HE DID.
02:35:12  11    Q.   AND DID YOU FIND THAT IMPLAUSIBLE?
02:35:14  12    A.   YES.
02:35:15  13    Q.   WE'VE HAD A CHANCE TO LOOK AT THE LOAN APPLICATIONS THAT
02:35:20  14    YOU CONFRONTED MR. HORNG WITH.  JUST TO BE CLEAR, WERE THOSE
02:35:25  15    LOAN APPLICATIONS, THE AMOUNT OF INCOME LISTED ON THEM, WERE
02:35:28  16    THEY INCONSISTENT WITH THE DEFENDANT'S TAX RETURNS?
02:35:30  17    A.   YES.
02:35:30  18    Q.   DID THEY REPORT HIGHER INCOME THAN THE TAX RETURNS DID?
02:35:35  19    A.   YES.
02:35:36  20    Q.   AND ONE OF THEM REPORTED A FOREIGN ACCOUNT AS WELL?
02:35:39  21    A.   YES.
02:35:40  22    Q.   AND WHEN YOU CONFRONTED MR. HORNG WITH THOSE LOAN
02:35:43  23    APPLICATIONS DID YOU FIND HIS EXPLANATION TO BE IMPLAUSIBLE?
02:35:49  24    A.   YES.
02:35:59  25    Q.   SO GIVEN THE TOTALITY OF THE DEFENDANT'S EXPLANATIONS TO
```

REDIRECT EXAMINATION BY MR. PITMAN

02:36:05  1    YOU AND YOUR DIFFICULTY RECONCILING THEM TO REALITY, WAS THAT A

02:36:10  2    RED FLAG FOR YOU?

02:36:11  3    A.   YES.

02:36:12  4    Q.   AND WAS THAT SOMETHING YOU CONSIDERED WHEN YOU REFERRED

02:36:14  5    THE CASE TO THE CRIMINAL SIDE?

02:36:15  6    A.   YES.

02:36:15  7    Q.   OKAY.  SO IT'S NOT ENTIRELY ACCURATE TO SAY THAT YOU

02:36:18  8    DIDN'T DO A THOROUGH INVESTIGATION?

02:36:20  9         MR. CANNON:  OBJECTION.  LEADING.

02:36:22  10        THE COURT:  OVERRULED.

02:36:23  11        THE WITNESS:  DID YOU SAY IT'S NOT ACCURATE TO SAY

02:36:28  12   THAT I DIDN'T DO A THOROUGH INVESTIGATION?  IS THAT THE

02:36:31  13   QUESTION?

02:36:32  14   BY MR. PITMAN:

02:36:34  15   Q.   WAS YOUR INVESTIGATION THOROUGH OR NOT?

02:36:36  16   A.   YES.

02:36:38  17   Q.   AND DID THE DEFENDANTS TELL YOU AT ANY TIME THAT THE

02:37:06  18   MILLIONS OF DOLLARS COMING IN TO THEIR BUSINESS'S BANK ACCOUNTS

02:37:11  19   WERE BEING SENT BY THEIR FAMILY MEMBERS?

02:37:14  20   A.   NO.

02:37:14  21   Q.   AND DID THE DEFENDANTS EVER TELL YOU THAT MS. LIN'S

02:37:19  22   BROTHER OWNED TIANJIN?

02:37:26  23   A.   NO.

02:37:27  24        MR. PITMAN:  I DON'T HAVE ANY FURTHER QUESTIONS,

02:37:28  25   YOUR HONOR.

RECROSS-EXAMINATION BY MR. CANNON

```
02:37:35   1              THE COURT:  MR. CANNON, DO YOU WANT BRIEF RECROSS, IS

02:37:38   2     THAT WHY YOU ARE STANDING?

02:37:39   3              MR. CANNON:  PLEASE, YOUR HONOR.

02:37:42   4              THE COURT:  OKAY.

02:37:44   5                        RECROSS-EXAMINATION

02:37:45   6     BY MR. CANNON:

02:38:06   7     Q.   GOOD AFTERNOON, AGAIN.

02:38:08   8     A.   HELLO.

02:38:08   9     Q.   NOW MR. PITMAN JUST ASKED YOU A LOT OF QUESTIONS THAT YOU

02:38:11  10     ANSWERED WITH TERMS LIKE, INCREDIBLE AND IMPLAUSIBLE AND

02:38:15  11     UNBELIEVABLE.  DO YOU REMEMBER THAT?

02:38:17  12     A.   I DO.

02:38:17  13     Q.   AND HE WAS TALKING ABOUT THEIR -- THE BUSINESS MODEL OF

02:38:23  14     THE SCRAP BUSINESS THAT TIANJIN WAS IN, RIGHT, AND REIJIN WAS

02:38:27  15     IN, CORRECT?

02:38:28  16     A.   CORRECT.

02:38:28  17     Q.   AND SO I THOUGHT I ASKED YOU SOME QUESTIONS ON

02:38:33  18     CROSS-EXAMINATION EARLIER ABOUT WHAT YOU KNEW ABOUT THIS SCRAP

02:38:37  19     BUSINESS; DO YOU RECALL THOSE QUESTIONS?

02:38:39  20     A.   YES.

02:38:40  21     Q.   AND DID YOU RESEARCH -- AND YOU TOLD ME YOU DIDN'T

02:38:43  22     RESEARCH THE SCRAP BUSINESS, DID YOU?

02:38:46  23     A.   NO, NOT THAT I RECALL.

02:38:47  24     Q.   YOU DIDN'T READ IRS MANUALS ABOUT THE SCRAP BUSINESS?

02:38:50  25     A.   NOT THAT I RECALL.
```

RECROSS-EXAMINATION BY MR. CANNON

02:38:52  1    Q.   YOU KNEW VERY LITTLE ABOUT THE SCRAP BUSINESS, RIGHT?

02:38:55  2    A.   THAT WOULD BE TRUE.

02:38:56  3    Q.   WOULD IT BE FAIR TO SAY YOU KNEW NOTHING ABOUT THE SCRAP

02:39:00  4    BUSINESS?

02:39:00  5    A.   NOT FAMILIAR ABOUT THE SCRAP BUSINESS.

02:39:04  6    Q.   SO WHEN YOU'RE TALKING ABOUT A SCRAP BUSINESS MODEL BEING

02:39:08  7    IMPLAUSIBLE, YOU'RE REALLY NOT MAKING THAT DECISION FROM A

02:39:12  8    POSITION OF ANY KNOWLEDGE, ARE YOU?

02:39:14  9    A.   I WOULD DISAGREE WITH THAT, BECAUSE THE -- IT SEEMS,

02:39:22  10   REGARDLESS OF WHAT BUSINESS, TO HAVE A BONUS COME AT THE END OF

02:39:26  11   THE YEAR OR THE NEXT YEAR AT THE MERCY OF A COMPANY BASED ON NO

02:39:31  12   FORMULA, THIS WAS THEIR BUSINESS MODEL, I DON'T FIND THAT

02:39:36  13   CREDIBLE.

02:39:36  14   Q.   IN YOUR OPINION, RIGHT?

02:39:38  15   A.   I DON'T FIND THAT CREDIBLE.

02:39:39  16   Q.   IN YOUR OPINION?

02:39:41  17   A.   I'M SPEAKING MY OPINION.  IN MY OPINION, THAT IS NOT

02:39:45  18   CREDIBLE.

02:39:45  19   Q.   AND -- BUT YOU DIDN'T DISCUSS THAT WITH ANYBODY THAT KNEW

02:39:50  20   ANYTHING ABOUT THE SCRAP BUSINESS?

02:39:51  21   A.   I DISCUSSED IT WITH MY MANAGER.

02:39:52  22   Q.   DID HE -- DID YOU DISCUSS -- DID HE KNOW ANYTHING ABOUT

02:39:56  23   THE SCRAP BUSINESS?

02:39:57  24   A.   I DON'T KNOW, HE WAS A LONG-TIME, VERY, VERY KNOWLEDGEABLE

02:40:02  25   PERSON.

RECROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 02:40:02 | 1 | Q.   BUT NOT ABOUT THE SCRAP BUSINESS? |
| 02:40:04 | 2 | A.   I DON'T KNOW.  I DON'T KNOW. |
| 02:40:06 | 3 | Q.   DO YOU KNOW ANYTHING ABOUT INTERNATIONAL TRADING BEFORE |
| 02:40:08 | 4 | YOU GOT TO THIS CASE? |
| 02:40:09 | 5 | A.   INTERNATIONAL TRADING?  NO, I'M NOT AN INTERNATIONAL |
| 02:40:13 | 6 | AGENT. |
| 02:40:13 | 7 | Q.   OKAY.  AND MS. POLLOCK ASKED YOU A BUNCH OF QUESTIONS |
| 02:40:18 | 8 | ABOUT WIRE TRANSFERS.  IF I CAN JUST APPROACH THIS WITNESS WITH |
| 02:40:34 | 9 | WHAT'S BEEN MARKED AS BATES NUMBER 70361 AND 70362.  IS THAT |
| 02:40:42 | 10 | THE KIND OF RECORD THAT'S GENERATED FOR A WIRE TRANSFER IN TO |
| 02:40:46 | 11 | BANK OF AMERICA? |
| 02:40:47 | 12 | A.   WELL, THESE OF BANK OF AMERICA STATEMENTS, SO THEY MUST |
| 02:40:54 | 13 | BE. |
| 02:40:55 | 14 | Q.   AND DOES THAT -- |
| 02:40:56 | 15 | A.   I DON'T RECALL SEEING THIS. |
| 02:40:58 | 16 | Q.   OKAY.  AND IF YOU LOOK AT THE BOTTOM, DO YOU RECALL THAT |
| 02:41:04 | 17 | ON A BANK OF AMERICA STATEMENT, IT LISTS WHO THE ORIGINATOR OF |
| 02:41:08 | 18 | THE WIRES IS? |
| 02:41:10 | 19 | A.   OKAY, WHICH FORM WOULD YOU LIKE ME TO LOOK AT? |
| 02:41:14 | 20 | Q.   IF YOU COULD LOOK AT THE 170362, LET'S START FROM THE |
| 02:41:18 | 21 | BOTTOM? |
| 02:41:19 | 22 | A.   OKAY. |
| 02:41:19 | 23 | Q.   AND YOU'VE SEEN A LOT OF WIRE TRANSFER FORMS IN YOUR |
| 02:41:22 | 24 | CAREER AS A SPECIAL AGENT, RIGHT? |
| 02:41:24 | 25 | A.   I'VE SEEN A LOT OF WIRE TRANSFERS LISTED ON BANK ACCOUNTS. |

RECROSS-EXAMINATION BY MR. CANNON

02:41:28  1    Q.   OKAY.  AND THE WIRE TRANSFER FORM SHOWS WHAT BANK

02:41:33  2    ORIGINATED THE WIRE TRANSFER?

02:41:34  3    A.   YES.

02:41:35  4         MR. PITMAN:  OBJECTION, YOUR HONOR.  HEARSAY.

02:41:42  5         THE COURT:  OVERRULED.

02:41:44  6    BY MR. CANNON:

02:41:44  7    Q.   AND THE WIRE TRANSFER FORM GENERALLY SHOWS WHO IS THE

02:41:48  8    CUSTOMER OF THE BANK THAT ORIGINATES THE WIRE TRANSFER?

02:41:51  9    A.   YES.

02:41:52  10   Q.   AND IT GIVES THE WHOLE ROUTING OF THE ENTIRE TRANSFER?

02:41:58  11   A.   THE WHOLE ROUTING?

02:41:59  12   Q.   YES.  YOU CAN TELL WHO ORIGINATED THE WIRE, WHAT BANK IT

02:42:05  13   GOT THROUGH, AND WHAT ACCOUNT THE WIRE TRANSFER MONEY ENDED UP

02:42:12  14   IN?

02:42:18  15   A.   YES.

02:42:19  16   Q.   OKAY.  NOW MR. PITMAN ASKED YOU SOME QUESTIONS ABOUT

02:42:35  17   LIVING BEYOND THEIR MEANS, RIGHT?

02:42:37  18   A.   YES.

02:42:37  19   Q.   AND REMEMBER HOW I TALKED TO YOU ABOUT A CASH HOARD

02:42:42  20   EARLIER?

02:42:44  21   A.   OF YOUR DEFINITION, YES.

02:42:46  22   Q.   AND OUT OF YOUR DEFINITION OF A CASH HOARD, IF I HAD A

02:42:51  23   MILLION DOLLARS BURIED IN MY BACKYARD, I CAN LIVE BEYOND MY

02:42:55  24   APPARENT MEANS, RIGHT?

02:42:56  25   A.   YEP.

RECROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 02:42:57 | 1 | Q.   AND OUT OF MY DEFINITION OF A CASH HOARD, MEANING |
| 02:43:01 | 2 | AVAILABILITY OF ASSETS, IF I HAD A MILLION DOLLARS OF ASSETS |
| 02:43:05 | 3 | THAT I COULD USE FOR LIVING EXPENSES, THAT WOULD ALLOW ME TO |
| 02:43:09 | 4 | APPEAR TO LIVE BEYOND MY MEANS, RIGHT? |
| 02:43:12 | 5 | A.   IT MIGHT, YES. |
| 02:43:13 | 6 | Q.   AND YOU TALKED ABOUT A FERRARI, RIGHT? |
| 02:43:18 | 7 | A.   YES. |
| 02:43:18 | 8 | Q.   AND IF YOU ARE LOOKING TO SEE WHOSE CAR THAT REALLY IS, |
| 02:43:28 | 9 | YOU WOULD WANT TO SEE HOW MANY NAMES ARE BEING PUT ON IT, |
| 02:43:30 | 10 | RIGHT? |
| 02:43:30 | 11 | A.   NO, I WOULD WANT TO SEE THE REGISTRATION. |
| 02:43:32 | 12 | Q.   OKAY.  BUT YOU THINK BECAUSE YOU WERE TOLD THAT IT WAS |
| 02:43:37 | 13 | REALLY THE BROTHER P.K.'S CAR WHEN HE CAME IN FROM CHINA, |
| 02:43:42 | 14 | RIGHT? |
| 02:43:42 | 15 | A.   THAT'S WHAT THEY SAID. |
| 02:43:43 | 16 | Q.   RIGHT.  SO IF IT WAS ONLY HIS CAR TO USE WHEN HE CAME IN |
| 02:43:48 | 17 | FROM CHINA, IT WOULD PROBABLY BE PRETTY LOW MILEAGE, RIGHT? |
| 02:43:51 | 18 | A.   IT COULD BE LOW MILEAGE IF IT WAS THEM USING THE CAR, |
| 02:43:55 | 19 | PEOPLE DON'T TEND TO DRIVE FERRARIS AS THEIR EVERYDAY CAR. |
| 02:44:01 | 20 | SO A FERRARI WITH LOW MILEAGE WOULD NOT IMPLY TO ME THAT |
| 02:44:05 | 21 | IT'S BECAUSE SOMEONE ELSE THAT LIVES IN ANOTHER COUNTRY IS |
| 02:44:08 | 22 | DRIVING IT. |
| 02:44:08 | 23 | Q.   IT'S A PIECE OF INFORMATION THAT WOULD BE USEFUL TO HAVE, |
| 02:44:11 | 24 | RIGHT? |
| 02:44:11 | 25 | A.   NO. |

RECROSS-EXAMINATION BY MR. CANNON

02:44:13  1    Q.   SO YOU DIDN'T BOTHER TO GET IT THAT PIECE OF INFORMATION?

02:44:17  2    A.   I SEE A CAR REGISTERED TO MEILI LIN, GARAGED BY MEILI LIN,

02:44:23  3    PAID FOR.

02:44:26  4    Q.   SO YOU ARE GIVING ME THE REASONS WHY YOU DIDN'T LOOK, BUT

02:44:29  5    THAT'S NOT WHAT I ASKED.  I ASKED, DID YOU LOOK FOR THAT PIECE

02:44:33  6    OF INFORMATION?

02:44:34  7    A.   WHAT PIECE OF INFORMATION?

02:44:36  8    Q.   WHAT THE MILEAGE WAS ON THAT CAR?

02:44:40  9    A.   THEY TOLD ME THE MILEAGE WAS LOW, THAT WAS THEIR

02:44:45 10    EXPLANATION, BUT THAT DOES NOT MEAN THAT IT'S BECAUSE SOMEONE

02:44:51 11    FROM ANOTHER COUNTRY HAD IT.

02:44:54 12    Q.   GOT IT.  OKAY.  AND YOU DIDN'T -- NOW, YOU WERE ALSO

02:45:02 13    STUNNED BY $179,000 THAT WAS PAID FOR A BENTLEY, RIGHT?

02:45:07 14    A.   YES.

02:45:07 15    Q.   AND YOU THOUGHT FOR SURE THAT WAS EVIDENCE OF MR. HORNG

02:45:12 16    AND MS. LIN LIVING BEYOND THEIR MEANS, RIGHT?

02:45:15 17    A.   I THOUGHT IT WAS UNUSUAL FOR SOMEONE TO WRITE A CHECK FOR

02:45:20 18    A BENTLEY.

02:45:21 19    Q.   AND THAT BENTLEY, YOU DISCOVERED, WAS IN FACT SHIPPED TO

02:45:27 20    CHINA, RIGHT?

02:45:28 21    A.   YES.

02:45:29 22    Q.   AND SO IF YOU'RE LIVING LARGE IN THE UNITED STATES, LIVING

02:45:34 23    BEYOND YOUR MEANS IN THE UNITED STATES, HOW DOES A BENTLEY IN

02:45:37 24    CHINA SHOW THAT YOU ARE LIVING BEYOND YOUR MEANS IN THE

02:45:40 25    UNITED STATES?

02:45:43  1    A.   AGAIN, THE ABILITY TO PURCHASE IT IN CASH AND SHIP IT, NOT

02:45:49  2    SOMETHING YOUR ORDINARY PERSON DOES.

02:45:54  3    Q.   DID YOU EVER CONSIDER THAT THAT MIGHT BE EVIDENCE THAT THE

02:45:57  4    MONEY WAS REALLY SOMEBODY ELSE'S?

02:46:01  5    A.   NO.

02:46:04  6    Q.   NOW, WITH THE -- YOU TALKED ABOUT A HOUSE THAT WAS WORTH

02:46:14  7    THREE AND A HALF MILLION DOLLARS, RIGHT?

02:46:17  8    A.   YES, IN 2004, IT'S PROBABLY MUCH HIGHER NOW.

02:46:20  9    Q.   AND DID YOU LOOK AT THE TITLE OF THAT HOUSE?

02:46:23  10   A.   I DON'T RECALL.

02:46:25  11   Q.   DO YOU RECALL IF ANYBODY ELSE'S NAME WAS ON IT BESIDES

02:46:29  12   MEILI LIN'S?

02:46:31  13   A.   I DON'T RECALL.

02:46:32  14   Q.   WAS HER MOTHER'S NAME ON THAT PROPERTY?

02:46:34  15   A.   POSSIBLY, I DON'T KNOW, I DON'T RECALL.

02:46:37  16   Q.   AND WHEN YOU WERE TALKING TO THE TAXPAYER'S REPRESENTATIVE

02:46:40  17   AND THE TAXPAYERS, YOU WERE TOLD THAT THEIR MOTHER WAS GOING TO

02:46:45  18   MOVE TO CALIFORNIA, DIDN'T YOU?

02:46:47  19   A.   NO.

02:46:50  20   Q.   NOW, MR. PITMAN ALSO ASKED YOU SOME QUESTIONS ABOUT

02:46:56  21   MORTGAGE INTEREST, RIGHT?

02:46:57  22   A.   RIGHT.

02:46:58  23   Q.   AND HE SHOWED YOU TAX RETURNS, ONE OF THEM IS STILL UP, I

02:47:03  24   THINK, THIS IS GOVERNMENT'S EXHIBIT 26 THAT SHOWS $478,000 IN

02:47:10  25   MORTGAGE INTEREST PAID THAT YEAR, RIGHT?

02:47:12  1    A.   RIGHT.

02:47:13  2    Q.   AND SO -- AND THAT WAS A NUMBER THAT WAS ON THEIR TAX

02:47:16  3    RETURN, RIGHT?

02:47:19  4    A.   I WOULD HAVE TO TIE IT TO THE TAX RETURN, BUT THERE WAS A

02:47:22  5    SIGNIFICANT AMOUNT OF MORTGAGE INTEREST ON THEIR TAX RETURN.

02:47:25  6    Q.   SO THIS WASN'T SOMETHING THAT WAS HIDDEN FROM YOU, YES?

02:47:29  7    A.   NO.

02:47:30  8    Q.   AND IF YOU WERE REPORTING THAT MUCH MORTGAGE INTEREST,

02:47:33  9    IT'S OBVIOUS THAT YOU HAVE TO HAVE ASSETS TO PAY THAT MORTGAGE

02:47:39  10   INTEREST?

02:47:39  11   A.   YES.

02:47:39  12   Q.   SO THIS ISN'T ANYBODY WHO IS HIDING ANYTHING?

02:47:45  13   A.   I'M NOT GOING TO SAY THEY ARE NOT HIDING ANYTHING.

02:47:48  14   Q.   NO, BUT THEY ARE CERTAINLY NOT HIDING THE PAYMENT OF THE

02:47:51  15   MORTGAGE INTEREST?

02:47:51  16   A.   THEY ARE NOT HIDING THE PAYMENT OF THE MORTGAGE INTEREST.

02:47:54  17   Q.   AND THEY ARE NOT HIDING THE MONEY OR ASSETS THAT ARE BEING

02:47:56  18   USED TO PAY THE MORTGAGE INTEREST, ARE THEY?

02:47:58  19   A.   OH, I WOULDN'T SAY THAT.

02:48:00  20   Q.   OKAY.  NOW, YOU TALKED ABOUT THE WIRE TRANSFER COST,

02:48:06  21   RIGHT?

02:48:07  22   A.   RIGHT.

02:48:07  23   Q.   AND GETTING MONEY OUT OF A FOREIGN COUNTRY, IN ADDITION TO

02:48:15  24   THE TRIVIAL WIRE TRANSFER COST, YOU HAVE A CURRENCY ADJUSTMENT

02:48:20  25   COST, RIGHT?

RECROSS-EXAMINATION BY MR. CANNON

| | | |
|---|---|---|
| 02:48:20 | 1 | A.   UH-HUH. |
| 02:48:21 | 2 | Q.   AND YOU HAVE OTHER COSTS WHEN YOU ARE DEALING WITH QUOTAS? |
| 02:48:27 | 3 | A.   I DON'T KNOW ABOUT QUOTAS. |
| 02:48:30 | 4 | Q.   DO YOU KNOW ABOUT CURRENCY CONTROLS IN CHINA? |
| 02:48:32 | 5 | A.   I KNOW WHAT THE TAXPAYERS OR DEFENDANTS TOLD ME. |
| 02:48:36 | 6 | Q.   OKAY.  AND YOU KNOW THAT THERE ARE COSTS TO GETTING MONEY |
| 02:48:41 | 7 | OUT OF CHINA? |
| 02:48:41 | 8 | A.   I AM NOT AWARE OF COSTS TO GET MONEY OUT OF CHINA. |
| 02:48:45 | 9 | Q.   YOU ARE AWARE THAT IT CAN BE DIFFICULT TO GET MONEY OUT OF |
| 02:48:50 | 10 | CHINA? |
| 02:48:50 | 11 | A.   THE DEFENDANTS SAID THAT IT'S LIMITED TO A CERTAIN AMOUNT. |
| 02:48:53 | 12 | Q.   AND SO IF YOU ARE GOING TO GET MORE MONEY OUT, DOES IT |
| 02:48:56 | 13 | COST MORE MONEY TO GET IT OUT OF CHINA? |
| 02:48:58 | 14 | A.   THEY HAVE SOME PLAN TO CIRCUMVENT THE LAWS IN CHINA TO GET |
| 02:49:02 | 15 | THE MONEY OUT.  SO I DON'T KNOW WHETHER THEY PAY FOR THAT FEE |
| 02:49:05 | 16 | TO, BASICALLY, CIRCUMVENT THE LAWS. |
| 02:49:07 | 17 | Q.   OKAY.  SO AND NOW ARE YOU AN EXPERT ON CHINA LAW? |
| 02:49:14 | 18 | A.   CERTAINLY NOT. |
| 02:49:16 | 19 | Q.   DID ANY OF -- DID HENRY HORNG OR MEILI LIN EVER USE THE |
| 02:49:21 | 20 | TERM CIRCUMVENT THE LAWS OF CHINA? |
| 02:49:25 | 21 | A.   YES. |
| 02:49:25 | 22 | Q.   THEY USED THE TERM "CIRCUMVENT" THE LAWS OF CHINA? |
| 02:49:29 | 23 | A.   WELL, I HAVE IT WRITTEN IN MY NOTES WHAT THEY SAID. |
| 02:49:31 | 24 | Q.   BUT THE TERM "CIRCUMVENT?" |
| 02:49:35 | 25 | A.   I WOULD HAVE TO REFRESH MY NOTES. |

RECROSS-EXAMINATION BY MR. CANNON

02:49:38  1    Q.   SO AS YOU ARE SITTING HERE, YOU DON'T RECALL --

02:49:41  2    A.   THEY MAY HAVE SAID GET AROUND THE RESTRICTIONS, THAT COULD

02:49:45  3    HAVE BEEN -- GET AROUND, CIRCUMVENT.  BASICALLY, MOVE THE MONEY

02:49:53  4    IN A WAY WHERE IT'S ILLEGAL, I GUESS, FOR THEM TO MOVE MONEY.

02:50:00  5    I DON'T KNOW.

02:50:01  6         BUT THEY SAID THERE'S A CERTAIN AMOUNT, AND TO CIRCUMVENT

02:50:05  7    THE GOVERNMENT RESTRICTIONS, THEY MOVE IT.

02:50:12  8    Q.   IS IT FAIR TO SAY IT'S DIFFICULT AND COSTLY TO GET MONEY

02:50:15  9    OUT OF CHINA, RIGHT?

02:50:16  10   A.   I WOULDN'T KNOW.  I DON'T KNOW HOW TO GET MONEY OUT OF

02:50:19  11   CHINA.

02:50:19  12   Q.   OKAY.  SO THAT'S ANOTHER THING YOU DIDN'T INVESTIGATE,

02:50:23  13   RIGHT?

02:50:23  14   A.   HOW TO GET MONEY OUT OF CHINA?

02:50:26  15   Q.   RIGHT.

02:50:27  16   A.   NO.

02:50:27  17   Q.   YOU DIDN'T TELL UP TO SEE IF THEY WERE TELLING YOU THE

02:50:29  18   TRUTH ON THAT?

02:50:31  19   A.   NO.

02:50:39  20   Q.   AND YOU JUST SAID THAT YOU WANTED TO LOOK AT YOUR NOTES

02:50:42  21   AGAIN TO REFRESH YOUR RECOLLECTION, RIGHT?

02:50:43  22   A.   RIGHT.  FOR THAT SPECIFIC WORD YOU WERE LOOKING FOR.

02:50:46  23   Q.   GOT IT.

02:50:47  24        AND MR. PITMAN SHOWED YOU YOUR NOTES MANY TIMES WHILE HE

02:50:51  25   WAS ASKING YOU QUESTIONS, RIGHT?

02:50:53  1    A.   UH-HUH.

02:50:53  2    Q.   AND YOU LOOKED AT THEM?

02:50:55  3    A.   I LOOKED BRIEFLY FOR THE ANSWER THAT HE WAS LOOKING FOR,

02:51:00  4    WHAT SECTION IT WOULD BE IN.  I DIDN'T REVIEW EVERY PAGE OF MY

02:51:02  5    NOTES.

02:51:03  6    Q.   OKAY.  SO YOU LOOKED THROUGH YOUR NOTES FOR THE ANSWER

02:51:06  7    MR. PITMAN WAS LOOKING FOR, RIGHT?

02:51:07  8    A.   RIGHT.

02:51:08  9    Q.   AND IF YOU WOULD FIND THE ANSWER IN YOUR NOTES THAT

02:51:12  10   MR. PITMAN WAS LOOKING FOR, YOU WOULD READ IT FROM YOUR NOTES,

02:51:16  11   RIGHT?

02:51:16  12   A.   RIGHT.

02:51:17  13   Q.   BECAUSE YOU DIDN'T REALLY RECALL THE ANSWER, YOU WERE

02:51:20  14   JUST --

02:51:20  15   A.   NO, I WOULD RECALL, I WOULD REFRESH MY RECOLLECTION

02:51:24  16   THROUGH MY NOTES.

02:51:25  17   Q.   AND MR. PITMAN STARTED HIS REDIRECT WITH A QUESTION ABOUT

02:51:37  18   FREEZE CODES, RIGHT?

02:51:39  19   A.   RIGHT.

02:51:40  20   Q.   AND THE PURPOSE OF FREEZE CODES IS YOU DON'T WANT TO HAVE

02:51:45  21   THE CIVIL PORTION OF THE IRS ACTING AS A STALKING HORSE FOR THE

02:51:50  22   CRIMINAL PORTION OF THE IRS, RIGHT?

02:51:51  23   A.   ACTING LIKE A STALKING HORSE?  I'M NOT FAMILIAR WITH THAT

02:51:55  24   TERM.

02:51:55  25   Q.   WELL, YOU TALKED ABOUT NOT SHARING INFORMATION.



02:51:58  1    A.   NO.  WHAT I SAID WAS YOU DON'T WANT TO HAVE CIVIL ACTIONS

02:52:07  2    ON AN IN-PROGRESS CRIMINAL CASE.

02:52:09  3    Q.   RIGHT.  AND THE REASON IS YOU DON'T WANT -- THERE'S

02:52:13  4    SUPPOSED TO BE A LIMITATION OF COMMUNICATION BETWEEN THE CIVIL

02:52:15  5    SIDE OF THE IRS AND CRIMINAL SIDE, RIGHT?

02:52:18  6    A.   WE DON'T WANT CIVIL ADJUSTMENTS BEING ASSESSED DURING A

02:52:22  7    CRIMINAL INVESTIGATION.

02:52:25  8    Q.   THEY'VE SUPPOSED TO BE SEPARATE?

02:52:29  9    A.   YES.

02:52:29  10   Q.   AND YOU WERE WORKING FROM DAY ONE WITH A CRIMINAL GOAL IN

02:52:33  11   MIND, RIGHT?

02:52:34  12   A.   I DIDN'T KNOW IF IT WAS GOING TO BE CRIMINAL GOAL IN MIND,

02:52:37  13   I DON'T HAVE A GOAL IN MIND.  WHEN I BEGIN A CASE, I BEGIN

02:52:41  14   GATHERING FACTS.  AND AS THE FACTS EVOLVE, THE CASE EVOLVES.

02:52:48  15   Q.   AND YOU DIDN'T GATHER ANY FACTS ABOUT WHO WAS THE SOURCE

02:52:52  16   OF THE FUNDS COMING INTO THE UNITED STATES?

02:52:55  17   A.   JUST THAT THEY WERE WIRE TRANSFERS INTO THE BUSINESS

02:52:58  18   ACCOUNT.

02:52:58  19   Q.   OKAY.  YOU DIDN'T GATHER FACTS ABOUT HOW THE SCRAP METAL

02:53:03  20   BUSINESS WORKED?

02:53:05  21   A.   I DIDN'T BELIEVE THEIR STORY OF HOW THEY WERE PAID.

02:53:08  22   Q.   OKAY.  SO IF YOU DIDN'T BELIEVE IT, THAT MEANS YOU DON'T

02:53:11  23   HAVE TO GATHER ANY FACTS, IN YOUR OPINION, RIGHT?

02:53:14  24   A.   THAT'S NOT RIGHT.

02:53:16  25   Q.   NOW -- AND YOU TALKED ABOUT A BUSINESS CARD THAT HAD

RECROSS-EXAMINATION BY MR. CANNON

02:53:30  1    MR. HENRY HORNG'S NAME ON IT AND THE NAME FLORENCE TRADING,

02:53:36  2    RIGHT?

02:53:36  3    A.   YES.

02:53:36  4    Q.   AND IN ADDITION TO THAT CARD, DID YOU EVER FIND A

02:53:43  5    TRANSACTION THAT MR. HORNG ENGAGED IN ON BEHALF OF FLORENCE

02:53:50  6    TRADING?

02:53:50  7    A.   I FOUND A DEPOSIT REIJIN INTERNATIONAL, DBA FLORENCE

02:53:59  8    TRADING.

02:53:59  9    Q.   THAT'S NOT THE QUESTION I ASKED YOU.  I'M ASKING YOU ABOUT

02:54:03  10   HENRY HORNG.

02:54:04  11       DID YOU EVER FIND A TRANSACTION THAT HENRY HORNG ENGAGED

02:54:09  12   IN ON BEHALF OF FLORENCE TRADING?

02:54:14  13   A.   NO.

02:54:15  14   Q.   SO THE ONLY CONNECTION THAT YOU HAVE BETWEEN HENRY HORNG

02:54:21  15   AND FLORENCE TRADING IS ONE BUSINESS CARD, RIGHT?

02:54:24  16   A.   YES, AND HIS STATEMENT.

02:54:26  17   Q.   YES.  AND HAVE YOU EVER BEEN TO JAPAN?

02:54:31  18   A.   NO, I HAVEN'T.

02:54:32  19   Q.   HAVE YOU -- DO YOU KNOW ANYTHING ABOUT JAPANESE CULTURE

02:54:37  20   AND BUSINESS CARDS?

02:54:39  21   A.   NO, I DON'T.

02:54:41  22   Q.   NOW, MR. PITMAN ALSO ASKED YOU SOME QUESTIONS ABOUT

02:54:51  23   GETTING INFORMATION FROM FOREIGN BANK ACCOUNTS, RIGHT?

02:54:55  24   A.   YES.

02:54:56  25   Q.   AND THE IRS ACTUALLY HAS WAYS TO GET INFORMATION FROM

02:55:04  1    FOREIGN BANK ACCOUNTS, DON'T THEY?

02:55:06  2    A.   WE HAVE WAYS.

02:55:08  3    Q.   AND HE ASKED YOU QUESTIONS ABOUT A 1099-DIV, BUT A 1099 IS

02:55:15  4    A FORM A U.S. BANK GENERATES, RIGHT?

02:55:21  5    A.   HE ASKED ME WHETHER I EVER RECEIVED ONE FROM A FOREIGN

02:55:25  6    BANK, MY ANSWER WAS NO.

02:55:27  7    Q.   AND THE REASON YOU HAVEN'T RECEIVED A 1099 FROM A FOREIGN

02:55:29  8    BANK IS THAT THE REPORT FROM A FOREIGN BANK HAS A DIFFERENT

02:55:33  9    NUMBER ON IT, RIGHT?

02:55:33  10   A.   I'M NOT AWARE OF ANY FOREIGN BANK INCOME REPORTINGS.

02:55:40  11   Q.   YOU ARE NOT AWARE OF ANY FOREIGN BANK INCOME REPORTINGS?

02:55:43  12   A.   THAT WHERE FOREIGN BANKS REPORT THE INCOME TO THE U.S., I

02:55:50  13   HAVEN'T SEEN ONE, SO IF IT COMES ON A DIFFERENT FORM, I HAVEN'T

02:55:53  14   SEEN IT.

02:56:07  15   Q.   AND THIS WAS EXHIBIT 26, COULD WE GO TO EXHIBIT 25, TOO,

02:56:11  16   PLEASE.

02:56:15  17        AND THESE ARE INFORMATION THAT WAS REPORTED UNDER

02:56:22  18   MS. LIN'S SOCIAL SECURITY NUMBER, RIGHT?

02:56:24  19   A.   YES.

02:56:25  20   Q.   IT WASN'T REPORTED UNDER MR. HORNG'S SOCIAL SECURITY

02:56:28  21   NUMBER, WAS IT?

02:56:30  22   A.   NO, IT WASN'T.

02:56:30  23   Q.   AND THAT WAS THE SAME FOR BOTH EXHIBITS 25 AND 26,

02:56:34  24   CORRECT?

02:56:35  25   A.   CORRECT.

885

02:56:56   1        MR. CANNON:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

02:56:58   2        THE COURT:  THANK YOU.

02:57:02   3     MS. POLLOCK?

02:57:05   4        MS. POLLOCK:  I HAVE NO QUESTIONS, YOUR HONOR.

02:57:07   5        THE COURT:  THANK YOU.

02:57:08   6     MR. PITMAN, YOU GET THE LAST WORD.

02:57:10   7        MR. PITMAN:  NO.  THANK YOU, YOUR HONOR.

02:57:10   8        THE COURT:  ALL RIGHT.  MAY MS. GARRISON BE EXCUSED?

02:57:13   9        MS. POLLOCK:  NO, YOUR HONOR.  I WOULD LIKE HER TO BE

02:57:15  10  SUBJECT TO RECALL.

02:57:16  11        THE COURT:  ALL RIGHT.

02:57:18  12     MS. GARRISON, I'M GOING TO LET YOU GO NOW.  YOU ARE

02:57:21  13  SUBJECT TO RECALL, SO THAT MEANS YOU CAN'T TALK ABOUT YOUR

02:57:23  14  TESTIMONY TO ANYONE, YOU UNDERSTAND THAT, BUT YOU DON'T HAVE TO

02:57:26  15  SIT AROUND HERE EITHER.

02:57:27  16     AND YOU WILL BE GIVEN NOTICE OF WHEN YOU NEED TO RETURN,

02:57:29  17  CORRECT, MS. POLLOCK?

02:57:31  18        MS. POLLOCK:  YES, YOUR HONOR.

02:57:33  19        THE WITNESS:  IS IT -- WHEN I RECEIVE NOTICE, IS THAT

02:57:35  20  GOING TO BE WITHIN A 30-MINUTE OR AN HOUR --

02:57:38  21        THE COURT:  MR. PITMAN CAN TALK TO YOU ABOUT THAT SO

02:57:41  22  THAT YOU SHOULD BE CLEAR ON THAT, OKAY?  DON'T LEAVE TOWN.

02:57:43  23        THE WITNESS:  I WON'T LEAVE TOWN, BUT CAN I LEAVE

02:57:48  24  SAN JOSE?

02:57:49  25        THE COURT:  TALK TO MR. PITMAN.  WE WON'T NEGOTIATE

02:57:51  1        THAT HERE.

02:57:52  2                    THE WITNESS:  OKAY.  THANK YOU.

02:57:59  3                    THE COURT:  ALL RIGHT.

02:58:00  4           I THINK THIS WOULD BE A GOOD TIME FOR OUR AFTERNOON BREAK.

02:58:04  5    LET'S TAKE A 15-MINUTE BREAK.  WE WILL COME BACK AT 3:15.

03:03:13  6              (RECESS FROM 3:03 P.M. UNTIL 3:15 P.M.)

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3

4                    **<u>CERTIFICATE OF REPORTER</u>**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13             THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 5/12/18